UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT COURT OF FLORIDA
FORT LAUDERDALE DIVISION

PULSEPOINT, INC., f/k/a DATRAN
MEDIA CORP.,

      Plaintiff,                                    CASE NO.:

            v.

7657030 CANADA INC., d/b/a ACQUINITY
INTERACTIVE, LLC, f/k/a MODERNAD
MEDIA LLC f/k/a PUREADS; ACQUINITY
INTERACTIVE, LLC; MODERNAD MEDIA LLC;
WARREN RUSTIN, an individual, and JOHN DOES 1-100,


      Defendant.
_____/

## **COMPLAINT**

***COMES NOW***, Plaintiff, PULSEPOINT, INC., f/k/a DATRAN MEDIA CORP., (hereinafter "DATRAN" or "CREDITOR") by and through its undersigned counsel, and sues the Defendants, 7657030 CANADA INC., d/b/a ACQUINITY INTERACTIVE, LLC, f/k/a MODERNAD MEDIA LLC f/k/a PUREADS; ACQUINITY INTERACTIVE, LLC; MODERNAD MEDIA LLC; WARREN RUSTIN, an individual, and JOHN DOES 1-100, and alleges:

## **NATURE OF THE ACTION**

1.      This is a civil action brought by CREDITOR to recover $2,292,063.73 owed by ModernAd Media LLC ("ModernAd" or "DEBTOR") to CREDITOR pursuant to the judgment of the New York State Supreme Court, Hon. Barbara Kapnick, dated May 20, 2013 and entered on June 13, 2013, confirming the award of Arbitrator Thomas Halket, Esq. of the American Arbitration Association, dated January 9, 2013, as modified on January 18, 2013 (the "Award"), plus interest accruing from the date of the Award at a rate of 9% per-annum. A true and correct copy of the Award is attached hereto as ***Exhibit "A"***.

2.      DEBTOR failed to pay for services rendered by CREDITOR, from August 2010 through December 2011, under a certain Skylist Hosted Services Agreement, dated January 9, 2008 (the "Skylist Agreement").

3.      On January 1, 2011, DEBTOR – a company with annual revenues believed and reported to be roughly $120,000,000.00 – purported to sell substantially all of its assets to defendant 7657030 CANADA INC., d/b/a Acquinity Interactive, LLC ("Acquinity"), for the fire sale price of $2,682,783.00, through the sale of DEBTOR's ownership interests in several subsidiaries.  The sale of substantially all of its assets for less than fair value left DEBTOR unable to pay its debts to CREDITOR and other creditors.

4.      CREDITOR has suffered harm as a direct and proximate result of DEBTOR's conduct of transferring assets that it maintained an ownership interest in to third party corporate entities and/or individuals that are either owned, operated, or managed by DEBTOR, in whole or in part, or have such a significant relationship with DEBTOR that the third party received the asset(s) without paying reasonably equivalent value in exchange for the asset(s).  Such sale(s) rendered DEBTOR insolvent.

5.      Upon information and belief, such sales were made with the purpose of hindering, delaying, and/or defrauding creditors.

6.      In this suit, CREDITOR seeks, inter alia, (1) to collect upon the Judgment against DEBTOR in the amount of $2,292,063.73, plus penalties, interest at a rate of 9% per-annum, and attorneys' fees; and (2) to foreclose on and enforce the Judgment, by setting aside and declaring fraudulent, null and void as against CREDITOR, the purported conveyances of certain assets from DEBTOR to Acquinity, the other Defendants, and any other parties, as yet unknown, and declaring those transfers to be subject to CREDITOR's claim.

## INTRODUCTION, JURISDICTION AND VENUE

7.      CREDITOR brings causes of action sounding in fraudulent transfer against DEBTOR for conduct in violation of Chapter 726, Florida Statutes.

8.      On May 29, 2013, CREDITOR received a final and unsatisfied judgment against DEBTOR in the amount of $2,292,063.73, inclusive of pre-judgment interest, attorneys' fees, costs and expenses.  A true and correct copy of the Judgment is attached hereto as ***Exhibit "B"***.

9.      The Court has jurisdiction over this claim pursuant to 28 U.S.C. § 1332(c), as the parties are citizens of different states, there is complete diversity among the parties and the amount in controversy exceeds $75,000.00.

10.     Venue is proper in Broward County, Florida, because the parties are all either residing in or doing business in Broward County, Florida.

## THE PARTIES

11.     Plaintiff DATRAN is a Delaware corporation with a principal place of business of 345 Hudson Street, 5th Floor, New York, NY 10014.

12.     Upon information and belief, Defendant ModernAd, the DEBTOR, is a Florida company with a principal place of business located at 2200 SW 10th St., Deerfield Beach, FL 33442.

13.     Upon information and belief, Defendant 7657030 Canada Inc., d/b/a Acquinity Interactive is a Canadian Corporation doing business in the United States of America.  At all times relevant to this Complaint, Defendant 7657030 Canada Inc. maintained an office at 2200 SW 10th St., Deerfield Beach, FL 33442.

14.     Upon information and belief, Defendant Acquinity Interactive, LLC ("Acquinity LLC") is a Florida company, formed on November 28, 2011, with a principal place of business located at 2200 SW 10th St., Deerfield Beach, FL 33442.

15.     Upon information and belief, Defendant Warren Rustin is an individual who resides in Boca Raton, Florida.  Upon information and belief, Mr. Rustin is a founder and owner of ModernAd.

## FACTUAL BACKGROUND

16.     DEBTOR was an Internet marketing company, which provided lead generation services, display advertising, call center solutions, and email, search, and affiliate marketing from around or about May 2007 through December 31, 2010.

