01/09/2008  17:31   5617505156   PUREADS LLC   PAGE  02



# MASTER SERVICES AGREEMENT

This Master Services Agreement ("Agreement") is entered into as of this 29th day of November 2007 (the "Effective Date") by and between Datran Media Corp., with its principal place of business located at 345 Hudson Street, 5th Floor, New York, New York 10014, ("DM"), and PureAds, a Florida company, with a principal place of business located at 2701 NW Boca Raton Blvd., Ste. 111, Boca Raton, FL 33431 ("Company"), and sets forth the terms and conditions under which DM, through its affiliated entities or subsidiaries, will provide certain services to Company as may from time to time be mutually agreed upon. DM and Company may be collectively referred to hereinafter as "the parties." This Agreement provides the general terms and conditions for use in connection with services provided by DM entities to Company. Each Attachment hereto shall bind the individual contracting parties to such Attachment and shall not bind Datran Media Corp. nor any other DM entity unless a party thereto.

1. **Services.**

    1.1  Various services (the "Service(s)") to be provided to Company by DM, through its affiliates or subsidiaries, shall be described on separate, mutually executed Services attachments (the "Attachments") as may from time to time be issued hereunder. Each Attachment shall define with specificity the Services, the term, the applicable pricing, and other appropriate terms and conditions applicable to such Services.

    1.2  Each Attachment shall be governed by the terms and conditions of this Agreement; however, in the event of any conflict between this Agreement and an Attachment, the provisions of the Attachment shall prevail.

    1.3  Notwithstanding anything to the contrary in an Attachment or in this Agreement, the parties agree that neither party shall be required to begin any work under an Attachment until such Attachment has been executed by the parties.

    1.4  Company understands and agrees that by executing this Agreement, Company is not committing or obligating itself to use the Services of DM and that no work or charges are or shall be authorized hereunder unless and until authorized in writing by an Attachment signed by both parties.

    1.5  In the event Company has an existing agreement with DM for a particular DM service which agreement is not superseded by an Attachment to this Agreement for such Service (a "Pre-Existing Agreement"), such Pre-Existing Agreement shall be supplemental to this Agreement and shall remain in full force and effect to govern the particular relationship between the parties as set forth in such Pre-Existing Agreement.

    1.6  Subject to Section 4, DM shall have the right to use third parties and consultants in performance of its obligations and the Services hereunder and, for purposes of this Agreement, all references to DM or its employees shall be deemed to include such third parties and consultants.



EXHIBIT "E"

\\\BO - 024293/000008 - 194947 v10

01/09/2008 17:31 5617505156 PUREADS LLC PAGE 03

1.7 This Agreement is non-exclusive to DM and DM shall have the right to enter into similar agreements with other third parties.

1.8 Company agrees that this Agreement constitutes an exclusive agreement with DM for the Services provided hereunder in each applicable attachment.

2. **Price and Payment.**

2.1 <u>Payments to DM</u>. The Services provided by DM shall be at the pricing set forth in the applicable Attachment. In the event an Attachment does not reference any specific pricing, such Services shall be provided at DM's then current standard time and material rates and charges. DM will submit invoices for charges, fees and expenses on a monthly basis. DM's obligations hereunder are conditioned upon Company's fulfillment of its payment obligations, as applicable. If Company fails to pay fees invoiced by DM within the time frame specified in the applicable Attachment(s), DM shall have the right to suspend performance of the applicable Service(s) without notice to Company, until Company pays all such overdue amounts. In the event that DM concludes reasonably and in good faith that Company may not be able to perform its obligations under this Agreement or an Attachment, DM reserves the right to suspend, without prior notice, its performance under the Agreement or an Attachment.

2.2 <u>Payments to Company</u>: Commissions or other fees payable to Company by DM shall be paid to Company as set forth in the applicable Attachment(s).

2.3 <u>Payments to Either Party</u>. The following terms apply to all payments made by one party to the other party:

2.3.1 Payment of each invoice shall be in U.S. dollars and shall be paid within the timeframe specified in the applicable Attachment(s).

2.3.2 If a party disputes the terms of an invoice or commission statement in good faith, that party must raise such dispute with the other party within ten (10) days of its receipt of such invoice or commission statement, or that party's right to dispute such invoice or commission statement shall be waived. At no time may a party withhold payment of fees or commissions that are not subject to a good faith dispute between the parties.

