UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT COURT OF FLORIDA
FORT LAUDERDALE DIVISION

PULSEPOINT, INC., f/k/a DATRAN
MEDIA CORP.,

       Plaintiff,                               CASE NO.: 0:13-CV-61448

            v.

7657030 CANADA INC., d/b/a ACQUINITY
INTERACTIVE, LLC, f/k/a MODERNAD
MEDIA LLC f/k/a PUREADS; ACQUINITY
INTERACTIVE, LLC; MODERNAD MEDIA LLC;
WARREN RUSTIN, an individual,
8333947 CANADA INC; and JOHN DOES 1-100,

       Defendant.
_____/

## CORRECTED AND AMENDED MOTION FOR EXPEDITED DISCOVERY AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT THEREOF

      Pursuant to Rule 26 of the Federal Rules of Civil Procedure, Plaintiff  Pulsepoint, Inc.,

f/k/a Datran Media Corp. ("Datran" or "Plaintiff" or "CREDITOR"), moves this Honorable

Court for the entry of an Order  (1) granting Plaintiff leave to serve limited, immediate discovery,

including without limitation the Request for Production attached hereto as **Exhibit "A"** on

Defendants 7657030 Canada, Inc., d/b/a Acquinity Interactive, f/k/a ModernAd Media LLC,

f/k/a PureAds; ModernAd Media LLC; Acquinity Interactive, LLC; Warren Rustin; 8333947

Canada Inc., ("8333947 Canada"), and John Does 1-100 (the "Doe Defendants") (collectively

"Defendants") and on third parties; (2) requiring Defendants and the third parties upon whom

Plaintiff serves discovery subpoenas to  respond to the subpoenas within seven calendar days of

the date of service and (3) for such other relief as this Court deems just and proper.  In support of

thereof, Plaintiff submits the following memorandum of law.

## INTRODUCTION

This action involves the fraudulent transfer of assets with the intent to defraud and evade creditors.  CREDITOR requires limited expedited discovery in this action: (1) to identify the Doe Defendants, their locations and legal status for purposes of serving CREDITOR's Complaint upon them pursuant to Rule 4 of the Federal Rules of Civil Procedure ("FRCP"), and (2) to assess whether pre-judgment attachment of Defendants' and/or the Doe Defendants' property is necessary to prevent DEBTOR'S continued laundering of assets through potentially judgment-proof entities.

## PRELIMINARY STATEMENT

As set forth more fully in the Amended Complaint, DEBTOR owes CREDITOR $2,292,063.73, pursuant to the judgment of the New York State Supreme Court, Hon. Barbara Kapnick, dated May 20, 2013 and entered June 13, 2013, confirming the award of Arbitrator Thomas Halket, Esq. of the American Arbitration Association, dated January 9, 2013, as modified on January 18, 2013 (the "Award"), plus interest accruing from the date of the Award at a rate of 9% per-annum. See Complaint at Exhibit A.  CREDITOR's Complaint seeks injunctive relief to stop the transfer and dissipation of assets from ModernAd Media LLC ("DEBTOR") to Defendants and/or other presently unknown entities and from Defendants to third parties.  DEBTOR – a company with revenues of roughly $120 million-per-year – purported to sell substantially all of its assets to defendant 7657030 Canada, Inc., d/b/a Acquinity Interactive ("Acquinity"), for the fire sale price of approximately $2.7 million. Complaint at ¶¶ 3, 24-38.  DEBTOR subsequently transferred to Warren Rustin substantially all of the $2.7 million it received in that asset sale. Id. at ¶¶ 58, 64-68.  The sale of substantially all of its assets for less

than reasonably equivalent value – first to Acquinity, and a second time to Warren Rustin – left DEBTOR insolvent and unable to pay its debts to creditors. Id. at ¶¶ 4, 65, 100-174.

Since the filing of the Complaint in this action, Defendants have begun the process of shutting down Defendant Acquinity, again, for the sole purpose of evading payment of the Judgment, as well as debts owed to other creditors. Defendants either have transferred, or are in the process of transferring, Acquinity's assets to a new entity, Defendant 8333947 Canada. 8333947 Canada is a mere continuation of ModernAd and Acquinity, the same as Acquinity was a mere continuation of ModernAd. *See* Affidavit of Anthony Provenzano ("Provenzano Aff.") ¶ 5 ("AQUINITY used the same employees, office space, equipment, and business model as MODERNAD and was merely a continuation of MODERNAD. Furthermore, all technology and data used by ACQUINITY in its business was acquired at MODERNAD. Without this data AQUINITY would have no business.")

