IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT IN
AND FOR PALM BEACH COUNTY,
FLORIDA

Case No.: Case No.:

**50 2012 CA 001957 XXXX**

**AH**

MODERNAD MEDIA, LLC, a Florida
limited liability company f/k/a Pure Ads, LLC

Plaintiff,

vs.

DATRAN MEDIA CORP., a Delaware
limited liability company,

Defendant.                              /

COPY
RECEIVED FOR FILING

JAN 31 2012

SHARON R. BOCK
CLERK & COMPTROLLER
CIRCUIT CIVIL DIVISION

## COMPLAINT

Plaintiff, MODERNAD MEDIA, LLC f/k/a PureAds ("ModernAd") sues

Defendant, DATRAN MEDIA CORP. ("Datran"), and alleges:

### Jurisdiction, Venue and Parties

1.      This is an action for damages exceeding $15,000.00, exclusive of

attorneys' fees, costs and interest.

·2.      At all times material hereto, ModernAd is a Florida limited liability

company with its principal place of business located in Palm Beach County, Florida.

ModernAd provides high-quality marketing services, including e-mail and affiliate

marketing in order to assist its customers effectively reach their target consumers and

maximize their return on investment.

3.      Pure Ads LLC ("PureAds") was the predecessor in interest to ModernAd

and collected, maintained and owned a proprietary computerized data base composed of

consumer names, postal addresses, telephone numbers and e-mail addresses.

4.      At all times material hereto, Datran was and continues to be a Delaware limited liability company.

5.      Venue is appropriate in Palm Beach County, Florida because ModernAd conducts business within this jurisdiction, and the cause of action accrued in Palm Beach County.

6.      Plaintiff has complied with all conditions precedent to the bringing of this action, or alternatively, Defendant has waived all conditions.

General Allegations

A.      The Licensing Agreement between PureAds and Datran

7.      Prior to August 24, 2007, PureAds and Datran entered into negotiations for the licensure of a proprietary computerized database composed of names, postal addresses, telephone numbers and associated e-mail addresses of individuals who have agreed to receive marketing communications from PureAds or other third parties (the "Database").

8.      As a result of the parties' negotiations, PureAds agreed to grant Datran a license for the information contained in the Database, including individuals first and last names, postal addresses, e-mail addresses, telephone numbers, IP addresses, time/date stamps, and original site source URLs.

9.      The parties agreed that Datran's license was for the purpose of providing marketing campaigns on behalf of PureAds that included e-mail marketing, response marketing, telemarketing and/or direct mail marketing.

10.     In exchange for the license, Datran agreed to provide PureAds a license fee in the amount of fifty percent (50%) of the net revenue generated by Datran in

connection with the use of the information contained in the Database (the "Net Revenue").

11.     The parties also agreed that Datran could subtract from the Net Revenue generated a $0.25 cpm fee for every 1000 e-mails sent for sending fees, chargebacks, and bad debt (the "CPM").

12.     Datran further agreed to keep accurate records of the Database usage, Net Revenue, and CPM. Each month Datran was responsible for providing an accurate breakdown to PureAds of the expenses and revenues generated through the use of the Database.

13.     PureAds and Datran also agreed that the license agreement will be in full force and effect for one (1) year and automatically renew for an additional one-year period, unless either party provided a notice of its intent not to renew the agreement.

14.     In order to ensure that PureAds received any notice under the licensure agreement, Datran agreed to provide written notice under the agreement by personal delivery, express courier, confirmed facsimile, confirmed e-mail or certified or registered mail, return receipt requested to Ed Schifer. The purpose of designating a specific person to whom notices must be directed under the agreement was to ensure a PureAds employee with sufficient knowledge of the license agreement could evaluate Datran's correspondence to ensure compliance with the agreed to terms.

15.     PureAds and Datran also agreed any further amendments to the terms and conditions of their agreement to license the Database would be by written agreement executed by the parties.

3

16.     Although the parties negotiated and eventually agreed to the terms and conditions of the license agreement outlined above, PureAds and Datran never reduced this agreement to an *executed* written contract. During the course of their business relationship, however, both PureAds and Datran's undertook the obligations and enjoyed the benefits detailed above. Both PureAds and Datran's conduct and course of dealing created benefits and obligations for each party.

17.     Specifically, PureAds allowed Datran unlimited access to its Database and provided it individuals' information for marketing campaigns. In return, Datran was to collect the income, provide adequate reports on expenses and revenues, and provide PureAds 50% of the net revenue, minus the $.25 CPM.

18.     ModernAd acquired PureAds' rights under the agreement and Datran continued the arrangement with ModernAd at all relevant times hereto.

B.     Unilateral Change to the CPM

19.     On November 16, 2009, Datran forwarded to ModernAd's a generic email which they claim was sent to a ModernAd executive on July 1, 2008, with the subject "Partner Update" to ModernAd and, upon information and belief, several other third party business partners. The e-mail was sent from a generic address Datran used to send newsletters and other mass communications. The November 16, 2009 email is attached as Exhibit "A."

20.     The email, which was addressed to "Datran Media List Partner," stated that any fees associated with the utilization of Datran's premium mailing systems will be borne equally between Datran and its partners.

4

21. The Partner Update email, however, does not reference the licensing agreement where the parties had previously agreed to a CPM amount.

22. The Partner Update email did not indicate that ModernAd was using Datran's "premium mailing systems" or was specifically subject to the increase.

23. Additionally, the Partner Update email was not sent to Ed Schifer or confirmed by ModernAd.

24. The Partner Update email was purposefully vague and ambiguous so ModernAd would not be adequately informed that Datran was unilaterally and materially changing the terms and conditions of the licensing agreement.

25. The Partner Update email was deceptive because it does not: (1) clearly state that the increase in costs applied to ModernAd's agreement with Datran; (2) define the difference "premium mailing systems" and the normal mailing systems; and (3) does not state the increased amounts that would be deducted from the Net Revenue.

26. Datran designed the Partner Update email to conceal the additional costs per mailing so that it could arbitrarily withhold additional amounts from ModernAd's portion of Net Revenue without committing to a specific agreed to formula or method.

27. ModernAd never agreed to this unilateral increase to the CPM.

28. Datran also failed to advise ModernAd of the increased CPM when it reported its breakdown of the expenses and revenues generated through the use of the Database.

29. Although the reports after the Partner Update email contained each month's "mail cost," they did not disclose the methodology for determining the amounts disclosed or the increased CPM rate. As a result, ModernAd could not determine from

5

the revenue report that the CPM had been clandestinely altered by Datran, nor could it determine the amount Datran was impermissibly withholding from ModernAd's Net Revenue.

30.    Upon information and belief, Datran also under reported its Net Revenue owed to ModernAd on a monthly basis.

31.    ModernAd was damaged because of Datran's deceptive and unfair practice of (1) failing to properly inform ModernAd that it was withholding more CPM than agreed; (2) unilaterally and impermissibly withholding funds otherwise owed to ModernAd; and (3) failing to clearly and accurately report the amounts of CPM withheld from ModernAd's portion of the Net Revenue.

## COUNT I – VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

32.    ModernAd adopts and realleges the allegations in paragraphs 1 through 30 as if fully set forth herein.

33.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful unfair methods of competition, unconscionable acts or practices, and unfair and/or deceptive acts or practices in the conduct of any trade or commerce. *See* Section 501.204, Florida Statutes (2007).

34.    At all relevant times material hereto, ModernAd was a "consumer" as defined by Section 501.203, Florida Statutes.

35.    At all times material hereto, Datran committed and engaged in the following deceptive and unfair trade practices:

6

(a)     Datran, unilaterally and without ModernAd's consent, impermissibly increased the CPM for the use of the Database and withheld more funds from the Net Revenue than was agreed to by the parties;

(b)     Datran provided ModernAd inadequate notice of its intent to increase the CPM because:

(i)     The Partner Update was generalized, vague, and sent to numerous unrelated companies;

(ii)     The Partner Update email failed to clearly state that the unspecified increase in costs specifically applied to ModernAd's agreement with Datran for the use of the Database;

(ii)     The Partner Update email failed to define the difference between the "premium mailing systems" and the normal mailing systems used by Datran in its marketing campaigns;

(iii)     The Partner Update email does not specify the increased amounts that would be deducted from the Net Revenue;

(iv)     The Partner Update email was not sent to Ed Schifer, as agreed to by the parties;

(v)     Datran never confirmed ModernAd received and understood the impact of the Partner Update email on the agreement to license the Database; and

(vi)     The Partner Update email was sent to an individual at the Company with whom Datran has had only minimal contact and was not the person at ModernAd with whom Datran had regular communication regarding the database license agreement.

(c)    Datran failed to disclose and accurately report the increased CPM in the monthly revenue reports, including the methodology and rate used for determining the amounts withheld; and

(d)    Datran underreported Net Revenues owed to ModernAd in the monthly revenue reports.

36.    As set forth herein, Datran has engaged in misrepresentations, acts, practices or omissions which are material, and which are likely to mislead consumers acting reasonably under the circumstances; or Datran has committed acts or practices in trade or commerce which offend established public policy and are unethical, oppressive, unscrupulous or substantially injurious to consumers. Thus, Datran has engaged in unfair and/or deceptive acts or practices in the conduct of any trade or commerce in violation of § 501.204(1), Fla. Stat. (2007).

37.    Datran has engaged in acts and practices when it knew or should have known that its conduct was unfair or deceptive, and thus Datran has willfully used, or is willfully using, a method, act or practice declared unlawful under § 501.204, Fla. Stat. (2007).

38.    As a result of Datran's unfair and deceptive practices, ModernAd has been damaged and continues to be damaged.

WHEREFORE, ModernAd demands a judgment be entered against Datran for damages, interest, attorneys' fees, costs, and for such other and further relief as this Court deems just and proper.

Count II – Declaratory Judgment

39.    ModernAd adopts and realleges the allegations in paragraphs 1 through 30 as if fully set forth herein.

40.    ModernAd seeks a judgment from the Court declaring the American Arbitration Association proceeding in New York has no jurisdiction over any claim stemming from the licensing of the Database to Datran and that ModernAd has a right to seek redress in state court.

41.    Defendant filed an arbitration case with the American Arbitration Association ("AAA") styled *Datran Media Corp. v. ModernAd Meida fka Pureads*, Case Number: 13 117 Y 858 11 (the "Arbitration Case") on March 24, 2011, based on a Media Services Agreement dated November 29, 2007. *See* Demand for Arbitration attached as Exhibit "B."

42.    On May 2, 2011, in an effort to protect its interests, ModernAd filed a counterclaim in the Arbitration Case alleging, among other things, that Datran violated the written List Management Agreement ("LMA"), which, at the time, ModernAd believed had been executed by the parties. *See* ModernAd's Counterclaim attached as Exhibit "C" and the unexecuted LMA attached as Exhibit "D."

43.    The Counterclaims are independent to the alleged violations asserted by Datran in the Media Services Agreement, under which Datran brought its original demand for arbitration.

44.    As discussed above, ModernAd only recently discovered that the parties never executed the LMA after conducting a diligent search of its records.

9

45.     Defendant was also unable to produce an executed version of the LMA in response to ModernAd's discovery request in the Arbitration Case.

46.     On May 27, 2011, Defendant answered the counterclaim in the Arbitration Case asserting there was no executed LMA. *See* Answer to ModernAd's Counterclaim attached as Exhibit "E."

47.     Datran has also represented to the arbitrator that "neither party has been able to locate a fully execute copy of the List Management Agreement at issue." *See* Letter requesting permission to file a summary judgment attached as Exhibit "F."

48.     There is a bona fide, actual, present, and practical need for a declaration that there is no agreement for arbitration between Datran and ModernAd regarding disputes arising under the Data License and List Management Agreement.

49.     The declaration deals with a present, ascertained, or ascertainable state of facts.

50.     The declaration deals with a present controversy as to the arbitrability of the disputes arising under the Data License and List Management Agreement.

52.     ModernAd's rights are dependent upon the facts or the law applicable to the facts because ModernAd's right to access the Courts is dependent on the Court's determination that the claims arising under the Data License and List Management Agreement are not subject to arbitration.

53.     Datran has or reasonably may have an actual, present, adverse, and antagonistic interest in the subject matter, either in fact or law.

54.     The antagonistic and adverse interests are all before the Court by proper process.

55.     The relief sought is not merely the giving of legal advice by the Courts or the answer to questions propounded from curiosity.

WHEREFORE, Plaintiff demands this Court declare there is no agreement requiring ModernAd submit to binding arbitration for licensing its Database in the Arbitration Case, no arbitrable issues exist, and ModernAd has not waived its Constitutional right as a Florida Corporation to seek redress in Florida's Courts and grant such other and further relief as this Court deems just and proper.

Count III – Injunction pursuant to Fla. Stat. § 682.03

56.     ModernAd adopts and realleges the allegations in paragraphs 1 through 30 and 39 through 46 as if fully set forth herein.

57.     ModernAd brings this count to temporarily and permanently enjoin the New York Arbitration pursuant to Fla. Stat. § 682.03 (4), which allows a court to "stay an arbitration proceeding commenced... if it shall find that no agreement or provision for arbitration subject to this law exists between the party making the application and the party causing the arbitration to be had."

58.     ModernAd has a clear right to the injunction because there is no executed agreement between it and Datran to arbitrate disputes arising from licensing the Database.

59.     ModernAd does not have an adequate remedy at law because requiring ModernAd to arbitrate its claims would deny it the constitutionally protected right to access the courts.

11

60.    ModernAd would be irreparably harmed without an injunction because the Arbitration Case, which is scheduled to be heard in March 2012, has limited discovery and less procedural safeguards than those provided by Florida courts.

· 61.    ModernAd has a clear legal right to the requested relief because there is no executed agreement submitting it the binding arbitration.

62.    ModernAd has a substantial likelihood of prevailing on the merits and Fla. Stat. § 682.03 specifically authorizes the relief requested.

63.    The public interest will be served by the temporary injunction because it promotes access to the Courts by aggrieved Florida corporations.

WHEREFORE, Plaintiff demands this Court temporarily and permanently enjoin the Arbitration Action and grant such other and further relief as this Court deems just and proper.

### Demand for Jury Trial

64.    Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: January 31ˢᵗ, 2012.

