```
 1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
 2                    MIAMI DIVISION

 3
             Case No. 13-CV-61448-MARRA/MATTHEWMAN
 4

 5   PULSEPOINT, INC.,

 6
                    Plaintiff,
 7
     vs.                              WEST PALM BEACH, FLORIDA
 8                                    OCTOBER 30, 2013

 9
     7657030 CANADA, INC.,
10   doing business as
     ACQINITY INTERACTIVE, LLC
11   formerly known as MODERNAD
     MEDIA, LLC, formerly known
12   as PUREADS, ACQUINITY
     INTERACTIVE, LLC,
13   WARREN RUSTIN,
     JOHN DOES 1-100,
14

15                  Defendants.

16
      MOTION HEARING TRANSCRIPT ON PLAINTIFF'S CORRECTED & AMENDED
17    MOTION TO EXPEDITE DISCOVERY & DEFENDANTS' MOTION TO DISMISS
        AMENDED COMPLAINT OR IN THE ALTERNATIVE, MOTION TO STAY
18           BEFORE THE HONORABLE WILLIAM MATTHEWMAN,
                UNITED STATES MAIGISTRATE JUDGE
19

20   APPEARANCES:

21   FOR THE PLAINTIFF:
                           BY: TIMOTHY M. HARTLEY, ESQ.
22                         800 S.E. 3rd Avenue
                           Fourth Floor
23                         Fort Lauderdale, Florida 33316

24
     REPORTED BY:          JERALD M. MEYERS, RPR
25   TELEPHONE:            954-431-4757
```

```
 1
 2
    FOR THE PLAINTIFFS:
 3
 4
 5
 6                          LEWIS & LIN
                            45 Main Street
 7                          Suite 608
                            Brooklyn, NY  11201
 8                          BY: BRETT LEWIS, ESQ.
 9
10
    FOR THE DEFENDANT:
11
12
13
14                         LYDECKER DIAZ
                           1221 Brickell Avenue
15                         19th Floor
                           Miami, Florida 33131
16                         BY: JOAN CARLOS C. WIZEL, ESQ.
17
18
19
20
21
22  REPORTED BY:           JERALD M. MEYERS, RPR.
                           J.M. COURT REPORTING, INC.
23                         1601 N.W. 109TH TERRACE
                           Pembroke Pines, FL 33026-2717
24                         Telephone: 954-431-4757
25                         E-Mail Address: CRJM@AOL.COM
```

1  (Call to order of the Court)

2        THE COURT:  All right.  Good afternoon everybody.

3  Let's go ahead and call the case.

4        THE CLERK:  Calling case number

5  13-61448-Civil-Marra/Matthewman, Pulsepoint, Inc., formerly

6  known as Datran Media Corporation versus 7657030 Canada, Inc.

7        THE COURT:  All right.  Let's go ahead and get

8  appearances from counsel starting with counsel for plaintiff.

9        MR. HARTLEY:  Good afternoon, Your Honor.  Tim Hartley

10  Hartley law offices, Fort Lauderdale, counsel for the

11  plaintiff.

12        THE COURT:  Good afternoon.

13        MR. LEWIS:  And Brett Lewis, Lewis & Lin, LLC, New

14  York counsel for the plaintiff.

15        THE COURT:  Good afternoon.  And for the defendant?

16        MR. WIZEL:  Joan Carlos Wizel from Lydecker & Diaz on

17  behalf of the defendants that have appeared in the case, and

18  they are 7657030 Canada, Inc. Acquinity Interactive, LLC,

19  Modernad Media, LLC and Warren Rustin.

20        THE COURT:  All right.  Thank you.  And good

21  afternoon.

22        Now, the hearing today has been set on the plaintiff's

23  corrected and amended motion to expedite discovery, which is

24  docket entry number 33, and the defendant's motion to dismiss

25  the amended complaint, or in the alternative motion to stay,

1  which is at docket entry 34.

2         I have read the motions and the responses, and in some

3  cases the reply and surreply in this case, and it probably

4  makes sense to start with the defendant's motion to dismiss the

5  amended complaint, or in the alternative the motion to stay.

6  So that is the defendant's motion.

7         Let me then turn to Mr. Wizel.  Is that right?

8         MR. WIZEL:  Yes, Your Honor.

9         THE COURT:  All right.  Let me hear what you have to

10  say on this motion dismiss or alternative motion to stay.

11         MR. WIZEL:  Very well, Your Honor.  Should I use the

12  podium?  Is that okay with you?

13         THE COURT:  Whatever is more comfortable for you as

14  long as you are speaking into a microphone.

15         MR. WIZEL:  May it please the court.

16         THE COURT:  Yes.

17         MR. WIZEL:  Is this okay?

18         THE COURT:  Yes.

19         MR. WIZEL:  Very well.  Judge, we have moved to

20  dismiss on the basis that the parties back in 2007 entered into

21  a master services agreement that governed the relationship

22  between them, and it has, within that agreement, an arbitration

23  clause and a limitation of actions clause that says you can

24  only bring any actions arising out of this or relating out of

25  this agreement within one year.

Now, in thinking about how to best explain this case, I think it is important to make a distinction between two concepts.

One is a claim for fraudulent transfer to avoid a liability based on a contract and a fraudulent transfer based on an intent to avoid paying a judgment, and what we have here, both front and center is the first type of claim.

The plaintiffs have claimed that Modernad in January of 2010, or 2011, excuse me, transferred assets to Acquinity, and they did so to avoid liability under the contract, and so we are dealing with this concept of alleged fraudulent transfer, not the intent to avoid paying a judgment that was only obtained in 2013.

Now, when we look at the case that way, I think the case is very much like one of the cases that we have cited to the court in our motion, and it is called Tenant Health Care Corporation versus Maharaj, and that's a case out of the Fourth District Court of Appeal in 2001.

In that case there are claims of tortious interference with business relationships, breach of general partners, fiduciary duty, original breach of contract that was eventually dropped and a claim for fraudulent transfer for some of the defendants attempts to transfer assets out of the partnership to avoid liability under the contract with the plaintiff.

In that case the court looked at language that is very

1   similar to the language that we have in the master services

2   agreement that applies here that said, "Any controversy or

3   claim arising out of, or in connection with this agreement,

4   over an alleged breach thereof, shall be settled by

5   arbitration," and the court interpreted that language, and in

6   looking at the allegations in the claim said that the

7   fraudulent transfer claim falls within the purview of the

8   agreement.  Why?  Because the plaintiff relied on the

9   allegations of the contract.

10          The plaintiff referred to allegations in the contract

11   in the claim, and the facts all along arose out of the same

12   transaction and the same facts for which the plaintiff was

13   seeking an action referred to in the transfer.

14          So in that case the court compelled arbitration and

15   said that the claim falls within the arbitration clause, and so

16   we are seeking to apply that case to this fact.

17          Now, the language in our agreement is very similar.

18   If you look at page 2 of our motion to dismiss, we quote the

19   language of the agreement, and it says, "Any dispute or

20   controversy arising out of or related to this agreement, or any

21   breach hereof, shall be settled by binding arbitration in

22   accordance with the then current commercial arbitration rules

23   of the American Arbitration Association before the American

24   Arbitration Association in the City of New York."

25          So the language is very, very similar to the case in

1    Tenant.

2              THE COURT:  Well, I read the Tenant Maharaj case, and

3    let me ask you this, though:

4              How can underlying agreements control the Statute of

5    Limitations when the debtors, other than Modernad, were not

6    even parties to the agreements?

7              MR. WIZEL:  Well, Your Honor, we have cited several

8    cases to that FUDUCTA position.

9              When the plaintiff is relying on the agreement to

10   assert a claim against non-signatories to the contract, the

11   Doctrine of Estoppel, and there are three aspects of that

12   doctrine that we laid out in our motion, one of those aspects

13   says when the plaintiff relies on the contract to assert a

14   claim against non-signatories, the non-signatories can rely on

15   the contract and impose a contract against the plaintiff,

16   whereas a signatory can rely on that contract.

17             THE COURT:  But how could the contracts anticipate

18   fraudulent transfers in the future with various third-parties

19   who did not have any relationships to the contracts?

