**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| PULSEPOINT, INC. f/k/a DATRAN MEDIA CORP., <br><br>       Plaintiff, <br><br> v. <br><br> 7657030 CANADA INC., d/b/a ACQUINITY INTERACTIVE, LLC, f/k/a PUREADS; et al. <br><br>       Defendants. | Case No. 13-61448-CIV <br> MARRA/MATTHEWMAN |

**PLAINTIFF'S MOTION TO COMPEL *IN CAMERA* INSPECTION OF DEFENDANTS'**
**PRIVILEGE LOG DOCUMENTS AND INCORPORATED MEMORANDUM OF LAW**

Plaintiff, Pulsepoint, Inc. ("Plaintiff" or "Pulsepoint") by and through undersigned counsel, hereby moves this Court for entry of an Order compelling the Defendants to produce certain documents listed in Defendants' privilege log on the basis of the crime-fraud exception to the attorney-client privilege, and for other good cause stated herein.

**Introduction**

Defendants' failure to produce key documents has been an ongoing theme in this case, and has continually frustrated and delayed Plaintiff's efforts to unravel Defendant's vast network of entities and accounts established for the primary purpose of secreting assets and frustrating creditors. While Defendants have narrowed the scope of their privilege claims over the past two months, Defendants' Second Amended Privilege Log ("Log") is still vague on the most basic of details of the alleged "privilege," failing to provide, most notably, the identities of the specific entities referenced in the Log. This basic information is necessary for Plaintiff to even evaluate the validity of each privilege claim.

1

Furthermore, Defendant has withheld certain draft agreements that are decidedly discoverable, while producing others.  Of even greater concern, Plaintiff believes that the majority of the communications claimed in Defendant's privilege log were made in furtherance of fraud, i.e., assisting Defendants in their illegal and fraudulent transfer of assets to judgment proof and foreign entities, and thus fall within the crime/fraud exception to the attorney-client privilege.  Therefore, in order to determine the validity of Defendants privilege claims, it is necessary for this Court to order Defendants to make available disputed documents for an *in camera* inspection.

### Discovery Background

Defendants first produced a privilege log on January 10, 2014, in which Defendants identified 136 documents over which they asserted claims of privilege. *See* Affidavit of Brett Lewis ("Lewis Aff.") at ¶ 1, filed concurrently herewith.  Plaintiff identified what it believed to be a number of deficiencies in that log, and the parties worked to resolve areas of disagreement. Following several letters, emails, and meet and confers, the parties were able to narrow the scope of the disputed privilege claims to 42 documents. Lewis Aff., Exh 2.

The parties informed the Court of the dispute over the privilege log at the March 18, 2014 discovery hearing, as well as Defendants' agreement to produce an amended privilege log and to submit certain disputed documents to the Court for an *in camera* inspection.  This Court, accordingly, issued the March 20, 2014 Order directing Defendants to produce an amended privilege log. (DE 108).  Defendants produced a Second Amended Privilege log on March 31, 2014, and supplemented its production of documents. Lewis Aff., Exh. 3 ("Defendant's Second Amended Privilege Log").  Plaintiff now moves the Court to order an *in camera* inspection of the 42 disputed documents identified below, and requests the production of such documents on

the basis that they are draft documents, subject to the crime/fraud exception, and as otherwise established below.

**Argument**

**I.      The Log is Deficient and the Draft Agreements are not Subject to Privilege**

The burden of demonstrating the applicability of the attorney-client privilege rests on the asserting party. *Bogle v. McClure*, 332 F.3d 1347, 1358 (11th Cir. 2003); *Jackson v. Geometrica*, 2006 WL 510059, at *1 (M.D. Fla. Mar. 2, 2006).  It is well established that, "a privilege log should identify the documents or other communications for which a privilege is invoked, and provide sufficient detail to allow an opposing party and the court to determine whether the document is at least potentially protected by privilege." *See* Fed. R. Civ. P. 26(b)(5)(A)(ii); *CSX Transp. Inc. v. Admiral Ins. Co*., 1995 WL 855421, at *3 (M.D. Fla. July 20, 1995).

