# EXHIBIT 3

1    A.  I see it appearing here as per Warren Rustin, my
2    name.
3    Q.  Right, but in an individual capacity rather than
4    on behalf of ModernAd Media. I presume when you signed
5    that you were signing on behalf of ModernAd Media,
6    correct?
7    A.  Yeah. To the best of my knowledge, that I can
8    recall, I was signing on behalf of ModernAd Media and
9    myself and ModernAd Marketing.
10   Q.  Okay. Okay. I was just curious when I was
11   looking through as to why -- if there was some reason why
12   they didn't have the other entity listed.
13   A.  I honestly don't know.
14   Q.  Okay. Fair enough.
15   Okay. What was the purpose of this agreement, if
16   you recall?
17   A.  Please elaborate for me your definition of the
18   purpose.
19   Q.  Sure. Why did you sign this agreement?
20   A.  The main reason I signed the agreement was to
21   get out from the liabilities that I had at the time.
22   Q.  And what were those liabilities?
23   A.  The biggest liability was approximately 20
24   million dollars owed to Indicus (phonetic). There was
25   approximately two million dollars owed to Cisco. There

```
 1   was approximately a million or so on the lease remaining
 2   on the building. And most importantly, there was an AVC
 3   document that was signed with the Attorney General of
 4   Florida that I was extremely concerned about being able to
 5   adhere to without the potential of facing criminal charges.
 6       Q.  Okay. All right. We'll talk about those in a
 7   minute.
 8       Who negotiated this agreement on your behalf?
 9   Anyone?
10       A.  Yes.
11       Q.  Who?
12       A.  An attorney in Canada.
13       Q.  And what is his name?
14       A.  Eric Kirshner.
15       Q.  Kirshner?
16       A.  Yes.
17       Q.  Is he in Montreal?
18       A.  Yes, he is.
19       Q.  Okay. And do you know who, if anyone,
20   negotiated the terms of this agreement on behalf of the
21   purchaser?
22       A.  I do not know.
23       Q.  Do you know who owned 7657030 Canada, Inc. in
24   January of 2011?
25       A.  I do not know who owned that entity.
```

1    Q.  Right, I know that, but did they -- did you have
2  an understanding, did you know that the employees of
3  ModernAd, most of the employees of ModernAd will now
4  be working for Acquinity?
5    A.  I told the employees of ModernAd Media that I
6  was closing down ModernAd Media, it would no longer
7  exist, that I was selling certain assets, if they wanted to
8  move and work for the new company they were free to do
9  so.
10   Q.  Okay.
11   A.  That was my understanding.
12   Q.  Okay.  So you didn't know whether or not any of
13  the employees were actually going to go from ModernAd to
14  work for Acquinity?
15   A.  I didn't know for sure whether any of them would
16  go.  Again, it was their choice.  They knew I was shutting
17  down, they knew a new company was buying certain assets
18  of ModernAd Media, and they could choose whether or not
19  they wanted to go work for the new company.
20   Q.  Okay.  You didn't know for sure, but did you
21  have any kind of indication or reason to believe that
22  certain employees like Mr. Jonas, like Mr. Van Horn, like
23  Mr. Provenzano, like Mr. Modist would all be going to
24  work for Acquinity?
25   A.  Repeat the question, sorry, the first part?

```
 1              MR. HARTLEY: Would you read that back,
 2       please?
 3              (The court reporter reads back the question.)
 4              THE WITNESS: Yes. I knew that Greg Van
 5       Horn and Garry Jonas were starting their own
 6       company and that they would most probably be
 7       employed by their own company. I also knew that the
 8       existing employees who were now no longer going to
 9       work for ModernAd Media were probably going to go
10       work for Acquinity.
11    BY MR. HARTLEY:
12       Q.  And did you have any reason to believe that
13    Acquinity would be servicing more or less the same clients
14    as ModernAd had been servicing?
15              MR. DE ZAYAS: Objection to form.
16    BY MR. HARTLEY:
17       Q.  You can answer.
18       A.  Repeat the question, please.
19       Q.  Did you have any reason to believe that
20    Acquinity would now be servicing more or less the same
21    clients as had been serviced by ModernAd?
22              MR. DE ZAYAS: Objection to form.
23              THE WITNESS: Yes, that they would be
24       servicing quite a few of the customers that were
25       ModernAd Media's customers before. Yes.
```

