# EXHIBIT 9

## SERVICES AGREEMENT

**THIS SERVICES AGREEMENT** (the "Agreement") is effective the 1st day of _____ _____, 2011, between 7657030 CANADA INC., a Canadian corporation d/b/a "Acquinity" ("Acquinity"), and INDICUS SERVICES LTD., a company formed under the laws of BVI ("Service Provider").

## RECITALS

**WHEREAS,** Acquinity is a wholly-owned subsidiary of [Acquinity Parent, a ("Acquinity Parent" together with Acquinity, the "Acquinity Group")];

**WHEREAS,** pursuant to that Agreement for Sale and Purchase dated _____ _____, 2010 and effective January 1, 2011 by and between RevenuePath, Ltd., a corporation formed under the laws of Cyprus ("RevenuePath") and [Sarita Somani] (the "Faraji Purchase Agreement"), RevenuePath has agreed to purchase from [Sarita Somani] and [Sarita Somani] has agreed to sell to RevenuePath, all of the equity interests in, and assets of, Faraji Econsulting Corp. ("Faraji");

**WHEREAS,** pursuant to that Agreement for Sale and Purchase dated _____ _____, 2010 and effective January 1, 2011 by and between RevenuePath and Noureddine Belhaj ("Belhaj") (the "Belhaj Purchase Agreement", and collectively with the Faraji Purchase Agreement, the "Purchase Agreements"), RevenuePath has agreed to purchase from Belhaj, and Belhaj has agreed to sell to RevenuePath, all of Belhaj's equity interests in, and assets of, the companies owned by Belhaj and identified therein (the "Belhaj Companies," and together with Faraji, the "Acquired Companies");

**WHEREAS,** subject to the terms and conditions hereof, Acquinity desires to engage Service Provider on an exclusive basis to provide the Services (as defined in Section 1) during the Service Term (as defined herein) of this Agreement to Acquinity and its Affiliates, including advising and assisting Acquinity in facilitating relationships between Acquinity and its email partners;

**WHEREAS,** subject to the terms and conditions of, and pursuant to, the Services Agreement, Service Provider agreed to provide such Services to Acquinity and its Affiliates; and

**WHEREAS,** certain definitions of capitalized terms used herein but not otherwise defined are set forth in Article VII.

**NOW, THEREFORE,** in consideration of the promises set forth herein and the benefits to be derived herefrom, the parties hereby agree as follows:

## ARTICLE I
## SERVICES TO BE PROVIDED BY THE SERVICE PROVIDER

1.1. Services. For a period commencing on April 1, 2011 (the "Effective Date") and ending June 1, 2012 (the "Service Term"), Service Provider shall provide and perform on an exclusive basis, the services listed on Exhibit A attached to this Agreement (the "Services"),

**Deleted:** MAILBOX BRANDS, LLC, a Delaware limited liability company

**Deleted:** Mailbox

**Deleted:** the

**Deleted:** Mailbox

**Deleted:** WHEREAS, Online Groove Holdings, LLC, a Florida limited liability company ("Online Groove"), is a wholly-owned subsidiary of Nicemove Holdings, Ltd., a corporation formed under the laws of Cyprus ("Nicemove");¶
WHEREAS, pursuant to that Agreement for Sale and Purchase dated March 12, 2010 by and between Online Groove and Philip Jenkins ("Jenkins") (the "Jenkins Purchase Agreement"), Online Groove purchased from Jenkins, and Jenkins sold to Online Groove, all of Jenkins' equity interests in, and assets of, the companies owned by Jenkins and identified therein (the "Jenkins Companies");¶
WHEREAS, pursuant to that Agreement for Sale and Purchase dated March 12, 2010 by and between Online Groove and Opineum Marketing, LLC ("Opineum") (the "Opineum Purchase Agreement"), Online Groove purchased from Opineum, and Opineum sold to Online Groove, all of Opineum's equity interests in, and assets of, Webzero, Inc. ("Webzero");¶

**Deleted:** March 12, 2010

**Deleted:** Nicemove

**Deleted:** Nicemove

**Deleted:** d

**Deleted:** sold

**Deleted:** Nicemove

**Deleted:** March 12

**Deleted:** Nicemove

**Deleted:** Jenkins Purchase Agreement, the Opineum Purchase Agreement and the

**Deleted:** Nicemove

**Deleted:** d

**Deleted:** sold

**Deleted:** Nicemove

**Deleted:** the Jenkins Companies, Webzero and

**Deleted:** the parties entered into that Services Agreement dated March 12, 2010 (the "Services Agreement") pursuant to which

**Deleted:** d

**Deleted:** the

**Deleted:** t

**Deleted:** the Services

**Deleted:** the

**Deleted:** ; and

**Deleted:** WHEREAS, the parties desire to ame

**Deleted:** March 12, 2010

**Deleted:** the

SUPP000252

which Services shall be performed primarily outside of the United States. Exhibit A may from time to time be modified by the mutual written agreement of the parties. During the Service Term of this Agreement, the Service Provider agrees to serve Acquinity diligently and faithfully, to perform all duties to the best of its ability, and to devote its full time and best efforts to the conduct of Acquinity's business.

1.2.   Fees.

(a)   Service Fees Payable to Service Provider.  Service Provider will provide the Services for a service fee payable as follows (collectively, the "Service Fee"):

(i)   [Fourteen (14)] consecutive monthly payments of US\$1,200,000 each, beginning on April 21, 2011 and continuing on or before the twenty-first (21st) day of each month thereafter with the final payment due and payable on May 21, 2012; and

(ii)   At such time that Acquinity has generated [seventy million Dollars ($70,000,000.00 USD) NEED TO ESTABLISH NEW THRESHOLD TO ACCOUNT FOR NET PROFITS ALREADY GENERATED] of Net Profits (which calculation shall only include the revenue directly relating to the e-marketing business) following the execution of this Agreement (hereinafter referred to as the "Payoff Revenue Target"), then Acquinity shall, within ninety (90) days after Acquinity Group reached the Payoff Revenue Target, accelerate the payment of the remaining Service Fee to Service Provider and make a final balloon payment of all remaining amounts due hereunder.

