```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION

 3
                  Case No. 13-CV-61448-MARRA/MATTHEWMAN
 4

 5   PULSEPOINT, INC.,

 6
                      Plaintiff,
 7
     vs.                                    WEST PALM BEACH, FLORIDA
 8                                           MARCH 18, 2014

 9
     7657030 CANADA, INC.,
10   doing business as
     ACQINITY INTERACTIVE, LLC
11   formerly known as MODERNAD
     MEDIA, LLC, formerly known
12   as PUREADS, ACQUINITY
     INTERACTIVE, LLC,
13   WARREN RUSTIN,
     JOHN DOES 1-100,
14

15                    Defendants.

16
      MOTION HEARING TRANSCRIPT ON DEFENDANT'S MOTION TO DISMISS
17         AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM OR
     ALTERNATIVELY FOR MORE DEFINITE STATEMENT AND MOTION TO ENFORCE
18           DISCOVERY ORDER AND MOTION FOR SANCTIONS
               BEFORE THE HONORABLE WILLIAM MATTHEWMAN,
19                UNITED STATES MAIGISTRATE JUDGE

20   APPEARANCES:

21   FOR THE PLAINTIFF:
                                  BY: TIMOTHY M. HARTLEY, ESQ.
22                                800 S.E. 3rd Avenue
                                  Fourth Floor
23                                Fort Lauderdale, Florida 33316

24
     REPORTED BY:              JERALD M. MEYERS, RPR
25   TELEPHONE:                954-431-4757
```

```
 1
     FOR THE PLAINTIFFS:
 2

 3

 4
                         LEWIS & LIN
 5                       45 Main Street
                         Suite 608
 6                       Brooklyn, NY  11201
                         BY: BRETT LEWIS, ESQ.
 7

 8

 9   FOR THE DEFENDANTS:

10

11
                         LYDECKER DIAZ
12                       1221 Brickell Avenue
                         19th Floor
13                       Miami, Florida 33131
                         BY: JOAN CARLOS C. WIZEL, ESQ.
14

15

16
                         BY: ALEXANDER PASTUKH, ESQ.
17                       1395 Brickell Avenue
                         Suite 800
18                       Miami, Florida 33131
19

20

21

22   REPORTED BY:        JERALD M. MEYERS, RPR.
                         J.M. COURT REPORTING, INC.
23                       1601 N.W. 109TH TERRACE
                         Pembroke Pines, FL 33026-2717
24                       Telephone: 954-431-4757
                         E-Mail Address: CRJM@AOL.COM
25
```

1  (Call to order of the Court)

2       THE COURT:  All right.  Good afternoon everybody.

3  Let's go ahead and call the case.

4       THE CLERK:  Calling case number

5  13-61448-Civil-Marra/Matthewman, Pulsepoint, Incorporated,

6  formerly known as Datran Media Corporation versus 7657030

7  Canada, Incorporated doing business as Acquinity Interactive,

8  LLC, formerly known as Modernad Media, LLC, formerly known as

9  Pureads, Acquinity Interactive, LLC Modernad Media, LLC, Warren

10 Rustin, an individual, John Does 1-100 and 8333894 Canada,

11 Incorporated.

12      THE COURT:  All right.  Let's go ahead and get

13 appearances of counsel starting with counsel for the plaintiff.

14      MR. HARTLEY:  Good afternoon, Your Honor.  Tim

15 Hartley, Hartley law offices for the plaintiff.

16      THE COURT:  All right.

17      MR. LEWIS:  Your Honor, Brett Lewis, Lewis & Lin, LLC

18 for the plaintiff.

19      THE COURT:  All right.  Good afternoon to both of you.

20 And for the defendant?

21      MR. PASTUKH:  Good afternoon, Your Honor.  Alexander

22 Pastukh, Alexander Pastukh, P.A. on behalf of 8333947 Canada,

23 Inc.

24      THE COURT:  All right.  Good afternoon.

25      MR. WIZEL:  Good afternoon, Your Honor.  Joan Carlos

```
 1   Wizel from Lydecker Diaz on behalf of defendants 7657030
 2   Canada, Inc., Acquinity Interactive LLC, Modernad Media, LLC
 3   and Warren Rustin.
 4         THE COURT:  All right.  So, Mr. Wizel, you represent
 5   all of the other defendants and Mr. Pastukh represents the 833
 6   defendant?
 7         MR. WIZEL:  Correct.
 8         THE COURT:  All right.  And who else do we have?
 9         MR. PASTUKH:  This is my client, Jeff Hotchford.
10         THE COURT:  All right.  Good afternoon.
11         MR. HOTCHFORD:  Good afternoon.
12         THE COURT:  All right.  So the hearing today was set
13   down on 8333947's motion I believe to dismiss the amended
14   complaint for failure to state a claim, or alternatively for a
15   more definite statement, and then also it was set down on
16   docket entry 98 which is a motion to enforce discovery order
17   and motion for sanctions.
18         Now, as far as the motion dismiss the amended
19   complaint, I have reviewed the defendant 8333947 Canada, Inc's
20   motion to dismiss, which is docket entry 81.
21         I have reviewed the plaintiffs memo in opposition,
22   which is docket entry 90, and then I believe the defendant 833
23   filed a reply, and I have reviewed that.  I have also reviewed
24   some of the case law in the case.
25         So let's deal with the motion to dismiss first and
```

1   then we will go to the discovery issue.  And why can't you

2   answer the complaint?

3         Everybody else in the case has answered.  What is the

4   problem with having, that 833 is having with the complaint?

5         MR. PASTUKH:  Your Honor, as I put in my motion to

6   dismiss, if you look at the complaint itself, there are 3

7   paragraphs basically affiliated with my client, and they are

8   all in one claim, the 7th claim which is labeled de facto

9   merger.

10        The 3 paragraphs that deal with that or might deal

11   with my client, they don't really say anything as far as what

12   it is that plaintiff is seeking as far as a claim against my

13   client.

14        If you look, Your Honor, at their response they cite

15   to a couple of paragraphs that seem to have more to do with

16   their claims then the complaint even has.

17        The problem is that paragraphs 4, 5 and 6 that they

18   have cited in their response, they are not in this complaint.

19   They might have been in the original complaint.  They are not

20   in the first amended complaint.

21        THE COURT:  When you say paragraphs 4, 5 and 6, what

22   do you mean?

23        MR. PASTUKH:  In their response, in docket entry

24   number 90 --

25        THE COURT:  Right.  I have it.

1          MR. PASTUKH:  -- they keep citing, and they say

2    specifically the complaint alleges that, and they are relying I

3    think on these paragraphs 4, 5 and 6.  If you look at the

4    complaint, the first amended complaint --

5          THE COURT:  Where in their motion do they say that?

6          MR. PASTUKH:  It first appears on page 4 in their

7    response.

8          THE COURT:  I see.  Where they specify paragraphs 4,

9    5, and 6?

10         MR. PASTUKH:  Correct, and they do that throughout.

11         THE COURT:  Okay.

12         MR. PASTUKH:  So I agree that paragraphs 190, 191 and

13   192 are in that 7th claim dealing with my client, but 4, 5 and

14   6 are not in the first amended complaint.

15         There is nothing else in this first amended complaint

16   that refers to my client.  So when you look at the 7th

17   complaint in paragraphs 190, 191 and 192, it says de facto

18   merger, but then there is talk in here about mere continuation,

19   alter ego.

20         All of these things are addressed in my motion to

21   dismiss, Your Honor.  There are exceptions as you know to the

22   successor non-liability.  One of then is de fact to merger, but

23   you need a little bit more.

24         Their response that cites to Seawell and cites to the

25   Airport Services, they are distinguishable completely from this

case.  And if you look at the paragraphs here, the 190, 191,
192 they flip and flop back.  There is words alter ego in
there.

That's not in the complaint, and I can't use their
response to the motion to dismiss to put me on notice of what
claims there may be.

There are words about mere continuation, and the
problem is that in their response it talks about that there may
be other causes of action for fraudulent conveyances, or what
not against my client.

So, Your Honor, I think that they failed to at least
state a cause of action under de facto merger, if that is what
they are trying to do.  If they are trying to do alter ego,
they have definitely failed if they have trying to do anything
else.

THE COURT:  What is missing?  I am looking at the 7th
claim, paragraphs 189 through 192.  What is missing for a de
factor merger claim, because that is what it is labeled.  It is
labeled, "De facto merger, Florida common law."

MR. PASTUKH:  Sure.

THE COURT:  What is not in there that should be in
there?

MR. PASTUKH:  There is no facts.  There are no facts
attributing to that.  There may be these elements that they
say -- I mean, the only thing I see is in 190 I believe what

1  they are trying to do is, it is almost like an injunctive

2  relief.

3      They say "have or are in the process of."  There is

4  nothing actually saying that it has happened.

5      191 the only thing that I can see is it says they

6  share the corporate structure and ownership, and then they

7  start talking about a mere continuation and alter ego.  Those

8  are different than the de facto merger.

9      A mere continuation is a separate exception to the

10 successor non-liability.  Alter ego, as Your Honor knows, is

11 another completely different animal unto itself.

12     Then you have 192 which talks about again mere

13 continuation.  So I wouldn't say that just because they labeled

14 it de facto merger it has to be de facto merger, but I need to

15 know whether or not they are traveling under de facto merger.

16     If they are traveling under mere continuation, alter

17 ego, trying to do something with the fraudulent conveyance, and

18 that's my problem is I just don't think there is enough in here

19 in these 3 paragraphs, and then the amended complaint itself to

20 put me on notice of what it is that they are seeking against my

21 client.