17.     Upon information and belief, Warren Rustin is the Managing Member of DEBTOR.

18.     Acquinity and Acquinity LLC (collectively the "Acquinity Companies") are Internet marketing companies that provide lead generation services, and email, mobile web, and social media marketing.

19.     Upon information and belief, Garry Jonas is CEO of both Acquinity Companies, and supervises the management of the corporation.

20.     Both Acquinity Companies function as a single entity.  Acquinity LLC was formed in November 2011 for the sole purpose of shielding the assets of Acquinity.

21.     Upon information and belief, both DEBTOR and Acquinity use(d) a process called co-registration to generate sales leads for their clients.

22.     Co-registration is an Internet-based marketing practice, which consists of the process of obtaining the permission to send an individual more information on a topic while the individual is in the process of doing something else at the time the permission is granted. For example, in the process of registering a piece of software or opening a free email account, an individual is asked to check various boxes asking for more information about the products or services of the company or on a variety of topics. If the individual checks any of these boxes, he has "co-registered" for something else. Co-registration leads are used to generate website traffic and market products targeted to the interests of the co-registrant.

23.     Upon information and belief, from mid-2007 until January 1, 2011, Warren Rustin was the President of DEBTOR, and Garry Jonas was employed as DEBTOR's Chief Executive Officer.

24.     In late December, 2010, Mr. Rustin announced to DEBTOR's clients that he had "recently sold certain assets of DEBTOR to a group of DEBTOR's executives that includes our former CEO Gary Jonas, Greg Van Horn and Josh Greenberg. They have formed an internet marketing company named Acquinity Interactive and will be extremely well positioned to continue to grow and develop your existing marketing activity. As part of the Acquinity transition, ModernAd Media will no longer be involved in internet marketing activities."

25.     CREDITOR did not receive a copy of this letter.

26.     During the Arbitration, DEBTOR was deliberately vague about which of DEBTOR's assets had been transferred to Acquinity and which remained.  DEBTOR's former CFO and Acquinity's current CFO, Scott Modist, testified that only "certain assets and liabilities" were conveyed by DEBTOR to Acquinity, and claimed that Acquinity had not acquired DEBTOR's email marketing business – the dispute between CREDITOR and DEBTOR was over DEBTOR's refusal to pay for email marketing services rendered by CREDITOR pursuant to the Skylist Agreement.  He also indicated that DEBTOR still had employees, and was in business servicing "middle markets."

27.     Mr. Modist tried to conceal the fact that Acquinity had acquired DEBTOR's email marketing assets, stating: "in the asset purchase agreement, there was no mention of the email business."  Mr. Modist's statement was technically accurate – there was no mention of the email business in the asset purchase agreement between DEBTOR and Acquinity (the "Asset

Purchase Agreement") – however, DEBTOR's email marketing business was subsumed in the assets of the entities that Acquinity acquired from DEBTOR.

28.     Despite working in the same building where ModernAd's offices were located, and despite having personal knowledge of the Asset Purchase Agreement, and exactly which assets had been conveyed from DEBTOR to Acquinity, Mr. Modist repeatedly denied having any knowledge about DEBTOR's assets, other than to dissimulate that DEBTOR was still a going concern – well after that had ceased to be the case.

29.     Mr. Modist's testimony that DEBTOR was still in the email marketing business was intended to conceal the full extent of the asset transfers from DEBTOR to Acquinity.  It is also contradicted by Warren Rustin's letter of December 2010 to DEBTOR's customers – a letter that CREDITOR never received – which announced that ModernAd was out of the Internet marketing business.

30.     On or about January 13, 2011, in a letter addressed "Dear Partner," Mr. Jonas proclaimed that he had, "formed a new company, Acquinity Interactive, along with two former ModernAd Media executives, Greg Van Horn and Josh Greenberg." A true and correct copy of the foregoing letter is attached hereto as ***Exhibit "C"***.  Jonas stated that Acquinity had acquired "certain strategic assets of ModernAd." *Id*.  For both advertisers and publishers, Jonas assured clients that, "your existing campaigns will remain unaffected," and to expect to hear from their current account managers. *See id*.  Jonas referred to Acquinity as, "our new entity." *Id*.

31.     Existing partners were not informed of anything that would change in their dealings with the company, other than vague allusions to "new products," and "expanded opportunities." *Id*.  Indeed, Mr. Jonas gushed, "[w]e have spent the last four years perfecting the formula that will be your platform for success and more profitable media in 2011." *Id*.

32.     By letter of that same date from Scott Modist, Chief Financial Officer of both ModernAd and Acquinity, to "Our Valued Customers," Mr. Modist stated that, "we have transitioned certain aspects of our operations from ModernAd Media, LLC to Acquinity Interactive (the "Modist Letter"). A true and correct copy of the Modist letter is attached hereto as ***Exhibit "D"***.  As the CFO of DEBTOR, he would have known which assets were transitioned and which were not.

33.     Mr. Modist used the word "our" to describe the operations that were "transitioned."  The use of the personal pronouns "we" and "our" in the January 13 letters was

intended to convey to customers that Acquinity was a continuation of DEBTOR, a position that DEBTOR has taken in two unrelated litigations.

34.     The Modist Letter further instructed DEBTOR's customers to "direct all future payments to Acquinity Interactive, 2200 SW 10th Street, Deerfield Beach, FL 33442," the same address at which DEBTOR conducted business. *Id*.