2.3.3 Any late payment shall be subject to any costs of collection, including reasonable legal fees, and shall bear interest at the rate of one and one-half percent (1.5%) per month (prorated for partial periods) or at the maximum rate permitted by law, whichever is less.

2.3.4 During the term of this Agreement and applicable Attachment(s) and for at least one (1) year thereafter, each party shall maintain accurate books and records relating to any payments due to the other party hereunder. Each party shall have the right to examine, inspect, audit, review and copy or make extracts from all such books, records and any source documents used in the preparation thereof during normal business hours upon written notice to the other party at least five (5) business days prior to the commencement of any such examination, inspection, review or audit. Any such audit will be conducted in a manner that does not reasonably interfere with the other party's business activities and shall be conducted no more frequently than once every six (6) months. If a party is owed payment, the delinquent party shall immediately make any overdue payments disclosed by the audit plus applicable interest. Such audits shall be at the auditing party's expense, however; if the audit reveals overdue payments in excess of ten percent (10%) of the payments owed to date, the delinquent party shall immediately pay the cost and expense of such audit. Such audit shall be limited to those books and records that specifically relate to information pertinent to payments due the other party.

3. **Proprietary Rights and Restrictions.**

\\\BO - 024293/000008 - 194947 v10

3.1   The parties agree that (a) Company shall retain and own all proprietary rights in and to its business, any data provided by Company to DM and Company's trademarks and (b) DM shall retain and own all proprietary rights in and to all of DM's intellectual property, including but not limited to any Services provided hereunder (including all software, source codes, modifications, updates and enhancements thereof or any other aspect of the Services), all data obtained by DM from commercially available sources or from other sources that are overlayed onto data provided by Company, any responses, confirmations or other forms of information from individuals contacted by DM utilizing data provided by Company to DM, DM marketing materials, all DM entities' websites, and any trademarks and logos which are owned or controlled by DM and made available to Company through the Services or otherwise.

3.2   The parties understand and agree that DM is the sole owner of any and all intellectual property rights associated with all creative copy, graphics, design, content, materials or other information created by DM on Company's behalf. No images, graphics, copy, content, materials or subject lines may be used by Company without the prior express written permission of DM.

3.3   Notwithstanding anything contained in this Section 3, unless otherwise expressly agreed to in writing, all suggestions, solutions, improvements, corrections, and other contributions provided by Company to DM regarding the Services or other DM materials provided to Company, shall be owned by DM, and Company hereby agrees to assign any and all such rights to DM, and Company shall execute any documents necessary to make such assignment effective. Nothing in this Agreement shall preclude DM from using in any manner or for any purpose it deems necessary, the know-how, techniques, or procedures acquired or used by DM in the performance of any Services hereunder.

3.4   No implied licenses are granted herein, and Company may not use any Service except pursuant to the limited rights expressly granted in this Agreement and Attachments hereto.

3.5   Company shall not reverse engineer the Service, or disassemble, decompile, or otherwise apply any procedure or process to the Service in order to ascertain, derive, and/or appropriate for any reason or purpose, the source code or source listings for the Service or other software provided under this Agreement or any Attachment, or any algorithm, process, procedure or trade secret information contained in the Service or any software provided by DM.

4.   **Confidentiality.**

4.1   The terms of this Agreement and each Attachment and all information and data that one party (the "Receiving Party") has received or will receive from the other party (the "Disclosing Party") about and in the course of providing the Services, including DM's proprietary systems, operations and software and other matters that are proprietary and confidential information, including without limitation any information that is marked as "confidential" or should be reasonably understood to be confidential or proprietary to the Disclosing Party and any reference manuals compiled or provided hereunder ("Confidential Information").

4.2   Without granting any right or license, the obligations of the parties hereunder shall not apply to any material or information that: (i) is or becomes a part of the public domain through no act or omission by the Receiving party; (ii) is independently developed by the Receiving party without use of the Disclosing party's Confidential Information; (iii) is rightfully obtained from a third party without any obligation of confidentiality to the Receiving party; or (iv) is already known by the receiving party without any obligation of confidentiality prior to obtaining the Confidential Information from the Disclosing party. In addition, neither party shall be liable for disclosure of Confidential Information if made in response to a valid order of a court or authorized agency of government, provided that notice is promptly given to the party whose Confidential Information is to be disclosed so that such party may

Datran Media Corp. Confidential
Page 3 of 10

\\BO - 024293/000008 - 194947 v10

seek a protective order and engage in other efforts to minimize the required disclosure. The parties shall cooperate fully in seeking such protective order and in engaging in such other efforts.