CREDITOR has been and continues to be harmed as a direct and proximate result of DEBTOR's transferring its assets to third party corporate entities and/or individuals that are either owned, operated, or managed by DEBTOR, in whole or in part, are owners of DEBTOR, or have such a significant relationship with DEBTOR that the third party received the asset(s) without paying reasonably equivalent value in exchange for them. Defendants made said transfers through the Doe Defendants with the sole purpose of hindering, delaying, and/or defrauding CREDITOR and/or other creditors, by secreting the Doe Defendants' true identities and locations. Complaint at ¶¶ 4, 68, 154 and 186.

Indeed, the former Chief Marketing Officer of ModernAd and Acquinity has signed a sworn affidavit in which he states that:

> The main purpose for the change from MODERNAD to ACQUINITY was to attempt to avoid the claims of certain creditors of MODERNAD, including the claims of DATRAN

> MEDIA CORP, and to attempt to avoid obligations under certain continuing contracts which had been entered into by MODERNAD including the contract with DATRAN MEDIA CORP.

Provenzano Aff., ¶ 5.  Now, the gang at ModernAd are at it again – they're shuffling off all of the assets of Acquinity into a new entity in the apparent belief that the Court system is too ponderous to hold them accountable. Any such distributions would be subject to attachment or a constructive trust.  However, CREDITOR requires further information in order to apply to the Court for that equitable relief.

Despite reasonable efforts, CREDITOR has been unable to discover the identity of the Doe Defendants, as the names of and relationships between said entities and Defendants is not publicly available.  Defendants, and the third parties discussed below, are in exclusive possession of information as to their identities.  Furthermore, based on Defendants' past and present conduct, CREDITOR fears that if immediate discovery is not granted, Defendants will continue to engage in transfers between and/or through unknown entities outside the Court's jurisdictional reach, such that would render satisfaction of the Award impossible and any judgment entered herein unenforceable.

Because Defendants have conducted these transfers in a manner designed to mask the identity of the Doe Defendants, CREDITOR anticipates that it will need to pursue discovery through several layers of companies and/or individuals to obtain the information it needs to identify the Doe Defendants.  It is therefore imperative that each third party served with a discovery subpoena be required to respond quickly so that CREDITOR can obtain discovery from any companies located further "upstream" before Defendants can shuffle assets to potentially judgment-proof entities.

As further discussed below, CREDITOR respectfully submits that the Court should grant

this motion because CREDITOR has good cause for seeking expedited discovery.

## FACTS SUPPORTING GOOD CAUSE FOR EXPEDITED DISCOVERY

As alleged in the Complaint, Plaintiff proffers the following:

**A. The Fraudulent Asset Purchase Agreement**

DEBTOR is an Internet marketing company, which provided lead generation services, display advertising, call center solutions, and email, search, and affiliate marketing from around or about May 2007 through December 31, 2010. Complaint at ¶ 16.  Warren Rustin is the Managing Member of DEBTOR. Id. at ¶ 17. Acquinity is an Internet marketing company that provides lead generation services, and email, mobile web, and social media marketing. Id. at ¶ 18. Garry Jonas, who was formerly the CEO of DEBTOR, is CEO of Acquinity, and supervises the management of the corporation. Id. at ¶ 19.  Warren Rustin was the President of DEBTOR, and alleges to be DEBTOR'S sole shareholder. Id. at ¶¶ 23, 115-17. Garry Jonas was DEBTOR's Chief Executive Officer, and has testified to having made an investment in DEBTOR, before he denied it. Id. at ¶¶ 23, 170. In conversations with the Chief Marketing Officer of ModernAd, Mr. Jonas at all times, "stated that ModernAd was his company." Provenzano Aff., ¶ 6.

On or about January 13, 2011, in a letter addressed "Dear Partner," Mr. Jonas announced to DEBTOR's clients that he had "formed a new company, Acquinity Interactive, along with two former ModernAd Media executives, Greg Van Horn and Josh Greenberg." See Complaint at Exhibit C.  Mr. Jonas stated that Acquinity had acquired "certain strategic assets of ModernAd." See id.  For both advertisers and publishers, Jonas assured clients that, "your existing campaigns will remain unaffected," and to expect to hear from their current account managers. See id.  Mr. Jonas referred to Acquinity as, "our new entity." See id.

Existing partners were not informed of anything that would change in their dealings with

the company, other than vague allusions to "new products," and "expanded opportunities."
Complaint at Exhibit C.  Indeed, Mr. Jonas gushed, "[w]e have spent the last four years
perfecting the formula that will be your platform for success and more profitable media in 2011."
Id.  By letter of that same date from Scott Modist, Chief Financial Officer of both DEBTOR and
Acquinity, to "Our Valued Customers," Mr. Modist stated that, "we have transitioned certain
aspects of our operations from ModernAd Media, LLC to Acquinity Interactive (the "Modist
Letter"). See Complaint at Exhibit D.