Respectfully submitted,

LYDECKER | DIAZ
*Counsel for Plaintiff*
1221 Brickell Avenue, 19th Floor
Miami, Florida 33131
Telephone: (305) 416-3180
Facsimile:  (305) 416-3190

By: _____
     ALAN FELDMAN, ESQ.
     FBN: 797251
     AARON FINESILVER, ESQ.
     FBN: 577022
     ONIER LLOPIZ, ESQ.
     FBN: 579475
     ROLAND POTTS, ESQ.
     FBN:0087072

13



**From:** Datran Media [mailto:DatranMedia@Datran-News.com]
**Sent:** Monday, November 16, 2009 12:55 PM
**To:**
**Subject:** [SP] Partner Update



Dear Datran Media List Partner,
As you know, the team here at Datran Media is continually working to deliver the best results for our clients. Through hard work, talent, and technology, we have dedicated ourselves to the ongoing pursuit of excellence and a commitment to driving value. As we have prided ourselves on operational efficiencies we have been able to achieve strong ROI for our partners, year in and year out. Given the rising cost to build and maintain a state-of-the-art technology infrastructure, we have examined the total return on various aspects of our operations and have found areas which can be optimized, particularly our premium mailing systems. So that we are able to stay aligned with our partners - effective immediately - any fees associated with the utilization of premium mailing systems will be borne equally between us and our partners and will allow us to continue to leverage this valuable component of our network. We are confident that the developments in our core business will result in greater returns for our partners over the coming months and we look forward to more collaboration with you on even more ways to create value together. If you have any questions, you can contact our VP of Client Services, Michael Lewis, directly at (212) 706-4830.

Sincerely,

Doug Smith
CFO
Datran Media

About us                          Thought Leadership

Digital Media Solutions           News & Press

Email Services                    Contact us

 Find us on
Facebook

 Go to Datran Media Home

© Copyright 2008, *Datran Media Corp.* All Right Reserved.





Sponsored by: Aperture

A Datran Media Solution

*Quinn Jalli, Esq.*
*Datran Media*
Senior Vice President of List
Management and Chief Privacy
Officer
345 Hudson St, 5th Floor
New York, NY 10014
Email
Tel: (212)-706-4897

This electronic communication, and all information herein, including files attached hereto, is private, and is the property of the sender. This communication is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure of; dissemination of; distribution of; copying of; or, taking any action in reliance upon this communication, is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone, 212-706-9781, AND DESTROY THE ORIGINAL AND ALL COPIES OF THIS COMMUNICATION. Thank you

**EXHIBIT B**

American Arbitration Association
*Dispute Resolution Services Worldwide*

Please visit our website at www.adr.org if you
would like to file this case online. AAA Case Filing
Services can be reached at 877-495-4185.

**COMMERCIAL ARBITRATION RULES
DEMAND FOR ARBITRATION**

| | |
|---|---|
| *MEDIATION: If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box.* ☐ | |
| *There is no additional administrative fee for this service.* | |

| Name of Respondent | Name of Representative (if known) |
|---|---|
| Acquinity Interactive, fka ModernAd Media, fka PureAds | Shannon Gierasch |
| Address | Name of Firm (if applicable) |
| 2200 S.W. 10th St. | The Gierasch Group, LLC |
| | Representative's Address |
| | 3520 Thunderhill Road |

| City | State | Zip Code | City | State | Zip Code |
|---|---|---|---|---|---|
| Deerfield Beach | FL | 33442 | York | PA | 17402-4440 |
| Phone No. | | Fax No. | Phone No. | | Fax No. |
| 954-312-4740 | | 954-312-4940 | 717-880-1994 | | |
| Email Address: | | | Email Address: | | |
| scottm@acquinityinteractive.com | | | sglerasch@yahoo.com | | |

The named claimant, a party to an arbitration agreement dated November 29, 2007_____, which provides for arbitration under the
Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

**THE NATURE OF THE DISPUTE**
Breach of contract arising out of Respondent's failure to pay for services rendered pursuant to the Hosting Services Agreement, dated
November 29, 2007.

| Dollar Amount of Claim $740,000 | Other Relief Sought: ✗ Attorneys Fees    ✗ Interest |
|---|---|
| | ✗ Arbitration Costs    Punitive/ Exemplary  ✗ Other Accruing |

Amount Enclosed $8,200_____  In accordance with Fee Schedule:  ◯ Flexible Fee Schedule    ✗ Standard Fee Schedule

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:
Arbitration experience; commercial contract experience; internet agreement experience

Hearing locale New York, NY_____  (check one) ◯ Requested by Claimant   ✗ Locale provision included in the contract

| Estimated time needed for hearings overall: | Type of Business: Claimant Digital Marketing Technology |
|---|---|
| ___14___ hours or ___2___ days | Respondent Email Acquisition and Marketing |

Is this a dispute between a business and a consumer?  Yes ✗ No  Does this dispute arise out of an employment relationship?  Yes ✗ No

If this dispute arises out of an employment relationship, what was/is the employee's annual wage range?  Note: This question is required
by California law. ◯ Less than $100,000 ◯ $100,000 - $250,000 ◯ Over $250,000

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration
Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity
to file an answering statement.

| Signature (may be signed by a representative)  Date: 3/24/11 | Name of Representative |
|---|---|
| | Brett E. Lewis, Esq. |
| Name of Claimant | Name of Firm (if applicable) |
| Datran Media Corp. | Lewis & Hand, LLP |
| Address (to be used in connection with this case) | Representative's Address |
| 345 Hudson Street, 5th Floor | 45 Main Street, Suite 608 |

| City | State | Zip Code | City | State | Zip Code |
|---|---|---|---|---|---|
| NY | NY | 10014 | Brooklyn | NY | 11201 |
| Phone No. | | Fax No. | Phone No. | | Fax No. |
| 888.494.4764 | | | 718.243.9323, Ext. 2 | | 718.243.9326 |
| Email Address: | | | Email Address: | | |
| Legal@DatranMedia.com | | | Brett@LewisHand.com | | |

To begin proceedings, please send a copy of this Demand and the Arbitration Agreement, along with the filing fee as
provided for in the Rules, to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100
Voorhees, NJ  08043.  Send the original Demand to the Respondent.

## DESCRIPTION OF CLAIM

The Parties

1. Claimant Datran Media Corp. is Delaware corporation with a principal place of business of 345 Hudson Street, 5th Floor, New York, NY 10014 ("Datran").

2. Respondent ModernAds Media LLC, f/k/a, PureAds LLC is a Florida company with a principal place of business located at 2200 SW 10th St., Deerfield Beach, FL 33442 ("ModernAds").

Jurisdiction

3. The operative contract between the parties – a Master Services Agreement, dated November 29, 2007 (the "Agreement") – contains a Governing Law clause, which provides that: "[t]his Agreement and each Attachment shall be governed by, interpreted and construed in accordance with the laws of the State of New York, without reference to its conflict of laws rules or principles." Agmt., §14.1, attached hereto as Exhibit A.

4. The Agreement contains an arbitration clause mandating that, "[a]ny dispute or controversy arising out of or related to this Agreement or any breach hereof shall be settled by binding arbitration in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association before the American Arbitration Association in the City of New York, State of New York." Agmt., §12.1.

5. The Agreement also provides that, "Any award shall be final and binding and judgment thereon may be entered in any court of competent jurisdiction." Agmt., § 12.1.

<u>The Agreement</u>

6. The parties entered into the Agreement on November 29, 2007. The Agreement contains general terms and conditions applicable to services ("Services") offered by Datran to Respondent, which Services were detailed in various attachments. *See* Agmt., §§ 1.1, 1.2.

7. Among other provisions, the Agreement provides: "The Services provided by [Datran] shall be at the pricing set forth in the applicable Attachment . . . [Datran] will submit invoices for charges, fees and expenses on a monthly basis." Agmt., § 2.1.

8. The Agreement also provides that, "If a party disputes the terms of an invoice or commission statement in good faith, that party must raise such dispute with the other party *within ten (10) days* of its receipt of such invoice or commission statement, or that party's right to dispute such invoice or commission statement *shall be waived.*" Agmt., § 2.3.2 (emphasis added).

9. The Agreement also makes clear that, "[a]t no time may a party withhold payment of fees or commissions that are not subject to a good faith dispute between the parties." Agmt., § 2.3.2.

10. In the event that a payment required under the Agreement is late, such payment "shall be subject to any costs of collection, including reasonable legal fees, and shall bear interest at the rate of one and one-half percent (1.5%) per month (prorated for partial periods) or at the maximum rate permitted by law, whichever is less." Agmt., § 2.3.3.

2

11. The Agreement further provides: "In the event any action is brought to enforce any provision of this Agreement or any Attachment, or to declare a breach of this Agreement, the prevailing party shall be entitled to recover, in addition to any amounts awarded, reasonable legal and other related costs and expenses, including attorney's fees, incurred thereby." *See* Section 12.2.

12. On or about January 9, 2008, Datran and ModernAds entered into the Skylist Hosted Services Agreement (the "Skylist Agreement"), which was attached to the Agreement as Attachment F. *See* Exhibit B. The Skylist Agreement also incorporated the Agreement by reference.

13. Under the Skylist Agreement, Datran was to provide ModernAds with "access to technology to be used in connection with email marketing services." Skylist Agmt., § 1.1.

14. Payment is due under the Skylist Agreement on the first day of each month. *See* Skylist Agmt., § 4.3.

15. The term of the Skylist Agreement was twelve months from the execution of the agreement, and contained an automatic renewal clause, which renewed the agreement for another twelve months, unless ModernAds provided, "written notice of termination thirty days prior to the end of the then current term." Skylist Agmt., § 10.1.

16. On September 26, 2008, Datran and ModernAds amended the Agreement to name ModernAds as a party to the Agreement, replacing PureAds. *See* Exhibit C.

17. As of November 2, 2009, Datran and ModernAds Amended the Skylist Agreement by agreeing to a minimum monthly Hosted eMarketing Price of

3

$92,500. The amended Skylist Agreement had an initial term of fourteen months, beginning on the execution date and ending, "the later of (i) fourteen (14) months thereafter or (ii) the last day of the month December 31, 2010." Skylist Agmt., Amendment #3, attached as Exhibit D. Unless ModernAds provided written notice of termination sixty days prior to the end of the then current term, the contract would automatically renew for an additional twelve-month term.

18. ModernAds did not provide notice of termination of the Skylist Agreement at any time. Accordingly, the Skylist agreement automatically renewed for an additional twelve-month term on January 2, 2011.

19. At all times following the execution of the Skylist Agreement, Datran provided email marketing services to ModernAds in accordance with the terms and conditions of such agreement. ModernAds accepted such services, without complaint, and received the benefit of the services.

20. ModernAds paid Datran $92,500 per-month from November 2009 through July 2010 for Services rendered under the Skylist Agreement.

21. ModernAds, however, has failed to pay for the Services it has received under the Skylist Agreement since July 2010. ModernAds owes Datran $92,500 per-month, for the months of August 2010 through March 2011, for a total of $740,000. Datran's damages are continuing to accrue at the rate of $92,500 per month. Datran's damages will continue to accrue until the Skylist Agreement is terminated, which can occur no earlier than January 2, 2012, provided that the Skylist Agreement is terminated in accordance with its terms.

4

22. ModernAds also owes Datran interest in the amount of 1.5% per month, plus costs of collection and attorney's fees.

### CLAIM NO. 1:
### Breach of Contract

23. Claimant, hereby, repeats and re-alleges paragraphs 1 to 22.

24. The parties are both sophisticated corporate entities. The contracts at issue are legally binding documents, negotiated at arms length, with the assistance of counsel.

25. Datran provided email marketing services in accordance with the Skylist agreement.

26. ModernAds failed to pay for those services.

27. Under the terms and conditions of the Agreement, ModernAds was required to dispute an invoice within ten days of its receipt of such invoice, or its right to dispute the invoice was waived.

28. ModernAds failed to complain within ten days of the date of receipt of any invoice under the Skylist Agreement. Accordingly, ModernAds waived its right to dispute each such invoice.

29. The Skylist Agreement bars any party from withholding fees or commissions that are not the subject of a good faith dispute between the parties.

30. There is no good faith dispute between the parties over payment of fees or commissions. ModernAds failed to complain, at any time, about the services performed by Datran Media under the Skylist Agreement. ModernAds never disputed its obligation to pay the invoices – it simply failed to pay.

31. ModernAds' failure to pay the August 2010 through March 2011 invoices constitutes a material breach of the Agreement and the Skylist Agreement.

32. As a result of ModernAds' breaches of the Agreement and the Skylist Agreement, Datran is entitled to $740,000 in damages, plus interest, plus costs of collection, arbitration fees, attorneys' fees, and such other damages as may accrue for Datran's provision of the Services through the end of the term of the Skylist Agreement.

WHEREFORE, Datran Media Corp. prays for the forgoing relief, and such further relief as this Panel deems proper.

Respectfully Submitted,

LEWIS & HAND, LLP
45 Main Street, Suite 608
Brooklyn, NY 11201
(718) 243-9323 ext. 2

By: _____
Brett E. Lewis

6

01/09/2008  17:31.    5517585156.          PUREADS  LLC.                    PAGE   02



## MASTER SERVICES AGREEMENT

This Master Services Agreement ("Agreement") is entered into as of this 29th day of November 2007 (the "Effective Date") by and between Datran Media Corp., with its principal place of business located at 345 Hudson Street, 5th Floor, New York, New York 10014, ("DM"), and PureAds, a Florida company, with a principal place of business located at 2701 NW Boca Raton Blvd., Ste. 111, Boca Raton, FL 33431 ("Company"), and sets forth the terms and conditions under which DM, through its affiliated entities or subsidiaries, will provide certain services to Company as may from time to time be mutually agreed upon. DM and Company may be collectively referred to hereinafter as "the parties." This Agreement provides the general terms and conditions for use in connection with services provided by DM entities to Company. Each Attachment hereto shall bind the individual contracting parties to such Attachment and shall not bind Datran Media Corp. nor any other DM entity unless a party thereto.

1.    Services.

      1.1    Various services (the "Service(s)") to be provided to Company by DM, through its affiliates or subsidiaries, shall be described on separate, mutually executed Services attachments (the "Attachments") as may from time to time be issued hereunder. Each Attachment shall define with specificity the Services, the term, the applicable pricing, and other appropriate terms and conditions applicable to such Services.

      1.2    Each Attachment shall be governed by the terms and conditions of this Agreement; however, in the event of any conflict between this Agreement and an Attachment, the provisions of the Attachment shall prevail.

      1.3    Notwithstanding anything to the contrary in an Attachment or in this Agreement, the parties agree that neither party shall be required to begin any work under an Attachment until such Attachment has been executed by the parties.

      1.4    Company understands and agrees that by executing this Agreement, Company is not committing or obligating itself to use the Services of DM and that no work or charges are or shall be authorized hereunder unless and until authorized in writing by an Attachment signed by both parties.

      1.5    In the event Company has an existing agreement with DM for a particular DM service which agreement is not superseded by an Attachment to this Agreement for such Service (a "Pre-Existing Agreement"), such Pre-Existing Agreement shall be supplemental to this Agreement and shall remain in full force and effect to govern the particular relationship between the parties as set forth in such Pre-Existing Agreement.

      1.6    Subject to Section 4, DM shall have the right to use third parties and consultants in performance of its obligations and the Services hereunder and, for purposes of this Agreement, all references to DM or its employees shall be deemed to include such third parties and consultants.

1.7   This Agreement is non-exclusive to DM and DM shall have the right to enter into similar agreements with other third parties.

1.8   Company agrees that this Agreement constitutes an exclusive agreement with DM for the Services provided hereunder in each applicable attachment.