20             MR. WIZEL:  Right.  And that's I think part of the

21   distinction that I wanted to make at the beginning.

22             We are dealing with mainly the transfer, but, again,

23   how could the contracts anticipate fraudulent transfers in the

24   future?

25             You are saying here that, I guess what you are arguing

1    is that this is an action based on a contract, and the contract

2    required arbitration, but isn't this really an action based on

3    an arbitration award and a final judgment entered by the New

4    York State Court?

5            MR. WIZEL:  No, Your Honor, because the arbitration

6    award was only entered in 2013.  The transfer of the assets

7    from Modernad to Acquinity, as alleged in the complaint,

8    happened in January of 2011.

9            So there was no arbitration award.  There was not even

10   an arbitration initiated when the transfer occurred.  So that

11   is what gives rise to all of these claims.  It is not

12   transferred.

13           Now, wha tthe plaintiff is alleging in the complaint

14   is that Acquinity, who was the transferee, may be seeking to

15   transfer those assets.

16           We don't think they are going to allege any facts to

17   support that allegation, but that's what the conclusory

18   allegations say.

19           THE COURT:  Well, is the plaintiff relying on the

20   underlying contracts in the complaint, or are they relying on

21   the arbitration award in the final judgment and simply

22   explaining the contract or the contracts as background for the

23   pleadings and for the court?

24           MR. WIZEL:  They have to rely on the contracts, Your

25   Honor, because it is the contracts that gave rise to the

1    alleged fraudulent transfer in January of 2011.

2        There was no arbitration award. There was not even a

3    claim filed or made against Modernad at the time of the

4    transfers. So they have to rely on the contracts.

5        That's why they cited or they set out the terms of the

6    agreements in the complaint, and they alleged that when that

7    transfer occurred, it was done by Modernad to avoid creditors.

8        THE COURT: And when was that done?

9        MR. WIZEL: That was January 1, 2011.

10        THE COURT: Okay. When was the arbitration award?

11        MR. WIZEL: The arbitration award, it was this year,

12    and I can give you the exact date.

13        THE COURT: But aren't they arguing that the transfers

14    are ongoing?

15        MR. WIZEL: Well, they are saying that Acquinity now,

16    after the judgment was entered, is seeking to transfer assets.

17        That's the general allegation, to other companies,

18    that we don't know who they are, but that's the allegation, but

19    the problem is if they cannot attach liability to Acquinity.

20        They can certainly not go against transferees of

21    Acquinity which would not be subject to a claim for fraudulent

22    transfer that happened on January 1st of 2011.

23        THE COURT: And the transfer that happened on January

24    1st, 2011 was the transfer from Modernad to Acquinity; is that

25    right?

1          MR. WIZEL:  Correct.  Correct.

2          THE COURT:  All right.

3          MR. WIZEL:  And so the allegation is when that

4   happened Modernad was seeking to avoid the liability under the

5   contract and not pay the contract, and that now, even years

6   later they are alleging that Acquinity, which is a separate

7   company, is seeking to transfer assets, but they cannot lay the

8   connection without attaching liability to Acquinity at the

9   first transfer.

10          The problem is, Your Honor, even when they started the

11   arbitration, they even named Acquinity in the arbitration.

12          The arbitration was filed in March of 2011.  March

13   3rd, 2011, only a few months after the transfer was made, and

14   in that arbitration they named Acquinity, and they decided, for

15   whatever reason, to drop Acquinity from the arbitration, and

16   they proceeded only against Modernad.

17          So I think what is clear is that Acquinity, at least

18   Acquinity can enforce the terms of the agreement against the

19   plaintiff and those changes require a one year Statute of

20   Limitations and arbitration to commence within one year, and

21   they haven't done that.

22          So if they cannot attach liability to Acquinity back

23   then.  They cannot attach liability to Acquinity for what it is

24   doing today, and those are the allegations in the complaint.

25          THE COURT:  All right.  And you had mentioned

1    something about domestication of the arbitration award in a

2    Florida court.

3         What is happening in the state court action that would

4    change the outcome of this case, if anything?

5         MR. WIZEL:  Well, there are two actions in state

6    court.  The first one is an action in aid of execution of the

7    judgment for which there was actually a deposition on Monday.

8    This past Monday.

9         THE COURT:  Of who?

10        MR. WIZEL:  Of the corporate representative of

11   Modernad.

12        THE COURT:  Okay.

13        MR. WIZEL:  So that deposition has taken place, and

14   now the plaintiffs can move to enforce the judgment in that

15   action, or whatever else they decide to do.  That's the status

16   of that action.

17        The other action is the action that was filed by

18   Modernad against Datran.

19        THE COURT:  Well, that was the one that the trial

20   court dismissed?

21        MR. WIZEL:  The trial court dismissed.  Exactly.

22        THE COURT:  And where is the Fourth District Court of

23   Appeal with that counterclaim case?  Have they ruled or have

24   they heard oral argument yet?

25        MR. WIZEL:  They have not ruled, nor the parties have

1   requested oral argument.  The briefing was completed I believe

2   in July of this year.  So we have been checking every week.

3           I checked this morning, and the opinion has not come

4   out yet, and it is still pending.

5           THE COURT:  But how would the outcome of that appeal

6   directly impact this case?

7           MR. WIZEL:  Two ways, Your Honor.  As you may recall,

8   the claim that we attempted to make here in the trial court in

9   Florida was also made in the New York arbitration, and that

10  arbitration proceeded to a final hearing, and that claim was

11  adjudicated in the New York arbitration.

12          It was denied against our client, and there were

13  attorney's fees assessed against our client.

14          THE COURT:  That was some sort of setoff claim?

15          MR. WIZEL:  Yes.  It would be a setoff claim.

16          MR. LEWIS:  Allegedly?

17          MR. WIZEL:  Correct.

18          THE COURT:  Right.

19          MR. WIZEL:  If it was successful, there would be a

20  setoff claim.

21          THE COURT:  And what is the basis of that claim?

22          MR. WIZEL:  The basis of the claim is that the parties

23  have had an agreement called a list management agreement.

24          THE COURT:  A different agreement then the agreements

25  at issue in the arbitration?

1          MR. WIZEL:  Well, that agreement was also at issue in

2     the arbitration because there was a counterclaim that was

3     adjudicated.

4          THE COURT:  But it is not the agreement that you are

5     relying on to argue that there is a one year Statute of

6     Limitations in this case?

7          MR. WIZEL:  Correct.

8          THE COURT:  Okay.

9          MR. WIZEL:  Correct.

10         THE COURT:  All right.  Go ahead.

11         MR. WIZEL:  It is a separate agreement.  The results

12    are subject to arbitration.  That agreement contained an

13    arbitration clause, but the agreement was not signed.

14         The parties did not know it was not signed until later

15    on in the arbitration.  When we found out there was no signed

16    agreement, that's when we filed the action in the state court.

17         The action in the state court is based on a breach of

18    contract of all of the agreement and a FUDUCTA claim.

19         The way that the terms were changed between the

20    parties, we even claimed it violated the statute, and we are

21    willing to proceed on that claim here in the state court

22    because, in part, New York does not recognize such a cause of

23    action for a corporation, and all of this consumer statute in

24    New York only allows for individual parties, persons to bring

25    that type of claim, and so our argument here is we are entitled

1  to that claim to proceed in state court, even if the

2  arbitration provision in the unsigned contract was enforceable,

3  and that is what is at issue right now before the Fourth

4  District Court of Appeal.

5          THE COURT:  And that was a claim by who against who?

6          MR. WIZEL:  Modernad against Datran.

7          THE COURT:  All right.

8          MR. WIZEL:  Which is Pulsepoint now.

9          THE COURT:  Which is Pulsepoint now.  And what was the

10 approximate amount of the claim and what was the allegation as

11 to whether they owed money?

12         MR. WIZEL:  The allegation was $1,000,000.

13 Approximately $1,000,000, and it was based on a fee that Datran

14 was charging Modernad, and there was an arrangement as to what

15 that fee would be, which was 25 cents for every 1,000 e-mails,

16 and the fee was unilaterally changed by Pulsepoint, Your Honor,

17 or Datran, such that the damages to Modernad would be

18 approximately $1,000,000.