A proper privilege log must contain the following information:

(1) the name and job title or capacity of the author of the document;
(2) the name and job title or capacity of each recipient of the document;
(3) the date the document was prepared and if different, the date(s) on which it was sent to or shared with persons other than the author(s);
(4) **the title and description of the document;**
(5) **the subject matter addressed in the document;**
(6) **the purpose(s) for which it was prepared or communicated**; and
(7) the specific basis for the claim that it is privileged.

*Berlinger v. Wells Fargo, N.A.,* 2012 WL 640708, at * 2 (M.D. Fla. 2012), *quoting Roger Kennedy Construction, Inc. v. Amerisure Insurance Co.,* 2007 WL 1362746 * 1 (M.D. Fla. May 7, 2007) (emphasis added).

Defendant is also required to produce an attached draft document where the ultimate document would not have received privileged protection. *See In re Seroquel Products Liab. Litig.*, 2008 WL 1995058, at * 3 (M.D. Fla. May 7, 2008) ("If the ultimate document is purely a business document which would not have received any protection based upon privilege in any

event, draft language also receives no protection").  Defendants have selectively produced

certain draft documents, previously marked as "privileged" in their March 31, 2014 production;

however, illogically, continue to maintain their claim of privilege with respect to other draft

documents (namely, entries nos. 2, 4 and 5 of the Second Amended Privilege Log).  It bears

mentioning that the documents previously marked as "privileged" by Defendants, and reluctantly

produced, were all produced without a single redaction, because they were clearly discoverable

documents exchanged between lawyers allegedly representing different parties.

Additionally, Defendants' Second Amended Privilege Log *still* fails to name entities or

identify documents with enough specificity to determine the subject matter, purpose of their

creation, or for which entity they were created.  Plaintiff cannot, therefore, fully evaluate all of

the privilege claims, or even understand Defendants' rationale for maintaining its claim of

privilege over the remaining documents in the log.[1]  Below is a table outlining Plaintiff's

objections to the specified entries in the Log:

| Second Amended Privilege Log Entry # | Deficiency |
|---|---|
| 2 | Draft asset purchase agreement |
| 3-5 | Vague.  What agreements? Attachments not privileged. |
| 18-21 | Service agreement for what entity? Shareholder Agreement for what entity? Impermissibly vague. |
| 24 | Vague, doesn't state what the subsidiary's name is. |
| 25-28 | Facts not privileged. |
| 35 | Corporate filings not privileged. |

An *in camera* inspection of the disputed documents is the only way for the propriety of

Defendants' claims of privilege to be evaluated.  Accordingly, Plaintiff requests an *in camera*

inspection of the above Log entries. *Garner v. Wolfinbarger*, 430 F.2d 1093, 1104 (5th Cir.

---

[1] Plaintiff notes that Defendants have identified certain documents in their Second Amended Privilege Log as being "indisputably" privileged, and based on Defendants' "Descriptions" therein, Plaintiff does not dispute the following entries: 29-34; 36-43; 54-61

1970).

## II. Defendants' Claims of Privilege are Inapplicable Due to the Crime Fraud Exception

Defendants' privilege claims cannot stand if their lawyers' advice was "sought or obtained to enable or aid anyone to commit or plan to commit what the client knew was a crime or fraud." § 90.502(4)(a), Fla. Stat.; See also, *In re Grand Jury Investigation (Schroeder),* 842 F.2d 1223, 1226 (11th Cir. 1987); *JTR Enterprises, LLC v. An Unknown Quantity of Colombian Emeralds, Amethysts & Quartz Crystals*, 2013 WL 6570941, at * 3 (S.D. Fla. 2013).  Under section 90.502(4)(a), Florida Statues, "it is immaterial whether the lawyer knows that the client intends to commit a crime or perpetrate a fraud, so long as the client has the intention to do so sometime in the future." *First Union Nat'l Bank v. Turney*, 824 So. 2d 172, 187 (Fla. 1st DCA 2001).