1   BY MR. HARTLEY:
2       Q.  And how did you know that?
3       A.  Because when we had our discussion about them
4   wanting to leave and do their own business, they explained
5   to me the new forms of their business that they wanted to
6   do and I wasn't so interested in doing and that they would
7   work with some of the previous customers and suppliers
8   that ModernAd Media had before.
9       Q.  What was the new area of business that you were
10  not interested in getting into?
11      A.  Sweepstakes business. It was a, I believe, a B
12  savings. They wanted to do coupons and I wasn't
13  interested.
14      Q.  But they were going to continue with the co-reg
15  business internet marketing?
16      A.  They wanted to get out of the co-reg business and
17  they were looking at doing different types of internet
18  marketing.
19      Q.  Okay. Take a look at Exhibit D, the fourth
20  paragraph, the one that you had just read.
21      A.  The one that says we look forward?
22      Q.  No. It says if you are a publisher.
23      A.  Oh, okay. Sorry.
24      Okay.
25      Q.  Do you see the line where it says, "We have spent

1	Q.	Were you ever asked any questions about them,
2	how they worked, when you're going to be done, things
3	like that?
4	A.	No, not that I recall.
5	Q.	Okay. Was that because Mr. Jonas, Mr. Van
6	Horn, Mr. Modist were well familiar with those assets?
7	A.	Yes, and so was Josh Greenberg.
8	Q.	Josh Greenberg? Who is Josh Greenberg?
9	A.	He was the CTO of ModernAd Media.
10	Q.	Okay. And did he also transition -- I'm sorry,
11	was he also employed later by Acquinity?
12	A.	Yes, he was.
13	Q.	Okay. So it would be fair to say that Acquinity
14	was well familiar with the assets that it had purchased
15	from ModernAd, correct?
16	A.	I believe that's a fair statement, yes.
17	Q.	Now, the purchase price for the assets purchased
18	pursuant to Schedule O was $3,191,483. Who received that
19	money?
20	A.	I did not receive that money. ModernAd Media
21	did not receive that money. If I'm not mistaken, to the
22	best of my knowledge the total of the asset purchase price
23	was offset by liabilities.
24	Q.	Are those the liabilities on Schedule P?
25	A.	Just a second. I need to find that.

```
 1      space, so it came to my attention.
 2          Q.   When did that take place?
 3          A.   I don't recall the exact date. I believe it was
 4      sometime in 2011.
 5          Q.   Okay.
 6          A.   Late 2011.
 7          Q.   Who is Mailbox Brandt, LLC?
 8          A.   It's an entity, and I do not recall what it was set
 9      up for specifically.
10          Q.   Who owned Mailbox Brandt, LLC?
11          A.   I don't recall.
12          Q.   Was it owned by ModernAd Media?
13          A.   I don't recall.
14          Q.   Did you own it?
15          A.   I don't recall.
16          Q.   Now, again, the preamble to this document, I'm
17      sorry, it would have been recitals refer to Acquinity -- do
18      you need to get up and stretch?
19          A.   No, I'm okay. Go ahead.
20          Q.   You're okay?
21          A.   Yep.
22          Q.   Acquinity assuming certain obligations. Is that
23      correct; Acquinity assuming certain obligations of Indicus
24      Services, LTD or should that say obligations to Indicus
25      Services, LTD?
```