(b)   Guaranties by Acquinity Parent and RevenuePath.  Acquinity Parent and RevenuePath (sometimes referred to collectively herein as the "Guarantors," and individually as a "Guarantor") hereby jointly and severally agree to absolutely and unconditionally guaranty the payment and performance by Acquinity of its obligations under this Agreement. The obligations of each Guarantor constitute a guarantee of performance and not merely of collection, and are absolute and unconditional under all circumstances. Service Provider shall have the right to require any or all of the Guarantors to pay, comply with and satisfy their obligations and liabilities under this Section 1.2(b) and shall have the right to proceed immediately against any Guarantor, upon a default by Acquinity under this Agreement, without being required to first bring any proceeding or take any action of any kind against Acquinity, any other Guarantor or any other person, entity or property. The liability of each Guarantor is independent of and separate from the liability of Acquinity, the other Guarantors and any other persons. The obligations of each Guarantor under this Section 1.2(b) shall not be discharged, impaired or otherwise affected by (i) the insolvency, bankruptcy, liquidation, readjustment, composition, dissolution or other similar proceeding involving or affecting Acquinity or any Guarantor, (ii) proceedings affecting the ownership of any of the above through merger, consolidation or otherwise, or (iii) inconsistent orders in or claims by parties to any such proceedings. Each Guarantor waives presentment, demand for payment or performance (including diligence in

2

SUPP000253

Deleted: Mailbox

Deleted: Mailbox

Deleted: <#>The sum of US\$7,400,000, which the Parties acknowledge has been paid to Service Provider prior to the date hereof: ¶

Formatted: Bullets and Numbering

Deleted: Twenty-three

Deleted: 23

Deleted: July

Deleted: 2010

Deleted: for the next consecutive twenty-two (22) months ending on June 1

Deleted: Mailbox

Deleted: d

Deleted: Mailbox

Deleted: the end of the year in which Mailbox

Deleted: ModernAd

Deleted: Nicemove

Deleted: Online Groove

Deleted: ModernAd

Deleted: .

Deleted: Nicemove

Deleted: Online Groove

Deleted: Mailbox

Deleted: Mailbox

Deleted: Mailbox

Deleted: Mailbox

making demands hereunder), notice of dishonor or nonperformance, protest, acceptance and notice of acceptance of this guaranty under this Section 1.2(b), and all other notices of any kind. To further secure the Guarantors' obligations under this Section 1.2(b), Acquinity Parent shall grant to Service Provider a security interest in all of Acquinity Parent's tangible and intangible assets as more fully set forth in that Security Agreement of even date herewith (the "Security Agreement"), and RevenuePath shall pledge to Service Provider all of their respective equity interests in the Acquired Companies as more fully set forth in that Pledge Agreement of even date herewith (the "Pledge Agreement").

(c)     Change of Control.

If a Change of Control occurs after Acquinity, the date of this Agreement, then prior to or as part of closing of the Change of Control transaction, Acquinity shall, in its sole discretion, either: (A) make a payment to Service Provider of an amount equal to the remaining balance of the Service Fee out of its own funds; or (B) require the acquirer of Acquinity or Acquinity Parent (the "Acquirer") to elect, prior to the closing of the Change of Control transaction, to either: (1) make a full payment to Service Provider at the closing of the Change of Control transaction of an amount equal to the remaining balance of the Service Fee, so that the Acquirer, Acquinity Parent, the Acquinity Group and/or any of their Affiliates shall be able to continue to engage in the email marketing business free of any further Service Fee payment obligations to Service Provider; or (2) agree that the provisions of Sections 4.1(a)(i), (iv) and (v) shall govern the parties' respective rights thereafter, and that for the five (5) year period beginning on the date of closing of the Change of Control, the Acquirer, Acquinity Parent, the Acquinity Group and all of their respective Affiliates, and their successors and assigns, shall be bound by the restrictive covenants set forth in Section 4.1(a)(v), all remaining Service Fee payments due under this Agreement to Service Provider shall cease and terminate with the exception of all accrued but unpaid portions of the Service Fee as of the date of the Change of Control and Service Provider shall have the right to engage in the business of email marketing. If and to the extent reasonably required by Service Provider, as part of the closing of the Change of Control, Acquinity shall cause the Acquirer to execute an instrument by which Acquirer agrees to be bound by the restrictive covenants in Section 4.1(a)(v).

**ARTICLE II**

**REPRESENTATIONS AND WARRANTIES OF THE SERVICE PROVIDER**

Service Provider represents and warrants to Acquinity as of the date hereof as follows:

2.1.     Organization and Qualification.  Service Provider has been duly formed, is validly existing under the laws of the country in which it was formed, and is in good standing under the laws of its jurisdiction of organization.  Service Provider has all requisite corporate power and authority to own, lease and operate its business and properties and to carry on the business as now being or heretofore conducted.  Service Provider is duly qualified to do business as a foreign corporation and is in good standing

3

**Deleted:** ModernAd

**Deleted:** ModernAd

**Deleted:** Nicemove and Online Groove

**Deleted:** (i)    If a Change of Control occurs prior to Acquinity paying $20,000,000 of the Service Fee, then prior to or as part of closing of the Change of Control transaction, Acquinity shall, in its sole discretion, either: (A) make a payment to Service Provider of an amount equal to the remaining balance of the Service Fee out of its own funds, or (B) require the acquirer of Acquinity Parent or Acquinity, as the case may be (the "Acquirer"), to make a full payment to Service Provider at the closing of the Change of Control transaction of an amount equal to the remaining balance of the Service Fee. The Acquirer, Acquinity Parent, the Acquinity Group and/or any of their Affiliates then shall be able to continue to engage in the email marketing business free of any further Service Fee payment obligations to Service Provider.¶
(ii)

**Deleted:** Mailbox

**Deleted:** has paid $20,000,000 of the Service Fee

**Deleted:** Mailbox

**Deleted:** ModernAd

**Deleted:** Mailbox

**Deleted:** ModernAd

**Deleted:** Mailbox

**Deleted:** Mailbox

**Deleted:** The

**Deleted:** Mailbox

SUPP000254

in each jurisdiction in which the ownership or leasing of its property or the conduct of its business requires such qualification.  True and complete copies of, as applicable, the certificate or articles of incorporation, bylaws, shareholders agreement, and other organizational documents of Service Provider, as in effect on the date hereof, have been made available to Acquinity, and Service Provider is not in violation of any provision thereof.