22     THE COURT:  All right.  Thank you.  Let me turn to

23 plaintiff's counsel, and why is he not right?  Why do you

24 allege enough in the 7th claim or elsewhere in the complaint to

25 withstand a motion to dismiss?

1           MR. LEWIS:  Thank you, Your Honor.

2           Mr. Pastukh and I spoke prior to today's hearing, and

3    I have advised him that because of the discovery that we have

4    been able to obtain in this case, we are in the process of

5    filing a second amended complaint.

6           I recognize some of the problems that he has pointed

7    out.  At this point, even though we think that with Florida

8    being a notice of pleading state, they are on notice of what

9    our claims are.

10          If he is requesting additional facts, we are willing

11   to put those in the second amended complaint.  We would ask

12   that the motion be rendered moot by the filing of our second

13   amended complaint and give them a chance to respond to that

14   complaint.

15          THE COURT:  All right.  And does the plaintiff need

16   permission to file a second amended complaint?

17          MR. LEWIS:  Probably so.  We probably need to file a

18   motion for leave to do so.  We have prepared the complaint.  We

19   haven't yet filed a motion for leave.

20          If I could make an ore tenus motion for leave to file

21   it today, we would do so, but I think it would be more proper

22   for us to put it in writing.

23          THE COURT:  Yes.  Why don't you go ahead and do a

24   written motion.  So I guess the plaintiff's position at this

25   point is that the plaintiff anticipates, in light of some of

1   the discovery that has been received filing a second amended

2   complaint and that, therefore, in light of that it doesn't

3   really have an objection to I guess granting the defendant's

4   motion in allowing the plaintiff to file an amended complaint;

5   is that right?

6          MR. LEWIS:  Right.  We have obtained enough discovery

7   to be able to flesh out in greater detail the claims against

8   Mr. Pasturkh's client.

9          THE COURT:  All right.  Because I have read

10  everything.  And if you are granted leave and are able to file

11  a second amended complaint, you should really specify exactly

12  what the claim is, what the elements are, what the facts are so

13  that it complies with Trombley and Ikball and those types of

14  cases, and then we will proceed from there.

15         MR. LEWIS:  All right.  Thank you, Judge.  Will do.

16         THE COURT:  All right.  So that takes care of that

17  motion.  Now, let me turn honor to the discovery issue because

18  I am concerned about the discovery issue, and in reading

19  through everything, and this is not a finding.

20         This is a concern that the court has that the

21  defendants are trying to stymie or hinder discovery, and if I

22  find that to be the case in this matter, because there has been

23  a claim by plaintiffs that the defendants are trying to stymie

24  or hinder discovery in order to allow assets to be dissipated

25  or sent away, if I find that to be the case, then the court

```
 1    will consider some very serious sanctions.

 2            So I just want to tell the parties that from the

 3    beginning.  I am not making any type of finding on that.

 4            However, one of the concerns that I have is the

 5    plaintiff makes an allegation that as far as to the request for

 6    production, defendants have not even filed a response, a formal

 7    response to the request for production.  Is that the case?

 8            MR. WIZEL:  Judge, let me start by saying this:  We

 9    have had several discussions about the motion, and that issue

10    has never been an issue really of dispute.

11            THE COURT:  But don't the rules require you to file a

12    response to a request for production?

13            MR. WIZEL:  Well, we filed a response.  The problem is

14    they moved to overturn our objections in the response, and Your

15    Honor did.  So what we did is we produced everything that was

16    requested in their request for production.

17            THE COURT:  Okay.  So your first response is to assert

18    objections and things of that nature?

19            MR. WIZEL:  Exactly.

20            THE COURT:  Okay.  And then we had a hearing and I

21    overruled the objections?

22            MR. WIZEL:  Yes.

23            THE COURT:  And then what you are saying is that in

24    response to that you produced discovery?

25            MR. WIZEL:  Yes.  Your Honor ordered us to produce
```

1    every single thing that was requested in the first request for

2    production, and that's exactly what we did in a week's time,

3    and not only that, but since it was not a matter of contention

4    during the meet and confer discussions, we didn't do anything

5    in the mean time, but upon receiving their reply yesterday, I

6    prepared a response that says we produced everything we have

7    had.

8         That's really what we have done the first day.  We

9    will produce, pursuant to the court's order, every document

10   that is in our possession, custody or control, and that is what

11   we did, and so this morning I sent opposing counsel the

12   responses, and I think that issue is moot.

13        THE COURT:  Because it seems like there is dispirit

14   positions from what I am hearing from the plaintiff and the

15   defendant.

16        It seems like the plaintiff is saying that things

17   haven't been produced and the defendant is saying things have

18   been produced, and I am trying to figure out and get to the

19   bottom of it because it seems that we should get through these

20   discovery issues and produce what needs to be produced, if it

21   has not been produced, and then move on.

22        Let me ask the plaintiff.  What about this issue with

23   the defendants allegedly not filing a response to a request for

24   production and not producing all of the discovery as you

25   allege?

1       MR. LEWIS:  All right, Your Honor.

2       THE COURT:  And make sure, the hearing is being

3   recorded, so I know it was just Mr. Wizel speaking a moment

4   ago, but just announce your name on the record before you start

5   speaking, so if we do have to have a transcript of this,

6   whoever transcribes it knows who is speaking.

7       MR. LEWIS:  Thank You, Your Honor.  Brett Lewis on

8   behalf of the plaintiff.

9       So, Your Honor, I disagree with Mr. Wizel's

10  characterization that the plaintiff never requested written

11  responses to our discovery requests.

12      We brought up this issue I believe on January 30th,

13  and if not on January 30th, during the meet and confer.

14      We certainly brought it up by letter on February 14th.

15  We may have raised another time, and in our February 14th

16  letter to the defendants, we said, "The defendants did not

17  include written responses to the first request, i.e. as to each

18  numbered document request, whether or not each defendant

19  individually had responsive documents in its possession and

20  produced all such documents.  We cannot fully assess where the

21  deficiencies in the production lie and whether you contend that

22  the production was complete as to each defendant."

23      THE COURT:  All right.  So let me ask you this:

24      As far as the request for production, then, your

25  request that the defendants respond to each enumerated request

1    and specify their response, has that been complied with?

2            In other words, I was told I believe that a new

3    response was just sent to you yesterday or today, or something

4    of that nature.

5            Has that now been complied with, or what is the status

6    of that?

7            MR. LEWIS:  I haven't seen it, Your Honor.  I had a

8    conversation with an associate in my office who says that there

9    was a response received; that there is the same response to

10   every request; basically that all documents were made available

11   to plaintiffs, for plaintiffs production and inspection.

12   Something to that nature.

13           I don't have a hard copy of the document.  I haven't

14   seen it myself yet.  I am looking at it on an iPad.

15           Defendants have made available for inspection and

16   related activities the documents in their possession, custody

17   or control as requested and pursuant to the court's order.

18           So it is the same exact response to every single

19   request that we made.  So it is something, it is not

20   particularly instructive because again there were other issues.

21           There are documents which very clearly were not

22   produced.  So saying that all of the documents were made

23   available to us for our production and copying does not even

24   take into account the discussions that we have had with counsel

25   over which documents specifically were not produced.

 1          One of the problems I think was that it became

 2   apparent that defendant's clients reviewed the documents and

 3   made the production themselves without their attorneys having

 4   actually had a chance to review the documents and make sure

 5   they were compliant with the court's order and with our

 6   requests.

 7          So they may not have even known what their clients

 8   exactly had produced to us, and we have had conversations over

 9   things.

10          It is not only Quick Books files which contain ledger

11   books and other accounting records.  Some accounting records

12   were produced, but not all accounting records.

13          Tax returns we have had issues with.  We gave an

14   example of one specific issue with a particular tax return that

15   a page that was missing which would have contained foreign bank

16   account numbers, but we received no tax returns for defendant

17   Modernad.

18          We received no state tax returns for any of the

19   defendants.  So when the defendants now produce on the morning

20   of this argument a paper that says that they made all of the

21   documents in their custody and control available to us, it is

22   not even accurate with the status of what was produced.

23          THE COURT:  All right.  Now, I have red document

24   number 98 which is the plaintiff's motion to enforce the

25   court's order, and I have read defendant's memorandum in

1   opposition to that motion which is docket entry 104, and then I

2   have read the plaintiffs reply which is docket entry 106.

3         What is it that plaintiffs still needs?  In other

4   words, what precisely is it that plaintiff still needs from the

5   defendants?

6         MR. LEWIS:  Plaintiff needs Quick Books files of each

7   defendant.  This motion specifically applies to Mr. Wizel's

8   clients.

9         It is my understanding that Mr. Pastukh's clients will

10  comply with whatever the court orders, even though this motion

11  is not made as to them, and he can speak to that himself.

12        I don't want to put words in his mouth, but that's my

13  understanding.

14        THE COURT:  All right.  So what you want is that you

15  say have not been produced is Quick Books files for each

16  defendant as to, I think I had narrowed the period of time or

17  imposed a period of time earlier.

18        MR. LEWIS:  I believe it was 3 years.

19        THE COURT:  All right.  What else?  What else is it

20  that you say they have not produced that they are supposed to

21  produce?

22        MR. LEWIS:  All tax returns.  Complete tax returns.

23  We have partial tax returns.  We have tax returns with a

24  missing page which would identify foreign bank accounts.

25        There is a reference in a tax return from Acquinity to

1    foreign bank accounts.  The page that is supposed to list those

2    numbers is missing.