35.     The letter provided that, "[o]ur banking information for ACH and Wire payments is:

| | |
|---|---|
| Receiving Bank: | Acquinity Interactive |
| Harris, N.A. | Account #397-582-8 |
| 111 W. Monroe Street | RTN #0710-00288 |
| Chicago, IL 60603 | Swift #HATRUS44" *Id*. |

36.     The letter further stated that the, "ACH and Domestic Wire Routing Numbers [for ModernAd and Acquinity] are the same." *Id.*

37.     CREDITOR received copies of both January 13 letters from Acquinity.

38.     The January 13 letters were drafted in such a way as to make it seem that some assets remained with DEBTOR, however, CREDITOR subsequently learned that substantially all of DEBTOR's assets had been conveyed to Acquinity.

39.     Following the asset sale, Acquinity continued to make use of CREDITOR's software and services under the Skylist Agreement, using DEBTOR's login credentials. Acquinity used CREDITOR's services without paying for them.  CREDITOR believed that it was DEBTOR that was accessing its software, not Acquinity.  No amendment of the Skylist Agreement was ever made to make Acquinity a party to that agreement.

40.     Acquinity concealed its use of the services and software from CREDITOR.  The fact of Acquinity's use only came out during discovery in the Arbitration.

41.     In or around August 2012, counsel for DEBTOR stated that DEBTOR was a mere shell, without assets.  Counsel's statement is supported by the following:

> a. Following the asset sale, DEBTOR ceased to do business.
>
> b. DEBTOR's Web site, located at www.ModernAdMedia.com, became inactive in or around early 2012, and has remained inactive.
>
> c. DEBTOR has no employees.

42.     A copy of the Asset Purchase Agreement was provided to CREDITOR's counsel during the Arbitration, but has since been destroyed in accordance with the terms of a non-

retention agreement.  CREDITOR has obtained the stated information concerning the Asset Purchase Agreement from an independent source.

43.     Upon information and belief, DEBTOR sold certain assets and membership interests in DEBTOR to Acquinity.  Mr. Rustin is also identified in the Asset Purchase Agreement as a party to the agreement, who is selling assets and membership interests to Acquinity.

44.     Upon information and belief, at the time of the "sale," DEBTOR was a highly profitable venture that generated in excess of $10 million in revenue per month. In fact, from January through June, 2010, the total revenue generated by DEBTOR's co-registration division, alone, was approximately $32,605,854.

45.     Upon information and belief, the total revenues generated by DEBTOR each month greatly exceeded its expenses, and DEBTOR regularly made significant profits.

46.     Upon information and belief, despite the profitability of DEBTOR, Mr. Rustin and Mr. Jonas structured the "sale" to appear as though DEBTOR was not making any money, and that it was necessary for Acquinity to assume certain liabilities of DEBTOR. By structuring the "sale" as an assumption of liabilities, Mr. Rustin and Mr. Jonas were able to depress the sale price of DEBTOR's assets and membership units.

47.     The Asset Purchase Agreement shows that Acquinity purchased DEBTOR's assets and membership units for slightly less than $3.2 million, which includes an assumption of liabilities. This amount is significantly less than the true value of the assets and membership units purchased by Acquinity.

48.     Upon information and belief, the Asset Purchase Agreement between Acquinity, DEBTOR, and Mr. Rustin does not reflect the true purchase price of the assets and membership units.  There was other consideration paid by Acquinity to DEBTOR and to Mr. Rustin that is not stated in the Asset Purchase Agreement.

49.     Upon further information and belief, one of the reasons that Mr. Rustin and Mr. Jonas structured the "sale" as they did, and depressed the sale price of DEBTOR's assets and membership units, was to diminish any assets available to pay creditors and to diminish liabilities to individuals with a contractual right to share in the profits of a sale or change in control of DEBTOR.

50.     Upon further information and belief, Mr. Rustin received one or more payments from Acquinity and/or Mr. Jonas, which were additional consideration for the "sale" of

DEBTOR's assets and membership units. These payment(s) are not included in the Asset Purchase Agreement.

51.     When questioned about the transaction, Mr. Jonas described the sale of DEBTOR's assets and membership units to Acquinity as mere "semantics," and insinuated that the sale was a sham transaction.

52.     Mr. Jonas further claimed that he manipulated the "sale" to meet his needs, and that his group's buyout of DEBTOR's assets and membership units and taking over operations did not, in fact, constitute a sale.

53.     The Acquinity Companies and DEBTOR have taken the position in an unrelated litigation, brought by Willem Adams, a former ModernAd and Acquinity employee, that the asset purchase agreement did not constitute a change in control or sale of the company.

54.     Mr. Jonas told Adams that the ModernAd sale is fictitious.

55.     Mr. Jonas told Mr. Adams that the ModernAd sale was only real to the degree he (Mr. Jonas) manipulated it to be.

56.     Mr. Jonas also stated that he and Mr. Rustin had a handshake deal related to the ModernAd transaction, and that Mr. Rustin would be taken care of.  Mr. Jonas's statement that Mr. Rustin would be taken care of and that there was a handshake deal indicates that Mr. Rustin would receive compensation for the ModernAd transaction that is not identified in the Asset Purchase Agreement.  The agreement formalizing the "sale" of DEBTOR's assets was entered into on Saturday, January 1, 2011.

57.     DEBTOR's attorney also represented to Mr. Adams' attorney that DEBTOR and Acquinity were the same company – that no change in control had taken place.

## THE SECOND TRANSFER

58.     Upon information and belief, following the sale of substantially all of DEBTOR's assets to Acquinity, Mr. Rustin caused DEBTOR to transfer $2,682,783 to himself, without consideration.