4.3  Each party agrees at all times to keep strictly confidential all Confidential Information belonging to the other party. Each party agrees to restrict access to the other party's Confidential Information only to those employees or subcontractors who (i) require access in the course of their assigned duties and responsibilities and (ii) have agreed in writing to be bound by provisions no less restrictive than those set forth herein.

4.4  The parties agree that a breach of this Section would result in irreparable injury to the non-breaching party for which monetary damages would be inadequate. In such event, the non-breaching party shall have the right to seek, in addition to other remedies available to it by law or pursuant to this Agreement, immediate injunctive relief against the breaching party without the need to post a bond.

5.  **Company's Facilities.**

5.1  To the extent required by DM, Company will make available to DM certain use of its facilities, computer resources, software programs, networks, personnel, and business information as are required to perform the Services set forth in any Attachment hereunder.

5.2  DM agrees to comply with Company's rules and regulations regarding safety, security, and conduct, provided DM has been made aware of such rules and regulations.

6.  **Representations and Warranties.**

6.1  Each party represents and warrants that at all times:

6.1.1  It has the right and full power and authority to enter into this Agreement and each applicable Attachment hereto.

6.1.2  It is duly organized and validly existing and in good standing under the laws of the state of its incorporation or formation.

6.1.3  It shall at all times fully comply with all applicable statutes, rules and regulations with respect to its business.

6.1.4  All of the data, images, graphics, design and content supplied to the other party was obtained, collected, compiled and/or complies with all applicable laws and/or regulations, including without limitation laws and regulations governing the creation and marketing of online materials, false and/or deceptive advertising, sweepstakes and/or gambling, adult content, comparative advertising, trade disparagement, libel, defamation and/or infringement of any kind, and that such data, images, graphics, design and content are not and will not be obscene, pornographic or indecent.

6.1.5  All data, images, graphics, design and content, including subject lines, products and/or services linked to any advertisements it provides to the other party are current, accurate, complete as possible, factually accurate and do not contain any fraudulent or deceptive materials, or material that misrepresents, ridicules or attacks an individual or group on the basis of age, color, national origin, race, religion, sex, sexual orientation or handicap.

6.1.6  Subject to applicable regulatory requirements, the content does not promote or make claims that are not easily provable, nor does it falsely represent the product, service or message being communicated.

6.1.7  The use, reproduction, distribution, or transmission of any data, images, graphics, design or content will not, and any data, images, graphics, design, content or web sites linked to the data, images, content or advertisements will not, violate any foreign or domestic, federal, state or local law, rule or regulation, or any rights of any third party including, but not limited to, any copyright, patent,

Datran Media Corp. Confidential
Page 4 of 10

\\BO - 0242293/000008 - 194947 v10

trademark, trade secret, or other proprietary or property right, or constitute false advertising, unfair competition, defamation, invasion of privacy or rights of publicity, or any other right of any person or entity.

6.1.8 All data, images, graphics, design and content supplied by one party to the other party will be in compliance with any exclusion policies for advertising provided by the other party, as amended from time to time in that party's sole discretion, including without limitation, pornography, firearms, Internet gambling, ammunition or tobacco products.

6.1.9 That all data, images, graphics, design and content supplied by one party to the other party will be distributed in accordance with the specifications set forth in the applicable Attachment(s) hereto.

6.1.10 It has all necessary intellectual property rights and/or licenses to utilize and provide all data, content, copy, graphics, design and images provided to the other party for publication pursuant to this Agreement and all applicable Attachments.

6.1.11 It will perform its duties, obligations and services set forth in this Agreement and applicable Attachment(s) in a competent and workmanlike manner.

6.2 EXCEPT AS OTHERWISE STATED IN THIS AGREEMENT, NEITHER PARTY MAKES ANY OTHER WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NONINFRINGEMENT.