The use of the personal pronouns "we" and "our" in the January 13 letters was intended
to convey to customers that Acquinity was a continuation of DEBTOR, which it was. See
Complaint at Exhibits C and D; Provenzano Aff., ¶ 4.  The Modist Letter further instructed
DEBTOR's customers to "direct all future payments to Acquinity Interactive, 2200 SW 10th
Street, Deerfield Beach, FL 33442," the same address at which DEBTOR conducted business.
Complaint at Exhibit D.  The letter provided that: "***ACH and Domestic Wire Routing Numbers
[for ModernAd and Acquinity] are the same***." Id. (**emphasis *added***)

CREDITOR received copies of both letters as a partner and customer of DEBTOR.
Complaint at ¶ 37.  The letters were drafted in such a way as to make it seem that some assets
remained with DEBTOR, however, CREDITOR subsequently learned that substantially all of
DEBTOR's assets had been conveyed to Acquinity via an asset purchase agreement (the "Asset
Purchase Agreement"). Id. at ¶ 38.

Around the time of the Arbitration in August 2012, counsel for DEBTOR stated that
DEBTOR was a mere shell, without assets. Complaint at ¶ 41.  The following supports counsel's
statement:

> a.   Following the asset sale, DEBTOR ceased to do business.

      b.  DEBTOR's Web site, located at www.ModernAdMedia.com, became inactive in

          or around early 2011, and has remained inactive.

      c.  DEBTOR has no employees.

Id.

That DEBTOR ceased to do business following the asset sale is not in genuine dispute. See

Complaint at ¶¶ 41, 166.  Mr. Rustin informed DEBTOR's customers of the "Acquinity

transition" in December 2010, and advised them that, "ModernAd Media will no longer be

involved in internet marketing activities." Complaint at ¶ 24.  CREDITOR did not receive a copy

of this letter at that time. Id. at ¶ 25.

    The "sale" of DEBTOR's assets occurred through an asset purchase agreement, with

DEBTOR and Mr. Rustin selling certain assets and membership interests to Acquinity.  See

Complaint at ¶ 27-28, 42-57.  Pursuant to the terms of the asset purchase agreement, DEBTOR

and Mr. Rustin sold substantially all of DEBTOR's assets to Acquinity. Id.

    At the time of the "sale," DEBTOR was a highly profitable company that generated in

excess of $10 million in revenue per month. Complaint at ¶ 44.  In fact, from January through

June 2010, the total revenue generated by DEBTOR's co-registration division, alone, was

approximately $32,605,854. Id.  DEBTOR regularly made significant profits. Id. at ¶ 45.

Despite the profitability of DEBTOR, Mr. Rustin and Mr. Jonas structured the "sale" to appear

as though DEBTOR was not making any money, and that it was necessary for Acquinity to

assume certain liabilities of DEBTOR. Id. at ¶ 46.  Acquinity purchased DEBTOR's assets and

membership units, together with certain liabilities, for slightly less than $3.2 million. Id. at ¶ 47.

This amount is a fraction of the true value of the assets and membership units purchased by

Acquinity. Id.

Mr. Jonas described the sale of DEBTOR's assets and membership units to Acquinity as mere "semantics," and insinuated that the sale was a sham transaction. Complaint at ¶ 51. Mr. Jonas further claimed that he manipulated the "sale" to meet his needs, and that his group's buyout of DEBTOR's assets and membership units and taking over operations did not, in fact, constitute a sale. Id. at ¶ 52.  DEBTOR and Acquinity have taken the position in unrelated litigation that the asset purchase agreement did not constitute a change in control or sale of the company. Id. at ¶ 53. Indeed, Mr. Jonas told at least one former employee that the ModernAd "sale" is fictitious. Id. at ¶ 54.  Mr. Jonas also told that same employee that the ModernAd "sale" was only real to the degree he (Mr. Jonas) manipulated it to be, and that Mr. Rustin would be taken care of. Id. at ¶ 55.  Mr. Jonas also stated that he and Mr. Rustin had a handshake deal related to the ModernAd transaction. Id. at ¶ 56.  These allegations are supported by ModernAd's former Chief Marketing Officer, who stated that the main purpose for the transition to Acquinity was to attempt to evade the claims of certain creditors, including Plaintiff, and to get out of certain recurring contracts, like the one with Plaintiff. *See* Provenzano Aff., ¶ 5.  In other words, it was a sham.

Mr. Jonas's statement that Mr. Rustin would be taken care of and that there was a handshake deal indicates that Mr. Rustin would receive compensation for the ModernAd transaction that is not identified in the Asset Purchase Agreement. Complaint at ¶¶ 50, 56.  The agreement formalizing the "sale" of DEBTOR's assets was entered into on Saturday, January 1, 2011. Id.  CREDITOR believes that additional payments were made from Acquinity and/or Mr. Jonas, to Mr. Rustin. Id. at ¶ 48.  Such payments were not specified in the Asset Purchase Agreement. Complaint at ¶ 56.  Mr. Rustin also stated to Mr. Jonas at a meeting with CREDITOR's CEO early in 2011 that Mr. Jonas had told him that he would take care of him. Id.

at ¶ 106-07.