2.   **Price and Payment**

2.1   Payments to DM.   The Services provided by DM shall be at the pricing set forth in the applicable Attachment. In the event an Attachment does not reference any specific pricing, such Services shall be provided at DM's then current standard time and material rates and charges. DM will submit invoices for charges, fees and expenses on a monthly basis. DM's obligations hereunder are conditioned upon Company's fulfillment of its payment obligations, as applicable. If Company fails to pay fees invoiced by DM within the time frame specified in the applicable Attachment(s), DM shall have the right to suspend performance of the applicable Service(s) without notice to Company, until Company pays all such overdue amounts. In the event that DM concludes reasonably and in good faith that Company may not be able to perform its obligations under this Agreement or an Attachment, DM reserves the right to suspend, without prior notice, its performance under the Agreement or an Attachment.

2.2   Payments to Company.   Commissions or other fees payable to Company by DM shall be paid to Company as set forth in the applicable Attachment(s).

2.3   Payments to Either Party.   The following terms apply to all payments made by one party to the other party:

2.3.1   Payment of each invoice shall be in U.S. dollars and shall be paid within the timeframe specified in the applicable Attachment(s).

2.3.2   If a party disputes the terms of an invoice or commission statement in good faith, that party must raise such dispute with the other party within ten (10) days of its receipt of such invoice or commission statement, or that party's right to dispute such invoice or commission statement shall be waived. At no time may a party withhold payment of fees or commissions that are not subject to a good faith dispute between the parties.

2.3.3   Any late payment shall be subject to any costs of collection, including reasonable legal fees, and shall bear interest at the rate of one and one-half percent (1.5%) per month (prorated for partial periods) or at the maximum rate permitted by law, whichever is less.

2.3.4   During the term of this Agreement and applicable Attachment(s) and for at least one (1) year thereafter, each party shall maintain accurate books and records relating to any payments due to the other party hereunder. Each party shall have the right to examine, inspect, audit, review and copy or make extracts from all such books, records and any source documents used in the preparation thereof during normal business hours upon written notice to the other party at least five (5) business days prior to the commencement of any such examination, inspection, review or audit. Any such audit will be conducted in a manner that does not reasonably interfere with the other party's business activities and shall be conducted no more frequently than once every six (6) months. If a party is owed payment, the delinquent party shall immediately make any overdue payments disclosed by the audit plus applicable interest. Such audits shall be at the auditing party's expense; however, if the audit reveals overdue payments in excess of ten percent (10%) of the payments owed to date, the delinquent party shall immediately pay the cost and expense of such audit. Such audit shall be limited to those books and records that specifically relate to information pertinent to payments due the other party.

3.   **Proprietary Rights and Restrictions**

Daifuk Media Corp. Confidential
Page 2 of 10

3.1   The parties agree that (a) Company shall retain and own all proprietary rights in and to its business, any data provided by Company to DM and Company's trademarks and (b) DM shall retain and own all proprietary rights in and to all of DM's intellectual property, including but not limited to any Services provided hereunder (including all software, source codes, modifications, updates and enhancements thereof or any other aspect of the Services), all data obtained by DM from commercially available sources or from other sources that are overlayed onto data provided by Company, any responses, confirmations or other forms of information from individuals contacted by DM utilizing data provided by Company to DM, DM marketing materials, all DM entities' websites, and any trademarks and logos which are owned or controlled by DM and made available to Company through the Services or otherwise.

3.2   The parties understand and agree that DM is the sole owner of any and all intellectual property rights associated with all creative copy, graphics, design, content, materials or other information created by DM on Company's behalf. No images, graphics, copy, content, materials or subject lines may be used by Company without the prior express written permission of DM.

3.3   Notwithstanding anything contained in this Section 3, unless otherwise expressly agreed to in writing, all suggestions, solutions, improvements, corrections, and other contributions provided by Company to DM regarding the Services or other DM materials provided to Company, shall be owned by DM, and Company hereby agrees to assign any and all such rights to DM, and Company shall execute any documents necessary to make such assignment effective. Nothing in this Agreement shall preclude DM from using in any manner or for any purpose it deems necessary, the know-how, techniques, or procedures acquired or used by DM in the performance of any Services hereunder.

3.4   No implied licenses are granted herein, and Company may not use any Service except pursuant to the limited rights expressly granted in this Agreement and Attachments hereto.

3.5   Company shall not reverse engineer the Service, or disassemble, decompile or otherwise apply any procedure or process to the Service in order to ascertain, derive and/or appropriate for any reason or purpose, the source code or source listings for the Service or other software provided under this Agreement or any Attachment, or any algorithm, process, procedure or trade secret information contained in the Service or any software provided by DM.

4.    Confidentiality.

4.1   The terms of this Agreement and each Attachment and all information and data that one party (the "Receiving Party") has received or will receive from the other party (the "Disclosing Party") about and in the course of providing the Services, including DM's proprietary systems, operations and software and other matters that are proprietary and confidential information, including without limitation any information that is marked as "confidential" or should be reasonably understood to be confidential or proprietary to the Disclosing Party and any reference manuals compiled or provided hereunder ("Confidential Information").

4.2   Without granting any right or license, the obligations of the parties hereunder shall not apply to any material or information that (i) is or becomes a part of the public domain through no act or omission by the Receiving party; (ii) is independently developed by the Receiving party without use of the Disclosing party's Confidential Information; (iii) is rightfully obtained from a third party without any obligation of confidentiality to the Receiving party; or (iv) is already known by the receiving party without any obligation of confidentiality prior to obtaining the Confidential Information from the Disclosing party. In addition, neither party shall be liable for disclosure of Confidential Information if made in response to a valid order of a court or authorized agency of government, provided that notice is promptly given to the party whose Confidential Information is to be disclosed so that such party may

01/03/2008  17:31    5517505156              EUREADS LLC                        PAGE  05

seek a protective order and engage in other efforts to minimize the required disclosure. The parties shall cooperate fully in seeking such protective order and in engaging in such other efforts.

4.3.   Each party agrees at all times to keep strictly confidential all Confidential Information belonging to the other party. Each party agrees to restrict access to the other party's Confidential Information only to those employees or subcontractors who (i) require access in the course of their assigned duties and responsibilities and (ii) have agreed in writing to be bound by provisions no less restrictive than those set forth herein.

4.4.   The parties agree that a breach of this Section would result in irreparable injury to the non-breaching party for which monetary damages would be inadequate. In such event, the non-breaching party shall have the right to seek, in addition to other remedies available to it by law or pursuant to this Agreement, immediate injunctive relief against the breaching party without the need to post a bond.

5.     Company's Facilities.

5.1.   To the extent required by DM, Company will make available to DM certain use of its facilities, computer resources, software programs, networks, personnel, and business information as are required to perform the Services set forth in any Attachment hereunder.

5.2.   DM agrees to comply with Company's rules and regulations regarding safety, security, and conduct, provided DM has been made aware of such rules and regulations.

6.     Representations and Warranties.

6.1.   Each party represents and warrants that at all times:

6.1.1   It has the right and full power and authority to enter into this Agreement and each applicable Attachment hereto.

6.1.2   It is duly organized and validly existing and in good standing under the laws of the state of its incorporation or formation.

6.1.3   It shall at all times fully comply with all applicable statutes, rules and regulations with respect to its business.

6.1.4   All of the data, images, graphics, design and content supplied to the other party was obtained, collected, compiled and/or complies with all applicable laws and/or regulations, including without limitation laws and regulations governing the creation and marketing of online materials, false and/or deceptive advertising, sweepstakes and/or gambling, adult content, comparative advertising, trade disparagement, libel, defamation and/or infringement of any kind, and that such data, images, graphics, design and content are not and will not be obscene, pornographic or indecent.

6.1.5   All data, images, graphics, design and content, including subject lines, products and/or services linked to any advertisements it provides to the other party are current, accurate, complete as possible, factually accurate and do not contain any fraudulent or deceptive materials, or material that misrepresents, ridicules or attacks an individual or group on the basis of age, color, national origin, race, religion, sex, sexual orientation or handicap.

6.1.6   Subject to applicable regulatory requirements, the content does not promote or make claims that are not easily provable, nor does it falsely represent the product, service or message being communicated.

6.1.7   The use, reproduction, distribution, or transmission of any data, images, graphics, design or content will not, and any data, images, graphics, design, content or web sites linked to the data, images, content or advertisements will not, violate any foreign or domestic, federal, state or local law, rule or regulation, or any rights of any third party including, but not limited to, any copyright, patent,

01/09/2008   17:51   6617566155                    PUREADS LLC                         PAGE   09

trademark, trade secret or other proprietary or property right, or constitute false advertising, unfair competition, defamation, invasion of privacy or rights of publicity, or any other right of any person or entity.

6.1.8   All data, images, graphics, design and content supplied by one party to the other party will be in compliance with any exclusion policies for advertising provided by the other party, as amended from time to time, in that party's sole discretion, including without limitation, pornography, firearms, Internet gambling, ammunition or tobacco products.

6.1.9   That all data, images, graphics, design and content supplied by one party to the other party will be distributed in accordance with the specifications set forth in the applicable Attachment(s) hereto.

6.1.10   It has all necessary intellectual property rights and/or licenses to utilize and provide all data, content, copy, graphics, design and images provided to the other party for publication pursuant to this Agreement and all applicable Attachments.

6.1.11   It will perform its duties, obligations and services set forth in this Agreement and applicable Attachment(s) in a competent and workmanlike manner.

6.2   EXCEPT AS OTHERWISE STATED IN THIS AGREEMENT, NEITHER PARTY MAKES ANY OTHER WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NONINFRINGEMENT.

7.   Limitation of Liability.

7.1   DM SHALL NOT BE LIABLE TO COMPANY OR ANY THIRD PARTY FOR ANY UNAVAILABILITY OR INOPERABILITY OF THE SERVICES, TELECOMMUNICATIONS SYSTEMS OR THE INTERNET, TECHNICAL MALFUNCTION, COMPUTER ERROR, CORRUPTION OR LOSS OF INFORMATION OR OTHER INJURY, DAMAGE OR DISRUPTION OF ANY KIND.

7.2   IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES, INCLUDING, BUT NOT LIMITED TO, BUSINESS INTERRUPTION OR LOSS OF PROFITS, BUSINESS OPPORTUNITIES, OR GOOD WILL, EVEN IF SUCH DAMAGES ARE FORESEEABLE AND WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY SUCH DAMAGES, AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY REMEDY.

7.3   DM'S MAXIMUM AGGREGATE LIABILITY UNDER THIS AGREEMENT AND EACH ATTACHMENT SHALL NOT EXCEED THE AMOUNT OF CHARGES PAID BY COMPANY FOR THE SERVICES WHICH GAVE RISE TO SUCH DAMAGES.

7.4   Any cause of action arising from or in connection with this Agreement or an Attachment must be asserted within one (1) year of the date upon which such cause of action accrued, or the date upon which the complaining party should have reasonably discovered the existence of such cause of action, whichever is later.

8.   Term.

8.1   This Agreement shall remain in effect until terminated by either party as provided herein.

8.2   Each Attachment shall remain in effect until it has expired or is terminated on its own terms.

9.  Indemnification.

9.1  By Company.  Company agrees to indemnify and hold DM, its parents, affiliates and/or subsidiaries, and each of their respective officers, directors, employees, and agents (each a "DM Indemnitee") harmless from and against any and all third party claims, actions, losses, damages, liabilities, costs and expenses (including, without limitation, reimbursement for reasonable attorneys' fees and disbursements incurred by a DM Indemnitee in any action between Company and the DM Indemnitee, or between the DM Indemnitee and any third party or otherwise) arising out of or in connection with (a) the breach of any of Company's representations, warranties or obligations set forth in this Agreement and applicable Attachments, (b) any fraudulent conduct committed by Company, and (c) any and all claims, suits, administrative proceedings or criminal investigations (i) for libel, violation of right of privacy or publicity, copyright infringement, trademark infringement or other infringement of any third party right, fraud, false advertising, misrepresentation, product liability or violation of any law, statute, ordinance, rule or regulation throughout the world in connection with any and all copy, content, images provided by Company, any advertisement, keyword search for an advertisement or on Company's or DM's website, (ii) relating to any virus, worm or "Trojan horse" or other contaminating or destructive features contained in an advertisement or on Company's website, or otherwise relating to an advertisement or Company's website, (iii) any other materials or information to which end users of a service provided hereunder can link from an advertisement or Company's website, (iv) the gross negligence or willful misconduct on the part of Company, its employees, officers, directors, agents or representatives; and/or (v) the products or services offered by Company.

9.2  By DM.  DM agrees to indemnify and hold Company, its parents, affiliates and/or subsidiaries, and each of their respective officers, directors, employees and agents (each a "Company Indemnitee") harmless from and against any and all third party claims, actions, losses, damages, liabilities, costs and expenses (including, without limitation, reimbursement for reasonable attorneys' fees and disbursements incurred by a Company Indemnitee in any action between the Company Indemnitee and any third party) arising out of or in connection with (a) the breach of any of DM's representations, warranties or obligations set forth in this Agreement and each applicable Attachment, (b) any fraudulent conduct committed by DM, and/or (c) any and all claims, suits, administrative proceedings or criminal investigations that the Services provided by DM infringe a U.S. patent, copyright, trade secret, trademark, privacy or other intellectual property right of any third party.

9.3  Conditions for Indemnification.  The indemnification obligations set forth in this Section 9 hereof are contingent upon the following conditions: (a) DM or Company, as the case may be (the "Indemnified Party") must promptly notify the Company or DM as the case may be (the "Indemnifying Party") in writing of the third party claim or action (however, failure of the Indemnified Party to so promptly notify the Indemnifying Party will not relieve the Indemnifying Party of its indemnification obligations hereunder, except to the extent it has been damaged thereby); (b) the DM Indemnitee or the Company Indemnitee, as the case may be, and the Indemnified Party will reasonably cooperate with the Indemnifying Party in the defense of the matter; and (c) the Indemnifying Party will have primary control of the defense of the action and negotiations for its settlement and compromise; provided, however, that the Indemnified Party may, at its own cost, obtain separate counsel to represent its interests.

10.  Publicity.  [No publicity option:  Neither party shall disclose or permit the disclosure to any other person the existence of this Agreement or any of the transactions contemplated hereby unless such disclosure is required to fulfill such party's duties and obligations hereunder, is approved in writing in advance by the other party or is required by any applicable law, regulation (including, but not limited to, stock exchange regulations) or legal process.  Any public announcement or similar publicity with respect to this Agreement or the transactions contemplated hereby will be issued, if at all, at such time and in such manner as is agreed by the parties.]  [Publicity option: DM shall be permitted to identify

WEB-0000000000 - MAGYVER

Company as a DM client and may use Company's name, website address(es) and any related information in connection with DM marketing materials and press releases.]

11.  **Independent Contractor Status/Subcontractors.**

11.1  Each of the parties are independent contractors. Nothing herein shall be construed to place the parties in a relationship of principal and agent, partners or joint venturers, and neither party shall have the power to obligate or bind the other party in any manner whatsoever.