19         THE COURT:  All right.  And have the parties in this

20 case held a scheduling conference yet?

21         MR. WIZEL:  We have not, Your Honor, because there was

22 no scheduling order from the court requiring it to happen 21

23 days after the last defendant filed an appearance or a response

24 to the complaint.

25         THE COURT:  And who has not yet filed any appearance?

1          MR. WIZEL:  The last added defendant has not, and

2     that's 8333947 Canada, Inc.  It is a Canada company.

3          The plaintiff has stated in their papers that they

4     have to figure out how to serve that company in Canada.  I

5     believe it is just a matter of figuring out the logistics and

6     Canada law how that works.

7          I don't know if they know the whereabouts of the

8     company.  I believe they do, but they haven't served them.

9     That's the last thing that I know.

10         THE COURT:  Okay.

11         MR. WIZEL:  And so they haven't filed an answer.

12         THE COURT:  All right.  Now, your motion to dismiss

13    argues that the plaintiffs claims are time barred by the one

14    year Statute of Limitations which you have talked about, but if

15    the court were to deny the motion to dismiss the complaint,

16    your alternative would be in the state action pending

17    resolution of the two state court matters; is that right?

18         MR. WIZEL:  That's right.

19         THE COURT:  And why is that?  Why should the matter be

20    stayed regarding those two state court matters?

21         One is just I think a domestication of the judgment

22    and the other one is a case that was dismissed and it is now on

23    appeal before the Fourth DCA; is that right?

24         MR. WIZEL:  That is right.  Those are the two cases we

25    are relying on, and the reason we think it should be stayed is

1   because the action in aid of execution, they could proceed to

2   enforce the judgment there.

3           The only allegations that Modernad has not paid is

4   that they haven't returned calls, and so they are pursing that

5   action in state court, and it is a remedy available to them,

6   and they are well within their rights to do that, and they have

7   taken the deposition already of the corporate representative,

8   and now they can move to enforce that judgment in state court.

9           Of course, they haven't done that yet.  The deposition

10  just took place this week.  We don't know what is going to

11  happen, but that is a remedy that is available to them.

12          Secondly, the second action, we have cited to the

13  court a case that says that a setoff can be considered in

14  determining a stay.

15          THE COURT:  Which case is that?

16          MR. WIZEL:  One second, Your Honor.

17          THE COURT:  Well, that's okay.  Why don't you go ahead

18  and continue your argument and later you can let me know.

19          MR. WIZEL:  Yes, Your Honor, and I apologize.  I will

20  find it and bring it back to you, to the court's attention.

21          So if we take that into account that a setoff action

22  could be considered in determining a stay, we are saying

23  between the two actions it is wise for the court to let the

24  state actions complete, finish, especially because the setoff

25  action could be substantial to the final award to be recovered,

1   if any, by Pulsepoint.

2        And lastly, Your Honor, we also move to stay under the

3   Buford Doctrine, and that's a doctrine that says that if there

4   is a substantial issue of state law pending in the state court

5   in the related action, the court should let the state court

6   decide that issue before proceeding in the federal case.

7        THE COURT:  Well, aren't those two state court actions

8   really parallel?

9        MR. WIZEL:  I believe they are, Your Honor.  If you

10  look at the requests, the subjects of the deposition that was

11  taken on Monday and the discovery the plaintiff is seeking in

12  this case, it is very similar.  The issues are the same.

13        Again, they all arise out of the initial transfer of

14  the assets from Modernad to Acquinity in January of 2011, and

15  that was the subject of the deposition on Monday.

16        That's the subject of the state action, and the other

17  action, the other state action, it would be a setoff to the

18  ultimate award.

19        THE COURT:  Okay.  Now, you had started off your

20  argument stating that there is a difference between a

21  fraudulent transfer to avoid contractual liability versus a

22  fraudulent transfer to avoid a judgment, and your argument I

23  think is that this case is a fraudulent transfer to avoid a

24  contractual liability allegation; is that right?

25        MR. WIZEL:  That's right, Your Honor.

1       THE COURT:  Are you sure?  Is this or could this be a

2   hybrid?  In other words, could it be a complainant that alleges

3   a fraudulent transfer to avoid a contractual liability and a

4   fraudulent transfer to avoid a judgment?

5       MR. WIZEL:  Let me clarify it then.  It is a

6   fraudulent transfer to avoid liability as to Acquinity and

7   Modernad based on the first transfer in January of 2011 when

8   there was no award, and now it is an allegation of fraudulent

9   transfer to avoid a judgment as to Acquinity, saying Acquinity

10  is today transferring assets, but the problem is they cannot

11  attach liability to Acquinity unless they can attach it in the

12  first transfer.

13      THE COURT:  Well, why is that?  Isn't there a

14  judgment?  There is no judgment against Acquinity?

15      MR. WIZEL:  No.

16      THE COURT:  Okay.  So what you are saying is that the

17  judgment was issued against Modernad; is that right?

18      MR. WIZEL:  That's right.  That's right.

19      THE COURT:  Because I know the plaintiff has pled

20  various counts of fraudulent transfer; is that right?

21      MR. WIZEL:  That's right, Your Honor.  Basically, if I

22  can break them down as a fraudulent transfer from Modernad to

23  Acquinity in January of 2011, a fraudulent transfer from

24  Modernad to Warren Rustin who was the president and member of

25  Modernad, and that is again January of 2011, and then Acquinity

1   to other parties, including the new defendant who has not

2   appeared in the case.

3        Those are basically the two layers that they have

4   alleged, but, again, there is no award entered against

5   Acquinity, and so they cannot attach liability against

6   Acquinity unless they do so based on the first transfer.

7        THE COURT:  But aren't they alleging that Acquinity

8   has basically acquired the assets of Modernad for less than

9   value, less then real fair market value in an effort to get the

10  assets of Modernad away from the reach of the creditors?

11       MR. WIZEL:  In January of 2011, yes, and that would go

12  to the merits of their claim, but we are not arguing the

13  merits.

14       We are arguing just that one is already subject to the

15  one year arbitration provision in the contracts.  And so, yes,

16  that is what we are arguing on the merits, and we think we can

17  dispute that and discuss that, but that's not the basis of the

18  motion to dismiss.

19       THE COURT:  And even though Acquinity was not a

20  signatory to the contract, you are saying that they are still

21  subject to the one year Statute of Limitations in the contract?

22       MR. WIZEL:  Correct, because the allegations against

23  Acquinity based upon the January 2011 transfer are based on the

24  agreements, and the agreements, and based on the judicial

25  estoppel argument that we have presented in the motion.

1        THE COURT:  What about Acquinity and Interactive, LLC

2   and Modernad and Media LLC and Warren Rustin?

3        MR. WIZEL:  Well, Acquinity, they are alleged to be a

4   d/b/a, but if you look at the complaint, there are no

5   allegations against the first defendant 7657030.

6        They are treating, I believe, that Canada, Inc., the

7   defendant, the same as Acquinity Interactive, LLC.  There are

8   virtually no allegations as to 7657030, and so the real parties

9   that are alleged in the complaint have not taken any part of

10  the transaction in Acquinity and Interactive, LLC Modernad

11  Media, LLC and again Warren Rustin who was the president and

12  member of Modernad Media.

13        THE COURT:  All right.  Is there anything else that

14  you wanted to add?

15        MR. WIZEL:  No, Your Honor.  If you have any

16  questions, I will be happy to answer them.

17        THE COURT:  All right.  Thank you.  All right.  Let me

18  turn to plaintiff's counsel and ask if you could address the

19  motion to dismiss the amended complaint filed by the

20  defendants, or in the alternative, a motion to stay.

21        MR. LEWIS:  Thank you, Your Honor.  If it please the

22  Court, I will remain where I am standing.

23        THE COURT:  You are Mr. Lewis, right?

24        MR. LEWIS:  Yes.

25        THE COURT:  Okay.

1          MR. LEWIS:  So, Your Honor, off the bat there were

2     several statements that opposing counsel made which in my

3     estimation are not quite accurate or were not completely clear.

4          One of the statements was that my client can only

5     allege, I believe his argument would be that my client could

6     only allege fraudulent conveyance arising out of a judgment

7     debt.