To determine whether the crime-fraud exception applies, a two-part test laid out in *In re Grand Jury Investigation* is employed: (1) there must be a *prima facie* showing that the client was engaged in fraudulent (or criminal) conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a fraud (or crime) subsequent to receiving the benefit of counsel's advice; (2) there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it.  *JTR Enterprises,* 2013 WL at * 3; *see Gutter v. E.I. Dupont De Nemours,* 124 F.Supp.2d 1291, 1305 (S.D. Fla. 2000).

Once the movant has made these showings, the burden of persuasion shifts to the party invoking the privilege to provide a reasonable explanation of the conduct or communication to rebut the *prima facie* showing. *Gutter*, 124 F.Supp.2d at 1307.

> "If the court accepts the explanation as sufficient to rebut the evidence presented by the party opposing the privilege, then the

> privilege remains. If the court does not find the evidence is sufficient to rebut the *prima facie* case, then the *prima facie* case still exists and the privilege is lost. In order to carry its burden of persuasion, the party seeking to invoke the privilege has to show by a preponderance of the evidence that the *prima facie* showing that the crime/fraud exception applies should not be accepted."

*Gutter*, 124 F.Supp.2d at 1307.

In *United States v. Zolin,* the Supreme Court set forth the procedure for invoking the crime-fraud exception. 491 U.S. 554, 562-565 (1989). Under *Zolin*, a party seeking to invoke the crime-fraud exception that lacks concrete evidence, independent of the documents for which the privilege is claimed, may ask the court to make an *in camera* review of the documents to determine the applicability of the exception. *Id.* Thus, according to *Zolin*:

> The court should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies. If the judge finds this threshold has been met, then the court can order the evidentiary *in camera* review in its sound discretion.

491 U.S. at 562.

Here, the parties have agreed that an *in camera* inspection is proper. Moreover, Plaintiff has a factual basis to support a good faith belief that *in camera* review of the Defendants' documents may reveal concrete evidence to establish that the crime-fraud exception applies. Specifically, Plaintiff has a good faith belief that Defendants have utilized the assistance of counsel to in setting up a vast web of entities through which Defendants fraudulently moved assets from one entity to the next, with little to no consideration, for the sole purpose of frustrating creditors. Regardless of whether Defendants' counsel were aware of their fraudulent intentions, it is likely that Defendants utilized attorney services to set up these sham entities in furtherance of an ongoing fraudulent and potentially criminal scheme. Thus, the crime-fraud

exception to the attorney-client privilege would be unquestionably applicable.  Plaintiff's good faith belief of Defendants fraud is based on, *inter alia*, the following evidence uncovered during discovery:

(1) **Dozens of Interconnected Entities Formed by Defendant.**

Defendants have created dozens of entities with complex ownership structures, of which there are no fewer than seven Canadian entities, two family trusts involving former ModernAd and current Acquinity CEO, Garry Jonas, his wife and her relatives, and ten related U.S. entities, with complex ownership structures often involving a family trust owning a Canadian entity, which owns another Canadian entity, which owns another Canadian entity, which owns another Canadian entity, which owns a U.S. entity. *See* Affidavit of Justin Mercer to Plaintiff's Second Motion to Enforce (DE 99), ¶¶6-12 (hereinafter, "Mercer MTE Aff.").

(2) **No Consideration for Transfer of Assets.**

Absolutely no consideration changed hands for any of the assets of ModernAd, despite the fire sale price.  Through an Asset Purchase Agreement dated January 1, 2011, ModernAd, a company that made in excess of $120 million in 2010, purported to sell all of its assets to 7657030 Canada Inc. for approximately $2,682,783. Mercer MTE Aff., Exh. 1.  The Asset Purchase Agreement makes no mention of any payment or allocation for intangible assets, customer contracts, data or goodwill. *See id.*  Moreover, there was no change of control, leadership, location, personnel or customers.  It was business as usual – except for the name change.