1    A.   That's a good question. I don't know the answer.
2    Q.   Okay. I'm presuming that there was an
3    agreement between ModernAd Media and Indicus Services,
4    LTD, correct?
5    A.   Yes, there was.
6    Q.   And that was not a monthly agreement, correct,
7    month-to-month agreement.
8    A.   Yes and no. No, it was not the traditional month-
9    to-month agreement like we had talked about earlier, but,
10   yes, I had financial obligations on a monthly basis of 1.2
11   million dollars a month.
12   Q.   Okay. But it was for, but the contract term that
13   was for more than a monthly period?
14   A.   Yes.
15   Q.   Is it an annual contract?
16   A.   No. I think it was a fixed term of either 30 or 36
17   months. I don't recall what the exact number was.
18   Q.   Okay. Okay. And this was to provide email
19   delivery services for ModernAd Media?
20   A.   It was, it was to provide consulting services on
21   the secret sauce of how to get inbox delivery from--
22   Q.   How to get an email to somebody's inbox
23   basically?
24   A.   Correct. Yes.
25   Q.   How to work through the system to get there --

1   A.  Yes.
2   Q.  -- and make sure it applies and--
3   A.. Yes. How to bypass the gatekeepers.
4   Q.  Okay. And Acquinity took over your obligation,
5   took over ModernAd's obligations to that agreement, right?
6   A.  Yes, it did.
7   Q.  Okay. Would it be fair to say that to be able to
8   get past the gatekeepers and to have the secret sauce is a
9   pretty valuable asset?
10  A.  I don't know.
11  Q.  Well, if your, if your business in part is to get
12  emails into people's inboxes and this is the way you do it
13  and these are the guys who do it for you, that's a pretty
14  valuable business arrangement, isn't it?
15  A.  Yes.
16  Q.  Okay. So this was something that Acquinity
17  would need for the operation of its business, right?
18  A.  I don't know.
19  Q.  Okay. Now, the LEC revenue, I'm sorry, the
20  residual LEC revenue defined as the funds, quote, the
21  funds of this agreement, is that something that was derived
22  in any way from the Indicus Services contract?
23  A.  No.
24  Q.  So that's a whole different thing?
25  A.  That's a whole different thing.

1  Q.  Whole different area of income? You are giving
2  that to Acquinity, you're assigning the contract, and they
3  are saying we are going to protect you from any LEC
4  regulatory issues, right?
5  A.  I'm sorry, repeat the question?
6  Q.  Yeah. You're assigning to -- so the deal is
7  you're assigning, ModernAd is assigning to Acquinity the
8  rights, duties, and obligations under the Indicus Services
9  contract.
10  A.  Mm-hmm.
11  Q.  And you're not only giving them the right to the
12  services under the contract, but you're also getting away
13  from a million two that you got to pay every month under
14  the contract, right?
15  A.  Yes and -- yes. So what happened there was
16  Acquinity is taking over those obligations. Indicus is
17  releasing me from those 1.2 million dollar a month
18  obligations, but I also gave them a very valuable piece of
19  software, the co-reg path.
20  Q.  Gave who?
21  A.  Gave Indicus.
22  Q.  Gave Indicus?
23  A.  Yes. I gave Indicus the co-registration path
24  technology.
25  Q.  That's under a different agreement, right?

```
 1        A.  Yes, they were.
 2        Q.  Any other firms?
 3        A.  I don't -- not that I can recall.
 4        Q.  Okay.  Other than the assets that are reflected in
 5   Exhibit D, the asset purchase agreement, has ModernAd
 6   Media ever sold any assets to any other entity?
 7        A.  No.
 8        Q.  Currently does ModernAd Media own any
 9   ownership interest in any other entity?
10        A.  Not that I'm aware of.
11            MR. DE ZAYAS:  When you get to the race
12        horses, let me know.
13            MR. HARTLEY:  I'm going to save that for you.
14            All right, guys, let's wrap it up for today.
15        (The deposition was adjourned at 4:09 p.m.)
16   (Reading and signing of the deposition was not waived by
17                the witness and all parties.)
18
19
20
21
22
23
24
25
```