**Deleted:** Mailbox

2.2.    Authority to Execute and Perform the Agreement.  Service Provider has the full right and power and all authority and approvals (including without limitation board and shareholder approval) required to enter into, execute and deliver this Agreement and to perform fully its obligations hereunder.  This Agreement has been duly executed and delivered by Service Provider.  This Agreement will be a valid and binding obligation of Service Provider in accordance with its terms, except that such enforceability may be subject to (i) bankruptcy, insolvency, reorganization or other similar laws affecting or relating to enforcement of creditors' rights generally, and (ii) general equitable principles.

2.3.    Licenses; Compliance with Laws, etc.  Service Provider has all Licenses which are necessary to carry on its business as presently conducted.  Such Licenses are in full force and effect; no violations are or have been recorded in respect of any License; and no proceeding is pending or, to Service Provider's knowledge, threatened to revoke or limit any License.  Service Provider is in compliance with the terms of such Licenses.  With respect to its business, Service Provider has at all times complied with all applicable Laws.

2.4.    Non-Contravention.  The execution and delivery of this Agreement by Service Provider, the consummation by Service Provider of the transactions contemplated hereby and the performance by Service Provider of this Agreement in accordance with its terms will not (i) violate any provision of the articles of incorporation, bylaws, shareholders agreement, or other organizational documents of Service Provider, (ii) violate, conflict with or result in the breach of any provision of, or result in a modification of or otherwise entitle any party to terminate, or constitute (whether after the filing of notice or lapse of time or both) a default (by way of substitution, novation or otherwise) under, any Contract, or (iii) otherwise require the consent of or notice to any third party.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES BY ACQUINITY AND THE GUARANTORS

Acquinity and each Guarantor represents and warrants to the Service Provider as of the date hereof as follows:

**Deleted:** Mailbox

3.1.    Organization and Qualification.  Acquinity and each Guarantor: (i) has been duly formed, is validly existing under the laws of the state or country in which it

**Deleted:** Mailbox

SUPP000255

was formed, and is in good standing under the laws of its jurisdiction of organization; (ii) has all requisite corporate power and authority to own, lease and operate its business and properties and to carry on its business as now being or heretofore conducted; and (iii) is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the ownership or leasing of its property or the conduct of its business requires such qualification. True and complete copies of, as applicable, the certificate or articles of incorporation or organization, bylaws, shareholders agreement, operating agreement, and other organizational documents, if available, of Acquinity and each Guarantor, as in effect on the date hereof, have been made available to Service Provider, and none of Acquinity or any of the Guarantors is in violation of any provision thereof.

      3.2.   Authority to Execute and Perform the Agreement. Acquinity and each Guarantor has the full right and power and all authority and approvals (including without limitation board and shareholder or member approval) required to enter into, execute and deliver this Agreement and to perform fully its obligations hereunder and, as applicable, the Security Agreement and the Pledge Agreement. This Agreement has been duly executed and delivered by Acquinity and the Guarantors, and the Security Agreement and the Pledge Agreement have been duly executed and delivered by the applicable parties. This Agreement, the Security Agreement and the Pledge Agreement will be valid and binding obligations of the parties thereto in accordance with their respective terms, except that such enforceability may be subject to (i) bankruptcy, insolvency, reorganization or other similar laws affecting or relating to enforcement of creditors' rights generally, and (ii) general equitable principles.

      3.3.   Licenses; Compliance with Laws, etc. Acquinity and each Guarantor has all Licenses which are necessary to carry on its business as presently conducted. Such Licenses are in full force and effect; no violations are or have been recorded in respect of any License; and no proceeding is pending or, to Acquinity's and each Guarantor's knowledge, threatened to revoke or limit any License. Acquinity and the Guarantors are in compliance with the terms of such Licenses. To their knowledge, with respect to its business, Acquinity and each Guarantor has at all times complied with all applicable Laws.

      3.4.   Non-Contravention. The execution and delivery of this Agreement by Acquinity and the Guarantors, the consummation of the transactions contemplated hereby and the performance by Acquinity and the Guarantors of this Agreement, the Security Agreement and the Pledge Agreement, in accordance with their respective terms will not (i) violate any provision of the articles of incorporation, bylaws, shareholders agreement, operating agreement or other organizational documents of Acquinity or any Guarantor, (ii) violate, conflict with or result in the breach of any provision of, or result in a modification of or otherwise entitle any party to terminate, or constitute (whether after the filing of notice or lapse of time or both) a default (by way of substitution, novation or otherwise) under, any Contract, or (iii) otherwise require the consent of or notice to any third party.

5

Deleted: Mailbox

Deleted: Mailbox

Deleted: Mailbox

Deleted: Mailbox

Deleted: Mailbox

Deleted: Mailbox

Deleted: Mailbox

Deleted: Mailbox

Deleted: Mailbox

Deleted: Mailbox

Deleted: Mailbox

### ARTICLE IV
### TERMINATION

4.1.    Termination.

(a)    Payment Default by Acquinity.  In the event that Acquinity fails to pay any amounts due and payable hereunder within ten (10) days following receipt of written notice from the Service Provider specifying such failure to pay when due as provided in Section 1.2, and such failure is not due to a termination by Acquinity in accordance with Section 4.1(b) (a "Payment Default"), Service Provider may, without notice or demand, exercise in any jurisdiction in which enforcement of this Agreement is sought the following rights and remedies:

(i)    Termination.  Immediately terminate this Agreement and Service Provider's remaining obligations hereunder.  Upon such termination, Service Provider shall no longer be bound by the provisions of Article V of this Agreement, except for Section 5.1 and Article VIII which shall survive termination, and Section 5.4 as it applies to any employees, agents, consultants, representatives, contractors, vendors, third party administrator licensors, suppliers, distributors, manufacturers, clients, customers or other business contacts of Acquinity and its Affiliates who were not also pre-existing employees, agents, consultants, representatives, contractors, vendors, third party administrator licensors, suppliers, distributors, manufacturers, clients, customers or other business contacts, of the Acquired Companies or their Affiliates prior to the date of this Agreement.

(ii)    Acceleration.  Declare all of the remaining Service Fee payments to be immediately due and payable and the same shall thereupon become immediately due and payable without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived, and collect all amounts due under this Agreement by any action provided in this Agreement or provided at law or in equity.

(iii)    Proceedings.  Institute any proceeding or proceedings to enforce the obligations of Acquinity and the Guarantors hereunder and Service Provider's rights with respect to any collateral therefor under the Security Agreement or the Pledge Agreement.