3            Defendant's counsel said that his clients say that's

4    the way it was filed with the IRS.

5            THE COURT:  Right.  I read that.

6            MR. LEWIS:  I don't know that we believe that.  There

7    are also state tax returns.  We understand that the State of

8    Florida and the State of Delaware, entities are required to

9    file tax returns.

10           We have no state tax returns.  We have no tax returns

11   for defendant Modernad whatsoever.

12           We have tax returns from defendant Rustin produced in

13   the other case which are incomplete.  We don't have the

14   schedules on which, I forget the number of the schedule, but

15   they are incomplete.

16           The schedule where the true accounting comes into

17   place, and you can see the company's assets and expenses.

18           Current bank records, those are a continuing

19   obligation to produce documents that are responsive.

20           These defendants, at least some of them are still in

21   business.  We haven't received any bank account records since

22   November, dating past November.  So to the extent that we

23   wanted to identify bank accounts that are current and may have

24   assets in them, we have been unable to do that.

25           Foreign bank account records, which I imagine will be

1    somewhat more contentious, is that the defendants may deny

2    their existence or they may deny that these particular

3    defendants are the owners of those accounts, but we have

4    information that people who worked for Acquinity were paid from

5    the bank accounts in Cyprus.

6          There were no bank account records produced from any

7    companies or any bank accounts in Cyprus.

8          We also know that the defendants have entities in

9    India and in Morocco and the British Virgin Islands.

10         There have been tens of millions of dollars, probably

11   in excess of close to $60,000,000 that we can document which

12   flowed to entities in those locations.

13         From what we can gather, those payments seem to be, it

14   seems like banking money offshore under the guise of these are

15   revenue sharing agreements with third-party companies when, in

16   fact, they are all related entities.

17         We don't have any of those bank account records, nor

18   do I necessarily expect the defendants to acknowledge that they

19   exist or that they belong to defendants, but we would

20   request --

21         THE COURT:  Well, if they know that they do, they are

22   obligated to produce them.

23         MR. LEWIS:  They are obligated to produce whatever

24   they have.  We know that there are payments made from those

25   accounts.

```
1            We have accounting records, and I want to be fair.

2    The defendants did produce a substantial amount of

3    documentation, much of which was useful.

4            The pieces that are missing are the ones that, well, I

5    should not say the only pieces that are missing, but the pieces

6    that we can see that are missing are some of the financial

7    pieces that would connect the dots to where the money is now.

8            THE COURT:   Right.   They have produced some of the

9    documents but not all according to you?

10           MR. LEWIS:   Correct.

11           THE COURT:   All right.   So can you think of anything

12   else?   Do you have anything else that they have not produced?

13           You mentioned Quick Books files for each defendant.

14   All of the tax returns you have mentioned.   The bank records

15   you have mentioned.

16           What other documents do you assert that defendants

17   have not produced?

18           MR. LEWIS:   We haven't really seen communications

19   concerning transfers of any assets to or between different

20   entities, to the extent that those exist.

21           There were what appear to be several different

22   transfers of assets or of changing of a business from one

23   entity to another entity without any documentation or papering.

24           To the extent that the defendants contend that there

25   is no documentation of this, we will rely on that.
```

1       THE COURT:  When you say communications, do you mean

2  communications between the two companies?

3       MR. LEWIS:  Between the two companies or by or between

4  the defendants.  Our request number 27 covers all documents

5  relating to any communications between defendants regarding the

6  ownership of defendants, including with that limitation, any

7  and all subsidiaries or affiliates owned by defendants, in

8  whole or in part.

9       So, to the extent that there are documents that talk

10 about the running of or the management of or the ownership of

11 these businesses, we believe that those would be copied.

12      There really is very, very little in the way of

13 anything that sheds any light on what these entities are.

14      We will find e-mails from the accounting department

15 saying, you know, "here we are authorizing half a million

16 dollars to buy tile or toilets or microwave ovens for the

17 office in India," but we won't find of what is now revenue path

18 which used to belong to Modernad when it was called Aliseum,

19 right, but, we won't find anything discussing the decision to

20 do that.  So, whether to the extent that those documents exist,

21 they are missing.

22      Also, there are no documents, for instance, showing, I

23 don't believe this was in our papers, but we have made some

24 connections since we even drafted some of these papers where

25 there was an entity owned by defendant Modernad, which is

1  debtor, called Awesium.

2         Modernad acquired this entity sometime in the middle

3  of 2010 and subsequently began building out, changed the name

4  of that entity.  There were 3 different entities.

5         There was one in Morocco, one in India and one in

6  Cyprus, and one was Feragi Consulting that became Revenue Path

7  E-Consulting, and one was, I don't recall the names exactly,

8  but there was one in India, there was one in Cyprus, and they

9  are all Revenue Path something.

10        This was on Modernad e-mails with Modernad letterhead

11 or signature lines.  People were busy setting these offices up,

12 spending money; you know, arranging for payrolls, and then

13 there is an asset purchase agreement between Modernad and

14 Acquinity.

15        Revenue Path was mentioned.  Aliseum, which is the

16 predecessor entity to Revenue Path is not mentioned.  There is

17 no mention of Revenue Path in any of those documents, and yet

18 Acquinity seemed to acquire and then start paying a number of

19 consultants who were previously paid by Modernad the same

20 amounts of money to conduct the same jobs for these new entity

21 names.

22        We don't have any paper explaining what this was, how

23 this transaction took place.  There is nothing.  So, to the

24 extent the defendants claim there is no paper, we will rely on

25 that and we will just assume that there was no consideration

1   given for this conveyance of assets; that they were simply

2   taken, and then I think as far as we know, I think that's it.

3           THE COURT:  All right.  So those would be the primary

4   5 issues, the Quick Books for each defendant, the tax returns

5   that you mentioned, federal and state, Florida and Delaware,

6   the current bank records, including foreign bank records,

7   communications between defendants or companies regarding

8   transfer of assets or changing the name of the business and

9   then the documents regarding Aliseum and the 3 different

10  entities, the Revenue Paths.

11          Those are the areas that you are primarily focused on

12  in getting discovery on?

13          MR. LEWIS:  Yes, Your Honor.  It is Aliseum and

14  Revenue Path, but also there is another entity called Trilium.

15  There is one called Indicus In Box Direct itself.

16          There is no paper showing how In Box Direct came to be

17  conducting the business that it is conducting with 80 percent

18  of its clients being former clients of Acquinity or customers

19  being former customers of Acquinity.

20          THE COURT:  And why do you think all of the discovery

21  is relevant?  What is the plaintiff's position as to what is

22  going on in a nutshell to summarize it for the court?

23          MR. LEWIS:  All of those entities are related.  They

24  are all alter egos in some way, shape or form of Gary Jonas who

25  it is our position was an owner of Modernad without having that

```
 1   be disclosed, and regardless of the fact assets of Modernad

 2   went to Acquinity, were taken without consideration.

 3          No payments have been made from those assets.  There

 4   is testimony by Warren Rustin who is purportedly the owner of

 5   Modernad that he was never paid consideration for the assets of

 6   Modernad.

 7          They are simply taken by Acquinity, and that now

 8   defendants have dispersed these assets of Acquinity amongst

 9   other entities which are all owned, operated and controlled by

10   Gary Jonas through a network of foreign and domestic companies

11   and trusts.

12          THE COURT:  So if I understand it, Modernad was owned

13   by Gary Jonas according to you?

14          MR. LEWIS:  We believe that Modernad was owned by Gary

15   Jonas.

16          THE COURT:  Sort of like a silent owner?

17          MR. LEWIS:  Correct.

18          THE COURT:  And then according to you, Modernad

19   Modernad transferred everything to Acquinity?

20          MR. LEWIS:  Correct.

21          THE COURT:  And then Acquinity is now transferring it

22   to different entities --

23          MR. LEWIS:  Correct, Your Honor.

24          THE COURT:  -- to get it beyond the reach of

25   plaintiff?
```

1          MR. LEWIS:  Correct.

2          THE COURT:  Is that pretty much what the allegation

3    is?

4          MR. LEWIS:  Yes, Your Honor.  To get it out of the

5    reach of plaintiff, and to be frank, the government and other

6    potential creditors.

7          MR. HARTLEY:  Your Honor, I am sorry to interrupt, but

8    I took the deposition --

9          THE COURT:  Please state your name for the record.

10          MR. HARTLEY:  Tim Hartley for the plaintiff.  I took

11    Mr. Rustin's deposition several months back.

12          He produced an asset purchase agreement that specified

13    certain asserts that were transferred to Acquinity, but what

14    was really transferred was several server after server after

15    server of information that is used to run Acquinity and the

16    successor companies, and those are the assets which we believe

17    have been spread out among all of these various entities for

18    which there is no consideration paid and which constitutes

19    fraudulent transfer, among other things.

20          THE COURT:  All right.  And when you said, you

21    mentioned that the government or FTC, or something, how does

22    that bear to this case and what is that all about?

23          MR. LEWIS:  I think it relates to this case, Your

24    Honor, in the sense that the defendants have a number of

25    parties who are coming after them for money and to change their

1   practices; to get them to change their practices.

2          The FTC filed a lawsuit against Acquinity and the

3   Revenue Path entities, as well as I believe Gary Jonas and

4   Cerritus Somany who is listed as the nominal owner of Revenue

5   Path.

6          We found an interesting document where she is being

7   paid a fee like to act as the shareholder.  It is like a

8   shareholder fee, this much money.

9          So it is our sense that the defendant Modernad was

10  sued by the Florida State Attorney General's Office for

11  violations of the CANSPAM Act in early 2010 and entered into a

12  settlement of 2.9 million dollars.