59.     Such transfer was made at a time when Mr. Rustin knew that CREDITOR had a claim against DEBTOR and had threatened DEBTOR with litigation.  Mr. Rustin was also aware of the Skylist Agreement, and knew, or reasonably should have known, that it contained an automatic renewal clause and had, in fact, renewed for another year.

60.     Indeed, CREDITOR and DEBTOR had been engaged in negotiations over the Claim from October to December 2010.  On January 24, 2011, CREDITOR sent DEBTOR a

formal notice demanding payment of CREDITOR's Claim, then roughly $475,000. CREDITOR also reminded DEBTOR that the operative agreement had renewed, and that DEBTOR was liable for making twelve additional payments of $92,500 each.

61.     DEBTOR knew or reasonably should have known that it was indebted to CREDITOR for a minimum of roughly $1,585,000.

62.     Following receipt of the January 24, 2011 letter, Mr. Modist responded by email, dated January 26, 2011, that, "[w]e hope to work out this matter in a mutually agreeable manner." Mr. Modist wrote from an Acquinity email address and made no distinction between Acquinity and DEBTOR in his pledge to work the matter out. At the time of Mr. Modist's email, he was CFO of Acquinity – not ModernAd.

63.     In fact, DEBTOR had no intention of paying the Claim, or negotiating in good faith. Mr. Modist's representation – made on behalf of DEBTOR – was intended to buy time for DEBTOR to dissipate and transfer its remaining assets to Mr. Rustin. Curiously, Mr. Modist later claimed not to have been the CFO of DEBTOR at the time, or to have had any knowledge of DEBTOR's affairs.

64.     Upon information and belief, Mr. Rustin in fact caused DEBTOR to dissipate and transfer substantially all of its assets to Mr. Rustin, and/or to third parties.

65.      Such transfer of substantially all of DEBTOR's assets was made with the actual intent to hinder, delay, or defraud CREDITOR, and rendered DEBTOR insolvent.

66.     DEBTOR transferred its assets to Mr. Rustin, without consideration.

67.     Mr. Rustin was an insider of DEBTOR.

68.     The transfer of substantially all of DEBTOR's assets to Mr. Rustin was concealed and hidden from CREDITOR.

69.     DEBTOR's counsel represented during the course of the Arbitration that DEBTOR had no assets, yet DEBTOR incurred unreasonable legal fees in the amount of $586,312.67. DEBTOR's counsel also represented that DEBTOR's attorneys' fees were paid by Mr. Rustin, personally.

70.     Upon information and belief, DEBTOR was unable to pay for its own defense because Mr. Rustin had transferred and dissipated DEBTOR's assets to himself.

71.     DEBTOR's counsel during the Arbitration, Lydecker Diaz, are counsel to Acquinity in several unrelated litigations.

72.     DEBTOR has failed to pay the Award, or even respond to emails or phone calls from CREDITOR's counsel inquiring into the payment of the Award.

## THE MASTER SERVICES AGREEMENT

73.     On November 29, 2007, Datran and ModernAd entered into a Master Services Agreement ("MSA"), a true and correct copy of which is attached hereto as ***Exhibit "E"***.  The MSA contains a Governing Law clause, which provides that: "[t]his Agreement and each Attachment shall be governed by, interpreted and construed in accordance with the laws of the State of New York, without reference to its conflict of laws rules or principles." MSA, §14.1.

74.     The MSA contains an arbitration clause mandating that, "[a]ny dispute or controversy arising out of or related to this Agreement or any breach hereof shall be settled by binding arbitration in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association before the American Arbitration Association in the City of New York, State of New York." MSA,§12.1.

75.     The MSA also provides that, "Any award shall be final and binding and judgment thereon may be entered in any court of competent jurisdiction." MSA, § 12.1.

76.     The MSA contains general terms and conditions applicable to services ("Services") offered by Datran to Respondent, which Services were detailed in various attachments. *See* MSA, §§ 1.1, 1.2.

77.     Among other provisions, the MSA provides: "The Services provided by [Datran] shall be at the pricing set forth in the applicable Attachment . . . [Datran] will submit invoices for charges, fees and expenses on a monthly basis." MSA, § 2.1.

78.     In the event that a payment required under the MSA is late, such payment: "shall be subject to any costs of collection, including reasonable legal fees, and shall bear interest at the rate of one and one-half percent (1.5%) per month (prorated for partial periods) or at the maximum rate permitted by law, whichever is less." MSA, § 2.3.3.

79.     The Agreement further provides: "In the event any action is brought to enforce any provision of this Agreement or any Attachment, or to declare a breach of this Agreement, the prevailing party shall be entitled to recover, in addition to any amounts awarded, reasonable legal and other related costs and expenses, including attorney's fees, incurred thereby." MSA, § 12.2.

80.     On or about January 9, 2008, Datran and ModernAd entered into the Skylist Agreement, which was attached to the Agreement as Attachment F. The Skylist Agreement also incorporated the MSA by reference.

81.     Under the Skylist Agreement, Datran was to provide ModernAd with "access to technology to be used in connection with email marketing services." Skylist Agmt., § 1.1.

82.     On or about November 2, 2009, Datran and ModernAd Amended the Skylist Agreement by agreeing to a minimum monthly Hosted eMarketing Price of $92,500. A true and correct copy of the Skylist Agreement, as amended, is attached hereto as ***Exhibit "F"***.

83.     ModernAd stopped paying for Services it received under the Skylist Agreement after July 2010.  The Skylist Agreement automatically renewed for another year on or about January 2, 2011.  ModernAd failed to make 17 required monthly payments of $92,500, for a total of $1,572,500.