7. **Limitation of Liability.**

7.1 DM SHALL NOT BE LIABLE TO COMPANY OR ANY THIRD PARTY FOR ANY UNAVAILABILITY OR INOPERABILITY OF THE SERVICES, TELECOMMUNICATIONS SYSTEMS OR THE INTERNET, TECHNICAL MALFUNCTION, COMPUTER ERROR, CORRUPTION OR LOSS OF INFORMATION OR OTHER INJURY, DAMAGE OR DISRUPTION OF ANY KIND.

7.2 IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES, INCLUDING, BUT NOT LIMITED TO, BUSINESS INTERRUPTION OR LOSS OF PROFITS, BUSINESS OPPORTUNITIES, OR GOOD WILL, EVEN IF SUCH DAMAGES ARE FORESEEABLE AND WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY SUCH DAMAGES, AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY REMEDY.

7.3 DM'S MAXIMUM AGGREGATE LIABILITY UNDER THIS AGREEMENT AND EACH ATTACHMENT SHALL NOT EXCEED THE AMOUNT OF CHARGES PAID BY COMPANY FOR THE SERVICES WHICH GAVE RISE TO SUCH DAMAGES.

7.4 Any cause of action arising from or in connection with this Agreement or an Attachment must be asserted within one (1) year of the date upon which such cause of action accrued, or the date upon which the complaining party should have reasonably discovered the existence of such cause of action, whichever is later.

8. **Term.**

8.1 This Agreement shall remain in effect until terminated by either party as provided herein.

8.2 Each Attachment shall remain in effect until it has expired or is terminated on its own terms.

Datran Media Corp. Confidential
Page 5 of 10

NRO - 024293/000008 - 194947 v10

9. **Indemnification.**

9.1 <u>By Company</u>. Company agrees to indemnify and hold DM, its parents, affiliates and/or subsidiaries, and each of their respective officers, directors, employees, and agents (each a "DM Indemnitee") harmless from and against any and all third party claims, actions, losses, damages, liabilities, costs and expenses (including, without limitation, reimbursement for reasonable attorneys' fees and disbursements incurred by a DM Indemnitee in any action between Company and the DM Indemnitee, or between the DM Indemnitee and any third party or otherwise) arising out of or in connection with (a) the breach of any of Company's representations, warranties or obligations set forth in this Agreement and applicable Attachments, (b) any fraudulent conduct committed by Company, and (c) any and all claims, suits, administrative proceedings or criminal investigations (i) for libel, violation of right of privacy or publicity, copyright infringement, trademark infringement or other infringement of any third party right, fraud, false advertising, misrepresentation, product liability or violation of any law, statute, ordinance, rule or regulation throughout the world in connection with any and all copy, content, images provided by Company, any advertisement, keyword search for an advertisement or on Company's or DM's website, (ii) relating to any virus, worm or "Trojan horse" or other contaminating or destructive features contained in an advertisement or on Company's website, or otherwise relating to an advertisement or Company's website, (iii) any other materials or information to which end users of a service provided hereunder can link from an advertisement or Company's website, (iv) the gross negligence or willful misconduct on the part of Company, its employees, officers, directors, agents or representatives, and/or (v) the products or services offered by Company.

9.2 <u>By DM</u>. DM agrees to indemnify and hold Company, its parents, affiliates and/or subsidiaries, and each of their respective officers, directors, employees and agents (each a "Company Indemnitee") harmless from and against any and all third party claims, actions, losses, damages, liabilities, costs and expenses (including, without limitation, reimbursement for reasonable attorneys' fees and disbursements incurred by a Company Indemnitee in any action between the Company Indemnitee and any third party) arising out of or in connection with (a) the breach of any of DM's representations, warranties or obligations set forth in this Agreement and each applicable Attachment, (b) any fraudulent conduct committed by DM, and/or (c) any and all claims, suits, administrative proceedings or criminal investigations that the Services provided by DM infringe a U.S. patent, copyright, trade secret, trademark, privacy or other intellectual property right of any third party.

9.3 <u>Conditions for Indemnification</u>. The indemnification obligations set forth in this <u>Section 9</u> hereof are contingent upon the following conditions: (a) DM or Company, as the case may be (the "Indemnified Party") must promptly notify the Company or DM as the case may be (the "Indemnifying Party") in writing of the third party claim or action (however, failure of the Indemnified Party to so promptly notify the Indemnifying Party will not relieve the Indemnifying Party of its indemnification obligations hereunder, except to the extent it has been damaged thereby); (b) the DM Indemnitee or the Company Indemnitee, as the case may be, and the Indemnified Party will reasonably cooperate with the Indemnifying Party in the defense of the matter; and (c) the Indemnifying Party will have primary control of the defense of the action and negotiations for its settlement and compromise; provided, however, that the Indemnified Party may, at its own cost, obtain separate counsel to represent its interests.