**B. Concealing the Transfers**

During the Arbitration, DEBTOR was deliberately vague about which of DEBTOR's assets had been transferred to Acquinity and which remained. Complaint at ¶ 26.  DEBTOR's former, and Acquinity's then-current, CFO Scott Modist testified that only "certain assets and liabilities" were conveyed by DEBTOR to Acquinity, and claimed that Acquinity had not acquired DEBTOR's email marketing business. Id. He also indicated that DEBTOR still had employees, and was in business servicing "middle markets." Id.  We now know these statements to be false.

Mr. Modist tried to conceal the fact that Acquinity had acquired the assets of DEBTOR's email marketing business, stating, "in the asset purchase agreement, there was no mention of the email business." Complaint at ¶ 27.  Mr. Modist's statement was technically accurate – there was no literal mention of the *email business* in the asset purchase agreement – however, DEBTOR's email marketing business – and all of DEBTOR's data – was subsumed in the assets of one or more of the entities that Acquinity acquired from DEBTOR. Id.  Despite working in the same building where DEBTOR's offices were located, and despite having personal knowledge of the Asset Purchase Agreement, and exactly which assets had been conveyed from DEBTOR to Acquinity, Mr. Modist repeatedly denied having any knowledge about DEBTOR's assets, other than to dissimulate that DEBTOR was still a going concern – well after that had ceased to be the case. Id. at ¶ 28.

Following the purported asset sale, Acquinity continued to make use of CREDITOR's software and services under the Skylist Agreement, using DEBTOR's login credentials.

Complaint at ¶ 39. Acquinity used CREDITOR's services without paying for them. Id.

CREDITOR believed that it was DEBTOR that was accessing its software, not Acquinity. Id.

No amendment of the Skylist Agreement was ever made to make Acquinity a party to that

Agreement. Id.  Acquinity concealed its use of the services and software from CREDITOR, even

as CREDITOR was suing DEBTOR over DEBTOR's unpaid use of the same services. Id. at ¶

40.  The fact of Acquinity's use only came out during discovery in the Arbitration. Id.

### C.  The Second Transfer

Following the sale of substantially all of DEBTOR's assets to Acquinity for $2,682,783,

Mr. Rustin caused DEBTOR to transfer the proceeds of the sale to him, without any

consideration. See Complaint at ¶ 58.  Such transfer was made at a time when Mr. Rustin knew

that CREDITOR had a claim against DEBTOR and had threatened DEBTOR with litigation.  Id.

at ¶ 59.  Mr. Rustin was also aware of the operative agreement, and knew, or reasonably should

have known, that it contained an automatic renewal clause – and had, in fact, renewed for

another year. Id.

Indeed, CREDITOR and DEBTOR had been engaged in negotiations over the Claim

from at least October 2010 through December 2010. Complaint at ¶ 60. On January 24, 2011,

CREDITOR sent DEBTOR a formal notice demanding payment of CREDITOR's Claim – at

that point roughly $475,000. Id.  CREDITOR also reminded DEBTOR that the operative

agreement had renewed, and that DEBTOR was liable for making twelve additional payments of

$92,500. Id.  In January 2011, Acquinity used DEBTOR's login credentials to CREDITOR's

software to send roughly 77 million marketing emails and continued to use CREDITOR's

software to send emails throughout 2011. Complaint at ¶¶ 39, 181.  DEBTOR knew or

reasonably should have known that it was indebted to CREDITOR for a minimum of roughly

$1,585,000. <u>Id.</u> at ¶ 61.

Following receipt of the January 24, 2011 letter, Mr. Modist responded by email, dated January 26, 2011, that, "[w]e hope to work out this matter in a mutually agreeable manner." Complaint at ¶ 62.  Mr. Modist wrote from an Acquinity email address, although he made no distinction between Acquinity and DEBTOR in his pledge to work the matter out.  <u>Id.</u>  At the time of Mr. Modist's email, he was CFO of Acquinity – not ModernAd. <u>Id.</u>  Mr. Modist later claimed not to have had any knowledge of DEBTOR's affairs. <u>Id.</u> at ¶ 63.

DEBTOR's counsel stated during the course of the Arbitration that DEBTOR had no assets, yet DEBTOR ran up legal fees in the amount of $586,312.67. Complaint at ¶  69. DEBTOR's counsel during the Arbitration, Lydecker Diaz, Attorneys & Counselors at Law, are counsel to ModernAd and Acquinity in several unrelated litigations. <u>Id.</u> at ¶ 71.