11.2  Company shall remain fully liable for the acts or omissions of any subcontractor, consultant, third-party service provider and/or agent engaged by Company in connection with Company's use of the Services.

11.3  DM has the right to use subcontractors for performance of the Services, provided that each subcontractor is bound to terms and conditions that are consistent with the requirements of this Agreement and the applicable Attachment(s) with respect to the work the subcontractor performs. DM is responsible for ensuring that the performance of its subcontractors meets the requirements of this Agreement and applicable Attachment(s).

12.   **Dispute Resolution.**

12.1   Any dispute or controversy arising out of or related to this Agreement or any breach hereof shall be settled by binding arbitration in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association before the American Arbitration Association in the City of New York, State of New York. Any award shall be final and binding and judgment thereon may be entered in any court of competent jurisdiction. Nothing in this paragraph will be construed to preclude any party from seeking injunctive relief in order to protect its rights pending arbitration.

12.2   In the event any action is brought to enforce any provision of this Agreement or any Attachment, or to declare a breach of this Agreement, the prevailing party shall be entitled to recover, in addition to any other amounts awarded, reasonable legal and other related costs and expenses, including attorney's fees, incurred thereby.

13.   **Non-Circumvention.** During the term of this Agreement and applicable Attachment(s) (the "Term") and for a period of six (6) months after expiration or termination of the Term, Company agrees, and acknowledges that it will not take any action to circumvent the relationship described within the applicable Attachment(s) by directly soliciting other online interactive marketing service providers to provide to it services similar to the services provided by DM to Company. To the extent applicable, Company further agrees that during the Term and for a period of six (6) months after expiration or termination of the Term, it will not engage, contract with, work with, license with, enter into and/or execute any performance-based online advertising and/or marketing relationship with any advertising network, website, newsletter, search engine, e-mail list, or any other type of Internet property (collectively, "Publishers") within any advertising network operated by DM, which is comprised of Publishers (the "Network"). In the event a Publisher does contact Company and Company finds out at a later time that such Publisher is a Publisher within DM's Network, then Company shall notify such Publisher immediately that it must work directly with DM and immediately halt any marketing campaigns it is conducting with such Publisher. Both parties agree and acknowledge that if Company violates its obligations under this Section, DM will suffer irreparable injury and shall be entitled to (a) liquidated damages in the amount of fifty percent (50%) of the gross revenues resulting from sales conducted by Company through the advertising and/or marketing efforts of such Publisher(s), (b) injunctive relief, and (b) any other remedies DM may have at law or in equity.

14.   **General Terms and Conditions.**

14.1   Governing Law. This Agreement and each Attachment shall be governed by, interpreted and construed in accordance with the laws of the State of New York, without reference to its conflict of laws rules or principles.

14.2   Entire Agreement. This Agreement, together with all Attachments and all exhibits attached hereto and thereto, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes any and all prior or contemporaneous oral or written agreements or understandings between the parties.

14.3   Assignment. This Agreement, all Attachments, and all rights granted hereunder and thereunder are not transferable or assignable without the prior written consent of the non-assigning party; provided however, that this Agreement and any applicable Attachments (which incorporate the terms of this Agreement by reference) may be assigned by either party without the other party's written consent to a person or entity who acquires, by sale, merger or otherwise, all or substantially all of the assets or business of that party, or to an affiliate of the assigning party. Subject to the foregoing, this Agreement shall inure to the benefit of, and shall be binding on, the parties and their respective successors and permitted assigns.

Direct Media Corp. Confidential
Page 8 of 10

14.4  Notices.  Any notice under this Agreement shall be in writing and delivered by personal delivery, express courier, confirmed facsimile, confirmed email or certified or registered mail, return receipt requested, and will be deemed given upon personal delivery, one (1) day after deposit with express courier, upon confirmation of receipt of facsimile or email or five (5) days after deposit in the mail.  Notices will be sent to a party at its address set forth below or such other address as that party may specify in writing pursuant to this Section 14.4.

To DM:              Datran Media, LLC.
                    Attn: Jeff Goldstein, Esq.
                    345 Hudson Street, 5th floor
                    New York, New York 10014
                    Fax No: (212) 706-1910

        With copy to:  Hogan & Hartson LLP
                    Attn: Tracy B. Gray, Esq.
                    1470 Walnut, Suite 200.
                    Boulder, Colorado 80302
                    Fax No: (720) 406-5301

To Company:         PureAds
                    Attn: Greg Van Horn
                    2701 NW Boca Raton Blvd., #111
                    Boca Raton, FL 33431
                    Fax No: 561.750.5156

14.5  Force Majeure.  Any delay in or failure of performance by either party under this Agreement or any Attachment will not be considered a breach of this Agreement and will be excused to the extent caused by any occurrence beyond the reasonable control of such party including, but not limited to, acts of God, power outages and governmental restrictions, laws or regulations; provided, however, that lack of funds shall not be deemed to be a reason beyond a party's reasonable control. The parties will promptly inform and consult with each other as to any of the above causes, which in their judgment may or could be the cause of a delay or failure in the performance of this Agreement, and shall use commercially reasonable efforts to remedy the delay or failure or implement an acceptable workaround which minimizes the effect of the delay or failure.

14.6  Severability and Reformation.  If any portion of this Agreement is determined to be or becomes unenforceable or illegal, such portion shall be reformed to the minimum extent necessary in order for this Agreement to remain in effect in accordance with its terms as modified by such reformation.

14.7  Waiver.  A waiver of any default, breach or non-compliance under this Agreement is not effective unless in writing and signed by the party to be bound by the waiver.  No waiver shall be inferred from or implied by any failure to act or delay in acting by a party in respect of any default, breach, non-observance or by anything done or omitted to be done by another party.  The waiver by a party of any default, breach or non-compliance under this Agreement shall not operate as a waiver of that party's rights under this Agreement in respect of any continuing or subsequent default, breach or non-compliance (whether of the same or any other nature).

14.8  Modifications.  Unless otherwise specified, any amendment, supplement or modification of or to any provision of this Agreement or an Attachment, any waiver of any provision of this Agreement or an Attachment and any consent to any departure by the parties from the terms of this Agreement or an Attachment, shall be effective only if it is made or given in writing and signed by both parties.

14.9  Survival. The provisions set forth in this Agreement and any applicable Attachments hereto, that by their very nature should survive termination or expiration of this Agreement and any applicable Attachment(s), shall survive.

14.10 Counterparts. This Agreement may be executed in counterparts, each of which will serve to evidence the parties' binding agreement.

The parties hereto agree to the foregoing as evidenced by their signatures below.

Agreed to By:

DATRAN MEDIA CORP.                          PUREADS

By:                                         By:
_____                     _____
      (Signature)                                 (Signature)

Tony Auerbeck                               Warren Rosen
(Name, typed or printed)                    (Name, typed or printed)

Managing Director of Sales                  CFO
       (Title)                                    (Title)

1/10/08                                     01/09/08
       (Date)                                     (Date)

Datran Media Corp. Confidential
Page 10 of 10



2701 NW Boca Raton Blvd
Ste 111
Boca Raton, FL, 33431
Tel: 561-750-5131
Fax: 561-750-5156

# FAX

| To: | Pat Aspra | From: | Warren |
| Fax: | 512- 857- 0368 | Pages: | 21 |
| Phone: | | Date: | 01/09/08 |
| Re: | Stylist Agreement | cc: | |

Comments: Storm Post Questionnaire

## Attachment F

### Skylist Hosted Services

This Attachment F ("Attachment F" or "Attachment") to the Datran Media Master Services Agreement ("Agreement") shall be binding on the parties to this Attachment F. The terms of the Agreement shall be incorporated by reference into this Attachment shall be deemed to refer to Skylist, Inc. ("Skylist"). All capitalized terms not otherwise defined in this Attachment shall have the meanings as defined in the Agreement. To the extent any terms herein are inconsistent with any terms in the Agreement; the terms of this Attachment F shall govern.

1.    Services.

1.1.   · Skylist shall provide Company with access to technology to be used in connection with email marketing services (the "Service") subject to the terms of the Agreement and this Attachment, the prices set forth in this Attachment, and the Acceptable Use Policy ("AUP") attached hereto as Schedule 1. Company may obtain optional professional services from Skylist, as set forth in Schedules 2 and 3 hereto.

1.2.   Skylist shall provide Company with its proprietary inventory management service, provided that Company (a) permits Skylist to profile Company's email database ("Inventory"), including an aggregate description of the data elements and the identity of Company's brand, and (b) is willing to receive appraisals of Company's Inventory from Skylist, with no obligation to accept such valuation. Should Company not comply with (a) and/or (b) herein, at any time, or should Company elect not to receive the inventory management service, Company's access to the service will be disabled. Further, such service shall expire ninety (90) days from the date of execution of this Attachment.

2.    **Right to Modify.** The Schedules to this Attachment may be supplemented, modified or amended (each a "Revision") by Skylist at any time at its sole discretion, and each such revision will be effective thirty (30) days after it has been sent to Company. If any Revision is not acceptable to Company, Company may terminate this Attachment as provided herein. Company's continued use of the Services under this Attachment after the effective date of such Revision shall be deemed to constitute acceptance of such Revision.

3.    Activation and Use of Service.

3.1.   Upon execution of this Attachment, Skylist shall provide Company with an account name and a password which will allow access to the Service. Company will use the Service as an Independent Content Provider ("ICP"). As an ICP, Company shall be liable and responsible for any and all activities conducted through its account by Company or, if applicable, by Company's users, whether or not such activities have been authorized by Company.

3.2.   Upon Skylist's request, Company shall provide Skylist with accurate and complete registration information with respect to Company's use of the Service (including the identity of Company's authorized users and their passwords) and promptly update such information as changes occur.

3.3.   Company's failure to provide or update its registration information shall constitute a material breach of this Attachment and shall be grounds for Skylist to terminate this Attachment or terminate the right of any person associated with Company to use the Service

(including any person using the Service through Company's account with or without Company's authority).

3.4.    Skylist support contact information is provided in Schedule 4, attached hereto.

## 4,    Charges/Payment.

4.1.    Company will be charged for use of the Service as set forth in this Section. All prices are subject to change at any time. Pricing requires a twelve (12) month contract.

Setup:

| Qty | Item Number | Item Description | Unit Price |
|-----|-------------|------------------|------------|
| 1 | SP-PRO-350 | StormPost Enterprise Setup, (Hosted) | $10,000 |
| | SP-CRD-999 | 12 Month Contract Discount | ($2,000) |
| | | Total Setup | $8,000 |

*StormPost Enterprise Setup (Hosted) includes setup of one (5) brand (registration of five (5) domains and up to fourty (40) IP addresses), two (2) hours of basic remote training, four (4) hours of integration consulting, site configuration, email ramping plan, basic whitelist and ISP feedback loop setup.

**Ongoing Costs:**
Pricing will be based on the number of messages sent per month

A specified cost per thousand email messages sent multiplied by the number of email messages sent per month divided by 1,000 will be the monthly charge, unless the monthly minimum has not been reached. Monthly charges will be finalized on the last day of the month using the following calculation:

Cost per 1,000 email messages sent multiplied by the number of email message sent used for the entire month divided by 1,000.

| Qty | Item Number | Item Description | Unit Price | Monthly Minimum |
|-----|-------------|------------------|-----------|-----------------|
| <20,000,00 | SP-ASP-235 | StormPost Enterprise, $0.30 CPM | $0.30 | $6,000 |
| 20,000,001-40,000,000 | SP-ASP-230 | StormPost Enterprise, $0.25 CPM | $0.25 | $7,500 |
| >40,000,001 | SP-ASP-225 | StormPost Enterprise, $0.20 CPM | $0.20 | $8,000 |
| 1 | SP-PRO-327 | StormPost Delivery Consulting (Tier 1) | N/A | $1,500 |

| | | | | |
|---|---|---|---|---|
| | | | | |

**StormPost Enterprise Delivery Consulting:**
Delivery Consulting is comprised of periodic sessions with a delivery consultant. During these sessions, the consultants may review delivery reports with the client, discuss findings, answering questions, make recommendations and/or share best practices. A written synopsis of each meeting will be delivered to the client via email. Additionally, consultants will spend time working actionable items and performing ISP Relation activities. This service does not include black list mediation. Any hours spent above and beyond the specified hours will be billed at a predetermined rate based on tier. Delivery Consulting is billed on a monthly basis and offered at four pricing tiers based on general mailing practices.

- Tier 1 – One (1) session per month, plus up to four (4) hours of additional work.
  - $1,500 per month
  - $300 per hour
- Tier 2 – Two (2) sessions per month, plus up to eight (8) hours of additional work.
  - $3,000 per month
  - $260 per hour
- Tier 3 – Three (3) sessions per month, plus up to sixteen (16) hours of additional work.
  - $5,000 per month
  - $245 per hour
- Tier 4 – Four (4) sessions per month, plus up to twenty-four (24) hours of additional work.
  - $7,500 per month
  - $200 per hour

4.2.    The monthly charge shall be the greater of (a) the number of email messages sent for the monthly period or (b) the Monthly Minimum. In event Company exceeds the Monthly Minimum, any additional email message sent beyond the Monthly Minimum will be charged at the next higher tier. For example, Company sends forty (40) million email messages. The first ten (10) million email messages are charged at a $1.00 CPM and the remaining thirty (30) million email messages are charged at a $0.90 CPM for a total monthly charge of $37,000.00

4.3.    Payment for monthly minimum bills shall be due on the first day of each month, including any extra changes from the previous month. Monthly fees are nonrefundable and nontransferable to additional monthly periods.

4.4.    In the event Company pays the applicable fees by credit card and Company performs a chargeback on such fees, Company shall be liable to Skylist for an amount equal to two times the applicable fee.

4.5.    Company shall be responsible for all charges arising out of its use of the Service whether or not Company authorizes such use.

5.    **Use of Service Content.**

5.1.    Company may charge its users under separate agreements for use of any information, communications, software, photos, video, graphics, music, sounds and other

material and services provided by Company (collectively referred to as the "Content") through the Service.

5.2.    Company acknowledges that Skylist is not responsible for and does not give any assurance to any person with respect to the validity, value, usefulness or accuracy of the Content. Company and any person using Company's account shall bear any risk associated with the Content. Skylist has the right to monitor the use of the Service, including the Content. However, Skylist does not prescreen, censor or review any Content prior to its appearance on the Service. Skylist has the right (but not the obligation) to require Company to remove, prohibit or discontinue any Content on the Service which Skylist, in its sole discretion, determines to be harmful, offensive or otherwise in violation of Schedule 1, as may be amended from time to time.

5.3.    Company understands and acknowledges that Skylist does not insert specific language on any email deployment or the Services that may be required by state or federal laws (i.e. ADV: in the subject line of an email).

5.4.    The Service shall be used solely to support Company's own internal operations. The Service shall not be (a) sold or licensed to or used by any third party or (b) used as a service bureau or for commercial time-sharing.

6.    **Intellectual Property Rights.**

6.1.    Content Subject to Rights.  Company agrees, and will require each of its users to agree, that it will only transmit Content on the Service that it has the appropriate rights to transmit.