8          You know, if you read the complaint or the amended

9     complaint, paragraph 109 where the first claim is, it makes it

10    very clear that the cause of action here is the first claim for

11    fraudulent conveyance is over efforts to evade a debt that was

12    already existing as of January of 2011, but that was

13    continuing.

14          Under the Florida Statute, the UFTA, Section 726.105,

15    Section 1-A and B, it is not required that a creditor have a

16    judgment in order to assert a claim for fraudulent conveyance.

17          Merely, that there is a debt.  There was a debt, and

18    as the affidavit of Tony Provanzano states, which we submitted

19    in connection with, I believe it was the expedited discovery

20    motion, he was a chief marketing officer of the defendant and

21    sat in at high level meetings where the transition from

22    Modernad to Acquinity took place or the Canadian entity that

23    was doing business as Acquinity took place, and he states very

24    clearly that the main reason why this was done was to avoid

25    having to pay creditors, including my client, and to get out of

1    bad contracts like the one with my client.

2           So I don't understand that that distinction that

3    opposing counsel is trying to make makes any difference at all

4    to their argument.

5           THE COURT:  Well, I think what they were saying, and

6    you can address it, I think what they are saying is because the

7    transfer from Modernad to Acquinity occurred on January 1st of

8    2011, it predated the commencement of the arbitration in March

9    of 2011 and, therefore, you should have sued Acquinity in the

10   arbitration, and you had a one year Statute of Limitations to

11   do it, if I understand their argument correctly.

12          MR. LEWIS:  I think that is one of the things that

13   they do seem to be arguing, and I can address that in several

14   different ways.

15          First of all, my client did initially, as opposing

16   counsel said, named Acquinity, even though Acquinity wasn't a

17   party to any of the agreements because we had become aware that

18   there was a new entity named Acquinity, and my client believed

19   that Acquinity had acquired the business of Modernad.

20          I was called by counsel for Modernad and Acquinity and

21   told that they are completely separate companies; that they

22   were in a different business; that they were not related to

23   each other, and we didn't have any factual information.

24          They were not signatories to the contract that was

25   governing the arbitration.  So upon representation of opposing

1   counsel, we removed them from the complaint.  From the claim.

2        The other issue also came up in arbitration I would

3   have to search to see if it was on record, and if it is in the

4   transcripts, but the issue of whether Acquinity could be a

5   proper party for the arbitration came up because we did try to

6   ask some questions, and I was the attorney who was asking those

7   questions of one of defendant's witnesses, their chief

8   financial officer into the relationship between Acquinity and

9   Modernad and the asset purchase agreement, and they objected up

10  and down that these were inappropriate for the scope of the

11  arbitration.

12       Acquinity was a different company, and the arbitrator

13  said, he allowed a few questions, but he said the contracts

14  cover Modernad and Datran.  Acquinity is not a party to them.

15  It is outside the scope of his jurisdiction to consider that.

16       So there was nothing more that we could have done, and

17  the only way that we would have been asserting a claim against

18  Acquinity would have been successor liability.

19       Acquinity is, in effect, Modernad because they

20  acquired the business.  Once we were told there was an asset

21  purchase for less then all of the assets, just only certain

22  assets is the way that they couched this language, and you will

23  see in some of the exhibits that we attached certain assets

24  language re-appears.

25       I don't want to testify as a witness, but I believed

1   that there were assets that remained with Modernad, and that

2   Modernad was a going concern business because I was being told

3   this by counsel.

4        THE COURT:  So, in other words, I guess what your

5   position is, is then in the arbitration you didn't have the

6   evidence to establish that Acquinity was receiving all of the

7   assets or a large portion of or a large portion or the major

8   portion of the assets from Modernad, and that you were

9   expressly told that they were completely unrelated.  So you

10  really had no evidence at that point to proceed against

11  Acquinity.

12       MR. LEWIS:  That's correct, and I believe that this is

13  a separate issue from whether or not my client or whether or

14  not Acquinity would fall, a fraudulent conveyance claim against

15  Acquinity for attempting to or conspiring to evade paying a

16  debt to my client falls within the scope of the underlying

17  agreements and their arbitration clause and contractual

18  limitations period, but, yes, Your Honor is absolutely correct.

19       We did not have sufficient evidence at that time to

20  establish successor liability against Acquinity to sue

21  Acquinity for the same underlying factual issues that we were

22  going after Modernad for.

23       THE COURT:  Do you have the evidence at that point to

24  establish the counts that are in your complaint in this case?

25       MR. LEWIS:  Absolutely not.  Absolutely not.

1          THE COURT:  And I know Mr. Wizel makes a distinction

2     of a fraudulent transfer to avoid a contractual liability which

3     he says is at issue in this case versus a fraudulent transfer

4     to avoid a judgment.

5          This lawsuit here in federal court, is this a lawsuit

6     regarding fraudulent transfers that are attempting to avoid the

7     judgment, fraudulent transfers that are attempting to avoid the

8     contractual liability, or sort of a combination?

9          MR. LEWIS:  A fourth answer, I think.  It is partially

10    a fraudulent conveyance action to avoid or reverse transfers to

11    avoid a judgment.

12          So anything that is taking place now where assets are

13    being conveyed to additional new entities is clearly being done

14    to avoid a judgment, and at some point it may have been done to

15    avoid an arbitration award.

16          The original actions that were taken in January of

17    2011, and it should be understood that the parties were

18    already, there had been meetings.  There had been attempts at

19    resolving the debt.

20          It wasn't that the lawsuit or the arbitration in March

21    of 2011 just sprang out of thin air.  There already was a

22    dispute, and there was a debt for close to half a million

23    dollars, and at the time that the defendants did this

24    transaction, part of what this claim is seeking, the fraudulent

25    conveyance claim is, is saying now we know.

1        We found out now that what was going on in January of

2   2011 was an effort to avoid paying a debt.

3        It is not a debt to avoid getting out of, I don't know

4   how they want to couch it.

5        They want to couch it as it was contractual.  I don't

6   see any contractual rights that or rights or remedies or

7   obligations under the software licensing agreement that would

8   have governed, you know, the debtor conveying assets to a

9   third-party and its principal in order to avoid having to pay.

10       That doesn't strike me as something that arises under

11  the licensing agreement, and I don't see any authority that the

12  other side has submitted that would support that, either.

13       You know, if Your Honor will permit, Your Honor is

14  familiar with the Tenant versus Maharaj decision --

15       THE COURT:  Right.

16       MR. LEWIS:  -- that the defendants are relying on.  It

17  was a doctor who signed employment agreements and another

18  contract with one of his entities.

19       He asserted claims under the employment agreement.

20  Both of these contracts contain arbitration provisions.

21       He asserted rights and obligations under both.  He

22  dismissed the employment related claims, but he still asserted

23  claims that arose under these agreements and against parties

24  who, I believe there was a hospital that was closely involved

25  at the time, and the doctor asserted claims against entities

1  that were all actively involved in performing in some way,

2  shape or form under these agreements.

3         So it is not at all the situation where there is a

4  company that did not exist that was formed for the specific

5  purpose of avoiding having to pay a debt, and it may be, and it

6  appears that there were other debts that they also wanted to

7  avoid paying, but one of them was to our client which makes it

8  no less of a fraudulent conveyance then if it was the only

9  debt, but they did form this new entity to avoid having to pay

10 debts.

11        The entity did not exist when the contract or the

12 arbitration provision or the contractual limitations clause in

13 the underlying agreements were signed.

14        They were never made a party to the agreements.  They

15 flat out represented that they were a separate company and not

16 subject to liability under these agreements during the

17 arbitration.

18        And, in fact, to go into this a little bit, because

19 this ties into a pattern of the defendant's behavior throughout

20 these proceedings, their Florida court state action was filed 9

21 months after the defendants filed counterclaims in their

22 arbitration; counterclaims in which they allege that the

23 arbitrator had jurisdiction or exclusive jurisdiction over

24 their counterclaims; that their counterclaims arose under an

25 agreement which was arbitrable.

1              We took discovery.  Extensive discovery.  It was

2    heavily contested, and then a month before the arbitration

3    hearings were supposed to start, they filed a claim in Florida

4    State Court and moved to stay the arbitration indefinitely and

5    claimed that they had never consented and that the arbitrator

6    lacks jurisdiction.