(3) **Entity Used as a "Conduit" to Launder Assets Abroad.**

By "Nominee Agreement" dated December 31, 2011, 7657030 Canada Inc. then transferred all of what were ModernAd's assets to Acquinity Interactive, LLC, for no

consideration. *See* Mercer MTE Aff., Exh. 4.  Thus, with the stroke of a pen, Acquinity Interactive owned the former $120 million business without paying a dime. 7657030 Canada Inc. was merely a "conduit" to purchase ModernAd and launder its assets through Canada. *See* Mercer MTE Aff., Exh. 3.

(4) **Inconsistent Reporting to IRS.**

When 7657030 Canada Inc. purported to hold ModernAd's assets for Acquinity Interactive, LLC (and before the Acquinity Delaware LLC was even licensed to do business in the state of Florida), Acquinity Interactive, LLC reported to the IRS that *it* — not 7657030 Canada Inc. — had acquired the assets of ModernAd Media LLC on January 1, 2011. *Compare* Mercer MTE Aff. Exh. 5 *with* Exh. 6.  7657030 Canada Inc. reported no income on its 2011 taxes, and actually posted a loss, whereas Acquinity Interactive, the LLC that did not own any assets of ModernAd until December 31, 2011, claimed $147,3332,888 in income for 2011. Mercer MTE Aff. at Exh. 5.

(5) **No Documentation of Asset Transfer from Acquinity Interactive to Inbox Express.**

While Plaintiff is currently trying to track the movement of assets from Acquinity to one of the many new entities recently spun by Defendant, one thing is clear, no effort was even made to paper an asset transfer from Acquinity Interactive LLC – a company that made on average in excess of $150 million from 2011-2012 – to any of the new entities formed by that company. *See* Mercer MTE Aff. at ¶¶ 13-15.  New entities merely sprung up, owned by the same cast of characters, without any payment for assets, contracts, data, or goodwill. *See* Mercer MTE Aff. at ¶ 15; compare *id.* at ¶ 13 with ¶ 14.  For example, as was the case with 7657030 Canada Inc. and Acquinity, Defendant 8333947 Canada Inc. d/b/a Inbox Direct a/k/a Inbox Express ("Inbox Express") is effectively owned and operated by the Irene Marciano Family Trust – Irene

8

Marciano being the wife of Garry Jonas, former ModernAd and Acquinity Interactive CEO. *See* Mercer MTE Aff. at Exh 7.  Garry Jonas and David Hatton, general counsel of Acquinity Interactive, are trustees of the Irene Marciano Family Trust. *Id.* at Exh. 8.  Not only are Acquinity Interactive's insiders actively involved in this new entity, *over 80%* of 8333947 Canada Inc.'s customers are the same as Acquinity Interactive, LLC's. *See* Mercer MTE Aff. at ¶¶ 13-15, Exhibits 9-10.  It is the same people, engaging in the same business with the same customers.

(6) **Defendants Deceptive and Misleading Testimony.**

Defendant Rustin was deposed in October in connection with the state court proceeding.  *See* Transcript of Deposition of Warren Rustin on October 28, 2013, pp. 1-143 (hereinafter, "WR Transcript"), at Lewis Aff. at Exhibit 3.  In his testimony, he was asked about entities in which ModernAd had an ownership interest. WR Transcript, p. 110:7-15.  Despite the fact that ModernAd acquired Elysium in March 2010, and was by extension an owner of the Revenue Path entities, Mr. Rustin omitted any mention of these companies in his testimony. WR Transcript 138:4-10.  By email to Garry Jonas dated November 4, 2010, Mr. Rustin wrote: "[t]he biggest issue is what do I do about Indicus?  I'd like to keep the P1 investment for myself and I also want to stay in the B2B telemarketing game so I'd also like to *keep* Digiprod.  I can make a comfortable living running those two businesses . . ."  (emphasis added), Lewis Aff. at Exhibit 4. Mr. Rustin testified that he sold ModernAd Media to get out of paying Indicus $20 million, but, per his November 4, 2010, he already owned Indicus. *See* Lewis Aff. at Exhibit 4; WR Transcript, p. 55:23-56:5, 110:22-113:19.