(iv)    Rights to Know-how; Innovations.  Service Provider shall have the unrestricted right (A) to utilize any technical and business know-how, customer information, or any other information previously utilized by the Acquired Companies in their Businesses prior to the execution of this Agreement, including any intellectual property rights transferred by the Acquired Companies to RevenuePath under the Purchase Agreements or instruments ancillary thereto, all

6

| Deleted: Mailbox |
| Deleted: Mailbox |
| Deleted: Mailbox |
| Deleted: Mailbox |
| Deleted: Mailbox |
| Deleted: , Jenkins or Belhaj |
| Deleted: Nicemove and Online Groove |

SUPP000257

of which shall be immediately turned over to and belong to Service Provider, and (B) to utilize any Acquinity Innovations and/or Out-of-Scope Innovations that were authored, reduced to practice, and/or developed by the Service Provider during the Service Term which are used in the business of email marketing, all of which shall be immediately made available to and belong to Service Provider; provided, that Service Provider is able to utilize the same without the use or disclosure of any Acquinity Group Confidential Information.

(v)      Restrictions on Acquinity and the Guarantors.  Beginning on the date of Payment Default, and continuing for a period of five (5) years thereafter, none of Acquinity, the Guarantors, their respective Affiliates or any of their successors or assigns shall, directly or indirectly, on its own or through any corporation, partnership, limited liability company, trust, company, proprietorship or other entity, business or person (including, without limitation, as a shareholder, member, principal, partner, officer, director, manager, employee, trustee, agent, consultant, representative or lender of any such entity, business or person):  (A) own, manage, operate, control, finance, assist, be employed by, have an interest in, lend its name to, lend its credit to, or render services or advice to or otherwise engage in any way in the business of email marketing or any business that competes, directly or indirectly, with the Businesses;  or (B) contact or proposition, or otherwise attempt to induce, influence, assist or solicit, nor accept the initiative of a third party in such regard, alone or by combining or conspiring with a third party, any employees, agents, consultants, representatives, contractors, vendors, third party administrator licensors, suppliers, distributors, manufacturers, clients, customers or other business contacts of Service Provider or its Affiliates, to terminate or modify their relationship with, or compete against Service Provider or its Affiliates or offer employment to, engage or hire any employee of Service Provider or its Affiliates or otherwise induce any such employee to resign his or her employment with Service Provider or its Affiliates. The foregoing shall not in any way limit or restrict the right of Acquinity and/or the Guarantors from contacting or propositioning, soliciting business from, any agents, consultants, representatives, contractors, vendors, third party administrator licensors, suppliers, distributors, manufacturers, clients, customers or other business contacts of Service Provider so long as Acquinity and/or the Guarantors had a business/commercial relationship with the aforementioned individuals and/or entities prior to the execution of this Agreement and such contact, proposition, solicitation and/or engagement did not and will not involve the business of email marketing.

(vi)      Other Remedies.  Exercise any other remedies available to Service Provider under this Agreement, the Security Agreement, the Pledge Agreement or at law or in equity.  In addition to any rights and remedies of Service Provider under the UCC, all rights and remedies of Service Provider under this Agreement, the Security Agreement and the Pledge Agreement and all other rights and

7

**Deleted:** the Acquired Companies, Jenkins or Belhaj, as applicable

**Deleted:** Mailbox

**Deleted:** Mailbox

**Deleted:** Mailbox

**Deleted:** Mailbox

**Deleted:** the

**Deleted:** the

**Deleted:** the

**Deleted:** Mailbox

**Deleted:** Mailbox

remedies of Service Provider under applicable law are cumulative and enforceable alternatively, successively or concurrently.

(b)  Termination of Agreement by Acquinity.  Notwithstanding any provision of this Agreement to the contrary, Acquinity may terminate this Agreement immediately in the event Service Provider breaches this Agreement by failing and/or refusing to perform those Services identified in Exhibit A pursuant to Section 1.1 during the Service Term and/or breaches any of the covenants or obligations under Sections 5.1, 5.3, 5.4, 5.5 and/or 5.6 of this Agreement, which breach is not remedied by the Service Provider within thirty (30) days following receipt of written notice from Acquinity specifying such breach or (ii) Acquinity may terminate this Agreement if either Belhaj or Jenkins is in breach of any restrictive covenants contained within their respective Consulting Agreements (as defined herein), provided said breach has not been cured within fifteen (15) days of written notice by ModernAd Media, LLC.

<div style="float:right;">
| Deleted: Mailbox |
| Deleted: (i) Mailbox |

| Deleted: Mailbox |
| Deleted: Mailbox |
</div>

4.2.   INTENTIONALLY OMITTED.

4.3.   Effect of Termination Pursuant to Section 4.1(b)(ii).  If this Agreement is terminated pursuant to Section 4.1(b)(i), all further obligations of the parties under this Agreement shall terminate, except that the provisions of Articles V, VI and VIII shall survive; provided, however, that (a) if this Agreement is terminated by Acquinity because of a breach by Service Provider in failing and/or refusing to perform those Services identified in Exhibit A pursuant to Section 1.1 during the Service Term, such termination shall be Acquinity's sole and exclusive remedy for such breach, and (b) if this Agreement is terminated by Acquinity because of the breach of this Agreement by Service Provider of the restrictive covenants set forth in Article V, Acquinity's rights to pursue all legal and equitable remedies against Service Provider, shall survive such termination unimpaired.

<div style="float:right;">
| Deleted: Mailbox |

| Deleted: Mailbox |
| Deleted: Mailbox |

| Deleted: Mailbox |
</div>

4.4.   Effect of Termination Pursuant to Section 4.1(b)(ii).  If this Agreement is terminated pursuant to Section 4.1(b)(ii), all further obligations of the parties under this Agreement shall terminate, except that the provisions of Articles V, VI and VIII shall survive; provided, however, that Acquinity's rights to pursue all legal and equitable remedies against Service Provider, shall survive such termination unimpaired.

<div style="float:right;">
| Deleted: Mailbox |
</div>

4.5.   Return of Records.  Upon termination or expiration of this Agreement, each party shall deliver to the other party a copy of all records, reports and data of the other party that are in its possession relating to the Services. Each party may retain copies of all such records, reports and data as such party may require, which copies will be prepared at the expense of such party.