13         We have information from people who are at meetings

14  with Mr. Jonas that he set about to find ways to bullet proof

15  the company against potential liability in the future.

16         So the fact that there could be potentially a future

17  government litigation, there could be creditors coming after

18  them, he wanted to make sure that his money was protected and

19  his entities were protected so that if there is a judgment

20  against one, it wouldn't sink the entire enterprise.

21         THE COURT:  And what is the FTC alleging, just in a

22  nutshell?

23         MR. LEWIS:  The FTC allegations, I believe, are

24  deceptive marketing practices in connection with a

25  co-registration scheme.  Tim Hartley can speak to that a little

1    bit more.

2            MR. HARTLEY:  Your Honor, Tim Hartley again.  In a

3    nutshell what the FTC is alleging is that rather than using

4    CANSPAM now, Acquinity was using text messaging to lure people

5    in to enter the co-registration path.

6            They would send a text to an individual saying, "You

7    have won a free iPad or you one a $1,000 gift card.  All you

8    have to do is register on this Website."

9            The person would then register and fill in the

10   information that is listed on the Website, and you would have

11   to go through a variety of other Websites in order to complete

12   the task required to win the free iPad, and apparently there

13   was an iPad somewhere.

14           I don't think it is this one, but there was one

15   somewhere, and that there were gift cards that were available,

16   but in the meanwhile, what is happening is that Acquinity is

17   gathering a tremendous amount of information which is then sold

18   to others who can use it for sales purposes.

19           THE COURT:  I see.  All right.  Now, Mr. Wizel, I will

20   give you a chance now if you could just respond to all of these

21   claims, and specifically I want to talk about the discovery

22   that they say has not been produced, but whatever issues you

23   would like to resolve and then we will go through the

24   discovery.

25           MR. WIZEL:  Yes, Your Honor.  Thank you very much.

```
 1              I want to first address the overall problems that we

 2    have with this discovery dispute.

 3              As Your Honor just witnessed, there was no real list

 4    of things that they provided us that they were missing.

 5              The only thing that they said they were missing was

 6    the one page from that tax return, and what I did is I went to

 7    my client and I said, "They are claiming this specifically,"

 8    and I came back to them and I said, "This was produced as was

 9    filed with the IRS."

10              Of course, my client is working on fixing that problem

11    and once the amended filing is done we will produce it under

12    our continuous duty to produce, but that is the main problem.

13              They raised all of these issues.  You look at their

14    motion, there is nothing specific about what they are

15    complaining about.

16              Look at the reply.  There is nothing specific about

17    what they are complaining we haven't produced, and that is why

18    in my response I had to list everything, the categories of

19    documents we are producing in multiple pages.

20              THE COURT:  Right.  I read that.

21              MR. WIZEL:  Because I did not know what is it that

22    they were complaining about.

23              I do know one thing.  They want the Quick Book files.

24    The first time the Quick Book files came up was during our Rule

25    26 conference.
```

```
 1            By that time the first request for production, you
 2   know, had been served in November.  We had our Rule 26
 3   conference in January at the end of January.
 4            This is the first time that this issue came up.  In
 5   their draft of the report, they included a request, a request
 6   itself for the electronic files.
 7            That's the first time they requested electronic files.
 8   During that conference they acknowledged they had not requested
 9   electronic files.  They had not requested Quick Books.  They
10   didn't know we had used Quick Books.
11            So that was the first request, and this is I think the
12   crux of the dispute.
13            THE COURT:  Well, why can't you just give them the
14   Quick Books?
15            MR. WIZEL:  Well, that's exactly my point, Your Honor.
16   I said to them, "Send me a second request for production for
17   the files."
18            The problem is, Your Honor, with the first request for
19   production, it was limited and we produced everything related
20   to that in those files.
21            THE COURT:  Didn't they ask for accounting records?
22            MR. WIZEL:  Well, if we are talking about specifics,
23   we can go into the specific requests.
24            THE COURT:  But what I am getting to is even if they
25   didn't use the word "Quick Books," did not their request for
```

1    production encompass Quick Books?

2         MR. WIZEL:  No.  Not all electronic files, and the

3    documents from Quick Books were requested from the first

4    request for production, we produced.

5         We produced some in paper form, some in electronic

6    form.  We gave them a DVD with documents from the Quick Book

7    files that responded to the specific request for production.

8         That is the second problem with their motion.  They

9    don't say, "Look at this request.  This is what we are missing.

10   This is what they have given us, and they have refused to

11   produce it."

12        They don't do that because we haven't done that, Your

13   Honor.  When they have come to us with a specific request that

14   is encompassed within the first request for production, we have

15   responded.

16        THE COURT:  Okay.  So let's deal with on the Quick

17   Books, are you saying it is not encompassed in the first

18   request for production?

19        MR. WIZEL:  It is not, and the Quick Book files have a

20   little more information then that requested.  Not only that,

21   Your Honor, but the most important thing, and this is I think

22   the problem:

23        I told them, "Send me a second request for production

24   and we will request an order of confidentiality for those

25   documents that are not covered within the first request for

1   production, and we will give you the Quick Book files." It was

2   that simple.

3         After different meets and confers and discussions, I

4   said, "Fine.  You know, I will agree even without even a second

5   request for production, I will give you the Quick Book files.

6   Just agree to an order of confidentiality."  It is that simple.

7         THE COURT:  Well, let me ask the plaintiff's counsel,

8   what about the Quick Books issue?  Mr. Wizel is saying that

9   they will produce the Quick Books documents as long as there is

10  a confidentiality order in place?  Why doesn't that resolve the

11  issue.

12        MR. LEWIS:  Well, Your Honor, it is a piece of the

13  issue.

14        THE COURT:  But as far as the Quick Books, why doesn't

15  that resolve the Quick Books portion of it?

16        In other words, you mentioned 5 categories of

17  documents that they have not produced.

18        From what I am hearing they are willing to produce the

19  Quick Books documents for 3 years, even though they say it was

20  not specifically part of the first request for production, but

21  in order to do that, they want to have a confidentiality

22  agreement.

23        What objection does the plaintiff have to that and

24  what response?

25        MR. LEWIS:  Generally speaking, Your Honor, we don't

1  have an objection.  Our issue is that this came up at the 11th

2  and a half hour after we reached out to the defendants and

3  tried again, heeding the court's order which the court issued

4  after we had filed our motion.

5       We decided to try to make an effort to resolve this

6  dispute without having the court have to weigh in and rule, and

7  what happened was it took several days to get a time where the

8  parties could speak.

9       By that point it was last Wednesday.  We said or we

10 gave specific time frames that be would need to have the

11 documents produced or have the files produced with electronic

12 files.  It should not take long to do this.  We would want them

13 in a week.

14      THE COURT:  All right.  Well, what about as far as

15 now, I mean I understand there has been some past history, but

16 as far as dealing with the issue now and setting aside some of

17 the other issues and requests in your motion, as far as the

18 Quick Book files for each defendant for the past 3 years, would

19 the plaintiff agree to a confidentiality order?

20      MR. LEWIS:  Covering items that were, we agree or I

21 would agree or the plaintiff would agree to some kind of

22 confidentiality order.

23      As long as Mr. Wizel says it would apply to items that

24 they believe are outside the scope of what was covered by our

25 request.

1      We disagree obviously that our requests were not broad

2  enough to encompass within them the Quick Book files because we

3  requested ledger books and other accounting records which we

4  believe are embodied in the Quick Books files.

5      THE COURT:  All right.  But what I am trying to get at

6  is from what I am hearings from Mr. Wizel, he is saying that

7  they are willing to produce the Quick Books files for each

8  defendant for the past 3 years.

9      MR. LEWIS:  We would accept them, Your Honor, yes.

10      THE COURT:  Along with a confidentiality agreement.

11      MR. LEWIS:  And that should not present an issue.

12      THE COURT:  All right.  So, Mr. Wizel, does that clear

13  up the issue on the Quick Book files?

14      MR. WIZEL:  Yes, Your Honor.  That is what we offered.

15      THE COURT:  And how long would you need to produce

16  those?

17      MR. WIZEL:  One week.

18      THE COURT:  All right.  So what I am going to do then

19  is I am going to order the defendants to produce the Quick Book

20  files for each defendant for the past 3 years.

21      Are the parties able to agree on the terms of a

22  confidentiality order?

23      MR. WIZEL:  We need to work that out, Your Honor.

24      THE COURT:  All right.  I will order that the

25  production that the documents will be deemed confidential

1   subject to the particular terms being worked out between the

2   plaintiff and the defendants, and if you all are not able to

3   work it out, then I will just enter one, but I assume that you

4   would be able to work it out.

5          MR. WIZEL:  Yes.  Just one clarification, Your Honor.

6   The Quick Book files include also things protected by the

7   attorney-client privilege, like fees paid to, legal fees paid

8   in the course of litigation to attorneys and that have

9   descriptions of what happened in the litigation.

10         THE COURT:  Right.  What you need to do on those, are

11  you saying that you want to redact those, or what is your

12  position?

13         MR. LEWIS:  We would like to extract those.  We are

14  going after financial documents.  I don't think the billing

15  records are really the issue here.

16         THE COURT:  Right.  I think billing records would not

17  necessarily be attorney-client client work product unless they

18  disclosed some confidential information.

19         MR. LEWIS:  Right.

20         THE COURT:  One thing you have to do is that if there

21  is a work product or an attorney-client privilege issue, you

22  have to do a privilege log.