84.     After the sale of substantially all of ModernAd's assets to Acquinity on January 1, 2011, Acquinity continued to use Datran's services without compensation.

## THE ARBITRATION

85.     On March 17, 2011, Datran filed a claim with the American Arbitration Association.  In it, Datran sought damages for ModernAd's failure to pay the required monthly fee of $92,500 for use of its services under the Skylist Agreement over a period of 17 months.

86.     ModernAd answered the claim and asserted counterclaims, seeking a money judgment against Datran.

87.     The parties selected Thomas D. Halket, Esq. to act as the Arbitrator in the matter and agreed to submit for his adjudication and award all matters in dispute between them pursuant to the terms of the MSA in accordance with the rules of the American Arbitration Association.

88.     In accordance with the AAA rules, the parties engaged in extensive discovery, submitted pre-arbitration and post-arbitration submissions to the Arbitrator and fully engaged in the Arbitration.  The parties participated in two separate four-day arbitrations, wherein testimony was taken of all parties.

89.     After the eight (8) days of arbitration, the parties submitted post-arbitration briefs for the Arbitrator's consideration.  Oral argument subsequently was held over a two-day period.

## THE ARBITRATION AWARD

90.     Thereafter, after having taken the oath prescribed by law and after the parties had duly appeared before him and submitted their proofs, completed his investigations and studies of all the facts, circumstances, elements, and proofs entering into the controversy so submitted to him as aforesaid and having fully considered all of the evidence and arguments submitted by the

parties, the Arbitrator determined and awarded to Datran as full settlement of its claims submitted to the Arbitration:

> a. $1,572,500 in damages;
>
> b. reasonable attorneys' fees and expenses in the amount of $429,701.23;
>
> c. administrative fees of $77,575; and
>
> d. pre-and-post-Award interest on all such amounts "at the rates set forth in, and calculated in accordance with the stipulation of the Parties dated December 19, 2012, amounting to $212,287.50, as of the date of the Award.

A true and correct copy of the Arbitration Award is attached hereto as ***Exhibit "A"***, and a true and correct copy of the December 19, 2012 Stipulation is attached hereto as ***Exhibit "G"***.

91.     The Arbitrator held:

> For the purpose of the determination of interest, (i) the amount paid in settlement of Claimant's claim shall be deemed to have been due to Claimant in 17 equal monthly payments commencing on the due day of the August 2010 monthly invoice and (ii) all other amounts to be paid to Claimant under this Award shall be deemed due as of the date of this Award.

The Arbitrator denied ModernAd's counterclaims.

92.     The Arbitrator further held that, "The above sums are to be paid on or before 90 days from the date of this Award . . . This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby denied."

93.     The Arbitration Award was duly sent or delivered to the parties on or about January 9, 2013, and was received by the petitioners and respondents herein on or about said date.  The Arbitrator issued an Amended Award on January 18, 2013.

94.     A petition to confirm the Award was brought on January 22, 2013, within weeks after the aforesaid delivery of the Arbitration Award to the parties, which petition was granted on May 20, 2013.  The award has not been vacated or modified upon any grounds specified in NY CPLR Section 7511.

95.     DEBTOR has not opposed the Arbitration Award.

96.     DEBTOR has failed to pay any of the Award, and has failed to respond to emails or telephone calls inquiring into payment of the Award.

97.     CREDITOR is concurrently moving to domesticate the Award in Florida.

98.     Upon information and belief, DEBTOR lacks sufficient assets to satisfy such Award, as DEBTOR conveyed substantially all of its assets to Acquinity for a fraction of their value.

99.     DEBTOR ceased to do business in 2011, has no employees, and is a mere shell without assets.

100.    DEBTOR's sale or conveyance of substantially all of its assets to Acquinity rendered DEBTOR insolvent.

101.    DEBTOR's sale of substantially all of its assets to Acquinity was without fair consideration.   Upon information and belief, DEBTOR had annual revenues of roughly $120,000,000.00 prior to the sale of substantially all of its assets to Acquinity, but sold those assets to Acquinity for slightly less than $3,200,000.00.

102.    Those assets included accounts receivable, which, upon information and belief, exceeded  $10,000,000.00.   In the alternative, Acquinity fraudulently misappropriated DEBTOR's accounts receivable.

103.    Upon information and belief, Acquinity made a side agreement with Warren Rustin, whereby Mr. Rustin personally received additional compensation from Acquinity for the assets of DEBTOR (the "Additional Compensation").

104.    Upon information and belief, the Additional Compensation was wrongfully paid to Mr. Rustin as part of a scheme to defraud creditors and cheat management employees out of change-in-control payments.

105.    DEBTOR's sale of substantially all of its assets to Acquinity without fair consideration was made with actual intent to hinder, delay, or defraud either present or future creditors.

106.    Mr. Rustin facilitated a sham transaction between himself and Mr. Jonas to allow Mr. Jonas to assume control of DEBTOR's assets and significant revenues as part of a fictitious sale that was also supported by a handshake deal between two high school friends, which guaranteed that Mr. Jonas would "take care of" Mr. Rustin.  This is evidence that the nature and ownership of DEBTOR facilitated misuse of corporate assets by Mr. Rustin.

107.    Mr. Rustin also stated to Mr. Jonas at a meeting with CREDITOR's CEO early in 2011 that Mr. Jonas had told him that he would "take care of" him.