10. **Publicity.** [**No publicity option:** Neither party shall disclose or permit the disclosure to any other person the existence of this Agreement or any of the transactions contemplated hereby unless such disclosure is required to fulfill such party's duties and obligations hereunder, is approved in writing in advance by the other party or is required by any applicable law, regulation (including, but not limited to, stock exchange regulations) or legal process. Any public announcement or similar publicity with respect to this Agreement or the transactions contemplated hereby will be issued, if at all, at such time and in such manner as is agreed by the parties.] [**Publicity option:** DM shall be permitted to identify

Datran Media Corp. Confidential
Page 6 of 10

\\BO - 024293/000008 - 194947 v10

Company as a DM client and may use Company's name, website address(es) and any related information in connection with DM marketing materials and press releases.]

11. **Independent Contractor Status/Subcontractors.**

11.1  Each of the parties are independent contractors. Nothing herein shall be construed to place the parties in a relationship of principal and agent, partners or joint venturers, and neither party shall have the power to obligate or bind the other party in any manner whatsoever.

11.2  Company shall remain fully liable for the acts or omissions of any subcontractor, consultant, third-party service provider and/or agent engaged by Company in connection with Company's use of the Services.

11.3  DM has the right to use subcontractors for performance of the Services, provided that each subcontractor is bound to terms and conditions that are consistent with the requirements of this Agreement and the applicable Attachment(s) with respect to the work the subcontractor performs. DM is responsible for ensuring that the performance of its subcontractors meets the requirements of this Agreement and applicable Attachment(s).

Datran Media Corp. Confidential
Page 7 of 10

\\BO - 024293/000008 - 194947 v10

12. **Dispute Resolution.**

   12.1 Any dispute or controversy arising out of or related to this Agreement or any breach hereof shall be settled by binding arbitration in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association before the American Arbitration Association in the City of New York, State of New York. Any award shall be final and binding and judgment thereon may be entered in any court of competent jurisdiction. Nothing in this paragraph will be construed to preclude any party from seeking injunctive relief in order to protect its rights pending arbitration.

   12.2 In the event any action is brought to enforce any provision of this Agreement or any Attachment, or to declare a breach of this Agreement, the prevailing party shall be entitled to recover, in addition to any other amounts awarded, reasonable legal and other related costs and expenses, including attorney's fees, incurred thereby.

13. **Non-Circumvention.** During the term of this Agreement and applicable Attachment(s) (the "Term") and for a period of six (6) months after expiration or termination of the Term, Company agrees and acknowledges that it will not take any action to circumvent the relationship described within the applicable Attachment(s) by directly soliciting other online interactive marketing service providers to provide to it services similar to the services provided by DM to Company. To the extent applicable, Company further agrees that during the Term and for a period of six (6) months after expiration or terminations of the Term, it will not engage, contract with, work with, license with, enter into and/or execute any performance-based online advertising and/or marketing relationship with any advertising network, website, newsletter, search engine, e-mail list, or any other type of Internet property (collectively, "Publishers") within any advertising network operated by DM, which is comprised of Publishers (the "Network"). In the event a Publisher does contact Company and Company finds out at a later time that such Publisher is a Publisher within DM's Network, then Company shall notify such Publisher immediately that it must work directly with DM and immediately halt any marketing campaigns it is conducting with such Publisher. Both parties agree and acknowledge that if Company violates its obligations under this Section, DM will suffer irreparable injury and shall be entitled to: (a) liquidated damages in the amount of fifty percent (50%) of the gross revenues resulting from sales conducted by Company through the advertising and/or marketing efforts of such Publisher(s), (b) injunctive relief, and (c) any other remedies DM may have at law or in equity.

14. **General Terms and Conditions.**

   14.1 **Governing Law.** This Agreement and each Attachment shall be governed by, interpreted and construed in accordance with the laws of the State of New York, without reference to its conflict of laws rules or principles.