**D. The Award**

On March 17, 2011, CREDITOR filed a claim with the American Arbitration Association. Complaint at ¶ 85.  In it, CREDITOR sought damages for DEBTOR's failure to pay the required monthly fee for use of its services under a certain Skylist Hosted Services Agreement (the "Skylist Agreement"). <u>Id.</u>  DEBTOR answered the claim and asserted counterclaims, seeking a money judgment against CREDITOR. <u>Id.</u> at ¶ 86.  The parties selected Thomas D. Halket, Esq. to act as the Arbitrator in the matter and agreed to submit for his adjudication and award all matters in dispute between them in accordance with the rules of the American Arbitration Association. <u>Id.</u> at ¶ 87.  In accordance with the AAA rules, the parties engaged in extensive discovery, submitted pre-arbitration and post-arbitration submissions to the Arbitrator and fully engaged in the Arbitration. <u>Id.</u> at ¶ 88.  The parties participated in two separate four-day arbitration hearings, wherein testimony was taken of all parties. <u>Id.</u>  The parties submitted post-

arbitration briefs for the Arbitrator's consideration. Id. at ¶ 89.  Oral argument subsequently was held over a two-day period. Id.

Thereafter, the Arbitrator determined and awarded to CREDITOR as full settlement of its claims submitted to the Arbitration:

> d.   $1,572,500 in damages;
>
> e.   reasonable attorneys' fees and expenses in the amount of $429,701.23;
>
> f.   administrative fees of $77,575; and
>
> g.   pre-and-post-Award interest on all such amounts "at the rates set forth in, and calculated in accordance with the stipulation of the Parties dated December 19, 2012, amounting to $212,287.50, as of the date of the Award.

Complaint at ¶ 90; see Award, Complaint at Exhibit A; see also December 19, 2012 Stipulation, Complaint at Exhibit G.

The Arbitrator held:

> For the purpose of the determination of interest, (i) the amount paid in settlement of Claimant's claim shall be deemed to have been due to Claimant in 17 equal monthly payments commencing on the due day of the August 2010 monthly invoice and (ii) all other amounts to be paid to Claimant under this Award shall be deemed due as of the date of this Award.

Complaint at ¶ 91; see id. at Exhibit A.

The Arbitrator denied ModernAd's counterclaims.  Id.  The Arbitrator further held that, "The above sums are to be paid on or before 90 days from the date of this Award . . . This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby denied." Complaint at ¶ 92.  The Arbitration Award was duly sent or delivered to the parties on or about January 9, 2013, and was received by the petitioners and respondents herein on or about said date. Id. at ¶ 93.  The Arbitrator issued an

12

Amended Award on January 18, 2013. Id.

A petition to confirm the Award was brought on January 22, 2013, within weeks after the aforesaid delivery of the Arbitration Award to the parties. Complaint at ¶ 94. The Award has not been vacated or modified upon any grounds specified in NY CPLR Section 7511. Id. at ¶ 95. DEBTOR, who did not oppose such petition, has failed to pay any of the Award, and has failed to respond to emails or telephone calls inquiring into payment of the Award. Id. at ¶¶ 96-97.  The Award was entered as a judgment of the New York State Supreme Court, Hon. Barbara Kapnick, dated May 20, 2013 and entered June 13, 2013.  Complaint at ¶ 1.

CREDITOR has domesticated the New York State judgment in Broward and Palm Beach counties by way of separate domestication actions.  As of the date of the filing of this Motion, DEBTOR has not taken any action to contest domestication of the New York judgment and, as such, the New York judgment has now become a valid Florida judgment. Counsel for DEBTOR has stated that DEBTOR ceased to do business in 2011, has no employees, and is a mere shell without assets. Id. at ¶ 99.

Since the Judgment was domesticated in Florida, Defendants have conspired again to evade their obligation under law to satisfy the Judgment. See Amended Compl., ¶¶ 190-92. Although DEBTOR agreed to participate in binding arbitration, and nowhere has contested the validity of the Judgment against it, DEBTOR and its related entities have thumbed their noses at the legal system and their obligations under the law.