6.2.    Lawful Use.  Company recognizes and agrees that Skylist at its sole discretion may monitor any and all areas of the Service to oversee compliance with this Attachment and the AUP, and Company will so inform its users that their use of the Service will constitute consent to such monitoring. If Company or any of its users restricts or inhibits any other Company or user of the Service, Skylist may, at its sole discretion, terminate or limit the right of Company or Company's user to use the Service.

6.3.    Domain Names and Unsubscribe Pages.  Skylist may provide domain names ("Domain Names") and unsubscribe web pages ("Unsubscribe Pages") hereunder. Unless otherwise agreed in writing, each such Domain Name and Unsubscribe Page shall be the property of Skylist. Notwithstanding Skylist's ownership, Company shall be responsible for Company's use of the Domain Names including, but not limited to Content contained on the web pages under the Domain Name.

7.    **International Usage.**  Company acknowledges that its use of the Service allows access to Content originating from other customers, ICPs and third parties located in countries other than the United States. Company agrees that its access to and use of such Content may be governed (in addition to this Attachment and Schedule 1) by separate terms and operating policies, which conform to appropriate and applicable national laws and customs.

8.    **Warranty.**  Company agrees that by transmitting or allowing the transmission of any Content on the Service, Company, Company's users and clients automatically warrant that Skylist has the royalty free, perpetual, irrevocable, nonexclusive worldwide right to transmit and display such Content in whole or in part on the Service. Company must obtain the consent of its

01/05/2008  12:51    5517505156                      FOREADS LLC                                    PAGE  08

clients to the covenants provided in this Section by requiring such persons to perform sign-on procedures, which will confirm their agreement to and acceptance of these conditions.

9.    **Indemnification.** Company agrees to defend, indemnify and hold harmless Skylist, its affiliated companies, licensees, employees, and ICPs from all liabilities, claims, causes of action and expenses, including reasonable attorneys' fees and internal expenses, arising out of Company's use of the Service, use of any Domain Names, breach of Schedule 1 by Company or Company's users, transmission of any Content on the Service whether or not such use was authorized by Company (including any claim that the Content was deceptive), use of the Service to send unsolicited commercial email (as determined in Skylist's sole discretion) or a claim that Company sent unsolicited commercial email, or the failure to remove a user from the Service when requested. Skylist reserves the right to approve Company's counsel to defend any such claims, which approval shall not be unreasonably withheld, and to approve any settlement agreement that is not fully covered by applicable insurance. Skylist shall cooperate with Company in the defense of any claims at Company's expense.

10.    **Term and Termination.**

10.1.    Term. The initial term of this Attachment is twelve (12) months, beginning upon execution of this Attachment and ending the later of (i) twelve (12) months thereafter or (ii) the last day of the month following the twelve (12) month anniversary. Upon conclusion of the initial term, the Services shall automatically renew for additional twelve (12) month terms unless Company provides written notice of termination thirty (30) days prior to the end of the then current term.

10.2.    Termination. The following grounds for termination supplement and are in addition to the termination provision set forth in the Agreement.

10.2.1. By Skylist if Company (a) sends any unsolicited commercial email or (b) violates any state, federal or other laws, in either case as determined in Skylist's sole discretion.

10.2.2. By Company if Skylist modifies Section 4 of this Attachment and the revision is not reasonably acceptable to Company.

10.3.    Upon termination or expiration of this Attachment (a) Skylist shall deliver to Company a text file containing all valid Company-owned email addresses in the Skylist system, provided the termination is not for Company's uncured breach of the Agreement or this Attachment; and (b) Company shall immediately pay the lowest Monthly Minimum fee described in Section 4.1 multiplied by the remaining months in the then-current commitment period, provided the termination is not caused by Skylist's uncured material breach of the Agreement or this Attachment. Termination of this Attachment and/or the Agreement shall not relieve Company's obligation to pay all fees that have accrued or are otherwise owed by Company under this Attachment or the Agreement. In the event termination occurs within one (1) year from execution of this Attachment, Company shall pay Skylist the difference between the Total Setup Fee and the Standard Setup Fee (each as described in Section 4.1).

10.4.    Skylist may immediately suspend Company's use of the Service if deemed reasonably necessary by Skylist to prevent any harm to Skylist's network, its business or its other customers, based on Company's misuse or alleged misuse of the Service, provided that Skylist shall promptly provide notice to Company of the suspension and the reason(s) therefore and provide Company an opportunity to cure, if practicable, depending on the nature of such misuse.

Company acknowledges and agrees that during any cure period described in this paragraph, Company shall be required to make all payments for the Services when due in accordance with this Attachment.

**11.   Data.**

11.1.   Company shall provide all source data for the email addresses uploaded to the Service ("Source Data"). The Source Data shall contain at a minimum, the IP address and url where the individual registered to receive messages and the time-stamp of such signup.

11.2.   Skylist shall have the right to retain records of all data pertaining to use of the Service by Company or Company's users including, but not limited to, usage, activity logs, and click-throughs. Skylist may disclose such data to third parties provided it is grouped with other Skylist clients' data and is presented in aggregate form. Skylist shall retain all rights in and to the aggregate data after termination or expiration of this Attachment.

11.3.   Notwithstanding the confidentiality provisions in the Agreement, Skylist may disclose usage information about specific email addresses and Content to respond to abuse complaints from other mail administrators, law enforcement agencies, courts, or any other governmental agency.

11.4.   Notwithstanding anything to the contrary in the Agreement, Skylist will use all data in a manner consistent with Skylist's and Company's privacy policies.

**12.   Publicity.** Skylist may (a) use Company's name and logo in any press release or marketing material that merely states that Company is a customer of Skylist, either on an individual basis or as part of a list of some or all of Skylist's other customers, and (b) display Company's name and logo on Skylist's website(s) and publicly available customer lists.

**13.   Sole Provider.** During the term of this Attachment, Skylist shall be the sole provider of email marketing hosting services to Company. Company agrees that it shall not use any other hosting services from any third party other than the Services provided by Skylist hereunder.

The parties hereto agree to the foregoing as evidenced by their signatures below.

**SKYLIST, INC.**                          **PUREADS.**

By: _____     By: _____

Name: _____     Name: _____Warren Rustin_____

Title: _____     Title: _____C F O_____

Date: _____     Date: _____01/09/08_____

## SCHEDULE 1

### Acceptable Use Policy

Company must sign this Acceptable Use Policy that sets the terms for use of the Skylist systems. Violation of the Acceptable Use Policy is cause for termination of any agreement between Skylist and Company.

**Every mailing must adhere to the following best practices:**

- Only be sent to lists of opt-in (preferably double opt-in) recipients
- Immediately honor any removal of unsubscribe requests
- Provide a physical mailing address in case a subscriber wants to contact you by mail.
- Provide source information on every recipient to be able to prove opt-in status
- State how the e-mail addresses opted in and whether the message is a recurring mailing or a one-time notification
- Company agrees to include language in the unsubscribe message of each of the emails it sends to its members or users indicating where each member opted in to receive mail from Company. (For example: John, you are receiving this email from Company Name because you opted in to receive special offers at www.yourdomain.com on xx/xx/2008 from 12.234.42.23.)
- Every message is required to have clear and working unsubscribe instructions at the top or bottom of the message. The message headers automatically contain the List-Unsubscribe header defined in RFC 2369.

**Violation:**

**To prevent abuse of the system, the AUP also stipulates that all mail sent through the system must:**

- Never confuse or mangle the Internet headers
- Never harass, threaten or cause distress, unwanted attention or discomfort to a person or entity.
- Not contain or transmit sexually explicit images or other content that is offensive.
- Not contain or transmit any unlawful, harmful, threatening, abusive, harassing, defamatory, vulgar, obscene, or hateful content or content which is racially, ethnically or otherwise objectionable, or which infringes upon the rights of any third party.
- Not impersonate any person, including but not limited to, an official of Skylist or an information provider, or communicate under a false name or a name not entitled or authorized to use.
- Not violate (intentionally or unintentionally) any applicable local, state, national or international law, including but not limited to any regulations having the force of law.
- Not send one-time mailings to a list of members after which the membership is deleted and recreated later. The membership must be a permanent list to which new members subscribe or unsubscribe themselves. This list may be maintained in an external system.

*In the event Company violates these terms in Skylist's sole discretion, Skylist may terminate services. Company should be aware that Company is responsible for the behavior of Company's list members.*

Agreed to By Company:

By: _____
(Signature)

_Warren Rustin_
(Name typed or printed)

_CFO_
(Title)

_01/09/07_
(Date)

## SCHEDULE 2
### Optional Professional Services

Professional Services Hourly Rate schedule:

| OFFERING | DESCRIPTION | HOURLY RATE |
|---|---|---|
| Design Services | Datran Media Professional Services (DMPS) graphic design team works with clients to provide design services for email content and related registration and landing pages. | $150 |
| Onsite Training | DMPS consultants travel to Customer locations to deliver product training in group sessions. Training covers both general usage as well as client specific scenarios. | $3,000 / Day + expenses |
| Remote Training | DMPS consultants deliver product training via phone or web conferencing. | $500 / hour |
| Integration Consulting | DMPS consultants advise Customers on the alternatives available for integrating legacy systems with Datran Media products and manage the actual implementation projects. | $250 / hour or fixed bid |
| Custom Reports | One time or recurring custom reports | $250 / hour (2 hour minimum) or fixed bid |
| General Consulting | Work performed in response to requests that is not covered by a prepaid service or Statement of Work (SOW), but is part of the core offerings of DMPS, will be billed at an hourly rate. This includes, but is not limited to, setup of additional domains and IPs, assisting with removing blocks, and informal, phone based training. | $250 |
| Brand Configuration | DMPS consultants work with clients to request white listing and certifications and also to set up necessary feedback loops. Included with Delivery Consulting. Only available to StormPost customers without delivery consulting | $250 / hour $2,500 / 5 domains or 1 brand |

| | | |
|---|---|---|
| Delivery Issue Mitigation | DMPS consultants work with Customers to attempt to remove Customer domains from various industry blacklists. Being registered on a blacklist can significantly impact a company's ability to deliver successful email campaigns. | Major blacklists - $25,000 + $500 / hour<br>Mid level blacklists - $5,000 + $250 / hour<br>Minor blacklists - $1000 + $250 / hour |
| Add On Services | Additional site (1 brand and up to 5 IPs)<br>Additional brand (up to 5 IPs) | $2,500 + $500 per month increase in support cost $2,500 |

Please, fill out the form below. For clarification on terms and definitions, please see page 9



# StormPost Client Questionnaire

## Company Name: PureAds, LLC.

## A) Mailing History

### 1) Mailing Contents Classification

| | Sent in the Past | Currently Sent | Plan to Send | First Party | Third Party Promotions | Standalone Promotions |
|---|---|---|---|---|---|---|
| Acquisition | ☐ | ☐ | ☒ | ☒ | ☐ | ☐ |
| Retention | ☐ | ☐ | ☒ | ☒ | ☐ | ☐ |
| Cross Sell /Up Sell | ☐ | ☐ | ☒ | ☒ | ☐ | ☐ |
| Transactional | ☐ | ☐ | ☒ | ☒ | ☐ | ☐ |
| Other | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

If sending mailings of type "other", please, describe:

## B) History of Previous Mailings

### 1) Your company currently sends email using:

(Mark all that apply)

☐ An Internal system

☐ Third-party software

☐ An ESP—Email Service Provider

Please, specify mailer or ESP(s) used?

2)   What mailing domain(s) and IP(s) are used to send mail?

| Domains | IP(s) | Are these dedicated to company mailings? (Y/N) | How long has it been sending? | Does "From" address match domain? (Y/N) |
|---|---|---|---|---|
| | | ☐ | | ☐ |
| | | ☐ | | ☐ |
| | | ☐ | | ☐ |
| | | ☐ | | ☐ |
| | | ☐ | | ☐ |
| | | ☐ | | ☐ |
| | | ☐ | | ☐ |

3)   Please, provide a few examples of the "From" address(es) in the
     Header(s) of your mailings:




4)   How frequently do you send mailings?




5)   Number of email messages you plan to send per month?
     20 – 60 messages per list.


6)   Does your company implement any frequency caps?
     ☒ Yes   ☐ No   TYPE: 2 – 3 per 24 hours


7)   Does your company have a process for verifying the *true* owner
     of an email address (i.e., using a confirmation message)?   ☐ Yes   ☐ No
     If so, please, explain below?

8) Currently, what type of reporting do you have available for your mailings? (Mark all that apply)

☐ Scheduled        ☐ Block Bounce
☐ Delivered        ☐ Opens
☐ Clicks           ☐ Opt-Outs
☐ Unsubscribes     ☐ Other
☐ Hard Bounce      ☐ Soft Bounce

If "Other", please, explain below?

9) Will your company be able to provide member dates of? (Mark all that apply)

☒ Date last opened   ☒ Date last clicked
☒ Unsub date         ☒ Optout date
☒ Date set to invalid (hard bounce)

10) Will your company be able to provide date last sent per member?  ☒ Yes  ☐ No

11) If your current reporting system does *not* break down bounces into categories (i.e., Hard, Soft, and Block), then how does your current system process bounces?
(If this question does not apply then skip to the next question.)

12) If your current reporting system breaks down bounces into Hard, Soft, Block Bounces, then what are the bounce thresholds to remove Soft, Hard, and Block Bounces?
(If this question does not apply then skip to the next question.)

13) How does your current platform process unsubscribe requests?

14) Unsubscribe requests are processed on a:

(Check One Please)

☐ Global Level (i.e., unsubscribed from all lists)

☒ List Level (i.e., only from the list associated with the request)

☐ Both Global and List Level

15) What type of unsubscribe mechanism(s) are used currently?

(Mark all that apply)

☐ An unsub email address

☐ One click link

☐ Link to preference page

☐ Replies to sent emails

☐ Online preference page requiring users to login

☐ Other:

16) How does your current system handle responses from recipients to any email campaigns?

17) Does your company use third party suppression list to purge against when sending mailings? ☐ Yes  ☐ No

18) Are any of the following Authentication Measures setup for mailing domains and IPs?  (Mark all that apply)

☐ Sender ID

☐ SPF Records

☐ Domain Keys
☐ DKIM

## C) Delivery Challenges

1) Are any mailing domains/IPs currently on a Blacklist(s)?  ☐ Yes  ☐ No

   a) If Yes, please, specify domain, IP(s), and Blacklist(s) below:

   b) Actions taken if any domains are currently on Blacklist(s)?

(If Mailing History Exists then fill out the rest of the section; otherwise, skip to the Data Source section.)

2) What kind of challenges have you had in the past with major domains (i.e., Yahoo, Hotmail, AOL, etc.), if any? Or, are you able to mail consistently to most domains?