7              So that's the reason why their claims were dismissed

8    by the Florida State Court.  They now appealed on a procedural

9    basis, claiming that the court should have held a fact hearing.

10   Whether or not they are successful in that, their claim is

11   going nowhere.

12             They then signed a stipulation which we can produce,

13   if it pleases the court, which said that they rely on the

14   decision of the Florida court.  If the Florida court found that

15   the jurisdiction was with the arbitrator, that would be the end

16   of the matter.  They would litigate.

17             The Florida court ruled in our favor and dismissed

18   their claims.  We litigated.  We spent hundreds of thousands of

19   dollars on that, and after that was over, they disregarded the

20   stipulation they entered into and they filed an appeal.

21             We never agreed to this.  So there is a pattern on the

22   their part, and we did put these things into our papers, and I

23   apologize to some extent for bringing in issues outside the

24   specific scope of these motions, but when I hear opposing

25   counsel, who was not even a party to any of these proceedings,

1  make representations like plaintiff should have named

2  Acquinity, you know, and make representations about the Florida

3  state action, it is a little bit upsetting at this point to use

4  those as excuses for why the case should not go forward.

5       THE COURT:  Because you are saying that the fraudulent

6  transfers were hidden from your clients and basically

7  misrepresented to you that these companies were not related?

8       MR. LEWIS:  Absolutely.

9       THE COURT:  All right.  Now, let me ask you this:  You

10  mentioned the Tenant versus Maharaj case.  That's not a Statute

11  of Limitations case.

12       I don't think any case cited by the defendants have

13  been a Statute of Limitations case.

14       MR. LEWIS:  Did I use those words?

15       THE COURT:  No, no.  The reason I say that is because

16  those are cases dealing with arbitration, but none of them make

17  a finding or make any decision about a Statute of Limitations.

18       So let me ask you the question I asked opposing

19  counsel:

20       How can the underlying agreements control the Statute

21  of Limitations when debtors other than Modernad, as I

22  understand it, were not even parties to the agreements?

23       MR. LEWIS:  I don't see how they could.  I mean, I

24  don't know what more I could say.

25       I don't see, as a matter of contract law, how entities

1   that did not exist and were not parties to a contract and were

2   not made parties to a contract, by amendment, or otherwise,

3   could purport to claim rights under a contractual limitations

4   provision which apply to disputes arising out of or relating to

5   that contract.

6        THE COURT:  And I mean you have also made an argument

7   in reading your papers, but could the contracts anticipate

8   fraudulent transfers in the future with various parties who did

9   not have any relationship to the contracts?

10        In other words, you have some contracts.  I guess if

11   they were software contracts that had an arbitration agreement,

12   how would those contracts in the arbitration agreement

13   anticipate fraudulent transfers in the future with other

14   parties who were not even parties to that contract?

15        MR. LEWIS:  Or in existence.  I mean, the level of

16   relatedness, we are approaching but for.  I don't think we are

17   approaching.  I think we are at but for causation here.  But

18   for the fact that there was an underlying agreement, there

19   would not have been a fraudulent conveyance.

20        I think we would have to, it is absolutely 100 percent

21   correct that had these parties never entered into a contract,

22   the defendants could not have fraudulently conveyed assets to

23   avoid having to pay a debt that arose under that contract, but

24   I don't see that.  The fraudulent conveyance had nothing to do

25   with the performance of the contract itself.

1    THE COURT:  Well, in your complaint are you relying on

2  the underlying contracts in your complaint?

3    Are you relying on the arbitration award in the final

4  judgment and simply explaining the contracts as background for

5  the court?

6    MR. LEWIS:  The latter, Your Honor.  We are using, or

7  as a matter of providing some background for the court to

8  understand how we came to where we are, we have put together a

9  very brief summary of factual pleadings concerning the

10  underlying agreements.

11    Nowhere in our papers do we allege any rights or any

12  right to any remedies arising out of a breach of the underlying

13  agreements.  We are not trying to re-litigate the contractual

14  issues.

15    THE COURT:  Right.  I mean, the contractual issues

16  were all litigated up in New York, and that's a settled matter;

17  is that right?

18    MR. LEWIS:  That is correct, Your Honor.

19    THE COURT:  Now, I noted that some of the dates I got

20  was January 1st, 2011 was the alleged fraudulent transfer.

21  March of 2011 was the arbitration.  When was the arbitration

22  award entered, approximately?

23    MR. LEWIS:  January.  I believe it was the 9th or the

24  11th of 2013, and then it was amended later in the month.

25  Possibly the 18th.

1          THE COURT:  And when was the final judgment entered?

2          MR. LEWIS:  I believe it was May of 2013.

3          THE COURT:  And then this action was filed after you

4     got the final judgment in New York State Court?

5          MR. LEWIS:  Correct, Your Honor.

6          THE COURT:  Now, the defendant is also arguing that

7     even if the motion to dismiss is denied, that the matter should

8     be stayed, and they refer to a domestication of an arbitration

9     award in state court as one of the reasons for that.

10          How would the domestication of the arbitration award

11     affect this case, if at all, and what is happening in the state

12     court action that could allegedly change the outcome of this

13     case, if anything?

14          MR. LEWIS:  In the state court case we have taken a

15     deposition.

16          MR. HARTLEY:  Your Honor, if I may address that?

17          THE COURT:  Sure.  And give me your name again?

18          MR. HARTLEY:  Yes.  Tim Hartley.

19          THE COURT:  All right.  Go ahead.

20          MR. HARTLEY:  I filed the notification actions both in

21     Broward Circuit Court and Palm Beach Circuit Court to make sure

22     that the judgment under the Uniform Enforcement & Foreign

23     Judgments Act was properly before a Florida court.

24          What we have done to date is, and I must say, though,

25     our efforts to take the deposition of the corporate

1   representative go back to July of this year, but we were

2   finally able to accomplish the first half of that on Monday

3   after a couple of court hearings in front of Judge Philips in

4   Broward Circuit Court.

5          Where we are right now is we have a second day of

6   depositions to be scheduled once we have had a chance to

7   analyze the financial information we were provided.

8          We have at this point not filed any actions or

9   proceedings supplementary, any third-party actions for

10  fraudulent transfer.

11         Frankly, we feel that what we filed in the District

12  Court covers those issues.  So what we are doing in state court

13  right now is basically the nuts and bolts of domesticating a

14  foreign judgment in Florida.

15         THE COURT:  All right.  And you say you have had one

16  depo in that case?

17         MR. HARTLEY:  Yes sir.  We have taken the deposition

18  of Warren Rustin who was the managing member of Modernad.  That

19  was completed.  Well, it began on Monday until we completed it

20  in short order.

21         THE COURT:  All right.  Now, what about the Florida

22  DCA case, the case where there was some sort of counterclaim

23  filed by the defendant, and it got dismissed and it went up to

24  the Fourth DCA?

25         I know the status of that case because I was told it

1   was fully briefed.  There is going to be no oral argument

2   because nobody requested it, and we are just waiting for an

3   opinion, but is that case relevant to this case and should it

4   cause this case to be stayed?

5         MR. LEWIS:  Your Honor, again, I obviously am biased,

6   but I can't see how that case is relevant to these proceedings

7   or how there could be a possibility of inconsistent rulings.

8         We have a judgment based on an award from an

9   arbitrator on a breach of a contract; a certain contract called

10  a sky list.  I believe it is sky list hosting agreement.

11        There is a counterclaim which is completely unrelated

12  which arose out of a different agreement.  That counterclaim,

13  it was litigated in the arbitration.

14        The arbitrator denied relief to defendants.

15  Defendants, nonetheless, filed an appeal of the state court

16  action that they had filed in Florida.

17        The best outcome that the defendants could possibly

18  hope for is that somehow they are able to prevail on their

19  motion and that there is a hearing than on fact issues to see

20  whether or not their state court claims should have been

21  dismissed without a factual hearing, and the same judge who

22  already dismissed those claims will get to rule.