ModernAd spent hundreds of thousands of dollars in 2010 and 2011 on setting up the office for Revenue Path and Indicus in India and Morocco. Lewis Aff. at Exhibit 5.  Mr. Rustin

testified that he gave ModernAd's co-registration path software to Indicus, an entity that we now know was owned by ModernAd. Lewis Aff. at Exhibit 4; WR Transcript, p. 113:115-24.  Warren Rustin testified that Garry Jonas wanted to get out of the co-registration business, but we know that is also not true, as Garry Jonas simply took over the Revenue Path entities and Indicus, and transferred the co-registration operations overseas. WR Transcript, p. 82:20-84:18; Lewis Aff. at Exhibits 4-5. Warren Rustin claimed that he was not compensated from the sale of ModernAd to Acquinity (WR Transcript, p. 99:17-23), but he claimed $2,258,201 from the sale on his tax returns, and claimed another $3.5 million in ModernAd profit in 2011, all of which was transferred out of the company's bank accounts. Lewis Aff. at Exhibit 6.

(7) **Defendants' Own Lawyers Called ModernAd and Acquinity the Same Company.**

The same lawyers who represented ModernAd and Acquinity also represented Indicus and the Revenue Path companies. *Compare* Second Amended Privilege Log at 3-6 *with* Lewis Aff. at Exhibit 7.  When they purported to convey ModernAd's assets to Acquinity, Defendants simply "terminated" ModernAd's lucrative revenue sharing agreements with the Revenue Path companies and Indicus, and replaced ModernAd's name with Acquinity's. Lewis Aff. at Exhibits 7, 8 and 9.  Acquinity stepped into the shoes of ModernAd without any consideration changing hands.

In a purported services agreement between Indicus and 7653070, Canada, Inc., Defendants' lawyers defined "Controlling Stockholder" as: "(i) Gary Jonas or Warren Rustin, (ii) any company or entity owned, directly or indirectly, by or for either or both of them whether or not existing on the date hereof . . ." Lewis Aff. at Exhibit 9 ("Services Agreement" SUPP0252-269,  at SUPP0265]).  In other words, the controlling stockholders of 7657030 Canada, Inc. were Garry Jonas **and** Warren Rustin.  The same agreement provides that the sale of "Acquinity

Parent" or any entity in the "Acquinity Group" to a "Controlling Stockholder" would not give rise to a change in control. *Id.* [at SUPP0264]. In other words, the sale of Acquinity to Warren Rustin *would not be a change in control*.

Significantly, Acquinity's lawyers made similarly frank and incriminating statements about the relationship between ModernAd and Acquinity.  Bradley A. Walker from Buchanan Ingersoll, in response to a request to remove the term "Acquinity Parent" from an agreement, stated:  "If Acquinity is essentially a combination of what ModernAd and Mailbox [ModernAd's subsidiary] were, then certainly we can remove the parent from the equation."  Lewis Aff. at Exhibit 10, [SUPP000355].  David Hatton, another Acquinity-ModernAd lawyer, stated: "Acquinity is actually identical to ModernAd in the fact that it will hold title to all relevant assets." *Id*.  Acquinity did not acquire *some* or certain ModernAd assets – it acquired title to *all relevant assets*, such that it was identical to ModernAd.

### (8) Defendants Are Continuing to Create New Entities to Add to the    Complex Web and Continue to Play "Hot Potato" with the Assets.