## ARTICLE V
## CONFIDENTIALITY

5.1.   Confidentiality.  Each party acknowledges that during the course of providing or receiving the Services, respectively, it may have access to the Confidential Information of the other party and its Affiliates (a "Disclosing Party").  For purposes of this Agreement, "Confidential Information" means information about a Disclosing Party's business, activities, or employees that is proprietary and confidential, which shall include all business, financial,

8

SUPP000259

technical, marketing, sales, budget and other information of a party which, by the nature and circumstances surrounding the disclosure, ought in good faith to reasonably be considered and treated as confidential or proprietary. Confidential Information shall not include any information that is or becomes generally available to the public other than as a result of a wrongful disclosure by the party receiving the Confidential Information (the "Receiving Party") or the Receiving Party's directors, officers, employees, agents or advisors to whom such Confidential Information may be disclosed (collectively, such Party's "Representatives") (it being understood that Confidential Information may be disclosed to such Representatives only to the extent that such persons have a need to know such information). Each party agrees that, unless it has received the prior written consent of the Disclosing Party, it will not, and will direct its Representatives not to disclose Confidential Information to any other person, other than another person to whom such disclosure is authorized under this Agreement. In the event that a Receiving Party is requested or required (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process or by law, rule or regulation, including but not limited to disclosure requirements under federal and state securities laws or the rules or regulations of any securities exchange or automatic securities quotation system) to disclose any Confidential Information, it is agreed that such Receiving Party shall provide the Disclosing Party with prompt notice of any such request, to the extent practicable, so that the Disclosing Party may seek an appropriate protective order and/or waive the Receiving Party's compliance with the provisions of this Section 5.1. It is further agreed that if, in the absence of a protective order or receipt of a waiver under this Agreement, the Receiving Party is, in the opinion of its counsel, compelled to disclose Confidential Information, or else to be liable for contempt or suffer other censure or penalty (including, without limitation, liability under, or any violation of, securities laws or the rules or regulations thereunder or under any securities laws or any rules or regulations of any securities exchange or automated securities quotation system), then the Receiving Party may disclose such Confidential Information without liability under this Agreement; provided, however, that such disclosure shall only be made to the extent required and that the Receiving Party shall give the Disclosing Party advance written notice of the information to be disclosed, to the extent practicable, and, at the Disclosing Party's request and expense, the Receiving Party shall seek to obtain assurances that such Confidential Information will be accorded confidential treatment. This Section 5.1 shall survive the termination or expiration of this Agreement.

    5.2.    Disclosure and Assignment of Work Resulting from Services.

        (a)    "Innovations" and "Company Innovations" Definitions. "Innovations" means all discoveries, designs, developments, improvements, inventions (whether or not protectable under patent laws), works of authorship, information fixed in any tangible medium of expression (whether or not protectable under copyright laws), trade secrets, know-how, ideas (whether or not protectable under trade secret laws), mask works, trademarks, service marks, trade names and trade dress. "Acquinity Innovations" means Innovations that the Service Provider, solely or jointly with others, conceives, develops, authors or reduces to practice that are either: (i) related to the Services provided to the Acquinity Group (as defined below) by Service Provider during the Service Term, or (ii) that are based upon, or use any Acquinity Group owned

9

| Deleted: Mailbox |
| Deleted: Mailbox |
| Deleted: the |
| Deleted: Mailbox |

Innovations or Acquinity Group Confidential Information, or were developed using Acquinity Group equipment and materials.

(b)     Disclosure and Assignment of Acquinity Innovations. Service Provider hereby does and will assign to Acquinity or Acquinity's designee all of Service Provider's right, title and interest in and to any and all Acquinity Innovations and all associated records. To the extent any of the rights, title and interest in and to the Acquinity Innovations cannot be assigned by Service Provider to Acquinity, Service Provider hereby grants to Acquinity an exclusive, royalty-free, transferable, irrevocable, perpetual, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to such non-assignable rights, title and interest. To the extent any of the rights, title and interest in and to the Acquinity Innovations can neither be assigned nor licensed by Service Provider to Acquinity, Service Provider hereby irrevocably waives and agrees never to assert such non-assignable and non-licensable rights, title and interest against Acquinity or any of Acquinity's successors in interest. Service Provider acknowledges and agrees that the consideration provided under this Agreement is sufficient consideration for all retroactive and prospective assignments of intellectual property to Acquinity by Service Provider.

(c)     Assistance. Service Provider agrees to perform, during and after the Service Term of this Agreement, all acts that Acquinity deems necessary or desirable to permit and assist Acquinity in obtaining, perfecting and enforcing the full benefits, enjoyment, rights and title throughout the world in the Acquinity Innovations as provided to Acquinity under this Agreement. If Acquinity is unable for any reason to secure Service Provider's signature to any document necessary or desirable with respect to filing, prosecuting, registering or memorializing the assignment of any rights under any Acquinity Innovations as provided under this Agreement, Service Provider hereby irrevocably designates and appoints Acquinity and Acquinity's duly authorized officers and agents as Service Provider's agents and attorneys-in-fact to act for and on Service Provider's behalf to take all lawfully permitted acts to further the filing, prosecution, registration, memorialization of assignment, issuance and enforcement of rights under such Acquinity Innovations, all with the same legal force and effect as if executed by Service Provider. The foregoing is deemed a power coupled with an interest and is irrevocable.

(d)     Out-of-Scope Innovations. If Service Provider incorporates or permits to be incorporated any Innovations relating in any way, at the time of conception, reduction to practice, creation, derivation, development or making of such Innovation, to Acquinity's business or actual or demonstrably anticipated research or development but which were conceived, reduced to practice, created, derived, developed or made by Service Provider (solely or jointly) either unrelated to such Service Provider's work for Acquinity under this Agreement or prior to the Effective Date (collectively, the "Out-of-Scope Innovations") into any of Acquinity Innovations, then Service Provider hereby assigns to Acquinity or Acquinity's designee all of Service Provider's right, title and interest in and to any and all Out-of-Scope Innovations and all associated records. To the extent any of the rights, title and interest in and to the Out-of-Scope Innovations cannot be assigned by Service Provider to Acquinity, Service Provider hereby grants to Acquinity an exclusive, royalty-free, transferable, irrevocable, perpetual, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to

10

Deleted: Mailbox...cquinity Group Confidentia ...

Deleted: Mailbox...cquinity Innovations. The ...

Deleted: The ...ervice Provider agrees to perfor ...