23         What is the plaintiff's position on that?  They want

24  to either redact or extract any attorney-client or work product

25  material.

1        MR. LEWIS:  Your Honor, the only issue that we would

2   have with respect to anything of that nature, there is another

3   issue that we wanted to bring to the court's attention later

4   would be if there are any communications to which the defendant

5   contends or claims privilege which we might maintain would be

6   subject to a crime-fraud exception.

7        With respect to those communications, we would need to

8   have further discussions about what to do about those, but

9   otherwise we don't have an issue with them redacting.

10       THE COURT:  All right.  And, Mr. Wizel, you are able

11  to do a privilege log for those items?

12       MR. WIZEL:  We could, yes, Your Honor.

13       THE COURT:  All right.  So I will have you do a

14  privilege log for those items.

15       MR. LEWIS:  And, Your Honor, if I might just add, just

16  to clarify when we mentioned that we would be okay with Quick

17  Books files, what we want is the electronic Quick Books

18  accounting software data files or other accounting software

19  files so that such files will function and operate with

20  commercially available applications software.

21       THE COURT:  Is that a problem, Mr. Wizel?

22       MR. WIZEL:  No, not a problem.

23       THE COURT:  Okay.  All right.

24       MR. WIZEL:  Now can I go to the next issue?

25       THE COURT:  Yes.  Go ahead.

1           MR. WIZEL:  Well, Your Honor, I think the Quick Books

2     files is going to take care of a lot of the other issues

3     because, in fact, that was our only point of discussion in

4     terms of the production, what we were missing.

5           They were complaining about Quick Book files.  They

6     did not bring up any of those issues, but let me go briefly

7     through them because they complained that I did not personally

8     review the --

9           THE COURT:  Right.  I read that.  They allege that you

10    didn't personally review.  You just basically let your client

11    give them boxes of documents.

12          MR. WIZEL:  That is not true, Your Honor.  I billed

13    over a day's worth in that one week of time that we had to

14    produce the documents of just communications with my client

15    about every single request for production that was in the 31

16    requests for production.

17          I went with them over each one of them.  They had

18    multiple questions, and my response was, "Let's produce it."

19          Let's produce because I don't want to be in front of

20    Your Honor again on a discovery issue, and I think that's a big

21    problem, Your Honor, because we come here in good faith, and we

22    come really with a bad light in front of you.  You know, the

23    things that they put in their motion is really not true.

24          THE COURT:  Well, that's why I set a hearing because I

25    want to hear your side and I want to hear what you have to say

1  because I want to find out what really is going on here.

2         MR. WIZEL:  Yes.  And on that front I can tell you

3  when we received Your Honor's order of December 16th, we could

4  appealed that, and we could have appealed that to the 11th

5  Circuit and we could have really delayed the process.

6         We said, "Forget about it.  Let's get on track with

7  the judge because we don't want to be fighting with Your Honor

8  on discovery issues," and within a week's time we produced 50

9  bankers boxes, DVD's, a DVD with electronic files, and we have

10  been working with opposing counsel to produce everything they

11  actually asked of us.

12         Now, all of these things they told you today, they

13  didn't ask for these things when we talked multiple times.

14         They asked for the Quick Books files.  That's it.  So

15  let me go over the rest of the stuff.

16         THE COURT:  Okay.

17         MR. WIZEL:  All complete tax returns.  They say they

18  were missing one page from the Acquinity tax return.  That is

19  the one that I addressed already.

20         THE COURT:  Right.

21         MR. WIZEL:  That was filed as was produced.  They say

22  they are missing state tax returns.

23         THE COURT:  Yes.  Florida and Delaware.

24         MR. WIZEL:  We produced all of the state tax returns,

25  and I listed the state tax returns that we produced in our

1  response, and those are all the tax returns that we have.

2        THE COURT:  All right.  So let me turn to the

3  plaintiff.

4        They say they have produced all of the state tax

5  returns.  Where is the dispute here?

6        MR. LEWIS:  We have not seen a single state tax

7  return, Your Honor.

8        THE COURT:  All right.  How did you produce them,

9  Mr. Wizel?

10        MR. WIZEL:  I am turning now to my response because I

11  actually put it in there when we produced them.

12        I believe they were included in the boxes that were

13  produced, and I have copies of the boxes and you can see how

14  they were produced and they were marked pursuant to what

15  document request they related to.

16        THE COURT:  So now were the boxes actually copied and

17  obtained by them, or did they come over to your client's

18  business and look through it, or what happened?

19        MR. WIZEL:  My client made them available for them to

20  come to the office and do whatever they wanted with the boxes,

21  and they decided to retain a copy service to simply copy

22  everything.

23        THE COURT:  All right.  So you said there were about

24  50 bankers boxes?

25        MR. WIZEL:  Yes.

1                    MR. HARTLEY:  47.

2                    THE COURT:  How many?

3                    MR. HARTLEY:  Tim Hartley.  47 boxes.

4                    THE COURT:  All right.  47.  So did you all get copies

5      of those 47 boxes?

6                    MR. HARTLEY:  Sir, we spent approximately $25,000

7      scanning in all of those boxes, and we have every document

8      produced.

9                    THE COURT:  All right.  And are there any state tax

10     returns?

11                   MR. LEWIS:  Your Honor, we have searched for them and

12     we have not located a single one.  Brett Lewis, by the way.  We

13     have not located a single state tax return.

14                   THE COURT:  All right.

15                   MR. LEWIS:  And they are not Bates stamped.  So it

16     makes it impossible for us easily to go back and check.

17                   THE COURT:  Right.  I understand, but I don't think

18     there is any legal obligation that they have to Bates stamp

19     them, is there?

20                   MR. LEWIS:  There are courts that have said it is the

21     better practice.

22                   THE COURT:  It is certainly the better practice.

23     There is no doubt and it protects the producer.  There is no

24     doubt about it, and it clarifies what is produced and what has

25     not been produced.

1   It makes it easier to find.  There is no doubt about

2   that, but it seems here that we have a misunderstanding that

3   they are saying that any tax return that they had from Florida

4   and Delaware was included in those boxes.

5   Is it possible, you said 47 boxes.  They said 50.  Is

6   it possible that you missed the 3 boxes with the tax returns?

7   MR. WIZEL:  Still 50.

8   THE COURT:  I mean, it sounds like that may be the

9   explanation.  What I am saying is, if they are saying,

10  Mr. Wizel, were there 50 boxes or approximately 50?

11  MR. WIZEL:  No.  There were exactly 50 boxes.

12  THE COURT:  All right.  So there is 50 boxes.  Now,

13  you say you got 47 copied?

14  MR. HARTLEY:  Your Honor, I don't have those records

15  in front of me, but my recollection is it was 47 boxes that

16  were produced.

17  THE COURT:  All right.  So it may very well be that

18  this whole dispute is because there are 3 boxes didn't get

19  copied.  So here is what I am going to do on the tax returns:

20  I am going to order that the parties meet and confer

21  on that and, if necessary, counsel go and meet where those

22  boxes are.

23  What I want Mr. Wizel to do is to show plaintiff's

24  counsel where those tax returns are, and let them get them

25  copied because those are simple things that should be produced.

1          You are saying they were produced.  Plaintiff's

2    counsel is saying they were not produced.  Now I hear there is

3    50 boxes versus 47 boxes.

4          It seems to me that if the attorneys got together and,

5    Mr. Wizel, would you make yourself available to show

6    plaintiff's counsel, either Mr. Hartley or Mr. Lewis where

7    those tax returns are in the boxes?

8          MR. WIZEL:  Absolutely.

9          THE COURT:  All right.  Is that acceptable to

10    plaintiff's counsel?

11          MR. LEWIS:  It is, Your Honor.  We also need to make

12    sure that we have complete tax returns for the other

13    defendants.

14          THE COURT:  Right.  No, I understand that.  I think

15    that is encompassed.  You mentioned all federal tax returns,

16    Florida and Delaware tax returns.

17          You said were incomplete on Rustin.  Apparently none

18    from Modernad.  Some others were incomplete.

19          MR. LEWIS:  Yes.

20          THE COURT:  To the extent that defendants have those

21    complete tax returns, then they are obligated to produce them.

22          Would you agree with that, Mr. Wizel?

23          MR. WIZEL:  Agreed, Your Honor.

24          THE COURT:  All right.  So what I will order then is

25    within 10 days of today's date that counsel meet and go through

1  the documents, and that defendant produce all of those tax

2  returns, to the extent they have them.

3          I am not saying you haven't produced them, but I am

4  saying you will produce them, and I think there may be some

5  misunderstanding here about the number of boxes that were

6  copied.

7          I don't know how that happened, but it is certainly

8  something that when you are saying 50 boxes and plaintiff's

9  counsel is saying 47 boxes, obviously something could have

10 fallen through the cracks.

11         MR. LEWIS:  Yes.

12         THE COURT:  All right.  So would you, would both

13 counsel, plaintiff and defense counsel agree that within 10

14 days you will both meet and try to resolve this tax return

15 issue, and the defendants will be ordered to produce any tax

16 returns completely that they haven't produced?

17         MR. HARTLEY:  Yes, sir.

18         MR. WIZEL:  Yes, Your Honor.

19         THE COURT:  All right.  Go ahead, Mr. Wizel.

20         MR. WIZEL:  Okay, Your Honor.  The next item that I

21 have is current bank records, and again this was never

22 requested of us.

23         THE COURT:  Okay.

24         MR. WIZEL:  They are saying or they acknowledge we

25 produced documents up to November which was when the request

1  for production was issued.  When it was served, and we

2  responded by giving them the 3 years that Your Honor requested

3  us to produce.