## FIRST CLAIM

## Fraudulent Conveyance (FL UFTA § 726.105(1)(a), (b))

108.    CREDITOR reavers and realleges paragraphs One (1) through One Hundred Seven (107) of the Complaint as if fully set forth herein.

109.    Upon information and belief, at the time of the purported conveyance of substantially all of the assets of DEBTOR to Acquinity on January 1, 2011, DEBTOR, 7657030 Canada, Inc., and Mr. Rustin knew that DEBTOR owed $462,500 to CREDITOR, and was contractually obligated to pay CREDITOR another $1,110,000 in 2011.

110.    CREDITOR's claim arose, and DEBTOR's debt to CREDITOR accrued, both before and after the purported transfer was made.  DEBTOR was aware of, and reasonably should have known about, CREDITOR's Claim.

111.    CREDITOR first demanded payment of the Claim in October 2010, and continued making such demands through March 24, 2011, at which time CREDITOR commenced the Arbitration.

112.    The purported transfer was made with actual intent to hinder, delay, or defraud DEBTOR's creditors.

113.    The purported conveyances rendered DEBTOR insolvent.

114.    The purported conveyances were not made in good faith and were not made for fair consideration.

115.    The purported transfers were made between insiders – Mr. Jonas was the CEO of DEBTOR at the time that Mr. Rustin was alleged to be DEBTOR's sole owner and shareholder. Mr. Jonas emerged as the principal owner of Acquinity, and Acquinity LLC, along with two of DEBTOR's former executives.  Mr. Jonas and Mr. Rustin were high school friends.

116.    Upon information and belief, Mr. Jonas owned an equity stake in DEBTOR, or in one of DEBTOR's subsidiaries, invested money in DEBTOR off the books, and shared in DEBTOR's profits, directly or indirectly.

117.    Mr. Rustin, alleged to be the sole owner of DEBTOR, was a party to the asset purchase agreement with Acquinity, and is believed to have been paid on the side additional consideration not contained in the asset purchase agreement, pursuant to a hand-shake deal with Mr. Jonas.

118. The structure of the purported transfer was concealed, and made to appear as a partial asset sale, when, in fact, the sale was of substantially all of DEBTOR's assets. Mr. Jonas claimed to have manipulated the transfer to suit his needs and called the transaction a "sham."

119. Mr. Jonas has taken the position in a two unrelated litigations that the sale of substantially all of DEBTOR's assets did not bring about a change in control in the company's ownership. This position has been echoed by DEBTOR's lawyers in those actions. DEBTOR will literally take any position, no matter how contradictory, to avoid having to perform on its contractual and legal obligations.

120. In written correspondence to DEBTOR's customers, Mr. Jonas and Mr. Modist referred to DEBTOR and Acquinity interchangeably, using the pronouns "we" and "our" to describe the "transition of certain aspects of our operations from [DEBTOR] to Acquinity Interactive."

121. Customers were told that nothing would change. The company would have the same address, same account managers, same bank accounts, same management, same phone numbers – same everything, except a different "entity" and a different name.

122. Before the transfer was made, CREDITOR had demanded that payment be made and threatened DEBTOR with legal action.

123. The transfer in question was of all or substantially all of DEBTOR's assets, including its office lease, employees, computers, servers, office equipment, and contracts. DEBTOR ceased doing business following the transfer.

124. Upon information and belief, Acquinity assumed all of DEBTOR's liabilities necessary for the continuation of DEBTOR'S business.

125. Upon information and belief, Acquinity misappropriated DEBTOR's receivables, instructing DEBTOR's customers, including CREDITOR, to make payments to Acquinity.

126. DEBTOR's receivables were not a part of the Asset Purchase Agreement, but were fraudulently transferred, without consideration.

127. In the alternative, DEBTOR's receivables were fraudulently conveyed to Acquinity for less than reasonably equivalent value.

128. Upon information and belief, DEBTOR concealed the true purchase price of the asset sale to defraud creditors, and to avoid obligations to creditors and employees under the change of control provisions in their employment contracts.

129.    DEBTOR became insolvent immediately after the transfer was made.  DEBTOR has multiple creditors with known claims believed to be well in excess of $3.2 million.

130.    These purported conveyances violated Chapter 726.105(1)(a) and (b), Florida Statutes, and harmed CREDITOR.

### SECOND CLAIM

### Fraudulent Conveyance (Chapter § 726.106(1))

131.    CREDITOR reavers and realleges paragraphs One (1) through One Hundred Seven (107) of the Complaint as if fully set forth herein.

132.    Upon information and belief, at the time of the purported conveyance of substantially all of the assets of DEBTOR to Acquinity on January 1, 2011, Defendants knew that DEBTOR owed $462,500.00 to CREDITOR.

133.    CREDITOR's claim arose, and DEBTOR's debt to CREDITOR accrued, before the purported transfer was made.

134.    The purported conveyances rendered DEBTOR insolvent.

135.    The purported conveyances were not made in good faith and were not made for reasonably equivalent value.

136.    The purported transfers were made between insiders – Mr. Jonas was the CEO of DEBTOR at the time that Rustin was alleged to be its sole owner and shareholder. Jonas emerged as the principal owner of Acquinity.

137.    Mr. Rustin, alleged to be the sole owner of DEBTOR, was a party to the asset purchase agreement with Acquinity, and is believed to have been paid additional consideration not contained in the asset purchase agreement on the side, pursuant to a hand-shake deal with Jonas.

138.    Before the transfer was made, CREDITOR had demanded that payment be made and threatened DEBTOR with legal action.