   14.2 **Entire Agreement.** This Agreement, together with all Attachments and all exhibits attached hereto and thereto, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes any and all prior or contemporaneous oral or written agreements or understandings between the parties.

   14.3 **Assignment.** This Agreement, all Attachments, and all rights granted hereunder and thereunder are not transferable or assignable without the prior written consent of the non-assigning party; provided however, that this Agreement and any applicable Attachments (which incorporate the terms of this Agreement by reference) may be assigned by either party without the other party's written consent to a person or entity who acquires, by sale, merger or otherwise, all or substantially all of the assets or business of that party, or to an affiliate of the assigning party. Subject to the foregoing, this Agreement shall inure to the benefit of, and shall be binding on, the parties and their respective successors and permitted assigns.

14.4 Notices. Any notice under this Agreement shall be in writing and delivered by personal delivery, express courier, confirmed facsimile, confirmed email or certified or registered mail, return receipt requested, and will be deemed given upon personal delivery, one (1) day after deposit with express courier, upon confirmation of receipt of facsimile or email or five (5) days after deposit in the mail. Notices will be sent to a party at its address set forth below or such other address as that party may specify in writing pursuant to this Section 14.4.

To DM:  Datran Media, LLC
        Attn: Jeff Goldstein, Esq.
        345 Hudson Street, 5th floor
        New York, New York 10014
        Fax No. (212) 706-1910

With copy to: Hogan & Hartson LLP
        Attn: Tracy B. Gray, Esq.
        1470 Walnut, Suite 200
        Boulder, Colorado 80302
        Fax No. (720) 406-5301

To Company:  PureAds
        Attn: Greg Van Horn
        2701 NW Boca Raton Blvd., #111
        Boca Raton, FL 33431
        Fax No. 561.750.5156

14.5 Force Majeure. Any delay in or failure of performance by either party under this Agreement or any Attachment will not be considered a breach of this Agreement and will be excused to the extent caused by any occurrence beyond the reasonable control of such party including, but not limited to, acts of God, power outages and governmental restrictions, laws or regulations; provided, however, that lack of funds shall not be deemed to be a reason beyond a party's reasonable control. The parties will promptly inform and consult with each other as to any of the above causes, which in their judgment may or could be the cause of a delay or failure in the performance of this Agreement, and shall use commercially reasonable efforts to remedy the delay or failure or implement an acceptable workaround which minimizes the effect of the delay or failure.

14.6 Severability and Reformation. If any portion of this Agreement is determined to be or becomes unenforceable or illegal, such portion shall be reformed to the minimum extent necessary in order for this Agreement to remain in effect in accordance with its terms as modified by such reformation.

14.7 Waiver. A waiver of any default, breach or non-compliance under this Agreement is not effective unless in writing and signed by the party to be bound by the waiver. No waiver shall be inferred from or implied by any failure to act or delay in acting by a party in respect of any default, breach, non-observance or by anything done or omitted to be done by another party. The waiver by a party of any default, breach or non-compliance under this Agreement shall not operate as a waiver of that party's rights under this Agreement in respect of any continuing or subsequent default, breach or non-compliance (whether of the same or any other nature).

14.8 Modifications. Unless otherwise specified, any amendment, supplement or modification of or to any provision of this Agreement or an Attachment, any waiver of any provision of this Agreement or an Attachment and any consent to any departure by the parties from the terms of this Agreement or an Attachment, shall be effective only if it is made or given in writing and signed by both parties.

Datran Media Corp. Confidential
Page 9 of 10

\\BO - 024293/000008 - 194947 v10

14.9 Survival. The provisions set forth in this Agreement and any applicable Attachments hereto, that by their very nature should survive termination or expiration of this Agreement and any applicable Attachment(s), shall survive.

14.10 Counterparts. This Agreement may be executed in counterparts, each of which will serve to evidence the parties' binding agreement.

The parties hereto agree to the foregoing as evidenced by their signatures below.

**Agreed to By:**

**DATRAN MEDIA CORP.**

By: _____
(Signature)

Tony Averbeck
(Name typed or printed)

Managing Director of Sales
(Title)

1/10/08
(Date)

**PUREADS**

By: _____
(Signature)

Warren Rustin
(Name typed or printed)

CFO
(Title)

01/09/08
(Date)

Datran Media Corp. Confidential
Page 10 of 10

\\BO - 024293/00000R - 194947 v10