## ARGUMENT

## THIS COURT SHOULD PERMIT DATRAN TO SERVE LIMITED, EXPEDITED DISCOVERY, AS GOOD CAUSE EXISTS AND DEFENDANTS WILL NOT BE PREJUDICED

**A.      This Court Has Authority To Grant Expedited Discovery**

Pursuant to Rule 26(d) of the Federal Rules of Civil Procedure ("FRCP"), parties may seek formal discovery before the required Rule 26(f) conference in certain circumstances, including "when authorized by [the FRCP], by stipulation, or by court order." Fed. R. Civ. P. 26(d)(1). Courts have "broad discretion in managing pretrial discovery matters." Klay v. All Defendants, 425 F.3d 977, 982 (11th Cir. 2005)(quoting Perez v. Miami-Dade Co., 297 F.3d 1255, 1263 (11th Cir. 2002)). Courts in this Circuit utilize a "good cause" standard in deciding whether to grant a request for expedited discovery. Biosense Webster, Inc. v. Scott, 2013 WL 1611338 at *1 (M.D. Fla. April 15, 2013); Dell, Inc. v. BelgiumDomains, LLC, 2007 WL 6862341 at *6 (S.D. Fla. Nov. 21, 2007); see Semitool, Inc. v. Tokyo Electron Am., Inc., 208 F.R.D. 273, 276 (N.D. Cal. 2002); accord 8A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2046.1 at 288 (3d ed. 2011)("[a]lthough [Rule 26(d)] does not say so, it is implicit that some showing of good cause should be made to justify such an order, and courts presented with requests for immediate discovery have frequently treated the question whether to authorize early discovery as governed by a good cause standard").

"Good cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." Semitool, 208 F.R.D. at 276. Factors courts consider in determining whether "good cause" exists to grant expedited discovery include: (1) the context of the request, including whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the responding party in complying with the request; and (5) the timing of the request, including how far in advance of the typical discovery process the request was made. Biosense, 2013 WL 1611338, at *1 (citing Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth., 234 F.R.D. 4, 6 (D.D.C. 2006)).

14

In reviewing the Disability Rights factors, several courts have found "good cause" to exist: where the scope of discovery is narrow (Biosense, 2013 WL 1611338 at *1; Qwest Comm. Int'l, Inc. v. WorldQuest Networks, Inc., 213 F.R.D. 418, 420 (D. Colo. 2003)); when expedited discovery will conserve court and party resources (Semitool, 208 F.R.D. at 276); where a case's resolution will be expedited (Wachovia Secs., LLC v. Stanton, 571 F. Supp. 2d 1014, 1050 (N.D. Iowa Aug. 5, 2008); and to uncover potential litigants' identities (Arista Records LLC v. Does 1-7, Case No. 3:08-CV-18 (CDL) (M.D. Ga. Feb. 25, 2008); BelgiumDomains, LLC, 2007 WL 6862341 at *6 ; United Parcel Serv. of Am., Inc. v. John Does One Through Ten, 2003 WL 21715365 at *1 (N.D. Ga. June 13, 2003); see also Dean v. Barber, 951 F. 2d 1210, 1215-16 (11th Cir. 1992)(error to deny plaintiff's motion to join John Doe defendant where identity could have been determined through discovery)).  Courts have also found "good cause" to exist, in cases involving allegedly fraudulent conveyances to discover information from the defendants and third parties. See Kremen v. Cohen, 2011 WL 6113198 (N.D. Cal. Dec. 7, 2011)(decided under a "reasonableness" standard that is substantially similar to this Circuit's "good cause" standard and considered same Disability Rights factors).

**B.    The Disability Rights Factors Weigh In Favor Of Datran, Thus Good Cause Exists To Grant Its Request For Limited, Expedited Discovery**

Factors "2," "3," "4" and "5" weigh strongly in favor of granting Datran's request for expedited discovery, whereas factor "1" is neutral.  See Disability Rights, 234 F.R.D. at 6.

First, a preliminary injunction motion is not required to grant expedited discovery. See Disability Rights, 234 F.R.D. at 6; see also Biosense, 2013 WL 1611338 at *1 (granting motion for expedited discovery although no motion for a preliminary injunction was pending). Datran has been and continues to be harmed by DEBTOR's transfer of assets to various unknown Defendants.  Complaint at ¶¶ 4, 68, 154 and 186.  However, without information as to the

identities of the Doe Defendants, Datran will be unable to serve the Complaint pursuant to Rule 4 or seek any equitable relief on, as yet, unknown defendants.  Further, if Datran cannot uncover this information quickly, DEBTOR will continue its conduct of shuttling assets to potentially judgment-proof entities, with the result that Datran will never be able to recover the Judgment.  <u>See</u> Complaint at ¶¶ 3-5, 20 and 41-52.  The recent discovery that Defendants are shutting down Acquinity and shuttling assets to a new entity illustrates CREDITOR's concern.  Thus, the fact that no preliminary injunction motion is pending is inconsequential, as expediency in obtaining the identity and methods of the wrongdoers is required.

Second, the scope of discovery Datran will gather in order to serve the Doe Defendants and to support a further application to the Court for equitable relief concerning the fraudulent transfers to the shell entities is necessarily limited, as provided in the CREDITOR's First Set of Expedited Document Production Requests. Attached hereto.