3) Are any mailing domains and IP(s) whitelisted with any ISPs?
   ☐ Yes  ☐ No

   a) If Yes, then list below:

4) Are any feedback loops set up to receive member complaints (e.g., when a recipient reports mail as junk or spam)?

a) If so, which feedback loops are setup?

b) If so, how are complaints processed?

c) If so, what domains/IPs are you processing these complaints for currently?

d) If so, what complaint rate(s) exist?

5) Are any of the following reputation services currently in use for any mailing domains/IPs? (Mark all that apply)

☐ Sender Score Certified

☐ Goodmail

☐ Habeas

☐ Other:

6) Are your lists divided into segments (i.e., source, domain, etc.), to aid in dealing with any delivery challenges? ☐ Yes  ☐ No

a) If yes, then, please further describe how you currently segment your lists?

7) Does your company send welcome messages to new list members?

☐ Yes   ☐ No

If Yes, then, welcome messages are sent in:

☐ Real-time   ☐ The next day

☐ N/A   ☐ Other

## D) Data Source

1) Please, provide URLs where list members currently register:

*Note: If there are a large number of URLs, please, specify how many URLs are involved in registration below -- (please, note if this is an actual or approximate number) AND Provide at least 3 URLs or enough to cover each data source category (see below) so we can review each signup process in full.*

| Signup URLs | Privacy Policy | What category is your collection process? | Does your company own the opt-in sites? (Y/N) | Is any data purchased? (Y/N) | How many records on list? | Date of oldest record on list |
|---|---|---|---|---|---|---|
| http://www.brandnamea merica.com/?PromoID=15644 | http://www.brandnameamer ica.com/priva cy.asp | We currently only have optin but we will begin using a DOI method with Stormpost | ☒ | ☐ | 3MM this is across all sites | No earlier than 06/01/2007 |
| http://www.brandnamea merica.com/ privacy.asp | http://www.br andnamerewa rds.com/priva cy.asp | We currently only have optin but we will begin using a DOI method with Stormpost | ☒ | ☐ | | |
| http://www.surveyrewar dscenter.co m/?PromoI D=15166 | http://www.su rveyrewardsce nter.com/priv acy.asp | We currently only have optin but we will begin using a DOI method with Stormpost | ☐ | ☐ | | |

\*\*Categorize the collection process using one of the following:  Double Opt-in, Opt-in with Verification,
Opt-in, Pre-Selected Opt-in with Verification, Pre-Selected Opt-in, Co-registration, or Other
*(See the Appendix for more information on the different collection process categories)*

If there are a large number of URLs, please, specify how many URLs below:

## E) Data Management

1) Do you archive or collect any of the following data for email subscriptions:

   (Mark all that apply)

   ☒ Source sign-up IP address

   ☒ Sign-up date and time

   ☒ Source sign-up URL

2) Is the source sign-up IP address, sign-up date and time, or source sign-
   up URL complete for all members?  ☒ Yes  ☐ No

3) If your data is co-registration or comes from multiple sources, then is your
   data:

   (Mark all that apply )

   ☐ Mixed together and mailed as one list

   ☒ Segmented by Source, Domain, and/or Date and mailed to individually

   ☐ Other     Describe:

4) Do you OR have you shared any data with other partners?

☒ Yes  ☐ No

   a) If 'Yes', then, how many providers are you sharing this data with?
      2 Partners - Datran & MediaWhiz

   b) If 'Yes', then, how do members unsubscribe from partner/affiliate
      communications?

They unsubscribe from the partners directly.

5) Does your company offer list management services (rent, share, lease, or buy 3rd party data) for other companies? ☐ Yes   ☒ No

6) What is the approximate number of new members added to your list(s) per day?

40 - 50,000

## Appendix: Definitions

**Member Responses** – responses generated when a recipient replies to an email communication. In the context of this questionnaire, we refer to a member response as all recipient emails received in response to your email marketing communications.

**Hard Bounce** – a bounce defined as a permanent error such as user@domain.com does not exist or invalid address.

**Soft Bounce** – a bounce indicating a transient error for a particular address that may be resolved in future attempts to deliver mail to that address. Examples include "exceed storage allocation" or attempting to send to a mail server that is unreachable.

Frequency Caps – limits defining the maximum rate at which a member receives email communications. The simplest form of a frequency cap is a rule which governs the number of mailings an individual member can receive over a set number of days.

Double Opt-in – also known as confirmed opt-in, an email address collection practice where the sender emails the new subscriber prior to adding them to their list. The recipient then is typically required to click on a link with in the email to confirm that they would like to be subscribe to your list. The purpose of this is to obtain consent to send messages to which the subscriber opted-in.

Opt-in with Verification – similar to Double Opt-in, in that the new subscriber is sent an email verifying their preferences, the only difference is that the new subscriber is not required to take action on the verification email. Once this email is sent, communications may commence.

Single Opt-in – also known as unconfirmed opt-in, an email address collection practice in which a recipient actively requests to receive defined sender communications. With this collection process, the sender does not confirm the subscription.

Pre-Selected Opt-in – a collection process with a pre-checked subscription box, defaulting the member to being subscribed. This requires the member to uncheck the box to remove consent.

Pre-Selected Opt-in with Verification – a collection process with a pre-checked subscription box, defaulting the member to being subscribed. This requires the member to uncheck the box to remove consent. The new subscribers (people who have left the box checked) will receive an email verifying the registration. The email communications will commence after the verification email has been sent, but unlike double opt-in does not require the recipient action of confirming by clicking on a link in the email.

Co-registration – an email addresses collection practice in which the sender acquires email addresses through a marketing partner's web site.

Co-reg with single partner sign-up – data where the sender acquiring the email addresses is explicitly identified/branded at the point of email address collection.

Co-reg w/ multiple partner sign-up – data where multiple senders/brands acquire an address via one selection of a co-reg sign-up form.

Purchased Data – data purchased from another or multiple other providers.

Feedback Loop – purpose of this mechanism is to cleanse mailing lists so that users receive only wanted email and senders aren't negatively affected by complaints. This is accomplished by senders receiving feedback, usually an email, that identifies members who reported the sender's communication as junk mail or spam. The sender can then remove those recipients from their mailings.

Complaint rate – the percentage of members, for a particular ISP, reporting a sender's communication as *junk mail or spam divided by the amount of mail delivered to that ISP.* ISPs commonly calculate the complaint rate by using the number of emails delivered to the inbox and not the total delivered.

AMENDMENT #3
TO
HOSTING SERVICES AGREEMENT

THIS AMENDMENT #1, entered into November 3, 2009 (the "Amendment Effective Date") by and between Skylist, Inc. ("Skylist") and ModernAd Media ("Customer") modifies that certain Hosting Services Agreement dated November 29, 2007 (the "Agreement") by and between the parties as hereinafter set forth.

Upon the Amendment Effective Date, the parties agree that the Agreement is hereby modified as follows:

Replace the "Ongoing Cost" Section of Exhibit A with the following.

EXHIBIT A
Hosted eMarketing Prices

Ongoing Costs:

Fixed fee deployment with no cap on emails deployed per month.

| Qty | Item Number | Item Description | Unit Price | Monthly Minimums |
|---|---|---|---|---|
| Unlimited Email Sends (1) | SP-ASP-220 | StormPost Enterprise, Flat rate fee | $92,500 per month | $92,500 |

(1)  Tier 2 Delivery Consulting and 24X7 System administration included.  Annual software license upgrades per Amendment 1.

Bandwidth, Co-Location and Hardware:
This Agreement does not include bandwidth, co-location services or computer hardware.

Term: The initial term of this attachment is fourteen (14) months, beginning upon execution of this Attachment and ending the last of (i) fourteen (14) months thereafter or (ii) the last day of the month December 31, 2010.  Upon conclusion of the initial term, the Services shall automatically renew for additional twelve (12) month term unless Company provides written notice of termination sixty (60) days prior to the end of the then current term.

All other terms and conditions not expressly modified herein remain unchanged and in full force and effect.

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized representatives to set their hands to this Amendment #1.

FOR SKYLIST, INC.                              FOR MODERNAD MEDIA

BY: _____                   BY: _____

NAME: Anthony D'Arro                           NAME: _____

TITLE: General Mgr.                            TITLE: COO

DATE: 11/12/09                                 DATE: 11/16/2009

AMENDMENT #1
TO
HOSTING SERVICES AGREEMENT

THIS AMENDMENT #1, entered in   as of September 26, 2008 (the "Amendment Effective Date") by and between Skylist, Inc. ("Skylist") and Modern   d Media ("Customer") modifies that certain Hosting Services Agreement dated, November 29, 2007 (the "Agreement")   y and between the parties as hereinafter set forth.

Upon the Amendment Effective Date, th e parties agree that the Agreement is hereby modified as follows:

The company formerly known as Pur cds will now be known as Modern Ad Media.  Skylist will make all necessary changes to any and all documents inten  lly to reflect the name change.

All other terms and conditions not ex; essly modified herein remain unchanged and in full force and effect.

IN WITNESS WHEREOF, the parti  hereto have caused their duly authorized representatives to set their hands to this Amendment #1.

FOR DATRAYMEDIA                          FOR MODERN AD MEDIA

BY: _____           BY: ___Warren Rustin_____

NAME: __MICHAEL P. LEWIS___             NAME: __Warren Rustin_____

TITLE: __VP  CLIENT  SERVICES__         TITLE: __President_____

DATE: ___10/27/08_____            DATE: ____10/15/08_____

THE LUSTIGMAN FIRM, P.C.
149 Madison Avenue, Suite 805
New York, NY 10016
Tel: 212.683.9180
Fax: 212.683.9181

Attorneys for
Respondent / Counterclaimant

### AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| DATRAN MEDIA CORP., | |
| Claimant, | Case No.: 13 117 Y 858 11 |
| v. | |
| MODERNAD MEDIA fka PUREADS, | ANSWER AND COUNTERCLAIMS |
| Respondent. | |

Respondent/Counterclaimant ModernAd Media (hereinafter "ModernAd"), by and through the undersigned attorneys, hereby responds to the Amended Demand For Arbitration filed by Claimant Datran Media Corp. ("Datran") as follows:

1.    ModernAd lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 1.

2.    ModernAd admits it is a Florida company with its principal place of business located at 101 North Federal Highway Suite #500, Boca Raton, FL 33432. ModernAd responds further that the remaining allegations contained in


EXHIBIT
C

paragraph 2 constitute a legal conclusion to which no response is required.

3. ModernAd respectfully refers the Arbitrator to the Master Services Agreement for an accurate recitation of the terms thereof.

4. ModernAd respectfully refers the Arbitrator to the Master Services Agreement for an accurate recitation of the terms thereof.

5. ModernAd respectfully refers the Arbitrator to the Master Services Agreement for an accurate recitation of the terms thereof.

6. ModernAd admits the Agreement contains general terms and conditions and respectfully refers the Arbitrator to the Master Services Agreement for an accurate recitation of the terms thereof. ModernAd responds further the term "various attachments" is too vague to permit ModernAd to admit or deny any allegations with respect to that term. ModernAd denies the remaining allegations contained in paragraph 6.

7. ModernAd respectfully refers the Arbitrator to the Master Services Agreement for an accurate recitation of the terms thereof.

8.    ModernAd respectfully refers the Arbitrator to the Master Services Agreement for an accurate recitation of the terms thereof.

9.    ModernAd respectfully refers the Arbitrator to the Master Services Agreement for an accurate recitation of the terms thereof.

10.    ModernAd respectfully refers the Arbitrator to the Master Services Agreement for an accurate recitation of the terms thereof.

11.    ModernAd respectfully refers the Arbitrator to the Master Services Agreement for an accurate recitation of the terms thereof.

12.    ModernAd denies the allegations contained in Paragraph 12 except respectfully refers the Arbitrator to Exhibit B with respect to the incorporation of the Master Services Agreement.

13.    ModernAd respectfully refers the Arbitrator to Exhibit B for an accurate recitation of the terms thereof.

14.    ModernAd respectfully refers the Arbitrator to Exhibit B for an accurate recitation of the terms thereof.

15.    ModernAd respectfully refers the Arbitrator to Exhibit B for an accurate recitation of the terms thereof.

16.    ModernAd responds that the term "Exhibit C" does not appear to refer to the correct document and therefore

3

is too vague to permit ModernAd to admit or deny the allegations contained in paragraph 16. ModernAd responds further that according to the document "Amendment #1 To Hosting Services Agreement" attached to the Arbitration Demand, the document on its face relates to a "Hosting Services Agreement", not the Master Services Agreement as alleged.

17.   ModernAd responds that the term "Exhibit D" does not appear to refer to the correct document and therefore is too vague to permit ModernAd to admit or deny the allegations contained in paragraph 17. ModernAd responds further by respectfully referring the Arbitrator to the actual document for an accurate recitation of the terms thereof.

18.   ModernAd denies the allegations contained in Paragraph 18.

19.   ModernAd denies the allegations contained in Paragraph 19.

20.   ModernAd admits the allegations contained in Paragraph 20.

21.   ModernAd denies the allegations contained in Paragraph 21.

22.   ModernAd denies the allegations contained in Paragraph 22.

4

23.   ModernAd hereby repeats its responses to Paragraphs 1 through 22.

24.   ModernAd lacks knowledge and information sufficient to form a belief as to the meaning of the undefined term "sophisticated corporate entities". ModernAd responds further that the remaining allegations contained in Paragraph 24 constitute a legal conclusion to which no response is required.

25.   ModernAd denies the allegations contained in Paragraph 25.

26.   ModernAd denies the allegations contained in Paragraph 26.

27.   ModernAd respectfully refers the Arbitrator to the cited document for an accurate recitation of the terms thereof, and responds further that Paragraph 27 contains a legal conclusion to which no response is required.

28.   ModernAd denies such a term or condition was part of Exhibit B.

29.   ModernAd denies the allegations contained in Paragraph 29, and responds further that Paragraph 29 contains a legal conclusion to which no response is required.

30.   ModernAd denies the allegations contained in Paragraph 30.

31.   ModernAd denies the allegations contained in Paragraph 31.

32.   ModernAd denies the allegations contained in Paragraph 32.

### AFFIRMATAIVE DEFENSES

33.   Datran's claim is barred by its own material breach(es) of contract and/or duty.

34.   Datran breached its covenant of good faith and fair dealing.

35.   Datran has not suffered any damages.

36.   Datran's claim is barred by the doctrine of estoppel.

37.   Datran's claim is barred by its own intentional, culpable conduct.

38.   Datran's failure to render its services in accordance with its own representations, within industry standards and within the terms of the parties' agreement substantially and fundamentally defeated the very purpose of such document and entitles ModernAd to rescission.

39.   Datran's claim is barred under the doctrine of unclean hands.

40.   The terms of the Agreement that Datran seeks to enforce are unconscionable.

6

41. To the extent that Datran suffered any damages, Datran failed to mitigate such damages.

42. To the extent that Datran suffered any damages, such damages are to be offset by any damages that Datran caused ModernAd to suffer.

43. ModernAd denies any and all allegations and averments against it that have not been specifically and expressly admitted herein.