23        If the defendants won every single motion that they

24  would have to win, they could conceivably some day down the

25  road, and I would say the possibilities of this happening would

1   be extremely remote, they could some day down the road perhaps

2   get a judgment for some amount of money which they could then

3   seek to enforce against my client, and my client would have to

4   pay it, but it doesn't affect the fact that the defendants have

5   taken actions to avoid paying debts and judgments that they owe

6   to my client right now, and I will reiterate that the two

7   agreements, the one under which defendants claims in state

8   court in Florida are asserted under the agreements under which

9   the debt and the judgment were awarded under are different.

10          THE COURT:  Okay.  I mean, I will admit that I am

11  having a little difficulty understanding why the case should be

12  dismissed on a Statute of Limitations basis when it appears the

13  plaintiff is merely seeking to go after fraudulent transfers

14  which have allegedly occurred over various points in time.

15          I mean, I am having a hard time finding that those

16  fraudulent transfers and the actions that you have in this case

17  would have to have been brought in the arbitration case within

18  a one year period, and I will turn to Mr. Wizel in a second

19  just to finish up the argument on that, but I am having a hard

20  time buying the defense argument on that, after having read

21  everything and doing some research, but is there anything else

22  that you want to add on regarding the motion to dismiss and/or

23  the alternative motion to stay?  And then I know we are going

24  to get to your motion to expedite discovery, but I want to go

25  through this process first.

1          MR. LEWIS:  I might only just briefly add I understand

2    that Your Honor is familiar with this and has read the papers

3    and you are familiar with them, so I don't want to just rehash

4    points that we made in our papers, but I would say, also, I am

5    just saying that the parties and the actions are the same does

6    not mean that they are.

7          The only party that overlaps in these cases is

8    Modernad and Datran, and those are the only parties that

9    overlap.

10         The other defendants are all new.  They are not

11   parties to the other actions and nor will they be.  And as far

12   as Buford, I mean we didn't admit it.

13         I believe we said in our papers that the defendants

14   remaining arguments lacked merit, but it does not appear to be

15   a doctrine which would involve, this is not a case involving

16   difficult questions of state law bearing on policy problems of

17   substantial public import.  We will just leave it at that.

18         THE COURT:  All right.  And before we turn to the

19   motion to expedite discovery, let me ask you, Mr. Wizel, as I

20   said, the court is having some difficulty understanding why a

21   one year Statute of Limitations contained in an arbitration

22   agreement in a software contract should be applied in a federal

23   case where the plaintiff is seeking to avoid fraudulent

24   transfers made over a period of time and in response to a

25   judgment which is final from a New York State court.

1    It is not an appeal.  It is final.  Plaintiff won in

2  that case.  I am having a hard time understanding your argument

3  as to why this matter should be dismissed on a Statute of

4  Limitations.  So I will give you just a couple of minutes to

5  give me anything else that you want to.

6    MR. WIZEL:  Thank you, Your Honor.

7    There were several statements made outside of the

8  record, so I think it is important to clarify what the

9  arbitration was about.

10    The arbitration was about when Modernad stopped using

11  the services as of December, 2010 which is the allegation, that

12  was the allegation in the arbitration, Acquinity continued

13  using the services that Datran was providing.

14    Again, that's the allegation in the arbitration, and

15  so there was, as counsel said, there was about $450,000 of debt

16  that the plaintiffs were alleging against Modernad from the

17  contract, from June of 2010 to December of 2010.

18    Now, if you notice the award is for much more than

19  that, and the reason is that they were claiming that Modernad

20  continued using the services.

21    Really what they are alleging is Acquinity continued

22  using the services of Datran after January of 2011, and so to

23  say that they didn't know Acquinity was involved and had

24  nothing to do with this, I don't think that's accurate.

25    I think it is clear that the judgment, the total

1   judgment included the services that Datran was allegedly

2   providing to Acquinity by virtue of their continued use of the

3   services, and so I just wanted to clarify that.

4         THE COURT: No. I understand that, and I understand

5   there may have been some argument made by both sides on matters

6   outside of the record on that.

7         On a motion to dismiss I am supposed to look to the

8   four corners of the complaint. I think probably the arguments

9   are just trying to educate the court a little bit about what

10   happened I guests I back in the arbitration proceeding.

11         MR. WIZEL: Right. And as he mentioned, I was not

12   part of that proceeding. I don't know what conversations he

13   might have had.

14         I don't know if they are part of the record, but I do

15   know what they are alleging in the complaint, and what they

16   alleging in the complaint, save for one letter that they

17   specifically mentioned of December of 2010, every other fact

18   that they alleged in the complaint to support the claim for

19   fraudulent transfer for the Modernad and Acquinity transfer,

20   those are all facts they knew.

21         THE COURT: So you are argue the plaintiffs had to

22   bring its claim by January of 2012 because the plaintiff knew

23   of the transfer in January of 2011?

24         MR. WIZEL: Absolutely.

25         THE COURT: Okay.

1        MR. WIZEL:  Or sometime in 2012, but certainly not in

2   2013.

3        THE COURT:  All right.  And do you know whether any of

4   these companies were even in existence in January of 2012?

5        MR. WIZEL:  January of 2012?  Acquinity was certainly

6   in existence.  The other company I honestly don't know.

7        THE COURT:  Okay.

8        MR. WIZEL:  I believe they were, but I cannot tell you

9   that there is a record that they were or not.  I believe they

10  were in existence.  Warren Rustin was obviously, you know, he

11  was the president and a member of Modernad.

12       Modernad, they knew about Modernad.  They had filed an

13  arbitration.  So I think they could have brought the action

14  certainly against Acquinity within that time, and they actually

15  attempted to do that in the arbitration, and they dropped them.

16       So why they didn't bring them again or they didn't try

17  to assert the claim within the time frame provided by the

18  contract, I don't know, but they didn't.  They sat on their

19  rights and that is what we think should entitle us to dismissal

20  of this case.

21       THE COURT:  All right.  Now, I know there is also a

22  motion that is pending which is docket entry 33 which is the

23  plaintiff's corrected and amended motion to expedite discovery.

24       So let me hear from the plaintiff on that.  Why should

25  the discovery be expedited in this case and has anything gone

1   on in this case yet.

2        MR. LEWIS:  Thank you, Your Honor.

3        Well, in the federal court arena there has not been

4   any discovery yet, and the reason why we filed the motion for

5   expedited discovery, frankly, is because we were anticipating

6   delays.

7        If we would have proceeded on a normal schedule from

8   the outset without delays we would have perhaps or there

9   wouldn't have been a need for the motion, but we anticipated

10  there would be delays, and having already litigated, I don't

11  want to cast aspersions, but we were anticipating there would

12  be delays.

13        THE COURT:  And there has been no scheduling

14  conference yet?

15        MR. LEWIS:  There has not been a scheduling conference

16  yet, no.

17        THE COURT:  Is that because, as the opposing counsel

18  said, that the Canadian company 765703 Canada, Inc. has not

19  been served yet?

20        MR. LEWIS:  833 which --

21        THE COURT:  Oh, I am sorry.  8333947 Canada, Inc.

22        MR. LEWIS:  Correct, and the reason for that, and my

23  co-counsel could speak to that better than I, but that entity

24  is not licensed to do business in Florida.

25        So we have been attempting to locate it and serve it

1  in Canada.  We can perhaps expedite things if opposing counsel

2  would be willing to accept service on behalf of that entity.

3          THE COURT:  It doesn't seem like he is willing to.

4          MR. WIZEL:  We don't represent that entity, Your

5  Honor.

6          THE COURT:  Okay.

7          MR. LEWIS:  But that entity, that may be the case.

8  Not yet.

9          THE COURT:  So what is the expedited discovery that

10 you are looking for and how expedited and how limited is it?

11         Because as you know you have to establish good faith

12 for the expedited discovery or establish a good faith basis for

13 it, and there are several factors that the courts discuss, such

14 as how limited it is and why it is needed and the harm to

15 either side, et cetera.

16         Why don't you address some of those factors for me.

17         MR. LEWIS:  All right.  Thank you, Your Honor.

18         The reason why we wanted expedited discovery was so

19 that we can identify any entities to which assets have been

20 conveyed by defendant Acquinity Interactive, and there is some

21 question there to Acquinity entities.