Since this action was initiated, Defendants have funneled assets through sham companies it controls, including 8333947 Canada Inc. and Inbox Express, LLC. *See* Mercer MTE Aff. at ¶¶ 12, 17.   Defendants' insiders have also pulled at least $22 million dollars of cash out of Defendant Acquinity in 2013 alone, and engaged in shady multi-million dollar loan transactions within and among each other. *See* Mercer MTE Aff. at ¶ 16.  Acquinity's bank accounts are now empty.

In light of the above evidence of fraud, Plaintiff has established a factual basis to warrant an *in camera* review of the Defendant's Privilege Log documents to determine whether the crime-fraud exception may be applied.  Specifically, the evidence all points to the fact that Defendants have utilized the assistance of counsel to further its fraudulent scheme, which

involved the formation of a vast network of sham entities through which Defendants fraudulently transferred assets from one to the next, with little to no consideration, and for the purpose of frustrating creditors.

Log entry nos. 2, 3-5, 18-21, 24-28 and 35 all refer and relate to legal advice concerning the formation of entities that have been used by Defendants to evade creditors by fraudulently transferring DEBTOR's assets to insiders and overseas entities.  While it is likely that such advice was given with full knowledge of Defendants' scheme, for the crime-fraud exception to apply, the advice need only to have been solicited by Defendants with the intent to engage in fraud.  Plaintiff submits that there is substantial evidence of fraud already in the record, sufficient to support a *prima facie* showing.  Defendants have also consented to an *in camera* review. Plaintiff believes that the disputed documents will contain highly material and probative evidence of fraud, and may contain information that will lead to the recovery of DEBTOR's assets.  As such, Plaintiff respectfully requests that the Court order an in camera inspection of the disputed documents, and, following such review, compel their production.

<u>**Conclusion**</u>

For the reasons stated herein, Plaintiff respectfully requests that this Court issue an Order granting *in camera* review and compelling Defendant to produce the disputed documents.

***DATED*** this 7th day of April 2014.

***HARTLEY LAW OFFICES, PLC***
Attorneys for Plaintiff
800 Southeast Third Avenue
Fourth Floor
Fort Lauderdale, Florida 33316
Telephone: (954) 357-9973
Facsimile: (954) 357-2275
Email: hartley@hartleylaw.net

By: /s/ Timothy M. Hartley
TIMOTHY M. HARTLEY
FL BAR NO. 979066

***LEWIS & LIN, LLC***
Attorneys for Plaintiff
45 Main Street, Suite 608
Brooklyn, NY 11201
Telephone: (718) 243-9323
Email: brett@iLawco.com

By: /s/ Brett E. Lewis
BRETT E. LEWIS
JUSTIN MERCER

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on April 7, 2014, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system and on all counsel or parties of record identified on the attached service list below via email and/or U.S. Mail.

/s/ Timothy M. Hartley
Timothy M. Hartley, Esq.
 Hartley@hartleylaw.net
HARTLEY LAW OFFICES, PLC
800 SE Third Avenue, Fourth Floor
Fort Lauderdale, Florida 33316
Tel. 954-357-9973
Fax: 954-357-2275

Attorney for Plaintiff

## <u>SERVICE LIST</u>

***Onier Llopiz, Esq.*** (FBN 579475)
Email: ol@lydeckerdiaz.com
***Joan Carlos Wizel, Esq.*** (FBN 37903)
Email: jcw@lydeckerdiaz.com
Email: rb@lydeckerdiaz.com
***Roland Potts, Esq.*** (FBN 087072)
Email: rp@lydeckerdiaz.com
Email: ag@lydeckerdiaz.com
LYDECKER DIAZ
1221 Brickell Avenue 19th Floor
Miami, Florida 33131
Tel. 305-416-3180
Fax: 305-416-3190
Attorneys for Defendants

***Alexander Pastukh, Esq.*** (FBN 809551)
Email: apastukh@appalaw.com
Alexander Pastukh P.A.
1395 Brickell Avenue, Ste. 800
Miami, Florida 33131
Tel: (305) 502-5715
Counsel for Defendant 8333947 Canada, Inc.