Deleted: Mailbox...cquinity's business or actua ...

such non-assignable rights, title and interest. To the extent any of the rights, title and interest in and to the Out-of-Scope Innovations can neither be assigned nor licensed by Service Provider to Acquinity, Service Provider hereby irrevocably waives and agrees never to assert such non-assignable and non-licensable rights, title and interest against Acquinity or any of Acquinity's successors in interest. Service Provider acknowledges and agrees that the consideration provided under this Agreement is sufficient consideration for all retroactive and prospective assignments of intellectual property to Acquinity by Service Provider. Notwithstanding the foregoing, Service Provider agrees that Service Provider will not incorporate, or permit to be incorporated, any Innovations conceived, reduced to practice, created, derived, developed or made by others or any Out-of-Scope Innovations into any Acquinity Innovations without Acquinity's prior written consent.

5.3.   <u>Non-Competition</u>.   <u>Except as otherwise set forth herein.</u> Service Provider shall not, directly or indirectly, on its own or through any corporation, partnership, limited liability company, trust, company, proprietorship or other entity, business or person (including, without limitation, as a shareholder, member, principal, partner, officer, director, manager, employee, trustee, agent, consultant, representative or lender of any such entity, business or person), own, manage, operate, control, finance, assist, be employed by, have an interest in, lend its name to, lend its credit to, or render services or advice to or otherwise engage in any way in a business that competes, directly or indirectly, with the Services being provided to Acquinity during the Service Term of this Agreement and for a period of five (5) years from the termination of this Agreement (the "Restricted Period") anywhere in the world. Such competition shall include, but not be limited to the development, management, and/or operation of an affiliate marketing program, the effectuation of an email/Internet marketing/mail program related thereto, and/or the creation of software or technical products that would compete with Acquinity and their respective Affiliates. <u>Notwithstanding anything to the contrary herein, none of Service Provider or its Affiliates shall be restricted or prohibited from engaging in search engine marketing or ancillary businesses associated therewith or the operation of the Jewish social networking site doing business as "JSpace".</u>

5.4.   <u>Nonsolicitation</u>. Service Provider agrees not to, during the Service Term of this Agreement and during the Restricted Period, directly or indirectly, contact or proposition, or otherwise attempt to induce, influence, assist or solicit, nor accept the initiative of a third party in such regard, alone or by combining or conspiring with a third party, any employees, agents, consultants, representatives, contractors, vendors, third party administrator licensors, suppliers, distributors, manufacturers, clients, customers or other business contacts of the Mailbox Group to terminate or modify their relationship with, or compete against the Acquinity Group or offer employment to, engage or hire any employee of the Acquinity Group or otherwise induce any employee of the Acquinity Group to resign his or her employment for the Acquinity Group.

5.5.   <u>No Interference with the Acquinity Group's Business</u>. Service Provider will not, at any time during the Service Term of this Agreement or during the Restricted Period, in any manner interfere with, disturb, disrupt, decrease or otherwise jeopardize the business or other activities of the Acquinity Group, or do or permit to be done anything which may tend to take away or diminish the trade, business or goodwill of the Acquinity Group or give to any person

11

| Deleted: Mailbox |
| Deleted: Mailbox |
| Deleted: Mailbox |
| Deleted: Mailbox |
| Deleted: such |
| Deleted: Mailbox |
| Deleted: Mailbox |
| Deleted: Mailbox Group, and its respective Affiliates by the Service Provider hereunder or with any businesses, products or services of Mailbox and/or any of Mailbox's parent's, subsidiaries or Affiliates (including without limitation Nicemove or Online Groove and their respective Affiliates (collectively, together with Mailbox, the "Mailbox Group"). |
| Deleted: the Businesses of the entities comprising the Mailbox |
| Deleted: Group |
| Deleted: Mailbox |
| Deleted: Mailbox |
| Deleted: Mailbox |
| Deleted: Mailbox |
| Deleted: Mailbox |
| Deleted: Mailbox |
| Deleted: Mailbox |

the benefit or advantage of the Acquinity Group knowhow, methods, procedures, or any other information related or useful to the Acquinity Group's business or other activities.

5.6.   Exclusivity.  Until such time, if any, as this Agreement is terminated pursuant to the provisions of Sections 4.1(a) or 4.1(b), Service Provider shall not, and Service Provider shall cause its Affiliates and Representatives not to, directly or indirectly, enter into any agreement or initiate, pursue or participate in any negotiation or discussion with, or provide any information to, or in any manner solicit, encourage, initiate, entertain or consider any inquiries, offers or proposals from any Person other than Acquinity with respect to (i) the possible disposition of any portion of the Businesses or any business combination involving the Businesses, whether by way of sale or transfer of assets or stock, merger, consolidation, share exchange or otherwise, or (ii) the performance of the Services by Service Provider for or on behalf of itself or any third party other than Acquinity and its Affiliates.

## ARTICLE VI
## INDEMNIFICATION

6.1.   Indemnification by Acquinity.  The Acquinity Group agrees to, jointly and severally, indemnify, defend and hold harmless Service Provider and its shareholders, directors, officers, employees, representatives, agents, Affiliates, successors and assigns (collectively, the "Service Provider Indemnitees") against, and hold Service Provider Indemnitees harmless from and in respect of, any and all losses, liabilities, suits, actions, proceedings, fines, penalties, judgments, assessments, taxes, damages, deficiencies, costs, expenses (including, without limitation, expenses of investigation and defense and reasonable fees, disbursements and expenses of counsel incurred by the Service Provider Indemnitees in any action or proceeding (including, without limitation, any action or proceeding to enforce the rights of the Service Provider Indemnitees hereunder) between the Service Provider Indemnitees and the Acquinity or Acquinity Group or between the Service Provider Indemnitees and any third party or otherwise, claims, liens or other obligations of any nature whatsoever (collectively, "Losses") based upon, arising out of, or otherwise in respect of or which may be incurred by virtue of or result from any attempt (whether or not successful) by any person to cause or require a Service Provider Indemnitee to pay or discharge any liability of, or claim against, any of the Acquinity Group of any kind in respect of the operation of its email marketing business or other businesses on or after the Effective Date; provided, that Acquinity shall not indemnify, defend or hold harmless any Service Provider Indemnitee for Losses arising out of actions by or conduct of such Service Provider Indemnitee where such actions are contrary to or directly violate a written directive of Acquinity.

## ARTICLE VII
## DEFINITIONS

Certain Defined Terms.  As used in this Agreement the following terms have the meanings indicated:

"Affiliate" shall mean with respect to any Person, another Person which is directly or indirectly controlled by, controlling or under common control with such Person.