4        I did not understand that to be an ongoing request for

5  monthly reports, in essence, of the bank records, and they, to

6  my knowledge, they haven't made that request.

7        THE COURT:  Let me ask plaintiff's counsel.  I know

8  that the request was made I guess up through November of 2013.

9        What is the basis for asking for current and ongoing

10  records of bank accounts?

11        MR. LEWIS:  Well, Your Honor, first of all, we did

12  bring this up, and we mentioned bank records being missing in

13  conversations, and also I believe in correspondence with the

14  other side when we were trying to resolve this issue.

15        Our basis is that it is a continuing enterprise.  The

16  Federal Rules of Civil Procedure require an ongoing obligation

17  to supplement document production during discovery.

18        So we would expect that if we were to request updated

19  documents and bank records that they would produce them, and

20  also as I had mentioned before, we are not only dealing with

21  updated records for the accounts that they have already

22  produced records for, but also other accounts for which no

23  records have been produced.

24        I did want to just get in there, Your Honor, that the

25  basis for us saying that Mr. Wizel had not reviewed the actual

1   documents himself before his client produced them was his

2   letter to us dated February 18, 2004 in which he said, "As you

3   know"-

4              THE COURT:  2014.

5              MR. LEWIS:  2014.  I apologize.  Where he says, "As

6   you know, the documents were produced directly from our clients

7   offices after arduous efforts to compile the documents in a

8   very short period of time which yielded production of over 40

9   bankers boxes."

10             Let's see.  "Our office is not yet in a position even

11  to evaluate the veracity of your claims."

12             So when we stated that documents and things had not

13  been produced, they say that they were not in a position to

14  evaluate the veracity of our claim.

15             THE COURT:  Right, but it doesn't say that he has not

16  looked at them.

17             MR. LEWIS:  I subsequently in conversations with

18  counsel have brought this up, and he has never denied the fact

19  that he did not look at the documents.

20             I believe what he just said to the court was that he

21  advised his client on what to produce and what not to produce.

22  I don't believe he said me reviewed 40 boxes of documents or 50

23  boxes of documents.

24             THE COURT:  Mr. Wizel?

25             MR. WIZEL:  That's true, Your Honor, and they

1  acknowledge in their response that my duties to make reasonable

2  inquiry, and I did that.

3      I spent multiple hours with my client going over every

4  request and what they needed to produce, and I complied with

5  that.

6      THE COURT:  Okay.  What about these bank records?  Is

7  the defendant in a position to produce these bank records?

8      MR. WIZEL:  Your Honor, I don't know exactly what they

9  mean by bank records, and that's part of the problem.

10     They say they did raise this issue before, but they

11  never said yesterday's bank records, and I don't think Your

12  Honor's order on the first request for production, which was

13  expedited discovery, was meant to do that to, in essence, for

14  us to report to the plaintiff on a monthly account of what our

15  bank account says.

16     THE COURT:  Well, what about these accounts that they

17  say that were missing?  The bank accounts from India, Morocco,

18  the Virgin Islands, Cyprus, the foreign account records, the

19  foreign bank account records, what about those bank account

20  records?

21     MR. WIZEL:  Non-existent, Your Honor.  Our client does

22  not have bank accounts in those places, and had they asked us

23  we would have told them, and I think they acknowledged That

24  none of the defendants have bank accounts in those places.

25     What they are trying to do, Your Honor, is try the

1    case in discovery before getting to trial, and to say that

2    Revenue Path and all of these other entities that they raised,

3    that they mentioned today that may or may not have bank

4    accounts there are the same as our client, but our clients, the

5    defendants have no bank accounts in those places.

6            THE COURT:  All right.  Let me hear from plaintiff's

7    counsel on that matter.

8            MR. HARTLEY:  If I may, Tim Hartley again.  If I may

9    go back to another point, what troubles me about what I just

10   heard is that today we have received a response to our request

11   for production where the defendant's counsel has said that all

12   documents in their possession have been produced.

13           Yet Mr. Wizel just stated before the court a few

14   minutes ago that he never actually reviewed the documents.

15           He didn't even look through the documents.  He advised

16   the client what they should produce, but he has no knowledge as

17   to what was actually produced.

18           So for him to file a pleading in this court saying,

19   "All documents have been produced," without that knowledge I

20   think begs the question.

21           How can they tell us today?  How can he sit there and

22   tell us today what has been produced and what has not been

23   produced?  It defies logic.

24           THE COURT:  All right.  Mr. Wizel?

25           MR. WIZEL:  Your Honor, you know, I work with in-house

1   counsel.  They also have obligation to the company, and to say,

2   can you imagine what they would have done if I had said, "It

3   has been a week and we need 3 or 4 days for my client to put

4   the documents together, and then I need to go over every

5   document in the 50 boxes and the electronic records before I

6   can give them to you.  So that means, you know, I need another

7   two weeks."

8          We would have been here on a motion for sanctions, you

9   know, look at the response.  They acknowledge that is not what

10  is required.

11         THE COURT:  So what you are saying is that you

12  communicated with your client and also with in-house counsel?

13         MR. WIZEL:  Absolutely.  Absolutely.  Mr. Jeffrey

14  Hotchford who is here, he is in-house counsel, and he and I

15  worked together in preparing the responses.

16         THE COURT:  Okay.  I understand your position.  Let me

17  go back to the bank account records and ask plaintiff's

18  counsel, either Mr. Hartley or Mr. Lewis, what they are saying

19  is that their clients have no Cyprus bank records, India bank

20  records, Morocco bank records, Virgin Island bank records, but

21  they just don't have that.

22         What is the plaintiff's position on that?  Because if

23  the defendant says, "We don't have it," what else can the court

24  do unless I am given evidence that they do have it and they are

25  not being accurate?

1              MR. LEWIS:  Well, this is the issue, Your Honor:  We

2     have reason to believe that they have these bank accounts, and

3     to an extent, I take Mr. Wizel's point.

4              He feels like we are trying to try the case in

5     discovery.  We are making connections based on the documents

6     that we have received and also based on information that we

7     received for people who worked for the defendants in the past,

8     and some of those individuals have told us things like that

9     they received some checks directly from Acquinity, from U.S.

10    bank accounts, and they received or wire payments and they

11    received wire payments from a bank account in Cyprus.

12             We also have records that show that Acquinity was

13    making wire payments out to a bank account in Cyprus for an

14    entity which they owned.

15             So if we want to engage in semantics and they want to

16    claim that that is not or they don't, the defendants, Acquinity

17    Modernad, don't own those bank accounts, they belong to someone

18    else, well, someone within the accounting department at

19    Acquinity and in Broward County, Florida was able to push a

20    button and make a wire payment from that account.  So that

21    suggests to us that they have these records.  They have

22    everything else.

23             THE COURT:  So what is it that you are asserting?  Are

24    you asserting that even though the named defendants may not

25    have those accounts, other entities that they control have

1   those accounts?

2           MR. LEWIS:  Yes, and that these defendants, that

3   certainly Acquinity controlled those accounts, Your Honor.

4           THE COURT:  All right.  And what evidence do you base

5   that on?

6           MR. LEWIS:  We base that on the fact that, first of

7   all, Revenue Path which exists in Cyprus, Morocco and India,

8   was a company that was action acquired by Modernad Media.

9           Modernad Media, following the asset transfer, the

10  asset purchase agreement with Acquinity ceased to do business,

11  and yet before Modernad ceased to do business, it set up

12  Revenue Path.

13          It changed the name of Aliseum and its subsidiary

14  entities to Revenue Path, this, that and the other thing.

15          Then we have payment records from Modernad where they

16  were spending half a million dollars to set up an office in

17  India and paying go salaries to consultants in India.

18          Those payments continued from Acquinity and Morocco

19  and Cyprus.  Those payments continued after Modernad was shut

20  down and Acquinity took over the business.

21          In addition to that, we have something that said, I

22  referred to it.  My associate is more familiar with the

23  documents and exactly what they said, but there was an

24  accounting record which referred to a shareholder fee, or

25  something like that, or some kind of share; basically a fee for

1  acting as the shareholder Cerritus Somany for acting like she

2  was the figurehead for the company.

3         THE COURT:  For what company?

4         MR. WIZEL:  For Revenue Path.

5         THE COURT:  I see.  Okay.

6         MR. LEWIS:  There was a document that showed that she

7  was receiving .03.5 percent of the profits of Revenue Path

8  India, but Acquinity was sending all the money, 36,000,000 or

9  38,000,000 went to THE various Revenue Path entities which

10 Cerritus Somany received .035 percent of it.

11        So if she is the owner of the business, why does

12 Acquinity need to give her an agreement or have a notation that

13 she gets .035 percent of the profits?

14        THE COURT:  And you are saying Revenue Path India,

15 Trilium, Indicas and In Box Direct, they are they all companies

16 that have bank accounts that the defendants control those

17 companies or have an ownership interest in those companies?

18        MR. LEWIS:  Your Honor, I believe so.  There was an

19 e-mail from Warren Rustin in 2010 where Gary Jonas was

20 communicating with him about Gary Jonas forming a new entity

21 and taking some of the people who worked for Modernad and Gary

22 Jonas cutting Warren Rustin out, and Warren Rustin said

23 something about wanting to keep Indicus.

24        "I would want to keep Indicus and run it," and there

25 was another entity, it might have been Zbiti.  I would have to

1   go back and check.  It might Digiprod.  I think it was

2   Digiprod, but Indicus was an entity that was receiving 1.2

3   million a month from Modernad and continued to receive 1.2

4   million a month from Modernad for 3 months after Acquinity

5   bought the assets of Modernad, and then it continued to receive

6   1.2 million a month from Acquinity.