139.    The transfer in question was of all or substantially all of DEBTOR's assets, including its office lease, employees, computers, servers, office equipment, and contracts. DEBTOR ceased doing business immediately following the transfer.

140.    DEBTOR became insolvent immediately after the transfer was made.

141.    These purported conveyances violated the Florida Uniform Fraudulent Transfers Act,  § 726.106(1).

## THIRD CLAIM

### Fraudulent Conveyance (FL UFTA § 726.105(1)(a), (b))

142.   CREDITOR reavers and realleges paragraphs One (1) through One Hundred Seven (107) of the Complaint as if fully set forth herein.

143.   Upon information and belief, following the sale of substantially all of DEBTOR's assets to Acquinity, Mr. Rustin caused DEBTOR to transfer $2,682,783.00 to himself, without consideration.

144.   Such transfer was made at a time when Mr. Rustin knew that CREDITOR had a Claim against DEBTOR and had threatened DEBTOR with litigation.

145.   DEBTOR and its President, Mr. Rustin, were also aware of the Skylist Agreement, and knew, or reasonably should have known, that it contained an automatic renewal clause – and had, in fact renewed for another year.

146.   Indeed, CREDITOR and DEBTOR had been engaged in negotiations over the Claim since October 2010.

147.   On January 24, 2011, CREDITOR sent DEBTOR a formal notice demanding payment of CREDITOR's Claim, then roughly $475,000.  CREDITOR also reminded DEBTOR that the operative agreement had renewed, and that DEBTOR was liable for making twelve additional payments of $92,500. Mr. Rustin and DEBTOR knew or reasonably should have known that DEBTOR was indebted to CREDITOR for a minimum of roughly $1,585,000.

148.   By email dated January 26, 2011, Mr. Modist responded that, "[w]e hope to work out this matter in a mutually agreeable manner."

149.   In fact, DEBTOR had no intention of paying the Claim, or negotiating in good faith.  Mr. Modist's representation was intended to buy time for DEBTOR to dissipate and transfer its remaining assets to Mr. Rustin.

150.   Upon information and belief, Mr. Rustin in fact caused DEBTOR to dissipate and transfer substantially all of its assets to Mr. Rustin, and/or to third parties.

151.   Such transfer of substantially all of DEBTOR's assets was made with the actual intent to hinder, delay, or defraud CREDITOR, and rendered DEBTOR insolvent.

152.   DEBTOR transferred assets to Mr. Rustin, without consideration.

153.   Mr. Rustin was an insider of DEBTOR.

154.   The transfer of substantially all of DEBTOR's assets to Mr. Rustin was concealed and hidden from CREDITOR.

155.    DEBTOR's counsel represented during the course of the Arbitration that DEBTOR had no assets, yet DEBTOR ran up legal fees in the amount of $586,312.67. DEBTOR's counsel also represented that DEBTOR's attorneys' fees were paid by Mr. Rustin.

156.    Upon information and belief, DEBTOR was unable to pay for its own defense because Mr. Rustin had transferred and dissipated DEBTOR's assets to himself.

157.    DEBTOR has failed to pay the Award, or even respond to emails or phone calls from CREDITOR's counsel inquiring into the payment of the Award.

158.    These purported conveyances violated Chapter 726.105(1)(a) and (b), Florida Statutes, and harmed CREDITOR.

## FOURTH CLAIM

### Fraudulent Conveyance (Chapter § 726.106(1))

159.    CREDITOR reavers and realleges paragraphs One (1) through One Hundred Seven (107) of the Complaint as if fully set forth herein.

160.    Upon information and belief, following the sale of substantially all of DEBTOR's assets to Acquinity, Mr. Rustin caused DEBTOR to transfer $2,682,783.00 to himself, without consideration.

161.    Such transfer was made at a time when Mr. Rustin knew that CREDITOR had a claim against DEBTOR and had threatened DEBTOR with litigation.

162.    Upon information and belief, Mr. Rustin in fact caused DEBTOR to dissipate and transfer substantially all of its assets to Mr. Rustin, and/or to third parties.

163.    Such transfer of substantially all of DEBTOR's assets was for no consideration and rendered DEBTOR insolvent.

164.    These purported conveyances violated Chapter 726.106(1), Florida Statutes, and harmed CREDITOR.

## FIFTH CLAIM

### De Facto Merger (Florida Common Law)

165.    CREDITOR reavers and realleges paragraphs One (1) through One Hundred Seven (107) of the Complaint as if fully set forth herein.

166.    Following the transfer of substantially all of DEBTOR's assets to Acquinity, DEBTOR ceased to do business.

167.    Acquinity had the same management, personnel, assets, and physical location, and is in the same general business as DEBTOR:

a. Garry Jonas, who was CEO of DEBTOR, is CEO of the Acquinity Companies;

b. Greg Van Horn, who was the Chief Information Officer of DEBTOR has the same role and same title at the Acquinity Companies;

c. The Acquinity Companies retained DEBTOR's CFO, Scott Modist, to perform the same function for them;

d. Employees report to the same office, sit at the same desks, use the same computers and phones, and service the same clients on the same contracts that they did prior to the transfer of substantially all of DEBTOR's assets to ModernAd. The only difference is that clients were instructed to make out their checks to "Acquinity."

168. Acquinity assumed all liabilities ordinarily necessary for the continuation of the DEBTOR's business.

169. Upon information and belief, there is a continuity of stockholders between DEBTOR and the Acquinity Companies.

170. Garry Jonas testified during the Arbitration that he invested in an Internet company with Warren Rustin. Although he subsequently denied investing in or being an owner of DEBTOR, Garry Jonas admitted to making "loans" to DEBTOR, and is believed to have been a *de facto* owner of DEBTOR.