Third, as previously mentioned, the purpose of requesting discovery is twofold: (1) to identify the Doe Defendants, their locations and legal status for purposes of serving the Complaint, and (2) to assess whether pre-judgment attachment of Defendants' property is necessary to prevent the continued laundering of assets through potentially judgment-proof entities.  Courts routinely grant expedited discovery in order to uncover the identity of potential litigants. <u>See</u> <u>BelgiumDomains, LLC</u>, 2007 WL 6862341 at *6.  Further, courts have found "good cause" to exist, in fraudulent transfer cases like this to aid in assessment of potential equitable relief. <u>See</u> <u>Kremen v. Cohen</u>, 2011 WL 6113198.  The court in <u>Kremen</u> opined that good cause existed to grant expedited discovery when there were allegedly commonalities of ownership or control amongst the parties, to discover information from the defendants and third parties regarding bank accounts used for the transfers, the corporate relationship amongst the

debtor and other entities, and the identity of potential related entities. 2011 WL 6113198.

Here, DEBTOR has ceased to do business. <u>See</u> Complaint at ¶¶ 41, 99 and 166.  Warren Rustin depleted DEBTOR of substantially all of its assets. <u>Id.</u> at ¶¶ 39, 58 and 64-68. DEBTOR's counsel claimed that DEBTOR is an empty shell. <u>Id.</u> at ¶¶ 41, 99.  DEBTOR, a $120 million-a-year business, transferred substantially all of its assets to Acquinity for roughly $3 million – a fraction of their worth. <u>Id.</u> at ¶¶ 3, 58, and 99.  Mr. Rustin then shut down DEBTOR and transferred substantially all of the proceeds of that sale to himself, depleting DEBTOR's assets completely. <u>Id.</u>  DEBTOR depleted its assets with full knowledge of CREDITOR's Claim and the claims of other creditors. Complaint at ¶¶ 59-61, 109-11.  In the mean time, Acquinity, which is owned and managed by insiders of DEBTOR, has been free to move assets to and through these "sham" entities with impunity.  <u>See id.</u> at ¶¶ 24, 51 and 115.  It appears that Defendants have now either shut down, or are in the process of shutting down Acquinity, again, for the primary purpose of avoiding and evading debts to creditors, including Plaintiff. *See* Am. Compl., ¶¶ 190-92.  Mr. Rustin's childhood friend, Mr. Jonas, is a principal of Acquinity and told his Chief Marketing Officer that ModernAd was *his* company. Complaint at ¶¶ 106, 115 and 170; Provenzano Aff., ¶ 6.  No matter what name they call it, ModernAd, Acquinity, and now 8333947 Canada is, and has always been Garry Jonas's company.

The asset sale at the heart of CREDITOR's claim is embroidered with numerous badges of fraud.  As stated above, Mr. Jonas described the sale of DEBTOR's assets and membership units to Acquinity as mere "semantics," and insinuated that the sale was a sham transaction. Complaint at ¶¶ 51, 177.  Mr. Jonas claimed that he manipulated the "sale" to meet his needs, and that his group's buyout of DEBTOR's assets and membership units and taking over operations did not, in fact, constitute a sale. <u>Id.</u> at ¶ 52.  In order to avoid change of control

payments to DEBTOR's middle management, DEBTOR and Acquinity have taken the position in unrelated litigation that the asset purchase agreement did not constitute a change in control or sale of the company. Id. at ¶ 53. Indeed, Mr. Jonas told at least one former employee that the ModernAd "sale" is fictitious. Id. at ¶ 54. Mr. Jonas also told that same employee that the ModernAd "sale" was only real to the degree he (Mr. Jonas) manipulated it to be, and that Mr. Rustin would be taken care of. Id. at ¶ 55. Mr. Jonas promised to take care of him as a part of their handshake deal. Complaint at ¶ 56. DEBTOR took pains to hide the extent of the asset purchase from CREDITOR – its former CFO and Acquinity's current CFO went out of his way to make it look like DEBTOR was a going concern business at a time when DEBTOR had ceased all business. Id. at ¶¶ 28-38. Indeed, Aqcuinity continued to use CREDITOR's software and ModernAd's data after acquiring substantially all of DEBTOR's assets. Id. at ¶¶ 39, 181. This added to the appearance that DEBTOR was still doing business. It also solidifies Acquinity's status as a continuation of DEBTOR's business. See id. at ¶ 33; Provenzano Aff., ¶ 4.

The connections between DEBTOR, its former owners, officers and directors, and Acquinity, and the active efforts to which they have all gone to obscure and conceal the true nature of the asset transfers at issue, raise too many red flags to believe that assets will not be further dissipated. Datran is unable to obtain the information as to the identity of the Doe Defendants or any remedy at all, without a Court order.