## COUNTERCLAIMS

As and for its counterclaims against Datran, ModernAd alleges as follows:

44. On or about August 24, 2007, Datran and PureAds entered into a Data License and List Management Agreement (hereinafter "List Management Agreement"). A copy of the List Management Agreement is attached hereto as Exhibit A.

45. Paragraph 15 of the List Management Agreement provides that "Any dispute or controversy arising out of or related to this Agreement or any breach hereof shall be settled by binding arbitration in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association before the American Arbitration Association in the City of New York, State of New York." See Ex. A.

7

46.    The List Management Agreement authorized Datran to market ModernAd's customer data in exchange for 50% of the net revenue generated by Datran.   Exhibit A at 11.

47.    The revenues were to be collected by Datran from third parties and then were to be split on a 50/50 basis.

48.    The List Management Agreement limited the costs that Datran could deduct prior to computing the 50/50 revenue shares to a maximum of 25¢ cpm (twenty five cents cost per thousand e-mails sent). Exhibit A at 11.

49.    The List Management Agreement required Datran to provide monthly reports of all costs incurred for each reporting period.

50.    The List Management Agreement required that any changes thereto must be made pursuant to a written agreement executed by both parties. Exhibit A at 7.

51.    There is no written agreement between the parties permitting Datran to deduct and retain for its own benefit fees in excess of 25¢ cpm.

52.    Datran committed breach of contract. Datran materially breached the List Management Agreement by deducting, and retaining for its own benefit, costs far exceeding the permissible 25¢ cpm allowed by the List Management Agreement.

8

53. Datran has been unjustly enriched at ModernAd's expense by deducting, and retaining for its own benefit, costs far exceeding the permissible 25¢ cpm allowed by the List Management Agreement.

54. Datran created and sent monthly reports which fraudulently concealed the moneys it retained in excess of the permissible 25¢ cpm.

55. Datran converted funds belonging to ModernAd to itself by unilaterally withholding revenue in excess of the permissible limit derived from managing ModernAd's lists.

56. The List Management Agreement requires Datran to maintain accurate books and records and gives ModernAd the right to audit such books and records.

57. Datran has not provided ModernAd with access to its books and records.

58. Upon information and belief, the amount of the fees improperly deducted and retained by Datran exceeds one million dollars ($1,000,000.00).

59. Upon information and belief, the amount that Datran's unjust enrichment exceeds one million dollars ($1,000,000.00).

60. As a result of Datran's material breach of the List Management Agreement and the covenant of good faith and fair dealing implied by law in every agreement, as well

9

as from Datran's unjust enrichment, conversion and fraudulent concealment, ModernAd is entitled to an amount to be determined in arbitration, including any costs, interest and attorney's fees permitted by the parties' agreement or under the law of the State of New York.

61.   ModernAd reserves the right to amend this pleading, to add additional defenses or claims, and to amend the amount demanded in its counterclaims as additional relevant information become available.

WHEREFORE, ModernAd requests that the claims contained in the Amended Arbitration Demand be dismissed in their entirety, and that the Arbitrator render judgment in favor of ModernAd on its counterclaim as well as such other and further relief as seems proper to the Arbitrator.

Dated:      New York, New York
            May 2, 2011

                        Respectfully submitted,

                        **THE LUSTIGMAN FIRM, P.C.**

                        By: _Scott Shaffer_
                        Scott Shaffer
                        149 Madison Avenue, Suite 805
                        New York, New York 10016
                        Tel: 212.683.9180
                        Fax: 212.683.9181

                        Attorneys for ModernAd Media, LLC

10



## DATA LICENSE AND LIST MANAGEMENT AGREEMENT

This Data License and List Management Agreement ("Agreement") is entered into as of this 24th day of August 2007 (the "Effective Date") by and between Datran Media, LLC, a limited liability company formed under the laws of the State of Delaware, with its principal place of business located at 345 Hudson Street, 5th Floor, New York, New York 10014, ("Datran"), and PureAds, a FL corporation, with a principal place of business located at 1730 S. Federal Hwy, Ste 345, Delray Beach, FL 33483 ("Company"). Datran and Company may shall be collectively referred to hereinafter as "the parties."

**WHEREAS** Company owns and maintains the website(s) located at
http://path.pureadstracking.com
and through ownership and the operation of said website(s), has collected and maintains a proprietary computerized database composed of names, postal addresses, telephone numbers and associated email addresses of individuals who have expressly opted-in to receiving marketing communications from Company or third parties (the "Database"); and

**WHEREAS** Company desires to license all or a portion of the Database (the "Data") upon the terms and conditions set forth below.

**NOW THEREFORE,** in consideration of the mutual premises and covenants set forth below, the parties agree as follows:

1.     **License.**  Company grants Datran an exclusive, worldwide, license for the term of this Agreement to use the Data described in Exhibit A attached hereto in accordance with the terms and conditions of this Agreement for purposes of providing marketing campaigns on behalf of Company that include email marketing, response marketing, telemarketing and/or direct mail marketing.  The license provided herein includes the right for Datran to use the Data to prospect on behalf of itself and/or Company and to share the Data with third-party service providers for the purpose of email message delivery, subject to the limitations set forth in this Agreement.

2.     **Delivery of Data.**  Company shall deliver the Data to Datran on the type of media, in the format, on the delivery date, containing those data elements, and updated as specified in Exhibit A.

3.     **License Fees; Payment.**  Datran agrees to pay license fees to Company for the use of the Data in accordance with the terms set forth in Exhibit A.

4.     **Reporting.** Datran will provide a relationship manager to oversee the receipt,



integration and monetization of the Data.  Additionally, Datran shall provide Company with monthly reports containing a detailed breakdown of all revenue activities in the month.

**5.     Right to Audit.**  During the term of this Agreement, Datran shall maintain accurate books and records relating to its usage of the Data and any payments due Company derived therefrom.  Company, or a designee of Company approved by Datran, shall have the right, at Company's sole cost and expense, to examine, inspect, audit, review and copy or make extracts from all such books, records and any source documents used in the preparation thereof during normal business hours upon written notice to Datran at least five (5) business days prior to the commencement of any such examination, inspection, review or audit.  Such audit shall be limited to those books and records that specifically relate to information pertinent to the use of the Data.

**6.     Ownership.**  Subject to the license granted to Datran herein, Datran and Company expressly agree that Company owns all proprietary rights in and to the Data. Datran and Company expressly agree that, as between Company and Datran, Datran owns all Data provided from commercially available sources or from other sources that are overlayed onto the Data.  However, to the extent that Datran receives responses, confirmations or other forms of information from, or enters into transactions with, individuals contacted by Datran utilizing the Data (a "Response"), Datran shall own any and all such Responses, and no restrictions contained herein concerning the use of any applicable individuals' Responses shall apply.

**7.     Term and Termination.**

        7.1     Term.  This Agreement shall continue in effect from the Effective Date for a period of one (1) year (the "Initial Term"), and shall automatically renew for successive one (1) year periods unless either party provides the other party with at least thirty (30) days prior written notice of its intent not to renew.

        7.2     Termination. During the Initial Term, each party shall have the right to terminate this Agreement and the license granted herein (i) for any reason, upon thirty (30) days' prior written notice; or (ii) in the event the other party violates any material provision of this Agreement in a material respect (an "Event of Default") and fails to cure such Event of Default in accordance with Section 7.3 hereof.  Any termination by Company pursuant to this Section 7.2 shall not affect any contractual obligations to which Datran has agreed with its clients prior to the effective date of termination and, therefore, Datran shall be able to use the Data to the extent necessary to fulfill any outstanding contracts entered into prior to termination.

        7.3     Notice and Opportunity to Cure. Upon the occurrence of an Event of Default during the Initial Term, a party shall deliver to the defaulting party a written notice of its intention to terminate that identifies in detail the Event of Default (a "Default Notice"). If the Event of Default remains uncured for thirty (30) business days following the receipt by the defaulting party of the Default Notice, the non-defaulting party may

terminate this Agreement and the license granted herein by delivering to the defaulting party a notice of termination that identifies the effective date of the termination.

    7.4    <u>Actions Upon Termination</u>. Upon termination of this Agreement, the following shall occur:

    a.    Company shall cease providing Data, including updates, to Datran.

    b.    Provided that Company is not in default under the Agreement, Datran shall pay to Company all sums due and owing, if any, within thirty (30) days of the effective date of termination.

    c.    Datran will cease use of the Data upon the effective date of termination, and return or destroy all copies of the Data upon Company's written request.

**8.**    **Suppression Lists.** In accordance with applicable federal and state law including, but not limited to, the CAN-SPAM Act of 2003 and any and all Federal Trade Commission enabling regulations, each party shall maintain a suppression list containing email addresses of individuals and/or entities that have expressed that they do not wish to receive subsequent e-mail marketing from that party  Company agrees that it will not deliver any Data to Datran that has not been compared against Company's suppression list and purged as required. Within forty-eight (48) hours of receiving an opt-out request, each party shall so notify the other. Each party will use good faith efforts to remove such information from its database(s) and update its suppression list within forty-eight (48) hours of receipt. Each party expressly agrees not to use its or the other party's suppression list for purposes of email marketing, or provide either party's suppression lists to any third party for such purpose.

**9.**    **Privacy.** Company and Datran acknowledge that adherence to fair information collection practices is of utmost importance. During the term of this Agreement, Company agrees that its website(s) will feature an easy-to-understand privacy policy, linked, at a minimum, conspicuously from each website's home page, with a link that contains the word "Privacy," that, (i) in addition to the disclosures about Company's privacy practices, expressly discloses that personal information may be shared with third parties, and (ii) offers the user an opportunity to opt out from certain collection and use of such personal information by Company or third parties. Datran shall have the right to terminate this Agreement on five (5) days prior written notice to Company if Company breaches this <u>Section 9</u> and fails to remedy such breach within said five (5) day period.

**10.**    **Confidential Information.** The parties agree that they may exchange proprietary information related to the provision and use of the Data in accordance herewith, including e-mail addresses, trade secrets, know-how and confidential information (collectively the "Confidential Information"). Confidential Information shall include the terms of and the existence of this Agreement and the Data. During the Term of this Agreement and at all times after its termination, each party and its employees and agents shall maintain the confidentiality of the Confidential Information of the other party and not sell, license, publish, display, distribute,

disclose or otherwise make available such Confidential Information to any third party nor use such Confidential Information except as authorized by this Agreement. Neither party shall disclose any such Confidential Information other than to employees, agents and permitted contractors of such party who reasonably need to know such Confidential Information in connection with the exercise of rights or the performance of obligations under this Agreement without the prior written consent of the other party. For purposes of this Agreement, the identity of DM's outsourced email service providers is DM Confidential Information and shall be treated in accordance with this Section 10,. Notwithstanding the foregoing, either party may disclose Confidential Information (a) as required by a properly authorized and authenticated governmental request, (b) in response to a subpoena or court order, (c) to comply with applicable laws, rules or regulations, or (d) in response to an investigation of fraud regarding a specific consumer. The parties agree and acknowledge that, for purposes of this Section 10, Confidential Information does not include the following information:

      a.     information which is in the public domain when it is received by or becomes known to the receiving party or which subsequently enters the public domain through no fault of the receiving party (but only after it enters the public domain);

      b.     information which is already known to the receiving party at the time of its disclosure to the receiving party by the disclosing party and is not known by the receiving party to be the subject of an obligation of confidence of any kind;

      c.     information which is independently developed or received by either party in connection with its own business activities; and

      d.     information which is received by either party without an obligation of confidence of any kind from a third party who the receiving party had no reason to believe was not lawfully in possession of such information free of any obligation of confidence of any kind, but only until the receiving party subsequently comes to have reason to believe that such information was subject to an obligation of confidence of any kind when originally received.

## 11.   Representations and Warranties.

    11.1   By Company. Company represents and warrants to Datran that

      a.     It has all rights necessary to enter into this Agreement and perform its obligations hereunder; and the execution, delivery and performance of this Agreement by either party will not violate any law, statute or other governmental regulation;

      b.     The Data will be as current, accurate and complete as possible using the source data, compilation and data processing methods normally employed by Company in the ordinary course of its business;

   c. The Data was obtained, collected and compiled using methods that fully comply with all applicable laws, rules and/or regulations including, without limitation, the CAN-SPAM Act of 2003;

   d. The email addresses contained in the Data were collected from Company-owned websites, were collected in compliance with all applicable laws and regulations, and with the applicable websites' privacy policies, and such privacy policies specifically disclose to users of such websites that personal information collected on the websites may be shared with third parties, and allow for Company to conduct the marketing activities contemplated hereunder; and

   e. Company will not sell, rent, lease, license, exchange and/or otherwise transfer any email address contained in any Suppression List(s). Company will not sell, rent, lease, license, exchange and/or otherwise transfer any email address of an individual or entity that has unsubscribed from receiving future email solicitations from Company and/or Datran.

  11.2 By Datran. Datran represents and warrants to Company that:

   a. It has all rights necessary to enter into this Agreement and perform its obligations hereunder; and the execution, delivery and performance of this Agreement by either party will not violate any law, statute or other governmental regulation; and

   b. Datran's use of the Data will, to the best of its knowledge, comply with all laws, statutes and governmental regulations applicable to its use of the Data.

  11.3 EXCEPT AS SET FORTH IN THIS AGREEMENT, THERE ARE NO OTHER WARRANTIES, EXPRESS OR IMPLIED HEREUNDER INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

**12.** **No Consequential Damages/Limitation of Liability.** NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR INDIRECT, SPECIAL, INCIDENTAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, LOST PROFITS) RELATED TO THIS AGREEMENT, ARISING FROM ANY CAUSE OF ACTION WHATSOEVER, INCLUDING, WITHOUT LIMITATION, CONTRACT, WARRANTY, STRICT LIABILITY, OR NEGLIGENCE, EVEN IF SUCH PARTY HAS BEEN NOTIFIED OF THE POSSIBILITY OF SUCH DAMAGES. EXCEPT FOR EITHER PARTY'S INDEMNIFICATION OBLIGATION UNDER SECTION 13, UNDER NO CIRCUMSTANCES SHALL THE LIABILITY OF EITHER PARTY EXCEED THE AMOUNTS PAID TO IT BY THE OTHER PARTY PURSUANT TO THIS AGREEMENT. Any cause of action arising from or in connection with this Agreement shall be asserted within one (1) year of the date upon which such cause of action accrued, or the date upon which the complaining party should have reasonably discovered the existence of such cause of action, whichever is later.

**13.    Indemnification.**

13.1    By Company.  Company shall indemnify and hold harmless Datran from and against any claims, including reasonable legal fees and expenses, that it has breached any warranty provided herein, or that the Data or Company's collection, compilation or use of the Data does or will infringe, violate or misappropriate any third party's U.S. patent, copyright, trademark, trade secret or other intellectual property rights, or any other third party rights, including, but not limited to, breaches of Company's stated privacy policy, and will pay all costs incurred, final judgments awarded or settlements entered into on such claims.