22         There is one which is the Canadian entity, Canada

23 7657030 Canada, Inc. d/b/a Acquinity Interactive, and then

24 there is Acquinity Interactive, LLC which is a Florida entity.

25 We don't know the relationships between those entities, but

1    there are two of them.

2         Then it has come to our attention that there is

3    another entity that was somewhat recently formed.  It is Canada

4    8333947 Canada, Inc. which is now conducting a substantial part

5    of Acquinity's former business.

6         They, in effect, are doing the same co-registration

7    e-mail marketing business that Modernad had before it

8    transferred its assets to Acquinity.

9         We are also informed that there are several other

10   entities that have been formed and that have assets have gone

11   to.  So we don't know anything about them.

12         THE COURT:  No.  I understand.  What type of discovery

13   is it that you want to do that?  Is it just a request for

14   production, or what is it that you wanted to do on an expedited

15   basis?

16         MR. LEWIS:  We drafted a list of requests for

17   production.  We wanted to get documents that would show if

18   assets have been have been conveyed to new entities; if any new

19   entities have been formed; who the officers are of those

20   entities.

21         We can certainly, if there are specific things that we

22   asked for which seem like which are overly broad, we can

23   certainly tailor this to finding out the identities of any

24   entities that may have been formed so that we will know that we

25   are dealing with a full universe hopefully of companies that

1    need to be defendants, so then we can proceed on an orderly

2    basis before the court without having to go back months from

3    now or 6 months from now and start adding new parties.

4              THE COURT:  And is it just a request for production

5    that you are seeking the expedited discovery on?

6              MR. LEWIS:  Ultimately.

7              MR. HARTLEY:  Your Honor, if I may address that?

8              THE COURT:  Sure.

9              MR. HARTLEY:  Thank you, sir.  Tim Hartley again.

10             It has been my experience that tailored focus

11   discovery is a lot more effective than shotgun discovery.

12             The last thing I want to do is to waste your time and

13   the party's time with overbroad requests that are not going to

14   get us anywhere, and what we are trying to do is to focus on

15   who are all of the proper parties to this case so that we can

16   serve them with subpoenas and find out what documentary

17   evidence they have of these transfers.

18             The reason that we are trying to expedite the matter

19   right now is because in the four months or so since this

20   complaint has been filed, we are already aware of new two new

21   and possibly three new entities that have been formed that are

22   taking over the business of Acquinity.

23             This comes from individuals who have worked for those

24   entities, and it is sort of like trying to catch smoke with a

25   net.  I mean, unless you know exactly who you are going after,

1   there is no way to or we could send document requests and

2   subpoenas to every entity that has got numbers in the name

3   Canada in it, and what we would be doing is wasting your time

4   with motions for protective order.

5          So rather than do that, we thought it would be

6   worthwhile to have just have a limited list of documentary

7   discovery to find out what entities are involved in move

8   forward from there.

9          THE COURT:  So you are basically seeking expedited

10  requests for production requesting certain limited documents

11  and requesting an expedited response to the request for

12  production?

13         MR. HARTLEY:  Exactly, and to allow us then to serve

14  subpoenas or information that may be derived from those

15  document productions.

16         THE COURT:  Subpoenas for depos or subpoenas for

17  documents?

18         MR. HARTLEY:  Subpoenas for documents, which we can

19  do, of course, without court order.  We can issue those from

20  our office, but we want to be able to focus on the correct

21  entities early on in this case.

22         THE COURT:  All right.  Let me turn to defense

23  counsel.

24         Why should the plaintiff not be allowed to expedite

25  discovery, assuming the motion to dismiss is resolved?

1    Why shouldn't the plaintiff be allowed to, regardless

2    of whether it is resolved, why should the plaintiff not be

3    allowed to expedite discovery in this case where they are

4    alleging that they are owed over $2,000,000 and that the

5    defendants are trying to evade payment of that?

6         What harm would there be to the defendants to allow

7    expedited discovery?

8         MR. WIZEL:  Well, two reasons, Your Honor, why it

9    shouldn't, why this motion should not be granted.

10        Number 1, they haven't shown good cause.  The reason

11   they haven't shown good cause is the entire basis of the motion

12   is we think, and you have heard the statements of counsel, we

13   have information.  We don't know from whom.  We don't know what

14   that it is about.

15        THE COURT:  Well, they did attach some things to their

16   complaint.  There was a letter.  There were letters.  There was

17   an affidavit that was filed.

18        There were letters that indicated that from a reading

19   of it, it seemed to indicate that Modernad was transferring its

20   assets to Acquinity and Acquinity just was going on and doing

21   the same business as Modernad had been doing, and yet trying

22   to, according to the plaintiff, get any assets that the

23   plaintiff might be able to collect upon out of the reach of the

24   plaintiff creditors.

25        So I mean I read the complaint.  I read the

attachments to the complaint.  There are some, I don't know if

they were memos or letters written by the defendant's president

or CEO, or whoever it was explaining to their customers about

the new company and how it is going to work, and I read all of

that.

I mean so it is more than just, I think it is more

than just conclusory.  I mean, there are some facts contained

in the complaint in the attachments.

So when you say it is not that they haven't met their

good faith burden, how much of a good faith burden do they have

to meet in order to simply get expedited discovery which is

pretty broad under Rule 26?

MR. WIZEL:  Well, Your Honor, to clarify, what they

are asking for, the basis of their motion is that we think that

today, not two years ago in January of 2011 there were these

letters and memos that you were referring to were issued, but

today Acquinity is seeking to transfer assets.

That basis has no factual support.  They say you have

heard argument of counsel.  It has come to our attention.  We

don't know from who.

The affidavit they submitted from Anthony Provanzano

says nothing about transfers that are happening supposedly

today or are preparing to transfer today.

It is purely speculative.  We don't know who provided

this information nor when it was provided, how they came to

1   know about this information.

2           They know that recently there are some companies that

3   were opened, and they believe that transfers are going to be

4   made in the future.

5           Where is that information coming from?  Where is that

6   coming from?  We don't know.  They have submitted no evidence

7   to support that claim.  And if you look at the cases, even the

8   cases they cite, most or all involve preliminary injunctions.

9   Why?  Because the discovery that they are seeking, they are

10  seeking one or two documents for production for evidence.

11          They are seeking approximately 31, 32 requests for

12  productions to every defendant, and it includes anything that

13  is from all documents sufficient to identify bank accounts held

14  by each defendant within the last 7 years; copies of all bank

15  accounts and records for each defendant within the last 7

16  years; documents relating to funds by a defendant, but were not

17  deposited into a bank account.  In other words, by the way,

18  this is document 33-1, Your Honor.

19          THE COURT:  Right.  I have it here in front of me.

20          MR. WIZEL:  When you look at this discovery request,

21  and they are asking for everything and anything in the world;

22  copies of each defendant's federal and State of Florida

23  corporate income tax returns for the last 7 years.

24          They are not seeking to identify companies that are

25  out there that in the future may obtain assets from Acquinity.

1     They are seeking from every defendant each and

2  everyone of these requests, and in order to do so they have to

3  at the very least have to establish an evidentiary basis

4  sufficient to show that these transfers are actually happening,

5  and they haven't done that.

6     In their motion, the best they can do is refer to the

7  allegations in the complaint at paragraphs 190 to 192, and when

8  you look at the allegations in the complaint as to what

9  transfers they claim are happening today, this is what the

10 complaint says:

11    "Upon information and belief, as a direct result of

12 the litigation and similar litigation as well as the suit that

13 was recently filed by the FTC against Acquinity, the defendants

14 the defendant at Acquinity and Acquinity, LLC have or are all

15 in the process of transferring all assets, personal technology

16 and business to the defendant 8333947 Canada, Inc for little or

17 no consideration.

18    Upon information and belief, defendants Acquinity and

19 Acquinity, LLC and defendant 8333947 Canada, Inc. share the

20 same corporate structure and ownership with the other

21 defendants," and there is a continuation.

22    They are basing their motion for expedited discovery

23 on the allegations of the complaint which are themselves not

24 specific.  They don't provide any evidentiary basis.