12

Deleted: Mailbox
Deleted: Mailbox
Deleted: Mailbox
Deleted: any
Deleted: Mailbox
Deleted: Mailbox
Deleted: Mailbox
Deleted: the
Deleted: (including without limitation Belhaj and Jenkins)
Deleted: Mailbox
Deleted: Mailbox
Deleted: Mailbox
Deleted: Mailbox
Deleted: Mailbox

SUPP000263

"Businesses" shall mean the email marketing businesses of the Acquired Companies.

"Change of Control," for the purposes of this Agreement, shall be deemed to have occurred as of the first day that any one or more of the following conditions shall have been satisfied:

(A)     the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that any unrelated "person" as such term is used in Section 13(d) and 14(d) of the Securities Exchange Act of 1934, (the "Exchange Act"), is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of Acquinity Parent or any entity in the Acquinity Group representing more than 50% of the combined voting power of Modern Ad's or such Acquinity Group entity's then outstanding securities entitled generally to vote;

(B)     the members of Acquinity Parent or any entity in the Acquinity Group approve a merger or consolidation of Acquinity Parent or such Acquinity Group entity with any other unrelated corporation or entity that is consummated, other than (i) a merger or consolidation in connection with a corporate reorganization, (ii) a merger or consolidation with a Controlling Stockholder or an Affiliate of Acquinity Parent or any entity in the Acquinity Group or a Controlling Stockholder, or (iii) a merger or consolidation that would result in the voting securities of Acquinity Parent or such Acquinity Group entity outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than 50% of the combined voting power of the voting securities of Acquinity Parent, such Acquinity Group entity or such surviving entity outstanding immediately after such merger or consolidation; or

(C)     the consummation of an agreement for the sale or disposition by Acquinity Parent or any entity in the Acquinity Group of all or substantially all of Acquinity Parent's or such Acquinity Group entity's assets, which is approved by the members of Acquinity Parent or such Acquinity Group entity as may be required by Law, other than a sale of assets in connection with a corporate reorganization or to a Controlling Stockholder or an Affiliate of Acquinity Parent or any entity in the Acquinity Group or a Controlling Stockholder.

"Contract" shall mean any contract, agreement, bond, note, indenture, mortgage, debt instrument, license (or other agreement concerning Intellectual Property), franchise, lease and other instrument or obligation of any kind, written or oral (including any amendments and other modifications thereto), whether written or oral, to which Service Provider is a party and related to the Businesses, or which are binding upon the Businesses.

"Consulting Agreements" shall mean those Amended and Restated Consulting Services Agreements date June 1, 2010, by and between ModernAd Media, LLC and Belhaj and Jenkins, respectively, as modified by those Termination of Amended and Restated Consulting Services Agreements of even date herewith.

13

| Deleted: ModernAd |
| Deleted: Mailbox |
| Deleted: Mailbox |

| Deleted: ModernAd |
| Deleted: Mailbox |
| Deleted: ModernAd |
| Deleted: Mailbox |
| Deleted: ModernAd |
| Deleted: Mailbox |
| Deleted: ModernAd |
| Deleted: Mailbox |
| Deleted: ModernAd |
| Deleted: Mailbox |

| Deleted: ModernAd |
| Deleted: Mailbox |
| Deleted: ModernAd |
| Deleted: Mailbox |
| Deleted: ModernAd |
| Deleted: Mailbox |
| Deleted: ModernAd |
| Deleted: Mailbox |

| Deleted: of even |
| Deleted: herewith |

SUPP000264

"Controlling Stockholder" shall mean (i) Gary Jonas or Warren Rustin, (ii) any company or entity owned, directly or indirectly, by or for either or both of them whether or not existing on the date hereof, and (iii) any trustee or other fiduciary holding securities under any employee benefit plan of Acquinity Parent.

| Deleted: Mailbox |
| --- |

"Governmental Body" means any federal, state, provincial, territorial, regional, local, municipal, foreign or other governmental, quasi-governmental or administrative body, instrumentality, department or agency or any other court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"Intellectual Property" shall mean the Intellectual Property Rights, including registered Intellectual Property Rights, that: (1) were developed by or on behalf of Service Provider for use in the conduct of its Businesses; or (2) are owned by Service Provider.

| Deleted: the |
| --- |
| Deleted: the |

"Intellectual Property Rights" shall mean all of the following: (1) United States, foreign, and international patent applications, utility model applications and patents, as well as related applications and all reissues, divisions, re-examinations, renewals, extensions, provisionals, continuations, and continuations-in-part, and equivalent or similar rights anywhere in the world in inventions and discoveries including invention disclosures; (2) proprietary and confidential information, including technical data, customer and supplier lists, trade secrets, know-how, databases, data compilations, data collections, tools, methods, and processes and all instantiations of the foregoing in any form and embodied in any media; (3) works of authorship, copyrights, copyright registrations and applications, and all other corresponding rights throughout the world; (4) mask works, mask work applications, mask work registrations, and any equivalent or similar rights in semiconductor masks, layouts, architectures, or topology; (5) industrial designs and any related registrations and applications throughout the world; (6) all computer software, modules, applications and coding, in source and object code, and data structures and databases, including all prior versions, bug fixes, flow charts, algorithms, programmers notes, compile instructions and documentation; (7) rights in World Wide Web addresses and domain names and any related applications and registrations, all trade names, logos, common law trademarks and service marks, trademark and service mark registrations and applications and all associated goodwill throughout the world; (8) the exclusive right to sue and collect damages for past infringement of any of the foregoing; and (9) any similar, corresponding or equivalent rights to any of the foregoing anywhere in the world.

"Laws" shall mean any federal, state, local or foreign law, statute, ordinance, rule, regulation, order, judgment or decree, injunctions, awards, administrative order or decree, administrative or judicial decision, and any other executive or legislative proclamation.

"License" shall mean any approval, consent, license, franchise, permit, order, registration, approval, waiver or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law, whether express or implied.

14

SUPP000265

"Net Profits" for the purposes of this Agreement shall mean the pre-tax revenue of Acquinity less operating costs for the relevant fiscal period.  Operating costs shall not include any payments made outside the Ordinary Course of Business (as defined in the Purchase Agreements) or which are otherwise inconsistent with past practices, to Acquinity's principals, related parties or Affiliates.