7          So we know of at least $17,000,000 in payments that

8   went to Indicus which was an entity that Warren Rustin said he

9   would like to keep.  If he said, "I would like to keep it and

10  run it," that tends to imply that they already owned it.  Yet

11  it shows up on none of the paper.

12         THE COURT:  All right.  So, Mr. Wizel?

13         MR. WIZEL:  Your Honor, this sounds to me like this is

14  an area for further discovery.  Depositions.  Additional

15  third-party subpoenas, but to request from the defendants their

16  bank account statements of the defendants and any company that

17  they own or have a part ownership in, we have produced

18  everything.

19         THE COURT:  All right.  Here is what I am going to do:

20  I am going to order the defendants to update what they have

21  already produced on bank records.

22         You say you have produced it through November 13th.  I

23  am going to order the defendants to produce it through March of

24  2014.  How long do you need to produce that?

25         MR. WIZEL:  Ten days Your Honor.

```
1            THE COURT:  All right.  Ten days will be fine.

2            Now, as far as the other bank records from India,

3    Morocco and the Virgin Islands, it appears that what the

4    plaintiff is alleging is that these are bank accounts in

5    foreign countries that may not be directly owned by the

6    defendants, but are somehow indirectly owned by the defendants.

7            What I am going to do is require the plaintiffs to

8    compile a supplemental request for production and serve it on

9    the defendants exactly what it is that you want, and then the

10   defendants will have to respond to that.

11           I am going to shorten the time for a response to that

12   because I want this matter to get resolved.

13           So what I will do is I am going to give the plaintiffs

14   leave, to the extent they need it, but what I want the

15   plaintiffs to do, because I want to know what we are asking for

16   and I want to specifically know what the response is.

17           If they want documents regarding India or Morocco or

18   the Virgin Islands or Cyprus or things of that nature, do a

19   specific request for production requesting those documents.

20           Then I will give the defendants 20 days to respond.  I

21   am not going to overly expedite it, but I want to make sure the

22   thing moves along quickly from the date that you receive the

23   request for production.

24           I believe that the next issue, which is Alisuem and

25   Trilium and Indicus and In Box Direct and Revenue Path, I think
```

1    I would have the same ruling on that.

2         What I would want to do is have the plaintiffs do a

3    specific request for production to the defendants on that on

4    those issues, and then let the defendants respond producing the

5    documents that they have or responding as they see fit within

6    20 days from the request for production.

7         I think what that does is it clarifies things.  We

8    don't have these misunderstandings going on and you know

9    exactly what you have asked for and the plaintiff knows exactly

10   what they are asking for, and there can't be, if we have

11   another hearing, there won't be any misunderstanding about what

12   was requested and things like of that nature.

13        The request could be any bank accounts that the

14   defendants hold directly or indirectly; something of that

15   nature or any other way that the plaintiffs wish to pursue it,

16   but what I want to get around is if the defendants, and I am

17   not saying they do, but if the defendants indirectly control or

18   own a bank account in India, or wherever, and the response is,

19   "We don't directly hold it," I want to get beyond that issue.

20        I want to get to the issue where if, in fact, the

21   defendants do control or indirectly own foreign bank accounts,

22   to produce that information to the plaintiffs.

23        You may not.  It may simply be that your response is,

24   "We don't directly or indirectly control any bank accounts.  We

25   don't have any bank accounts."

1        I don't know, but I would like to get the issue framed

2   properly.  So I want the plaintiffs to do an appropriate

3   request for production so there is no question about what is

4   asked for, and then the defendants do a written response,

5   either producing the documents or not, but doing a written

6   request or a response to the request for production so we know

7   exactly where the parties are at.  Do both sides understand

8   that?

9        MR. LEWIS:  Yes, Your Honor.

10        MR. WIZEL:  Yes, Your Honor.

11        THE COURT:  Any clarification that you need,

12   Mr. Wizel?

13        MR. WIZEL:  Your Honor, just one.  I think we have

14   covered all of the issues, but I just want to give one last

15   comment, and that is I hope, if nothing else, Your Honor, you

16   have taken away from this hearing that we have not been

17   hindering discovery.

18        We have not been trying to postpone anything.  We have

19   been working to produce everything that we need to produce and,

20   you know, there have been some things said in the motions and

21   the responses filed by the plaintiff, and I take those

22   personally because they are impugning my credibility, my

23   reputation, and really, I am really up to here, Your Honor,

24   because what they say is not supported.

25        I want to give you one example because in the reply

1   they complain about the way that I portrayed the meet and

2   confer discussions.

3           Well, the last meet and confer where I said, they

4   offered that we produce the Quick Book files under an order of

5   confidentiality and they would demand basically that we pay for

6   half of the fees of the copying costs and then they would drop

7   the motion for sanctions, you know, after our conversation,

8   Mr. Justin Mercer, who is an associate with Mr. Lewis, sent me

9   an e-mail confirming our conversation, and that's exactly what

10  he says, and I want to show you this because this is --

11          THE COURT:  Show it to plaintiff's counsel first and

12  see if there is any objection.  If not, than I will take a look

13  at it.

14          MR. LEWIS:  No.  I know what the e-mail says, Your

15  Honor.  There is no objection in him showing it to you.  I

16  would like a chance to respond.

17          THE COURT:  All right.  If you could pass that up,

18  please.  All right.  Give me just a second to review it.  All

19  right.  Go ahead, Mr. Wizel.

20          MR. WIZEL:  Okay.  Your Honor, if you look at the

21  communication, that is exactly what I conveyed to the court as

22  to what happened.

23          They say, "We offer this in exchange for this," and

24  that is what I said in my response.

25          Now, in their reply they are trying to say that I was

1  misrepresenting the facts to the court, and that they have the

2  right facts, and that is what they do over and over again,

3  especially Mr. Mercer, Your Honor, and that's impugning my

4  personal credibility with the court and accusing me and my firm

5  of doing things that we haven't done, and if anything else,

6  Your Honor, I want to go out of this hearings with having in

7  your mind clear as to what is going on here.

8           THE COURT:  All right.  Let me get a response from

9  either Mr. Hartley or Mr. Lewis.

10          MR. LEWIS:  Yes, Your Honor.  It is Mr. Lewis.

11          What happened on that day on March, a week ago

12  Wednesday is that we contacted Mr. Wizel to arrange a meet and

13  confer to try to resolve some of these discovery issues.

14          During the course of the conversation, I stated to

15  Mr. Wizel that it would not be enough for our client simply to

16  receive the requested Quick Books files at that point in time

17  because months had passed.

18          Our client had to spend tens of thousands of dollars

19  both scanning documents which should have been produced, in our

20  view, in electronic form, in native form, and also it took a

21  substantial amount of attorney time to review paper invoices

22  and categorize them which should not have had to happen, and

23  that we were also forced to draft a motion to compel after

24  requesting not only the ledgers and accounting records and

25  Quick Book files, but the other records, tax returns and things

1   of that nature and bank records at least three different

2   occasions before we made the motion, and that now we were so

3   many months past the point of when the defendants were

4   obligated to have produced all of these documents in the first

5   place that he had not reviewed the documents for compliance,

6   although I grant you, Your Honor, that Mr. Wizel spoke with

7   in-house counsel.

8           It is sort of like the fox guarding the hen house at

9   that point, and that our client was not going to be okay, that

10  some of the costs of all of this had to be shared by his

11  client.

12          Mr. Wizel then said, well, I had mentioned along with

13  our costs that it costs us $25,000 for scanning and Bates

14  stamping, and then I mentioned we had other costs and the costs

15  of drafting the motion.

16          Mr. Wizel said, "Well, my clients are not going to pay

17  for your costs of drafting the motion to compel," and something

18  along line of, "Well, what if we paid or what if we split costs

19  of the scanning and the Bates stamping?"

20          So to see that come back as being our offer, it is not

21  exactly what happened, and also we were in the context of

22  negotiation with them.  We never heard back from them.

23          The first response we heard was when they filed their

24  opposition papers.  So we were waiting to hear back from

25  Mr. Wizel about what his clients response was to his suggestion

1  that we could potentially split the costs of scanning and Bates

2  stamping, and then we get papers filed with the court saying

3  that we are demanding, you know, that they share those costs.

4        Now, we did say that our client would want to be

5  compensated for something because we felt that we had been

6  waiting months and months and months and that these delays were

7  meaningful; that we were seeing their connections that we may

8  not even have dreamed existed when we started the case, and

9  that there are entities and foreign bank accounts and all of

10 these things and that delay is everything in a case like this.

11       So our client wanted there to be some consequences,

12 but we were willing to lower our demands on what those

13 consequences would be instead of seeking recovery of all of the

14 attorneys' fees and all of the money for scanning when we

15 should not have had boxes of paper dumped on us.

16       We were willing to compromise that, and it came back

17 in a very different way.  At least that was our feeling in the

18 papers that Mr. Wizel filed.

19       THE COURT:  All right.  The last issue that we may not

20 have addressed is you had made a request for communications

21 between the defendants and companies regarding transfers of

22 assets regarding your request for production 27.

23       I don't know if I got into that with Mr. Wizel, but

24 they said they had a request for production number 27, and in

25 they in summary asked for any communications regarding transfer

1    of assets or changing of the business, communications between

2    the defendants or companies.  Have you produced that or can you

3    produce that?

4              MR. WIZEL:  We have produced those, and I think they

5    acknowledge they have some communications.  The fact that they

6    are not a lot of communications doesn't signify, you know, that

7    we have withheld anything.