171. Garry Jonas was also a co-owner of SA Enterprises, LLC ("SA Enterprises"), along with Warren Rustin. SA Enterprises was formed in June 2007, about the same time that DEBTOR's predecessor-in-interest, PureAds, was formed. Upon information and belief, SA Enterprises is an affiliate, subsidiary, or alter-ego of DEBTOR.

172. Upon information and belief, Warren Rustin is a part owner of Acquinity and Acquinity LLC, either directly, or through one or more of the following companies: GJ Holdings & Investments, Inc. ("GJ Holdings"), Megalo Media, Inc. ("Megalo Media"), and/or 3Sixty3, Inc. ("3Sixty3").

173. Upon information and belief, Gary Jonas is the principal owner of Acquinity and Acquinity LLC, either directly, or through one or more of the following companies: GJ Holdings, Megalo Media, and/or 3Sixty3.

174. Following the sale of substantially all of its assets to Acquinity, DEBTOR was rendered insolvent and ceased to do business.

176.    Administrative staff at the offices of DEBTOR's counsel in New York regularly referred to the Arbitration as "the Acquinity case," although Acquinity was not a named party. All of the witnesses that appeared in the case on behalf of DEBTOR were employed by Acquinity at the time of their testimony.

177.    Mr. Jonas described the sale of DEBTOR's assets and membership units to Acquinity as mere "semantics," and insinuated that the sale was a sham transaction.

178.    Mr. Jonas further claimed that he manipulated the "sale" to meet his needs, and that his group's buyout of DEBTOR's assets and membership units and taking over operations did not, in fact, constitute a sale.

179.    Defendants have taken the position in unrelated litigations brought by former ModernAd managers that the asset purchase agreement did not constitute a change in control or sale of the company.

180.    Mr. Jonas told one such manager, Willem Adams, that the "sale" of DEBTOR was fictitious.  Mr. Jonas also referred to Acquinity in correspondence to DEBTOR's customers as "our new entity," and took pains to assure them that nothing was changing except the name.

181.    Following the alleged asset sale, Acquinity continued to use CREDITOR's software and services, using DEBTOR's login credentials.

182.    Mr. Jonas also told Mr. Adams that the "sale" of DEBTOR was only real to the degree he (Mr. Jonas) manipulated it to be.

183.    As a result of the foregoing, the purchase of substantially all of DEBTOR's assets by Acquinity constituted a *de facto* merger of the two companies.

184.    Acquinity LLC was formed by Garry Jonas in November 2011 – after the sale of substantially all of DEBTOR's assets to Acquinity.

185.    Both of the Acquinity Companies are owned and controlled by Garry Jonas.

186.    Acquinity LLC is a sham entity established for the purpose of hiding Acquinity's ill-gotten assets from DEBTOR's CREDITOR(S).

187.    Upon information and belief, Acquinity, in fact, transferred DEBTOR's assets to Acquinity LLC, as a means of further shielding and protecting such assets from CREDITOR.

188.    Accordingly, Defendants Acquinity and Acquinity LLC are both liable to CREDITOR for the full amount of the Award.

## SIXTH CLAIM

### Fraudulent Conveyance (FL UFTA § 726.108)

189.     CREDITOR reavers and realleges paragraphs One (1) through One Hundred Seven (107) of the Complaint as if fully set forth herein.

190.     As a direct and proximate result of the foregoing, CREDITOR demands the remedies afforded to CREDITOR as per Florida Statute Section 726.108.  Such remedies are as follows:

> a. Any purported transfer of DEBTOR's assets away from DEBTOR was fraudulent and without fair consideration, and should be annulled, voided, disregarded and set aside to the extent necessary to satisfy CREDITOR's claims;
>
> b. An order enjoining DEBTOR and/or the transferees from further disposing of DEBTOR's assets;
>
> c. An order granting an attachment against the bank accounts and assets of DEBTOR, 7657030 CANADA, Inc., Acquinity, and Warren Rustin, to the extent necessary to satisfy CREDITOR's claims;
>
> d. An appointment of a receiver to ensure that any remaining assets of ModernAd do not continue to be transferred;
>
> e. A bond sufficient to cover the full amount of the Judgment, to be paid by Defendants for satisfaction of the Judgment; and
>
> f. any further relief that the Court deems fair, just and equitable.

### DEMAND FOR ATTORNEYS' FEES

191.     CREDITOR demands reasonable attorneys' fees, costs, and expenses against DEBTOR, as per the Skylist Agreement.

**WHEREFORE**, CREDITOR requests that the Court enter a judgment against DEBTOR and the transferee defendants for violation of Chapter 726, Florida Statutes, and further demands any further relief, including reasonable attorneys' fees, costs, and expenses, that the Court deems fair, just and equitable.

*DATED* this 2nd day of July, 2013.

*HARTLEY LAW OFFICES, PLC*
Attorneys for Plaintiff
800 Southeast Third Avenue
Fourth Floor
Fort Lauderdale, Florida 33316
Telephone: (954) 357-9973
Facsimile: (954) 357-2275
Email: hartley@hartleylaw.net

By: /s/ Timothy M. Hartley
TIMOTHY M. HARTLEY
FL BAR NO. 979066

*LEWIS & LIN, LLC*
Attorneys for Plaintiff
45 Main Street, Suite 608
Brooklyn, NY 11201
Telephone: (718) 243-9323
Email: brett@iLawco.com

By: /s/ Brett E. Lewis
BRETT E. LEWIS
FL BAR NO.