As to the fourth Disability Rights factor, the burden on Defendants to comply with Datran's discovery requests will be minimal because the requests are limited in time and scope. See Disability Rights, 234 F.R.D. at 6. Moreover, since the requested discovery is within the permissible scope under the FRCP, Defendants would be required to produce it in any event. Thus, there is minimal burden on Defendants to provide it now. See Biosense, 2013 WL

1611338 at *1 ("the information sought appears relevant to this case and therefore, expedited discovery will not prejudice [the defendants] since, apart from issues of confidentiality and privilege, the question is when, not if, they will have to provide the information").

Finally, the Rule 26(f) conference is at least two months away, if not longer.  Defendants have already requested a 30-day extension to answer the Complaint.  It has taken nearly two years to obtain a Judgment against Defendants, during which time Defendants have conveyed – and are continuing to convey – substantially all of DEBTOR's assets to themselves, individually, and, upon information and belief, to third parties.  Defendants have gone to extensive lengths to delay the disposition of CREDITOR's claims, and have failed to pay the Award or Judgment entered against them for over eight months.  Defendants are in the process of conveying all of DEBTOR's assets and Acquinity's assets to yet another bogus entity – 8333947 Canada .  If discovery is not conducted now, Defendants will continue to shuffle assets to additional potentially judgment-proof, sham entities with impunity.

Service of process was completed for the corporate Defendants on July 11, 2013 and for Defendant Warren Rustin on July 19, 2013. Responsive pleadings are due on August 30, 2013, by stipulation of the parties.  According to the schedule set out in the Court's Order Requiring Counsel to Confer, File Joint Scheduling Report and File Joint Discovery Report dated July 8, 2013 and Rules 26(f) and 16(b) of the FRCP, normal discovery would not begin until at least 2 months from now.  Furthermore, if the Doe Defendants are not uncovered through limited, immediate discovery, Datran will be unable to conduct the required 26(f) conference at all.  Thus, while the normal discovery process is several months away, Datran continues to be harmed without information as to the identity of all Defendants.  As such, we respectfully request that this Court grant expedited discovery immediately.

19

**<u>CONCLUSION</u>**

Without leave to engage in expedited discovery, CREDITOR has no way to recover the Award from the Doe Defendants or know if pre-judgment attachment of Defendants' property is necessary.  As Datran is unable to obtain the necessary identifying information and the good cause standard has been met, this Court should grant limited, expedited discovery on Defendants and the abovementioned third parties, require Defendants and the third parties upon whom Plaintiff serves discovery subpoenas to respond to the subpoenas within seven calendar days of the date of service and for such other relief as this Court deems just and proper

## CERTIFICATION OF LOCAL RULE 7.1 (e) CONFERENCE

Pursuant to Local Rule 7.1(e), the undersigned counsel has conferred with counsel for Defendant, Roland Potts, Esq., and is authorized to represent that the Defendants oppose the relief requested in this Motion.

**DATED** this 10th  day of September, 2013.

*HARTLEY LAW OFFICES, PLC*
Attorneys for Plaintiff
800 Southeast Third Avenue
Fourth Floor
Fort Lauderdale, Florida 33316
Telephone: (954) 357-9973
Facsimile: (954) 357-2275
Email: hartley@hartleylaw.net

By: /s/ Timothy M. Hartley
TIMOTHY M. HARTLEY
FL BAR NO. 979066

*LEWIS & LIN, LLC*
Attorneys for Plaintiff
45 Main Street, Suite 608
Brooklyn, NY 11201
Telephone: (718) 243-9323
Email: brett@iLawco.com

By: /s/ Brett E. Lewis
BRETT E. LEWIS

## <u>CERTIFICATE OF SERVICE</u>

I  HEREBY CERTIFY that on September 10, 2013, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system and on all counsel or parties of record identified on the attached service list below via email and/or U.S. Mail.

/s/Timothy M. Hartley
Timothy M. Hartley, Esq.
 Hartley@hartleylaw.net
HARTLEY LAW OFFICES, PLC
800 SE Third Avenue, Fourth Floor
Fort Lauderdale, Florida 33316
Tel. 954-357-9973
Fax: 954-357-2275
Attorney for Plaintiff

## SERVICE LIST

**_Onier Llopiz, Esq._** (FBN 579475)
Email: ol@lydeckerdiaz.com
**_Joan Carlos Wizel, Esq._** (FBN 37903)
Email: jcw@lydeckerdiaz.com
Email: rb@lydeckerdiaz.com
**_Roland Potts, Esq._** (FBN 087072)
Email: rp@lydeckerdiaz.com
Email: ag@lydeckerdiaz.com
LYDECKER DIAZ
1221 Brickell Avenue 19th Floor
Miami, Florida 33131
Tel. 305-416-3180
Fax: 305-416-3190
Attorneys for Defendants