13.2    By Datran.  Datran shall indemnify and hold harmless Company from and against any claims, including reasonable legal fees and expenses, that it has breached any warranty provided herein, or that Datran's use of the Data other than in accordance with the terms of this Agreement infringes, violates or misappropriates any third party's U.S. patent, copyright, trademark, trade secret or other intellectual property rights, or any other third party rights, and will pay all costs incurred, final judgments awarded or settlements entered into on such claims.

13.3    Conditions.  The indemnifying party's indemnification obligations are conditioned upon the indemnified party: (i) giving prompt notice to the indemnifying party of the claim or action; (ii) granting to the indemnifying party sole control of the defense or settlement of the claim or action (except that the indemnified party's prior written approval will be required for any settlement that reasonably can be expected to require a material affirmative obligation of, result in any ongoing material liability to or materially prejudice or detrimentally impact the indemnified party in any way); and (iii) providing reasonable cooperation and, at the indemnifying party's request and expense (except for the value of the time of the indemnified party's employees), assistance in the defense or settlement of the claim or action.

13.4    THIS SECTION 13 STATES THE ENTIRE LIABILITY AND SOLE REMEDY IN THE EVENT OF ANY THIRD PARTY CLAIM ARISING OUT OF INFRINGEMENT OR MISAPPROPRIATION OF THIRD PARTY INTELLECTUAL PROPERTY, VIOLATION OR INFRINGEMENT OF ANY OTHER THIRD PARTY RIGHTS.

**14.    Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to its conflict of laws rules or principles.  The jurisdiction and venue for all disputes hereunder shall be the state and federal courts in the City and State of New York.

**15.    Dispute Resolution.**  Any dispute or controversy arising out of or related to this Agreement or any breach hereof shall be settled by binding arbitration in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association before the American Arbitration Association in the City of New York, State of New York. Any award shall be final and binding and judgment thereon may be entered in any

court of competent jurisdiction. Nothing in this paragraph will be construed to preclude any party from seeking injunctive relief in order to protect its rights pending arbitration.

16.    **General Provisions.**

16.1    Severability. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect except to the extent that such invalid or unenforceable provision was material to the economic benefits of either party under this Agreement. Any provision of this Agreement held invalid or unenforceable only in part or degree shall remain in full force and effect to the extent not held invalid or unenforceable.

16.2    Entire Agreement and Modification. This Agreement supersedes all prior agreements between the parties with respect to its subject matter and constitutes a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter. This Agreement may not be amended except by a written agreement executed by the parties.

16.3    Waiver. A waiver of any default, breach or non-compliance under this Agreement is not effective unless in writing and signed by the party to be bound by the waiver. No waiver shall be inferred from or implied by any failure to act or delay in acting by a party in respect of any default, breach, non-observance or by anything done or omitted to be done by another party. The waiver by a party of any default, breach or non-compliance under this Agreement shall not operate as a waiver of that party's rights under this Agreement in respect of any continuing or subsequent default, breach or non-compliance (whether of the same or any other nature).

16.4    Assignment. This Agreement and all rights granted hereunder are not transferable or assignable without the prior written consent of the non-assigning party; provided however, that this Agreement may be assigned by either party without the other party's written consent to a person or entity who acquires, by sale, merger or otherwise, all or substantially all of the assets or business that party, or to an affiliate of the assigning party. Subject to the foregoing, this Agreement shall inure to the benefit of, and shall be binding on, the parties and their respective successors and permitted assigns.

16.5    Force Majeure. Any delay in or failure of performance by either party under this Agreement will not be considered a breach of this Agreement and will be excused to the extent caused by any occurrence beyond the reasonable control of such party including, but not limited to, acts of God, power outages and governmental restrictions, laws or regulations; provided, however, that lack of funds shall not be deemed to be a reason beyond a party's reasonable control. The parties will promptly inform and consult with each other as to any of the above causes, which in their judgment may or could be the cause of a delay or failure in the performance of this Agreement, and shall use commercially reasonable efforts to remedy the delay or failure or implement an acceptable workaround which minimizes the effect of the delay or failure.

16.6    Publicity. Neither party shall disclose or permit the disclosure to any other person the existence of this Agreement or any of the transactions contemplated hereby unless such disclosure is required to fulfill such party's duties and obligations hereunder, is approved in writing in advance by the other party or is required by any applicable law, regulation (including, but not limited to, stock exchange regulations) or legal process. Any public announcement or similar publicity with respect to this Agreement or the transactions contemplated hereby will be issued, if at all, at such time and in such manner as is agreed by the parties.

16.7    Notices. Any notice under this Agreement shall be in writing and delivered by personal delivery, express courier, confirmed facsimile, confirmed email or certified or registered mail, return receipt requested, and will be deemed given upon personal delivery, one (1) day after deposit with express courier, upon confirmation of receipt of facsimile or email or five (5) days after deposit in the mail. Notices will be sent to a party at its address set forth below or such other address as that party may specify in writing pursuant to this Section 16.7.

To Datran:
Datran Media, LLC
ATTN: Jeff Goldstein, Esq.
345 Hudson Street, 5th Floor
New York, NY 10014
Facsimile: 212-706-9758

With a copy to:
Hogan & Hartson L.L.P.
ATTN: Tracy B. Gray, Esq.
1470 Walnut Street, Suite 200
Boulder, CO 80302
Facsimile: 720-406-5301

To Company:
PureAds
ATTN: Ed Schifter
1730 S. Federal Hwy, Ste 345
Delray Beach, FL 33483
Facsimile: (561) 750-5156

16.8    Relationship of the Parties. Each of the parties are independent contractors. Nothing herein shall be construed to place the parties in a relationship of principal and agent, partners or joint venturers, and neither party shall have the power to obligate or bind the other party in any manner whatsoever.

16.9    Counterparts. This Agreement may be executed in counterparts, each of which will serve to evidence the parties' binding agreement.

WBQ - 024293/000003 - 190206 v3

16.10   <u>Survival</u>. Sections 6, 7.4, 10, 11, 12, 13, 14, 15 and 16 shall survive the termination or expiration of this Agreement.

**DATRAN MEDIA, LLC** ("Datran")          _____ ("Company")


By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

Date: _____          Date: _____

## EXHIBIT A

### 1. DESCRIPTION OF DATA:

The **Data** will consist of an initial file delivery of approximately _____ email data records for email permission or direct marketing.

All Data records delivered pursuant to the terms of the Agreement shall include the following elements:

        (a) first and last name
        (b) postal address, when available
        (c) e-mail address
        (d) telephone number, when available
        (e) IP Address
        (f)Time/Date Stamp
        (g) original site source URL

Company will provide daily new and valid Data updates throughout the Term hereof. Company expects that these daily updates will be approximately _____ entirely new records ("Update Target Amount") per day.

### 2. TYPE OF MEDIA, FORMAT AND DATE OF DELIVERY:

Media: via an FTP Site.

Format:    (a) comma-delimited fields
           (b) double-quoted text fields
           (c) no non-US ASCII characters

Delivery Date: within five (5) business days of the execution of the Agreement.

### 3. LICENSE FEES/ROYALTY PAYMENTS:

Datran shall pay Company a license fee in the amount of fifty percent (50%) of the net revenue ("Net Revenue") generated by Datran in connection with the use of the Data. For purposes of this Agreement, the term Net Revenue shall be defined as all revenues derived from the Data that is actually collected by Datran (minus a $.25/cpm fee for chargebacks, bad debt and sending fees and less any applicable broker commissions)

Datran shall provide Company a monthly report showing revenues earned and costs incurred in the reporting period attributable to use of the Data. Datran shall remit payment to Company net 45 days from the end of the month in which Net Revenue is collected.

BRETT E. LEWIS
LEWIS & HAND, LLP
45 MAIN STREET, SUITE 608
BROOKLYN, NY 11201
brett@lewishand.com
Tel: (718) 243-9323

Attorneys for Claimant-Counterrespondent Datran Media Corp.

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| DATRAN MEDIA CORP., | Case No. 13-117-y-858-11 |
| Claimant and counterrespondent, | |
| vs. | **ANSWER TO RESPONDENT'S COUNTERCLAIMS** |
| MODERNAD MEDIA f/k/a PUREADS, | |
| Respondent and counterclaimant. | |

Claimant and counterrespondent, Datran Media Corp. ("Datran"), by and through the undersigned attorneys, hereby responds to the counterclaims contained within the Answer and Counterclaims (the "Answer") filed by respondent ModernAd Media ("ModernAd") as follows:

44. Datran admits that Respondent attached an unsigned copy of a document purporting to be a List Management Agreement as "Exhibit A" to the Answer. Datran denies that the parties entered into the purported List Management Agreement, and affirmatively avers that unsigned draft agreements are unenforceable. Except as expressly so admitted, Datran denies the allegations of Paragraph 44 of the Answer.

45. Datran denies that the parties entered into the purported List Management Agreement. Datran respectfully refers the Arbitrator to the terms of the draft agreement, itself, for an accurate recitation of its terms. Datran denies the remaining allegations of Paragraph 45 of the Answer.


EXHIBIT
E

46. Datran denies that the parties entered into the purported List Management Agreement. Datran respectfully refers the Arbitrator to the terms of the draft agreement, itself, for an accurate recitation of its terms. Datran denies the remaining allegations of Paragraph 46 of the Answer.

47. Datran denies that the parties entered into the purported List Management Agreement. Datran respectfully refers the Arbitrator to the terms of the draft agreement, itself, for an accurate recitation of its terms. Datran denies the remaining allegations of Paragraph 47 of the Answer.

48. Datran denies that the parties entered into the purported List Management Agreement. Datran respectfully refers the Arbitrator to the terms of the draft agreement, itself, for an accurate recitation of its terms. Datran denies the remaining allegations of Paragraph 48 of the Answer.

49. Datran denies that the parties entered into the purported List Management Agreement. Datran respectfully refers the Arbitrator to the terms of the draft agreement, itself, for an accurate recitation of its terms. Datran denies the remaining allegations of Paragraph 49 of the Answer.

50. Datran denies that the parties entered into the purported List Management Agreement. Datran respectfully refers the Arbitrator to the terms of the draft agreement, itself, for an accurate recitation of its terms. Datran denies the remaining allegations of Paragraph 50 of the Answer.

51. Datran denies the allegations of Paragraph 51 of the Answer.

52. Datran denies the allegations contained in Paragraph 52 of the Answer.

53. Datran denies the allegations contained in Paragraph 53 of the Answer.

54. Datran denies the allegations contained in Paragraph 54 of the Answer.

55. Datran denies the allegations contained in Paragraph 55 of the Answer.

56. Datran denies that the parties entered into the purported List Management Agreement. Datran respectfully refers the Arbitrator to the terms of the draft

agreement, itself, for an accurate recitation of its terms. Datran denies the remaining allegations of Paragraph 56 of the Answer.

57. Datran denies the allegations contained in Paragraph 57 of the Answer.

58. Datran denies the allegations contained in Paragraph 58 of the Answer.

59. Datran denies the allegations contained in Paragraph 59 of the Answer.

60. Datran denies the allegations contained in Paragraph 60 of the Answer.

61. Paragraph 61 of the Answer contains legal conclusions to which no response is required.

## Affirmative Defenses

1. The agreement that ModernAd seeks to enforce is an unexecuted draft, and thus there was no acceptance and no binding obligations were created thereunder.

2. To the extent the agreement that ModernAd seeks to enforce is binding, ModernAd's claims are barred by that agreement's one-year limitation period on claims arising out of that agreement.

3. To the extent the agreement that ModernAd seeks to enforce is binding, ModernAd's claims are barred by its own material breaches of contract and/or duty.

4. ModernAd's claims are barred by the doctrine of waiver.

5. ModernAd breached its covenant of good faith and fair dealing.

6. ModernAd has not suffered any damages.

7. ModernAd's claims are barred by the doctrine of estoppel.

8. ModernAd's claims are barred by its own intentional, culpable conduct.

9. To the extent the agreement that ModernAd seeks to enforce is binding, ModernAd's failure to perform its obligations in accordance with its own representations, within industry standards and within the terms of the parties'

agreement substantially defeated the purpose of such agreement and entitles
Datran to rescission.

10. ModernAd's claims are barred by the doctrine of unclean hands.

11. To the extent the agreement that ModernAd seeks to enforce is binding, the terms
of that agreement are unconscionable.

12. To the extent that ModernAd suffered any damages, it failed to mitigate such
damages.

13. To the extent that ModernAd suffered any damages, such damages are to be offset
by any damages that ModernAd caused Datran to suffer.

14. Datran denies any and all allegations and averments against it that have not been
specifically and expressly admitted herein.

15. Datran reserves the right to add further affirmative defenses, based upon the
course of discovery and proceedings in this action.

DATED: May 27, 2011                           Respectfully submitted,
                                              LEWIS & HAND, LLP


                                              By  /s/ Brett E. Lewis
                                                 Brett E. Lewis
                                              Attorneys for Claimants-Counterrespondents

# LEWIS & LIN LLC

45 Main Street, Suite 608
Brooklyn, NY 11201-8200
>>>Tel:   (718) 243-9323
>>>Fax:  (718) 243-9326

www.ilawco.com

September 14, 2011

**VIA U.S. MAIL AND E-MAIL**
Thomas D. Halket, Esq.
AAA Arbitrator
thalket@halketweitz.com

Ms. Karen E. Smith
c/o American Arbitration Association
950 Warren Ave.
Providence, RI 02914-1414

Re: Datran Media v. ModernAd, AAA Matter No. 13 117 858 11

Dear Arbitrator Halket,

We are writing on behalf of our client Datran Media Corp. in the above-referenced matter ("Datran") in order to provide notice of our intent to request permission to file a motion for summary judgment dismissing respondent ModernAd Media's ("ModernAd") counterclaims.

We believe there is a strong legal basis for granting such a motion. Neither party has been able to locate a fully executed copy of the List Management Agreement at issue, and therefore the enforceable obligations between the parties have been created through their course of dealing, not through that instrument. Specifically, there is no obligation to provide written amendments to the List Management Agreement to modify any of the other obligations; ModernAd simply consented to the complained-of modification by knowingly continuing to deal with Datran after Datran informed ModernAd personnel by email of the proposed modification.

In the alternate, should a fully executed copy of the List Management Agreement emerge and be deemed binding on the parties, that agreement clearly bars respondent's counterclaims by its own terms. Datran can show definitively that ModernAd was on notice of the complained-of modification—at the highest levels—at least [13] months before these counterclaims were asserted, which is well past the 1 year limitation on such claims set in Section 12 of the List Management Agreement.

As the arguments above substantially cover the field of possible interpretations of the List Management Agreement, we do not anticipate any changes to the basis for



our motion at the conclusion of discovery, but in the interests of full deliberation and respect for the arbitration process, we would prefer to make our formal request to file the motion at that time. Should you grant respondent's Motion for Extension of Time dated September 6, 2011 in full and extend the deadline for dispositive motion requests, we will make our request for this motion by that deadline; should you deny that part of respondent's motion, please consider this letter effective as our formal request to move for summary judgment on respondent's counterclaims.

Sincerely,

Brett Lewis
Counsel for Claimant Datran Media Corp.