25    Again, the only attachments they refer to that they

1    actually have provided to the court refer to the transfers that

2    occurred in January of 2011, and not anything that is going on

3    today.

4         So I don't think they have presented good evidence as

5    to sufficient good cause as to why they should be allowed

6    expedited discovery, which, by the way, it would have started

7    already had they served this other defendant.

8         The only reason that the discovery has not started is

9    because we haven't had the scheduling conference, and the

10   reason that has not happened is because they haven't served the

11   defendant.

12        You heard the statements today.  They need to figure

13   out how to serve the defendant in Canada.  That's nothing that

14   we have done that has caused this alleged delay, and the reason

15   they filed the motion as admitted by counsel is because they

16   expected the delay.

17        That's not a basis for moving for expedited discovery,

18   and I would say at the time they did so they didn't have any

19   basis to say there was delay.  The only delay has been caused

20   by them not serving this defendant.

21        THE COURT:  Right, but on the other hand, if they

22   served them, the discovery process would be ongoing.

23        So there would be no need for expedition of the

24   discovery.  So what harm could there be to you, to the

25   defendants if they had been able to serve the Canadian

1   defendant, the last Canadian defendant, the process would have

2   already started and discovery would have been ongoing.

3        What harm could there be to you in expedited discovery

4   to allow them to do some discovery now before they are able to

5   serve that last remaining defendant and have a scheduling

6   conference?

7        MR. WIZEL:  Right.  Your Honor, keep in mind that when

8   they filed their motion, they asked for expedited discovery

9   asking for 7 days to return of all of these requests.

10       Now, we are not talking about the merits of discovery,

11  other than the scope because it is relevant to the expedited

12  discovery as warranted, and you are right.

13       If they had served the other defendant, we would be

14  now probably starting the discovery process, and that's an

15  option, that, you know, we are not being unreasonable.  I think

16  we could work that out under regular discovery rules.  You

17  know, they are asking for a 7 day turn around.

18       THE COURT:  Well, that might be too short, but I mean

19  if the court were inclined to grant it, I think that some of

20  the concerns that I see with the exhibit A on the motion for

21  expedited discovery, which is the plaintiff's, the proposed

22  request for production is, and I will ask the plaintiff in a

23  second before we end the hearing, but why they would need to go

24  back 7 years when it seems like the alleged transfer occurred

25  in January of 2011.

1           Why they would need to go back 7 years on some of

2   these requests, and additionally how much time defendants might

3   need to respond, 7 days is pretty short, but those are some of

4   the issues that if the court were inclined to grant the motion

5   to allow some limited expedited discovery, I would want to

6   address the issue of how far back they go as far as years and

7   how long it will be required for the defendants to respond and

8   whether there is any other issues that are overbroad in the

9   proposed request for production, because what I would like to

10  do is be fair to both sides.

11          I would like to be fair to the plaintiff in allowing

12  them to do what type of discovery they need to do to get this

13  case in the proper posture.

14          On the other hand, I don't want to be overbearing on

15  the defendants and require discovery that cannot be complied

16  with or that is too short of a time frame.

17          I think there might be some middle of the road area

18  there, but I haven't decided the issue yet, but if I did, and

19  if, in fact, I felt expedited discovery might be appropriate,

20  then there may be some modification of the request for

21  production that would be needed.

22          MR. WIZEL:  Yes, Your Honor, but I just want to be

23  clear that what they are asking in their motion is they

24  provided the court with a sense of urgency that there are these

25  transfers going on with no basis, and that is the motion that

1  we are attacking.  We are not dealing with the specific

2  requests for discovery.

3          THE COURT:  You are saying there is not a good faith

4  basis for the expedited discovery?

5          MR. WIZEL:  There has been no good cause shown by the

6  plaintiff.

7          THE COURT:  All right.  Thank you.  Since it is the

8  plaintiff's motion, let me turn to that last issue.

9          The defendant makes an argument that there is no good

10 cause for expediting discovery.  What is your good cause for

11 expediting discovery?

12         MR. LEWIS:  Your Honor, so this is one of those

13 situations where the defendants are in possession of most of

14 the information and most of the documents.  They are not in our

15 possession, and so we make do with what we have.

16         So we have presented a fair amount of evidence that

17 supports that there is something going on with conveyances, at

18 least through Modernad to Acquinity, and we did I believe in

19 our papers reference this new Canadian entity 8333947 Canada,

20 Inc. which the defendants have not denied is their new entity,

21 nor could they deny it because they would be back in court

22 later on once we have established conclusively that it is their

23 entity.

24         They would have to answer for the fact that they said

25 that it wasn't.  So we know that there is at least one new

1   entity that the assets have been conveyed to.

2        So that's more than just saying things that took place

3   on January 1st of 2011.  We have something new.  It has a

4   Website.  It is doing significant business.

5        We have information that it is doing very significant

6   business, but we don't have any records for that at this point

7   in time.

8        So in a case like this where there are, I believe that

9   everything that we have submitted which shows that these

10  defendants are trying to hide the ball and trying to hide the

11  money, the fact that there is a new entity with a new Website

12  which they have not denied, we took a deposition on Monday and

13  we haven't had a chance to go through it.

14       It was a deposition relating strictly to defendant

15  Modernad, and that's in the state court action.  The

16  domestication action, but we received in that action a copy of

17  an asset purchase agreement which is a complete and total sham.

18       We could submit this to the court.  Your Honor can

19  review this document, and we will submit it if Your Honor wants

20  to see it.

21       There is absolutely no consideration paid for good

22  will, for data, for e-mail lists, for technology, no

23  technology.  The computers have actual servers and the

24  furniture are the two things they did pay for.  Contracts.

25  Customers.  None of the things that would value, give value to

1  a company were included in this agreement.

2         Just poof.  All of the assets and all of the value for

3  Modernad just went to Acquinity.  So these are the same people

4  who did this who now are saying, "No, you don't have any

5  evidence that we are doing more of it."

6         Well, we have what we have.  We believe that we have a

7  good faith basis for believing that that is sufficient to show

8  that where there is fire there is fire.  It is not even smoke.

9         And if opposing counsel wants to stand up here and say

10 and represent there are no new entities that his client

11 Acquinity has formed, I suppose we could sit down and we could

12 wait and go through the normal discovery process, and we can

13 answer to that.  You know, as far as the scope of what we

14 requested, Your Honor, 7 years seems to me --

15         THE COURT:  For example, in request number 1 it says,

16 "All documents sufficient to identify any bank accounts held by

17 each defendant within the last 7 years."

18         Why would you need to go back 7 years when it seems

19 like it would only be, or it seems to me the relevant period of

20 time would be 2011, 2012 and 2013.

21         MR. LEWIS:  I agree.  I am not sure quite how 7 years

22 ended up being the time frame, Your Honor, and most of the

23 defendants didn't even exist before 2011.

24         Some of them have existed for quite a short period of

25 time.  There is only one entity which is Modernad which existed

1  before that.  And even with respect to Modernad, we don't

2  really need to go back much further than 2011.  Maybe 2010.

3      THE COURT:  All right.  I will tell you what I am

4  going to do:  I am going to take it under advisement, and I

5  will go ahead and get out an appropriate ruling as soon as I

6  possibly can, and I understand the urgency of the matter from

7  the side of the plaintiff and the lack of urgency see for the

8  mater or the defendant's argument that there is no urgency to

9  do it to the matter, but I will try and get this resolved as

10 soon as I can.

11      Was there anything else that either side needed to

12 bring up before we end today?

13      MR. HARTLEY:  No, Your Honor.

14      MR. LEWIS:  No, Your Honor.

15      MR. WIZEL:  No, sir.

16      THE COURT:  All right.  Thank you.  All have a good

17 afternoon.

18      MR. LEWIS:  Thank you, Your Honor.

19      MR. WIZEL:  Thank you.

20      THE CLERK:  All rise.  Court is in recess.

21      (Whereupon the proceedings were concluded)

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18                    C E R T I F I C A T E

19          I hereby certify that the foregoing is an accurate

20  transcription of proceedings in the above-entitled matter.

21
    NOVEMBER 12, 2013          S/JERALD M. MEYERS
22  _____          _____
        DATE                     JERALD M. MEYERS, RPR-CM
23

24

25