"Person" shall mean and include an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, a firm, an association, an unincorporated organization and a government or any department or agency thereof or any other entity.

"Representative" shall mean with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person and those of such Person's Affiliates, including legal counsel, accountants and financial advisors.

### ARTICLE VIII

### MISCELLANEOUS

8.1.    Assignment.  Service Provider may not transfer or assign this Agreement or any of their obligations or rights herein without the consent of Acquinity.  Any attempted assignment without such consent shall be void.

8.2.    Independent Contractor.  In performing the Services hereunder, Service Provider and any of their subsidiaries and Affiliates performing the Services hereunder shall be considered to be independent contractors.  In no event shall any party hereto be deemed a partner, co-venturer or agent of the other party hereto.

8.3.    Notices.  All notices, consents and other communications under this Agreement shall be in writing and may be given by personal delivery, by registered or certified mail (with proof of receipt, postage and expenses prepaid, return receipt requested), by a nationally recognized overnight courier service or facsimile.  All such notices shall be deemed to have been received as follows: (a) if delivered personally, when received, (b) if mailed, four (4) days after being mailed, (c) if sent by a nationally recognized courier service, when signed for, and (d) if sent by facsimile, when the facsimile has transmitted over the telephone lines, as evidenced by the confirmation report generated by the transmitting machine, in each case to the appropriate address or facsimile number set forth below:

Service Provider:    Indicus Services, Ltd.
                     Trident Trust Company (BVI) Limited
                     Road Tower, Tortola
                     British Virgin Islands VG1110

with a copy to:      Buchanan Ingersoll & Rooney PC
                     213 Market Street, 3rd Floor
                     Harrisburg, PA  17101
                     Attn:  Stephen C. Gierasch, Esq.
                     Facsimile:  717-233-0852

15

| Deleted: Mailbox |

| Deleted: <#>Affirmation; Effect on Pledge Agreement and Security Agreement.  Guarantors hereby confirm that the Security Agreement and the Pledge Agreement, and all collateral for their obligations under this Agreement, including but not limited to all liens, security interests and pledges granted by them under the Security Agreement or the Pledge Agreement, respectively, shall continue unimpaired and in full force and effect.¶ |
| Deleted: The |
| Formatted: Bullets and Numbering |
| Deleted: Mailbox |
| Deleted: the |

SUPP000266

Acquinity;    7657030 Canada Inc. d/b/a Acquinity,
                   2200 S.W. 10th Street

2200 S.W. 10th Street
Deerfield Beach, Florida 33442
Attn: Jesse Tomalty, Esq.
Facsimile: 954-312-4853

| Deleted: Mailbox |
| Deleted: Acquinity Brands, LLC |

*with a copy to:*
David Hatton, Esq.
Orshan Lithman, et al.
150 Alhambra Circle, Suite 1150
Coral Gables, FL. 33134
Facsimile: 305-854-6810

| Deleted: Holland & Knight LLP¶ |
| 701 Brickell Avenue .¶ |
| Suite 3000¶ |
| Miami, Florida 33131¶ |
| Attn: Rodney H. Bell, Esq.¶ |
| Facsimile: 305-789-7799 |

Any party may change its address for notice by giving notice to the other parties as hereinabove provided.

8.4.    Choice of Law; Jurisdiction.  This Agreement is to be construed and governed by the laws of the State of Florida (without giving effect to principles of conflicts of laws).  The parties irrevocably agree that any legal action or proceeding arising out of or in connection with this Agreement may be brought in any state or federal court located in Broward County, Florida (or in any court in which appeal from such courts may be taken), and each party agrees not to assert, by way of motion, as a defense, or otherwise, in any such action, suit or proceeding, any claim that it is not subject personally to the jurisdiction of any such court, that the action, suit or proceeding is brought in an inconvenient forum, that the venue of the action, suit or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court, and hereby agrees not to challenge such jurisdiction or venue by reason of any offsets or counterclaims in any such action, suit or proceeding.

| Formatted: Bullets and Numbering |

8.5.    Service of Process.  The Parties hereby agree that service of process on any party to this Agreement may be effectuated and shall be accepted by each party by registered mail, return receipt requested, or by any other manner provided for by applicable law and rules. The Parties acknowledge that service may be effectuated by mailing to each respective party's notice address identified above in section 8.3.

8.6.    Headings.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

8.7.    No Third Party Beneficiaries.  Except as expressly provided herein, nothing in this Agreement shall entitle any person other than the Service Provider or Acquinity Group or their respective successors and assigns permitted hereby to any claim, cause of action, remedy or right of any kind.

| Deleted: Mailbox |

8.8.    Counterparts; Facsimile.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but which together shall constitute

16

one and the same instrument.  Any signature page of any such counterpart, or any electronic facsimile thereof, may be attached or appended to any other counterpart to complete a fully executed counterpart of this Agreement, and any telecopy or other facsimile transmission of any signature shall be deemed an original and shall bind such party.

8.9.    Attorneys Fees.  Should any litigation, action, or suit or other proceeding be commenced between the Parties hereto and their representatives or should any party institute any proceeding in a bankruptcy or similar court which has jurisdiction over any other Party hereto or any or all of its property or assets concerning any provisions of this Agreement or the rights and duties of any person or entity in relation thereto, the Party or Parties prevailing in such litigation shall be entitled, in addition to such other relief as may be granted, to a reasonable sum for attorney's fees including an appeal or enforcement of any judgment which shall be determined by the court in such litigation or in a separate action brought for that purpose.

8.10.   Amendment.  No modification or amendment of this Agreement shall be binding upon either party unless in writing and signed by the parties hereto.

8.11.   Entire Agreement.  This Agreement constitutes the entire agreement between the parties pertaining to the subject matter hereof, and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties hereto regarding the subject matter hereof.

[Remainder of Page Intentionally Left Blank]

17

SUPP000268

Signature page of the Acquinity / Indicus Services Agreement

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

7657030 CANADA INC.,

By: _____
Name:
Title:

Deleted: MAILBOX BRANDS, LLC

INDICUS SERVICES LTD.

By: _____
Name: Noureddine Belhaj
Title: President

Deleted: SERVICE PROVIDER -

GUARANTORS:

[ACQUINITY PARENT ]

By: _____
Name:
Title:

Deleted: MODERNAD MEDIA, LLC

[REVENUEPATH, LTD.]

By: _____
Name:
Title:

18

SUPP000269