8              THE COURT:  Are there any others that you have that

9    you haven't produced?

10             MR. WIZEL:  Not to our best knowledge, no.

11             THE COURT:  Okay.  What I am going to do is I am going

12   to order any more that you do have to be produced.

13             What I will ask you to do is either you or in-house

14   counsel go through the documents, and when plaintiff counsel

15   comes over to meet with you or the two of you meet, that you

16   verify with him that everything that you have produced on these

17   communications has been produced, and if there is anything

18   else, if you could just show him where that was in the box of

19   documents.

20             MR. WIZEL:  Very well.

21             THE COURT:  Mr. Hartley.

22             MR. HARTLEY:  Tim Hartley for the plaintiff.  We would

23   ask, of course, that any electronic communication, including

24   e-mails be included in that.

25             THE COURT:  Right.  Is that included, Mr. Wizel?

1          MR. WIZEL:  Yes, Your Honor.

2          THE COURT:  Okay.  So electronics communications also.

3   All right.  So what I am going to do is go ahead and draft up

4   an order reiterating what was said here today.

5          Are there any other issues that need to be resolved

6   from any plaintiff or defendant?

7          MR. WIZEL:  Yes.  There is one thing that is being

8   brought up jointly to the court.

9          THE COURT:  All right.  Mr. Wizel, go ahead.

10         MR. WIZEL:  Yes.  We have been working the privilege

11  log, and there are communications that we have asserting the

12  privilege to.

13         THE COURT:  Okay.

14         MR. WIZEL:  And in working with Mr. Lewis, we believe

15  the best, they are claiming that the communications are not

16  entitled to privilege because they are subject to the crime

17  fraud exception.

18         THE COURT:  Right.  I am familiar with that exception.

19         MR. WIZEL:  And so we are working together on

20  finalizing the list of documents that we think are undisputedly

21  privileged like communications about litigation and advice

22  about litigation, but the rest of the communications we thought

23  it would be best to submit to Your Honor for an in-camera

24  inspection for Your Honor's review and determination of whether

25  the crime-fraud exception actually applies or not.

 1          THE COURT:  How many documents are we talking about
 2  just in general?
 3          MR. WIZEL:  Do you remember how many are on the list?
 4          MR. PASTUKH:  100, 150.
 5          MR. WIZEL:  Maybe 150.
 6          THE COURT:  All right.  And have the two of you gotten
 7  together to try and narrow that number down to try and discuss
 8  the issue to see what it is?
 9          MR. PASTUKH:  We are.  We are in the process.
10          THE COURT:  All right.  Here is what I am going to do:
11  Have you already done your privilege log?
12          MR. WIZEL:  Yes.  Yes.  We are amending it, but there
13  is one that we are working on now.
14          THE COURT:  Okay.
15          MR. LEWIS:  And, Your Honor, I would like to say we
16  have worked well on this particular issue.
17          There have been several back and forths.  There has
18  been some cooperation.  We wrote letters to further clarify our
19  position.
20          In response to that the defendants counsel said he
21  would produce some additional documents.  So it has narrowed
22  and clarified a couple of times, but we are at the point where
23  I think what is remaining is I think there is pretty clearly
24  documents which we believe may relate to efforts to create new
25  entities to avoid liability and, you know, they maintain that

1    they are privileged.

2          THE COURT:  All right.  Here is what I will do:  Did

3    you say you were going to be filing an amended privilege log,

4    Mr. Wizel?

5          MR. WIZEL:  Yes.  We are working together on doing

6    that, yes.

7          THE COURT:  All right.  How long do you think that is

8    going to take?

9          MR. WIZEL:  One week.

10         THE COURT:  All right.  Why don't you do this:  Within

11   10 days do an amended privilege log and then discuss that with

12   the plaintiff's counsel, and then there is two ways we can do

13   this.

14         I can give plaintiff's counsel time to simply file a

15   motion to ask that the court review it in-camera, or you can

16   both file a joint status report or a joint motion asking the

17   court to review it in-camera, but what I am asking you to do is

18   I have no problem reviewing them in-camera, but what I will ask

19   is that you both do is work together as much as you can to

20   eliminate unnecessary review.

21         So if you all can resolve most of the issues, and then

22   whatever you can't resolve, simply submit them to the court and

23   I will review them in-camera.

24         MR. WIZEL:  One question, Your Honor:  If we decide to

25   do it jointly, how long or how much space do we have to make to

1   present our position?

2          THE COURT:  Well, it might be better to do it

3   separately.  Why don't we do this:

4          I will give you 10 days to do an amended privilege

5   log.  How much time would plaintiff's counsel need, Mr. Lewis?

6          How much time would need to then just file a motion?

7   I guess it would be to compel production of documents on the

8   privilege log, or whatever the motion would be.

9          MR. LEWIS:  One week, Your Honor.

10         THE COURT:  All right.  And then you could respond in

11   a week?

12         MR. WIZEL:  Yes.

13         THE COURT:  All right.  So what I will do is you have

14   got 10 days to do an amended privilege log.  After that

15   plaintiff has 7 days to file a motion to compel production of

16   any documents that are on the privilege log and just briefly

17   explain what the position is and what the reason is you believe

18   that the work product or attorney-client privilege doesn't

19   apply and you will have 7 days after that to do a response, and

20   then what I will do is at that point probably issue an order

21   asking the defendant to submit them in-camera, and then I will

22   review them.  Does that solve the issue?

23         MR. WIZEL:  Yes.

24         MR. LEWIS:  Yes, Your Honor.

25         THE COURT:  All right.  And are there any other

```
 1   issues?  I know that Mr. Pastukh has been very silent here for
 2   a while.  It is probably the smartest choice of the afternoon.
 3           MR. PASTUKH:  Your Honor, I just wanted to elaborate
 4   on one thing Mr. Lewis had said because we had spoken about,
 5   you know, not having to have to file a motion to compel dealing
 6   with, you know, based on your rulings today.
 7           THE COURT:  Right.
 8           MR. PASTUKH:  The one issue I know we had talked about
 9   the Quick Book files.  I need to talk to my client.  I just
10   filed a notice of unavailability.
11           I am not going to be back until Monday.  I know that
12   we had said 7 days on the Quick Books files.  I would just ask
13   for a little bit more time; you know, maybe 10 days.
14           THE COURT:  All right.  On behalf of your client which
15   is?
16           MR. PASTUKH:  833.
17           THE COURT:  833.  Any objection to that from
18   plaintiff?
19           MR. LEWIS:  No, Your Honor.
20           THE COURT:  I know you are going out of town, or
21   something.  How much time would you need?
22           MR. PASTUKH:  By next Friday would be fine, I think,
23   for the Quick Book files and then to the extent --
24           THE COURT:  What is next Friday's date?  Do you know?
25           MR. PASTUKH:  The 28th, I think.
```

1         THE COURT:  Let's see, today day is the 18th.  All

2   right.  So I will give you until the 28th.

3         MR. PASTUKH:  Okay.  Thank you, Your Honor.

4         THE COURT:  And that would be as to that defendant

5   which is the 8333947 Candidate, right?

6         MR. PASTUKH:  Correct.

7         THE COURT:  All right.  The last issue is sanctions;

8   the request for sanctions.  I am going to deny the request for

9   sanctions at this point.

10        I am going to find that at this point I think the

11  parties are starting to work together, and I think that

12  sanctions would be inappropriate at this point.

13        However, in the future if I find that either side is,

14  well, I will just state it as playing games with discovery, not

15  producing, not conferring in good faith, things of that nature,

16  then the court will not hesitate to impose sanctions, but I am

17  not going to impose sanctions at this point.

18        What I want counsel to do is really, it seems like we

19  have very good counsel in this case on both sides, and what I

20  want you all to do is talk to each other.  Work on the

21  discovery issue.

22        I know you have clients to represent and the

23  plaintiffs have clients to represent, but as far as discovery

24  goes, you know, that just has to be produced by both sides, and

25  it shouldn't be to a point where I have to set hearing after

1   hearing after hearings and impose attorneys fees and sanctions

2   and things of that nature.

3          I will do it if I have to or if I think that one side

4   is dragging its feet or delaying or anything of that nature, or

5   being unreasonable in their requests, but at this point on this

6   motion I am not going to impose any sanctions.

7          I don't think it would be fair to impose sanctions at

8   this point, and I don't find a basis for it at this point, and

9   I think the parties and counsel are working together, but I

10  won't hesitate to impose them in the future, if necessary, and

11  I am hoping that that won't be necessary.

12         All right.  Is there anything else from the plaintiffs

13  side?

14         MR. LEWIS:  No, sir.

15         MR. HARTLEY:  No, sir.

16         THE COURT:  Anything else from any of the defendants

17  side?

18         MR. WIZEL:  No, Your Honor.

19         THE COURT:  All right.  I will get a written order out

20  on all of this, but, please, confer together and keep working

21  together and get most of these matters resolved so the matter

22  can get at issue.

23         All right.  Thank you all.  Have a good afternoon.

24         MR. WIZEL:  Thank you.

25         MR. LEWIS:  Thank you, Your Honor.

1        MR. HARTLEY:  Thank you, Your Honor.

2        (Whereupon the proceedings were concluded)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19              C E R T I F I C A T E

20        I hereby certify that the foregoing is an accurate

21   transcription of proceedings in the above-entitled matter.

22

   APRIL 24, 2014              S/JERALD M. MEYERS
23   _____         _____
        DATE                  JERALD M. MEYERS, RPR-CM
24

25